# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| PG PUBLISHING CO., INC. | ) | |
| d/b/a PITTSBURGH POST-GAZETTE | ) | Nos.  24-2788 |
| | ) | 24-3057 |
| Petitioner/Cross-Respondent | ) | |
| | ) | Board Case Nos. |
| v. | ) | 06-CA-248017 |
| | ) | 06-CA-263791 |
| NATIONAL LABOR RELATIONS BOARD | ) | 06-CA-269346 |
| | ) | |
| Respondent/Cross-Petitioner | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NEWSPAPER GUILD OF PITTSBURGH/ | ) | |
| CWA LOCAL 38061 | ) | |
| | ) | |
| Intervenor | ) | |

## MOTION OF THE NATIONAL LABOR RELATIONS BOARD FOR TEMORARY RELIEF UNDER SECTION 10(e) OF THE NATIONAL LABOR RELATIONS ACT

To the Honorable, the Judges of the United States
  Court of Appeals for the Third Circuit:

The National Labor Relations Board, by its Deputy Associate General

Counsel, respectfully moves the Court, pursuant to Section 10(e) of the National

Labor Relations Act ("the Act") (29 U.S.C. §§ 151, 160(e)), for a temporary

injunction against PG Publishing Co., Inc. d/b/a Pittsburgh-Post Gazette ("the

Company"). Section 10(e) of the Act empowers the Board "to petition [a] court of

appeals of the United States . . . for the enforcement of [its] order and for

appropriate temporary relief or restraining order," and enshrines the Court's "power to grant such temporary relief or restraining order as it deems just and proper."  29 U.S.C. § 160(e).

Here, as shown below, a temporary injunction is necessary because the Company's unfair labor practices have severely destabilized the bargaining unit, causing an over-two-year strike and a staggering drop in union membership. Without injunctive relief, eventual enforcement of the Board's unfair-labor-practice order—which includes an order for the Company to bargain collectively with its employees' union and restore the status quo of employees' working conditions—will have little to no practical effect.  To preserve the Board's remedial authority in this case, the Board asks that the Court enjoin the Company to comply immediately with aspects of the Board's Order in *PG Publishing Co, Inc. d/b/a Pittsburgh Post-Gazette*, reported at 373 NLRB No. 93 (Sept. 20, 2024) (ROA 3804-3831), and to continue such compliance until the Court issues its final judgment.[1]

---

[1] "ROA" refers to the record on appeal that has been transmitted to the Court under separate cover.  References preceding a semicolon are to the Board's findings; those following are to the supporting evidence.

## I.    FACTUAL BACKGROUND

### A.    The Collective-Bargaining Agreement Covering the Company's Editorial-Department Employees Expires; the Company Begins Bargaining with the Union Over a Successor Agreement

The Company publishes the Pittsburgh Post-Gazette, a print and electronic newspaper.  (ROA 3809.)  For many years, the Newspaper Guild of Pittsburgh/CWA Local 38061 ("the Union") has represented the Company's editorial-department employees.  (ROA 3809; 3527.)  The parties' most recent collective-bargaining agreement expired on March 31, 2017.  Under that agreement, unit employees received health insurance through the Western Pennsylvania Teamsters and Employers Welfare Fund ("the Fund").  (ROA 3809; 75-77, 892-944.)  In early 2017, the parties began negotiations for a successor agreement.  (ROA 3809.)[2]

---

[2] After contract expiration, the Company continued to make contributions to the Fund, consistent with a contract provision, but the Company did not pay for increasing health-insurance premiums.  In January 2020, an arbitrator concluded that the Company's failure to pay increasing premium costs was contrary to past practice developed under the agreement.  (Attachment A.)  Thereafter, the U.S. District Court for the Western District of Pennsylvania enforced the arbitrator's award, *PG Publishing, Inc. d/b/a Pittsburgh Post-Gazette v. Newspaper Guild of Pittsburgh, Comm. Workers of America, AFL-CIO Local 38061*, 2020 WL 7065834, *1–*4 (W.D. Pa. Dec. 3, 2020).  On appeal, in *PG Publishing, Inc. d/b/a Pittsburgh Post-Gazette v. Newspaper Guild of Pittsburgh, Comm. Workers of America, AFL-CIO Local 38061*, 19 F.4th 308 (3d Cir. 2021), this Court upheld

**B.** **The Company Fails To Bargain in Good Faith, Prematurely Declares Impasse, Unilaterally Implements Its Own Health Care Plan, and Monitors Union Activity**

Between 2017 and 2020, the Union and the Company met approximately 20 times for successor contract negotiations.  (ROA 3809-10.)  From the first bargaining session on March 10, 2017, the Company demanded concessions on a variety of terms and conditions of employment, including staffing levels and health benefits, but it never claimed an inability to pay for increases in wages or benefits.  (ROA 3809-10; 298, 682, 722-23.)  Specifically, the Company sought to have managers and non-unit employees perform bargaining-unit work, and to transition unit employees out of the Fund and into the company healthcare plan.  The Company proposed to pay 70 percent of the cost of the new plan, with unit employees paying the remaining 30 percent.  In addition, the Company maintained it should be able to change or terminate healthcare coverage at its discretion.  (ROA 3810; 91, 94, 96-97, 118-19, 128-29, 352-53, 366-67, 998-1057, 3489-90.)  In a responsive proposal, the Union underscored that it had made various concessions in previous years, leading to the suspension of wage increases for 11 years running.  (ROA 3809-10; 302, 688-89, 1060-99, 3114, 3489.)

---

the District Court's determination.  The Company has nevertheless failed to comply with the court-enforced arbitration award.

After nearly two years of bargaining, on August 6, 2019, the Company provided its "best offer."  (ROA 3815; 1603-51.)  The Union made counter-proposals on wages (ROA 3816; 1658-65), sick leave/disability (ROA 3816; 1668-70), and when, and how many, non-unit employees could perform bargaining-unit work (ROA 3815-16; 1655-56).  In the discussions that followed, the Company disagreed with aspects of the Union's proposals, but the parties did not review the entire union proposal.  (ROA 3816; 141-44, 578-80.)

The parties suspended bargaining in March 2020 due to the Covid-19 pandemic.  (ROA 3816; 1735-42, 3001-02.)  Nevertheless, on June 12, the Company sent the Union a letter containing its "final offer."  (ROA 3817; 112-13, 581, 1776-1875.)  The offer gave the Company unilateral discretion to subcontract bargaining-unit work or assign it to those outside the unit, and to reduce unit employees' work hours, albeit with a 10-day notice.  The offer likewise granted the Company the unfettered right to alter or eliminate the employees' short-term disability plan, and to implement layoffs and recalls.  And it moved employees from the Fund into the company health, dental, vision, and life insurance plans (requiring unit employees to pay 30 percent of the premiums for those plans), and gave the Company the right to unilaterally alter the plans.  (ROA 3817; 128-29, 371-72, 1776-1875.)

In the month after providing its offer, the Company told the Union it believed the parties were at impasse.  The Union repeatedly disputed that characterization and requested more bargaining.  (ROA 3817; 1878-94.)

Despite the Union's protests, on July 27, 2020, the Company declared impasse and unilaterally implemented the terms of its June 12 offer with some modifications.  (ROA 3817-18; 113, 144-45, 690-91, 1896-1920.)  Thereafter, the Union reiterated its view that the parties were not at impasse and asked to resume bargaining.  (ROA 3818; 1922-28.)

On October 24 and 31, to protest the Company's bargaining conduct, the Union held peaceful rallies on a public sidewalk outside the home of the Company's publisher.  During those rallies, company-hired security guards pointed their cell phones at rally participants and appeared to take pictures.  (ROA 3804 n. 1, 3818; 40-41, 43, 60-68, 726-27, 729-30, 736, 771-73, 1942, 1960, 1966, 3512-15.)

Two years later, on October 18, 2022, unit employees—who had been working under the Company's unilaterally implemented contract terms since late July 2020—commenced an unfair-labor-practice strike.  (Attachment B p. 3.)  That strike continues today.

Unit employees who have not crossed the picket line have been without company-provided health insurance since July 2020.  And those who returned to

work are paying substantially more for healthcare under the Company's unilaterally implemented healthcare plan.  Before the Company unilaterally substituted its plan for the Fund, employees who had elected family coverage, which was a majority of unit employees, paid $4,000 in annual premiums and a maximum deductible of $2,000, for a potential total annual expense of $6,000. Under the Company's unilaterally implemented plan, employees who elected family coverage paid $8,476 in annual premiums and an out-of-pocket maximum of $6,800, for a potential total annual expense of $15,276.  (Attachment C.)

In the wake of the Company's actions, the number of union members has tumbled from approximately 97 to 27, with many employees crossing the picket line to return to work under unilaterally imposed terms of employment, and others resigning from the Company.  (Attachment D p. 2.)

## II.    PROCEDURAL HISTORY

Acting on unfair-labor-practice charges filed by the Union, the Board's Regional Director issued a consolidated complaint against the Company, alleging that its bargaining conduct and surveillance of employee union activity violated the Act.  (ROA 855-68.)  After a hearing, an administrative law judge issued a decision finding that the Company violated the Act as alleged.  (ROA 3808-31.) The Company excepted to the judge's decision before the Board.  (ROA 3804.)

On September 10, 2024, while the exceptions to the judge's decision were pending before the Board, the Board's General Counsel petitioned for injunctive relief with the United States District Court for the Western District of Pennsylvania under Section10(j) of the Act, 29 U.S.C. § 160(j), which authorizes district courts to grant temporary relief pending final Board adjudications.  (Attachment E.)  The proposed injunction sought to halt the negative effects of the Company's failure to bargain in good faith with the unions representing its employees—including the Union here—pending litigation before the Board.  (Attachment E.)

On September 20, 2024, the Board issued a Decision and Order addressing the Company's violations involving the editorial-unit employees and their Union. The Board found, in agreement with the judge, that the Company had failed to bargain in good faith since approximately March 2019.  (ROA 3804 n.1, 3821.)  In so finding, the Board noted that "[a]n inference of bad faith is appropriate when the employer's proposals, taken as a whole, would leave the union and the employees it represents with substantially fewer rights than provided by law without a contract."  (ROA 3824.)  Here, the Board found, the Company's "proposals effectively sought the discretion to limit the Union's jurisdiction (via subcontracting and assigning bargaining unit work to nonunit employees)," and effectively precluded the Union "from representing bargaining-unit members'

interests concerning: work hours; health, dental, vision, and life insurance plans; the short-term disability plan; and layoffs/recalls." (ROA 3821.)

The Board further found, in agreement with the judge, that the Company unlawfully implemented its last, best, and final offer on July 27, 2020, at a time when the parties were not at impasse in bargaining. (ROA 3804 n.1, 3823.) The Board found (ROA 3804, 3823) that the record amply established the absence of a lawful impasse, not only because of the Company's overall bad-faith bargaining, but because the Company declared impasse at a time when neither party could have thought that further bargaining would be futile. As the Board explained, the parties "still needed to bargain about the Union's September 2019 proposal, [the Company's] June 12, 2020 last, best, and final offer, and the terms that [the Company] implemented on July 27, 2020"—all of which included movement on key issues. (ROA 3823.) Finally, the Board affirmed the judge's findings that the Company created the unlawful impression of surveillance at rallies held in public areas near the home of the Company's publisher. (ROA 3804 n.1, 3825.)

The Board's resulting remedial Order requires the Company to cease and desist from the violations found. Affirmatively, the Order requires, in relevant part, that the Company:

- on request, bargain with the Union as the unit employees' exclusive collective-bargaining representative concerning terms and conditions of employment and embody any resulting understanding in a signed agreement;

- submit written bargaining progress reports to the Board every 30 days;

- on request by the Union, rescind the unilateral changes to the unit employees' terms and conditions of employment implemented on about July 27, 2020;

- before implementing any changes to employees' wages, hours, or other terms and conditions of employment, notify and, on request, bargain with the Union

(ROA 3805-06.)

The Company has filed a petition for review of the Board's Decision and Order in this Court, and the Board has cross-applied for enforcement.

Since the issuance of the Decision and Order, the Board has also modified its petition in the Section 10(j) injunction proceeding in district court to withdraw its request for relief related to this case.  (Attachment F.)  *See, e.g. Miller v. Ca. Pacific Med. Ctr.*, 19 F.3d 449, 453 (9th Cir. 1994) (Section 10(j) injunctions expire when the Board decision issues).[3]  Nevertheless, the need for temporary injunctive relief remains, and as shown below, all of the relevant factors favor such relief.

## III.   ARGUMENT

As described above (pp. 1-2), Section 10(e) of the Act empowers the Board to obtain temporary relief where the Court deems it just and proper.  Congress provided for the Board to seek interim relief because "[t]ime is usually of the

---

[3] The petition regarding the other unions who represent the Company's employees is still pending before the District Court.

essence" in labor disputes, and the slow pace of litigation may "fall[] short of achieving the desired [statutory] objectives—the prompt elimination of the obstructions to the free flow of commerce and encouragement of . . . free and private collective bargaining." S. Rep. No. 80-105, at 8 (1947); *see also* S. Rep. No. 105, at 27 (violators may "accomplish their unlawful objective before being placed under any legal restraint" and "make it impossible or not feasible to restore or preserve the status quo pending litigation").

Courts, in turn, have broad power "to give 'just and proper' temporary relief to assure obedience to [Board] orders and effectuate policies of the Act." *United Auto Workers v. NLRB (Ex-Cell-O Corp.)*, 449 F.2d 1046, 1050 (D.C. Cir. 1971) ("*Ex-Cell-O Corp.*"); *see also Pascarell v. Vibra Screw Inc.*, 904 F.2d 874, 878 (3d Cir. 1990) (injunctive relief warranted when alleged violations "are likely to jeopardize the integrity of the bargaining process and thereby make it impossible or not feasible to restore or preserve the status quo pending litigation").

Although this Court has not explicitly addressed the standard for evaluating motions for injunctive relief under Section 10(e) of the Act, it would likely apply the same standard that applies in Section 10(j) injunction proceedings. *See NLRB v. Aerovox Corp.*, 389 F.2d 475, 476-77 (4th Cir. 1967) ("where the standards governing relief under Section 10(j) are met, it appears that relief under Section 10(e) is also proper"). In *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570 (2024),

the Supreme Court held that, in determining whether a Section 10(j) injunction is

warranted, district courts must apply the traditional four-part test for preliminary

injunctions.  Under that test, the court is to consider: (1) the likelihood of success

on the merits; (2) the likelihood of irreparable harm in the absence of preliminary

relief; (3) the balance of equities; and (4) whether an injunction is in the public

interest.[4]

The circumstances here satisfy the four-part test, and interim enforcement of

certain parts of the Board's Order should accordingly be granted.  As outlined

below, the Board seeks interim relief only to ensure the Company's immediate

compliance with the orders to bargain with the Union upon request, restore the

status quo that obtained prior to the unfair labor practices, and require the

Company to cease and desist from the unfair labor practices found by the Board.

### A.    The Underlying Administrative Proceedings Establish a Strong Likelihood of Success on the Merits

Likelihood of success is a function of the probability that the Court will

grant enforcement of the Board's order.  *Frankl v. HTH Corp.*, 650 F.3d 1334,

1355 (9th Cir. 2011); *see also Small v. Avanti Health Systems, LLC,* 661 F.3d

---

[4] The Supreme Court's decision abrogated the Third Circuit's holding in *Chester v. Grane Healthcare Co*., 666 F.3d 87, 89-90 (3d Cir. 2011), that a district court may grant Section 10(j) injunctive relief upon finding a "reasonable cause" to believe an unfair labor practice had occurred, and that the relief sought is "just and proper."

1180, 1187 (9th Cir. 2011). Accordingly, the Board can prevail on this factor by

showing it "is likely to succeed on the merits" (*Starbucks Corp.*, 144 S. Ct. at 1575

(quoting *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008)), and

need not show a certainty of winning. *See Univ. of Tex. v. Camenisch*, 451 U.S.

390, 394 (1981) ("likelihood of success" does not equate to "success").

Here, there are several bases for the Board's likely success on the merits.

The case has already been tried, and both an administrative law judge and the

Board have found that, under the record evidence, the Company failed to bargain

in good faith with the Union, unilaterally changed employees' terms and

conditions of employment in the absence of a lawful impasse, and created the

unlawful impression that employee union activity was under surveillance. *See Ex-*

*Cell-O-Corp.*, 449 F.2d at 1052 (noting "the increased probability of success on the

merits which usually accompanies a Board decision"). These findings, and the

Board's resulting Order, are unlikely to be disturbed on review, given the Court's

precedent holding that "review of orders of the Board is highly deferential." *Coral*

*Harbor Rehab. & Nursing Ctr. v. NLRB*, 945 F.3d 763, 767 (3d Cir. 2019) (internal

quotation omitted).

As the Court has explained, its "review of the Board's determination with

respect to the scope of the duty to bargain is 'quite circumscribed.'" *Lancaster*

*Nissan, Inc. v. NLRB*, 233 F. App'x 100, 103 (3d Cir. 2007) (quoting *Latrobe Steel*

*Co. v. NLRB*, 630 F.2d 171, 176 (3d Cir.1980)). Both this Court and the Supreme

Court "have noted the competence and experience of the Board in evaluating the

bargaining process and making informed judgments with respect thereto."

*Lancaster Nissan*, 233 F. App'x at 103-04 (citing *NLRB v. Ins. Agents' Intl.*

*Union*, 361 U.S. 477, 499, 505, 80 S. Ct. 419, 4 L.Ed.2d 454 (1960); *Saunders*

*House v. NLRB*, 719 F.2d 683, 688 (3d Cir.1983)). And "the Board's factual

determinations and reasonable inferences . . . drawn therefrom must be sustained if

supported by substantial evidence." *Allegheny Ludlum v. NLRB*, 301 F.3d 167,

175 (3d Cir. 2002).

Substantial evidence "means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Universal Camera Corp. v.*

*NLRB*, 340 U.S. 474, 488 (1951); *accord Citizens Publ'g & Printing Co. v. NLRB*,

263 F.3d 224, 232 (3d Cir. 2001). Accordingly, the Court "'may [not] displace the

[Board's] choice between two fairly conflicting views,'" *Quick v. NLRB*, 245 F.3d

231, 240 (3d Cir. 2001) (quoting *Universal Camera Corp.*, 340 U.S. at 488)),

"even if [it] would have made a contrary determination had the matter been before

[the Court] de novo." *Mars Home for Youth v. NLRB*, 666 F.3d 850, 853 (3d Cir.

2011) (internal quotation marks and citation omitted).

The Board's Decision and Order compellingly demonstrates that the

Company's overall bargaining conduct violated Section 8(a)(5) and (1) of the Act.

The statutory duty to bargain requires that parties "confer in good faith," 29 U.S.C.

§ 158(d), and "make a sincere, serious effort to adjust differences and to reach an

acceptable common ground" with the union. *NLRB v. Blevins Popcorn Co.*, 659

F.2d 1173, 1187 (D.C. Cir. 1981).  Far from meeting that standard, the Company's

proposals were "at odds with the basic concept of a collective-bargaining

agreement."  (ROA 3821 (internal quotation marks and citations omitted).)

Indeed, they gave the Company total discretion to unilaterally assign and outsource

unit work, determine hours of work, change healthcare benefits, and select

employees for layoff and recall—effectively "leav[ing] the [U]nion and the

employees it represents with substantially fewer rights than provided by law

without a contract."  (ROA 3821.)  The Company's premature declaration of

impasse—at a time when the parties had not, in fact, exhausted the opportunities

for compromise—only bolsters the Board's finding of overall bad faith in

negotiations.  (ROA 3822.)

Substantial evidence likewise supports the Board's separate finding that the

Company violated Section 8(a)(5) and (1) of the Act by unilaterally implementing

its contract proposals on July 27, 2020, without first bargaining to a good-faith

impasse for a successor collective-bargaining agreement. *See Citizens Publ'g &*

*Printing Co. v. NLRB*, 263 F.3d 224, 233 (3d Cir. 2001) (employer's unilateral

change absent overall impasse violates Section 8(a)(5) and (1) (citing *Litton Fin.*

*Printing Div. v. NLRB*, 501 US 190, 198 (1991)).  As a threshold matter, settled

law precludes a finding of impasse where the employer has engaged in overall bad-

faith bargaining.  *See Royal Motor Sales*, 329 NLRB 760, 762, 764 (1999),

*enforced*, 2 F. App'x 1 (D.C. Cir. 2001).  Even apart from that principle, however,

the underlying record amply establishes the absence of an impasse.  (ROA 3804

n.1.)  As the Board found, the Company declared impasse at a time when neither

party could have thought further bargaining would be futile, because they "still

needed to bargain about the Union's September 2019 proposal, [the Company's]

June 12, 2020 last, best, and final offer, and the terms that [the Company]

implemented on July 27, 2020"—all of which included movement on key issues.

(ROA 3823.)

Substantial evidence also supports the Board's finding (ROA 3804 n.1,

3824-25) that the Company violated Section 8(a)(1) of the Act by creating the

impression of surveillance of its employees' union or other protected activities.  As

the Board found and the record shows, company security guards pointed their cell

phones at, and appeared to photograph, employees who were peacefully protesting

the Company's bargaining conduct at rallies held on a public sidewalk.  (ROA

3825.)  *See National Steel and Shipbuilding Co. v. NLRB*, 156 F.3d 1268, 1271-72

(D.C. Cir. 1998).

In sum, there is a strong likelihood that the Court will grant the Board's cross-application for enforcement in this case, given the discretion granted to the Board in deciding the issues present here, and the substantial record evidence and settled law supporting the Board's findings.

## B.     The Bargaining Unit Will Suffer Irreparable Harm Absent Relief

Likely irreparable injury is established by showing "a present or impending deleterious effect" of the unfair labor practice "that would likely not be cured by later relief." *Frankl*, 650 F.3d at 1362.  The Board can make the requisite showing either through evidence that such harm is occurring (*see, e.g., Scott v. Stephen Dunn & Assocs.*, 241 F.3d 652, 667-68 (9th Cir. 2001)), or from inferences that such harm will occur given "the nature of the particular unfair labor practice at issue" (*Frankl*, 650 F.3d at 1362).

Applying these principles here, the Company's continuing Section 8(a)(5) violations—involving the failure to bargain in good faith and extensive unilateral changes—fall into the category of conduct "long [] understood as likely causing an irreparable injury to union representation." *Frankl*, 650 F.3d at 1362.  *See also Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1192 (9th Cir. 2011).  As shown below, the risk of irreparable harm supports an interim bargaining order and an order requiring that the Company recreate the conditions that would have existed but for its unfair labor practices.

An interim bargaining order is needed because, "[b]y unilaterally changing the employees' terms and conditions of employment" the Company has "'minimize[d] the influence of organized bargaining' and 'emphasiz[ed] to the employees that there is no necessity for a collective bargaining agent.'" *Citizens Publ'g & Printing Co.*, 263 F.3d at 233 (quoting *May Dep't Stores Co. v. NLRB*, 326 U.S. 376, 385 (1945)).  Moreover, even if the Court eventually enforces the Board's bargaining remedy, "the union is likely weakened in the interim, and it will be difficult to recreate the original status quo with the same relative position of the bargaining parties." *Frankl*, 650 F.3d at 1363.  "That difficulty," moreover, "will increase as time goes on."[5]  *Id.*

The present case underscores the truth behind these statements.  The number of union members has decreased by more than two thirds since the unfair-labor-practice strike started, and further defections are likely absent interim relief. Ultimate enforcement of the Board's Order and reestablishment of the bargaining relationship will likely have little effect if it only results in compelling the Company to engage in collective bargaining with a union that has already lost its base of support.  *See Avanti Health Sys.*, 661 F.3d at 1192 (noting that bargaining

---

[5] An unfair-labor-practice complaint issued earlier this year alleges that the Company is continuing to ignore its duty to bargain with the employees' union— by unilaterally granting benefits to employees who have crossed the picket line, and by failing to bargain in good faith over an interim agreement addressing health benefits.  (Attachment G.)

delays weaken union support, and a "Board order cannot remedy this diminished level of support").

The situation here equally demands an order to restore the status quo of working conditions that obtained before the Company's unfair labor practices. Unilateral changes made absent an impasse "strike at the heart of the Union's ability to represent unit employees" by allowing the employer to enjoy the fruits of its unlawful conduct, and to gain an undue bargaining advantage. *Little Rock Downtowner, Inc.*, 168 NLRB 107, 108 (1967), *enforced*, 414 F.2d 1084 (8th Cir. 1969). Here, the Company's unfair labor practices caused the bargaining-unit employees to strike. Those who remain on strike have lost all their benefits because the Company has no obligation to provide benefits for strikers. And those who have returned to work have been forced to spend substantially more money for healthcare, and to work under unilaterally imposed terms that essentially allow the Company total discretion to change many terms and conditions of employment at its whim.

Restoring the lawful status quo ante through interim rescission of the unilateral changes, upon the Union's request, is necessary to "salvage some of the important bargaining equality that existed" prior to the violations, *Silverman v. Major League Baseball Player Relations Comm., Inc.*, 880 F. Supp. 246, 259 (S.D.N.Y.), *aff'd*, 67 F.3d 1054 (2d Cir. 1995), so that meaningful bargaining can

resume as contemplated by the Board's Order.  Otherwise, the Company can leverage restoration of proper status-quo working conditions as "bargaining bait" to force acceptance of its bargaining proposals.  *Florida-Texas Freight, Inc.*, 203 NLRB 509, 510 (1973), *enforced*, 489 F.2d 1275 (6th Cir. 1974); *accord Sw. Forest Ind., Inc. v. NLRB*, 841 F.2d 270, 275 (9th Cir. 1988) (restoration of status quo ensures "meaningful bargaining").  Such action, in turn, would irreparably damage the "integrity of the bargaining process." *Vibra Screw*, 904 F.2d at 878.

More generally, as the Company's ongoing hostility to its bargaining obligations has weakened employees' resolve for union representation, an interim order to cease and desist from the unfair labor practices found, and from any like or related unfair labor practices, is necessary to stem further employee disaffection and restore faith in the bargaining process contemplated by the Act.  Given the Company's record and proclivity to violate the Act, it is reasonable to expect continued unlawful actions, absent an express order to cease and desist.

### C.    The Balance of Equities Favors Interim Relief

In determining the propriety of an injunction, the courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation marks and citation omitted).  Where a Board injunction request is at issue, the court must also bear in mind the underlying purpose of injunctive relief

under the Act, which is "to protect the integrity of the collective bargaining process and to preserve the [Board's] remedial power" while it resolves the case. *Miller v. California Pacific Medical Ctr.*, 19 F.3d 449, 461 (9th Cir. 1994). Thus, the Court must consider the probability that declining to issue an injunction will permit "an alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority." *Starbucks Corp.*, 144 S. Ct. at 1585 (Jackson, J., concurring in part) (citing *Frankl*, 650 F.3d at 1362).

Here, absent an injunction, eventual enforcement of the Board's Order will be a hollow victory for a severely compromised union, and for unit employees who have suffered myriad losses as a result of the Company's unfair labor practices. Indeed, the harm from the Company's unfair labor practices only grows and intensifies as more time passes. *See Kobell v. United Refining Co.*, 1998 WL 794860, at *9 (W.D. Pa. 1998) (holding that interim order to "negotiate collectively and in good faith, and restor[e] the status quo ante," justly and properly "safeguard[s] the [u]nion's position," its base of employee support, "and the collective bargaining process as a whole").

Further, in contrast to the serious harms being visited upon employees' statutory rights and the parties' collective-bargaining relationship, the affirmative actions required by the Board's Order will impose comparatively modest burdens on the Company. The Board directives to rescind unilateral changes and bargain

merely require the Company, at the Union's request, to restore the terms and

conditions of the contract to which it had long been bound. In addition, the

Company's only obligation under a bargaining order would be to bargain in good

faith to agreement or a bona fide impasse. *See Scott*, 241 F.3d at 669. The

Company would not be compelled to agree to any term or condition. *See H. K.

Porter Co. v. NLRB*, 397 U.S. 99, 102-06 (1970). Moreover, any agreement

reached could contain a condition subsequent, to account for the unlikely

possibility that the Court does not enforce the Board's bargaining order. *See, e.g.*,

*Lightner v. Dauman Pallet, Inc.*, 823 F. Supp. 249, 253 (D.N.J. 1992), *aff'd mem.*,

993 F.2d 877 (3d Cir. 1993) (employer may "insist as a condition of reaching

agreement" under the injunction order "that any labor contract be contingent on the

Board upholding its asserted unit determination").

Finally, an interim cease-and-desist remedy cannot be said to harm the

Company or outweigh the need for injunctive relief. A cease-and-desist order

would do nothing more than require the Company to obey the law. In sum, the

balance of hardships solidly favors granting interim injunctive relief.

### D.    Interim Relief is in the Public Interest

The Court's grant of interim relief will also advance the strong public

interest in preserving the integrity of the collective-bargaining process. Congress

intended to promote collective bargaining with its passage of the Act, which

"protect[s] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."  29 U.S.C. § 151.  Accordingly, as courts of appeals have recognized, the interest at stake when the Board seeks injunctive relief in a bargaining case is the public interest "in the integrity of the collective-bargaining process."  *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 906-07 (3d Cir. 1981); see *also Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 300 (7th Cir. 2001); *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 28 (1st Cir. 1986).  That public interest "is placed in jeopardy" when protracted litigation "threatens to circumscribe the Board's ability to fully remediate unfair labor practices."  *Bloedorn*, 276 F.3d at 300.  Injunctive relief in this case would promote meaningful collective bargaining and industrial peace, by preventing the Company from continuing to circumvent the Union and delay bargaining in the hopes of discouraging and dissipating union support.  Thus, the public interest favors granting temporary relief.

WHEREFORE, the Board requests that its motion be granted.  A proposed order is submitted herewith.


/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, D.C.  20570


Dated at Washington, D.C.
this 20th day of December 2024

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| **PG PUBLISHING CO., INC.** | ) | |
| **d/b/a PITTSBURGH POST-GAZETTE** | ) | Nos.  24-2788 |
| | ) | 24-3057 |
| **Petitioner/Cross-Respondent** | ) | |
| | ) | Board Case Nos. |
| **v.** | ) | 06-CA-248017 |
| | ) | 06-CA-263791 |
| **NATIONAL LABOR RELATIONS BOARD** | ) | 06-CA-269346 |
| | ) | |
| **Respondent/Cross-Petitioner** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **NEWSPAPER GUILD OF PITTSBURGH/** | ) | |
| **CWA LOCAL 38061** | ) | |
| | ) | |
| **Intervenor** | ) | |

## PROPOSED ORDER

To the Honorable, the Judges of the United States
  Court of Appeals for the Third Circuit:

Upon the Motion of the National Labor Relations Board for temporary injunctive relief *pendente lite*, pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), the Court finds that said motion is well taken and should be granted.

IT IS ORDERED THAT the Respondent, PG Publishing Co., Inc. d/b/a Pittsburgh-Post Gazette, and its officers, agents, successors, and assigns, are enjoined from:

(a) Failing and refusing to bargain with the Newspaper Guild of Pittsburgh/CWA Local 38061 (the Union) as the exclusive collective-bargaining representative of the employees in the bargaining unit.

(b) Unilaterally changing the terms and conditions of employment of its unit employees by implementing portions of its last, best, and final offer without first bargaining to a good-faith impasse.

(c) Creating the impression that it is engaged in surveillance of its employees' union or other protected concerted activities.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

IT IS FURTHER ORDERED THAT the Respondent, PG Publishing Co., Inc. d/b/a Pittsburgh-Post Gazette and its officers, agents, successors, and assigns, shall:

(a) On request, bargain with the Union as the exclusive collective-bargaining representative of the employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement:

All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology

Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

(b) Submit written bargaining progress reports every 30 days to the compliance officer for Region 6 of the National Labor Relations Board, and serve copies of the reports on the Union.

(c) On request by the Union, rescind the changes in the terms and conditions of employment for its unit employees that were unilaterally implemented on about July 27, 2020.

(d) Before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of employees in the bargaining unit described above.

(e) Forthwith post copies of this Court's opinion and order at its Pittsburgh, Pennsylvania facility at all locations where its notices to its employees are customarily posted.

(f) Within twenty days of the date of this Order, file with this Court and serve on Board counsel a sworn affidavit from a responsible officer of PG Publishing Co., Inc. d/b/a Pittsburgh-Post Gazette stating specifically the manner

in which it has complied with this Order, including how it has satisfied the posting requirement.

SO ORDERED

_____

United States Court of Appeals
For the Third Circuit

# Attachments: Table of Contents

Attachment A - Arbitrators Award and Opinion dated January 21, 2020, pp. 1-11

Attachment B - Witness Affidavit of Zachary Tanner dated June 27, 2023, pp. 1-5

Attachment C – Memo/Health Care Analysis dated February 21, 2024, pp. 1-3

Attachment D - Witness affidavit of Zachary Tanner dated December19, 2024, pp. 1-2

Attachment E - Amended Petition for Injunction Under Section 10(j) of the
        National Labor Relations Act, as amended, dated
        September 10, 2024, pp. 1-18

Attachment F - Second Amended Petition for Injunction Under Section 10(j)
        of the National Labor Relations Act, as amended, dated
        November 22, 2024, pp. 1-18

Attachment G - Order Consolidating Cases, Consolidated Complaint, and Notice
        of Hearing dated May 16, 2024, pp. 1-18

2020 WL 2857129 (W.D.Pa.) (Arbitration Award)
United States District Court, W.D. Pennsylvania.

Newspaper Guild PITTSBURGH, et al.,
v.
Pittsburgh POST-GAZETTE.

Nos. 20CV00236, 190201-03796.
January 21, 2020.

Editor's Note: This document was acquired from a Court file.

**Case Type: Labor**
**Award Amount: $0**
**Attorney for Petitioner: Joseph S. Pass**
**Attorney for Respondent: Richard C. Lowe Alice Ferot**
**Award Date: 02/14/2020**
**Arbitrator: Jay Nadelbach**

### Arbitrator's Award and Opinion

Appearances
For the Company: King & Ballow, Attorneys, Richard C. Lowe, Esq., Stephen B. Spolar, Esq., Chief HR Officer, Block Communications, Inc., Elliot N. Dinkin, President/CEO, Cowden Associates.
For the Union: Jubelirer, Pass & Intrieri, P.C., Attorneys, Joseph S. Pass, Esq. and Joseph J. Pass, Esq., Jonathan D. Silver, Unit Chairman, Raymond N. Burnett, former Company Director of Labor Relations (witness), Michael A. Fuoco, Edward P. Blazina.

**Arbitrator: Jay Nadelbach**

This case involves a contract question regarding the Company's obligation to pay for increases in employee health insurance costs following the expiration of the parties' 2014-2017 collective bargaining agreement. A hearing in this matter was held on October 28, 2019 at the Hyatt Regency Airport Hotel in Pittsburgh, Pennsylvania. Both sides were given a full and fair opportunity to present testimony and evidence in support of their respective positions. In addition, the parties submitted written post-hearing briefs setting forth their contentions. Following my receipt of the briefs on December 20, 2019, the hearing was deemed closed.[1]

### THE GRIEVANCE

The Union filed a grievance dated December 24, 2018. It stated, as follows:

> The Union grieves the Employer's refusal to pay the necessary contributions to the Health & Welfare Fund in order to maintain the benefits set forth in Exhibit B of the parties agreement. The contract requires the Employer provide such benefits. Furthermore, in the past when the contract expired, the parties practice has been the Employer continued to pay whatever was necessary to maintain the benefits set forth in the parties Agreement. This breach originally occurred January 2018, and the employer has indicated it will not contribute the necessary funds to maintain the agreed to benefits again in 2019.[2]

The Company's response, dated January 17, 2019, denied the grievance and provided three (3) reasons: (1) The grievance was untimely and barred by the doctrine of laches; (2) the collective bargaining agreement did not provide for or authorize

**ATTACHMENT A**

the Fund to change or increase contribution rates after January 1, 2017; and (3) Section 302 of the Labor Management Relations Act (LMRA) prohibits the Company from paying the Fund's unilateral increased contribution rate.

## ISSUES

The parties each framed the disputed issues differently. The Union proposed:

> Did the Company violate the parties' collective bargaining agreement by failing to maintain the agreed-upon health care benefits established in Article XX and as set forth in Exhibit B of the agreement? If so, what shall be the remedy?

The Company countered with two issues:
(1) Is the grievance arbitrable?

(2) Did the Company comply with the collective bargaining agreement when it paid its contributions to the Fund for the years 2015, 2016, and 2017, but not thereafter?

## BACKGROUND AND RELEVANT CONTRACT LANGUAGE

The parties have historically negotiated the provision of health insurance for both employee and family coverage summarized, in relevant part, as follows:
• The January 2002-December 2006 collective bargaining agreement provided in Article XX, section 3 that "effective July 1, 1998, the Company will provide the following family health insurance plan at no cost to the employee ...."

The agreement further provided in Article 22, section 2 that "[t]he terms and conditions of this Agreement shall remain in effect as long as negotiations continue ...."
• The January 2007-March 2010 agreement provided in Article XX, section 3 that "[e]ffective with the ratification of this contract, the Company will provide a health insurance and prescription drug plan to eligible employees. Employees shall contribute five (5) percent of their wages for health insurance up to 2,080 hours or $50,000, whichever occurs first. The Company will reduce wages by 5% to implement this contribution ...."

In addition, Article XXIII, paragraph 2 provided that the "terms and conditions of this Agreement shall remain in effect as long as negotiations continue ..."

• The August 1, 2010 - March 31, 2013 agreement provided in Article XX that "[e]ffective with the ratification of this contract, the Company will provide a health insurance and prescription drug plan to eligible employees, their spouses, and eligible dependents.... Employees shall contribute ten (10%) percent of their wages for health insurance up to $50,000 of earnings to a maximum of $5,000 per calendar year...."

In addition, Article XXIII, paragraph 2 provided that the "terms and conditions of this agreement shall remain in effect as long as negotiations continue ...."

• The October 2014 - March 2017 agreement provided in Article XX that "[a]ll provisions regarding the health insurance and prescription drug plan as set forth in the August 1, 2010 contract shall remain in effect through December 31, 2014."

In addition, "[e]ffective January 1, 2015 all eligible bargaining unit employees will participate in the Western Pennsylvania

Teamsters and Employers Welfare Fund." The agreement further provided that the "required [Company] contributions for the calendar year 2015 will be $1,229 per month for participating full-time bargaining unit employees (regardless of family size) .... The [Company] contributions for years 2016 and 2017 will not exceed a 5.0% annual increase above the $1,229 per month set forth above for calendar year 2015.... Increases in excess of 5% will be the responsibility of the covered bargaining unit members via direct billings from the Fund...."

• Article III ("Classifications, Wages and Schedules of Minimums") of the 2014-2017 agreement provided that

"Employees shall be paid weekly not less than the following wages in these classifications less a wage diversion of 10% of earnings to a maximum of $5,000 per calendar year. Effective April 1, 2016, such diversion shall be reduced to 8% and a maximum of $4,250 per calendar year. Effective January 1, 2017, the maximum diversion shall be $4,000 per calendar year ...."

There was no dispute that a key issue throughout all these rounds of negotiations leading each time to the final collective bargaining agreement was the provision of employee health benefits. As readily noted in the language of the agreements, the Union and its members over the recent number of years agreed to certain concessions to help alleviate the Company's financial burden of paying for health insurance costs. While previously the Company always paid in full (including any increases) for employees' health care coverage, wage diversions first were agreed to and appeared in the parties' 2007-2010 agreement. Years later, with the continuing increase in costs, the parties agreed that effective January 1, 2015 health care insurance would be provided through the Teamsters Western Pennsylvania Health and Welfare Fund (the "Fund"). This was a further effort to address the parties' financial concerns inasmuch as the participation in the Fund was far less expensive than the previously utilized self-insured, employer-sponsored plan. The parties also agreed in Exhibit B to a specific schedule of health benefits that the employees would enjoy. And additionally, aside from negotiating the amount of wage diversions as set forth in the 2014-2017 agreement, the parties further agreed to a specific cap of 5% for Company contributions for calendar years 2016 and 2017. Any increases in health insurance charged by the Fund in excess of the stated cap in those particular years would be borne by employees.

In the 2016 benefit year, the Fund imposed a 5.9% increase in contribution rates. Based upon the parties' agreement, the Company was responsible for 5% and the employees were to assume the additional .9% burden. To avoid taking more money out of everyone's pocket, however, the Union came up with the idea of adjusting or modifying the deductibles in the Exhibit B schedule of health benefits in order to offset the .9% cost. The Union ran with the idea and obtained the Company's consent to this modification (because technically, according to the Union, it was an amendment to the collectively bargained terms previously agreed to by the parties).

For the 2017 benefit year, the increase imposed by the Fund was exactly 5%. No further adjustments were required because it was the Company's obligation to pick up the entire 5% cost. The Company did so.

This was the contractual situation that existed through the expiration of the parties' agreement, on March 31, 2017. According to the Union, the Company all along nevertheless remained liable and responsible for any post-expiration increases that the Fund would impose, subject to negotiations that would take place between the Union and Company for a new, successor collective bargaining agreement. Stated differently, but for years 2016 and 2017 when the Company's financial obligation was capped, the parties' prior practice of the Company paying whatever was necessary to maintain the health benefits would remain. This was plainly understood by the parties, the Union contended. And when the Company refused to pay the increase imposed by the Fund for the 2018 benefit year, litigation at the NLRB and later via grievance-arbitration was commenced. Though the parties have continued to bargain, they have not yet agreed to a successor agreement.

Currently, the Union posited, the contractually promised benefits have been further reduced (because of the increase in deductibles to offset the overall costs) based upon the Company's continued refusal to meet it contractual obligation to pay for the increased health cost. Aside from the increase in year 2018, there was another 5% increase for the 2019 benefit year, and recently the Fund announced a 10.3% increase for the 2020 benefit year. It is these increases, the Union contended, that the Company should be responsible to pay. The Union presented two fundamental arguments in support of its position: a contractual maintenance of terms argument based upon the employees' commitment to divert wages and a past practice

argument based upon the Company's historical commitment to pay the increases in health care costs post-expiration and pending the conclusion of negotiations.

The Company, however, disagreed. The Company contended that there was no contractual obligation for it to pay any increases in the contribution rate after calendar year 2017. The parties' 2014-2017 agreement is clear and unambiguous. It provides for no such obligation in any years subsequent to the expiration of the parties' agreement on March 31, 2017.

The Company noted that, for 2017, the Fund assessed a contribution rate increase of 5% which the Company paid. The Company's financial obligation thereby rose to $1,354.97 per employee per month. But that was the extent of the Company's contractual obligation. Anything beyond 2017 would have to be negotiated between the parties. There has been no agreement on the responsibility for increased costs in 2018 and beyond. Any attempt to impose such a contractual obligation on the Company would be improper. And an arbitrator simply cannot write non-existent language into a collective bargaining agreement.

Moreover, the Union's past practice argument must fail. It is not supported by the facts. There was no binding past practice. Any prior instance whereby the Company paid for increased health care costs resulted from a contractual obligation only via an evergreen clause that continued the Company's obligation to pay for health insurance costs post-expiration. Beyond 2017, however, there was no such obligation. Indeed, the summary of health insurance benefits attached to the parties' contract also does not address an obligation to pay for health insurance. It merely provides details of the coverages, deductibles, and co-pays. Nothing in Exhibit B speaks to who pays the cost of increases that the Fund may assess. And finally, the Company argued that Section 302 of the LMRA regulates conduct with respect to Taft Hartley health and welfare plans. Under Section 302 (c), a multi-employer fund may not receive payments unless there is a written agreement between an employer and union authorizing such payments and detailing the basis for such payments. Indeed here, the Fund itself had no authority to increase contribution rates without the agreement of the Company and the Union. Certainly, employer contributions may not be required if the collective bargaining agreement does not authorize them. There is no provision in the parties' 2014-2017 agreement allowing for rate increases or employer contributions after 2017.

## PRELIMINARY ISSUES

### *The Company's position*

The Company raised several threshold arguments, claiming that the grievance was not arbitrable and should be dismissed without reaching the merits of the case. All of these preliminary contentions centered on the asserted untimeliness of the grievance and on the Union's alleged unreasonable delay in pursuing its contractual claims.

Simply put, the Company maintained that the parties' agreement requires that a grievance be filed with reasonable promptness. Here, according to the Company, the Union knew quite well by late 2017 that the Company going forward, upon the expiration of the parties' agreement, had no intention of paying for any contribution rate increases imposed by the Fund. Yet, the Union made a deliberate decision not to immediately grieve and it waited over one (1) year until December 24, 2018, to file a written grievance. In fact, the Union intentionally elected to proceed in a different forum. It right away filed an Unfair Labor Practice charge on January 5, 2018 alleging a violation of the National Labor Relations Act by the Company's refusal to increase its contributions to the Fund.

The suggestion by Union counsel that the Union's decision was merely a cost-savings measure, ie., not to spend money simultaneously on an NLRB and an arbitration proceeding, should be rejected, the Company urged. This so-called economic motivation by the Union cannot justify its decision. Moreover, by electing a different forum to pursue its claim, the Union effectively gave up its contractual grievance-arbitration rights. The more than one-year delay in filing a grievance cannot be ignored or overlooked. The Union's delay prejudiced the Company and signified an abuse of the contractual grievance procedure.

It is true, the Company noted, that the collective bargaining agreement does not contain a specific time limitation for the filing of a grievance. But time-frames for the processing of a grievance once one is filed clearly do exist and they, in turn,

signal the intent of the parties that a grievance must be filed with reasonable promptness. Case law supports such an intent and the Union's inaction, therefore, cannot and should not be condoned.

In addition, under the generally accepted doctrine of laches, the Union's unreasonable delay in filing and pursuing its contractual grievance should be seen as inequitable and unjust. Not only did the Union sleep on its rights, but its severely-delayed action has prejudiced the Company. The doctrine of laches recognizes that circumstances may have changed, witnesses may no longer be available, and evidence may no longer be procured. That is the case here. The Union was solely responsible for the lengthy delay and, as a result, the Company has been subjected to mounting potential monetary liability. The Union should, therefore, not be permitted to arbitrate the instant grievance.

### The Union's position

Although the contractual grievance and arbitration procedure set forth in the collective bargaining agreement is quite comprehensive, there is one item that is conspicuously absent. That item is a time limitation on the Union's right to file a grievance. For that reason alone, the Company's timeliness argument must fail. The Union is simply not required to file a grievance within a certain amount of time.

Equally important, there is no default or forfeiture language in the grievance provision. As such, there can be no consequences for a failure to file a grievance within a distinct amount of time. In this case, therefore, it is apparent that the Company is requesting the Arbitrator to read something into the parties' agreement that just does not exist. Interestingly, the only language that actually pertains to the consequences of a failure to meet a grievance time-frame addresses what takes place only after a grievance is filed. Article XVI ("Adjustment of Disputes"), section 6 states that '[o]nce a grievance is filed and the answering party fails to respond within the prescribed time limits, the grievance shall be automatically moved to the next step."

And as a final reason to reject the timeliness argument, the Union pointed out that the Company failed to establish and prove any prejudice at all that was suffered as a result of the alleged delay in filing a grievance. The fact is that the Company was well-aware that the Union intended to assert any and all of its rights in order to address the Company's failure to pay the cost necessary to maintain the contractual level of health benefits. Plainly, the NLRB proceeding addressed the exact same set of facts and circumstances giving to rise to the subsequent contractual grievance. The Company, therefore, immediately had availability to whatever testimony and evidence it believed was necessary to respond to the Union's claim. For all these reasons, the timeliness arguments should be dismissed.

### SUBSTANTIVE ISSUE

### The Union's claim

By failing to pay the costs necessary to maintain in full the contractually-promised health benefits, the Company violated Article XX and Exhibit B of the parties' agreement. Importantly, these contract provisions spell out the exact level of benefits that employees were supposed to receive.

Equally important, to obtain these precise benefits the employees agreed to the wage diversions set forth in the parties' agreement. Significantly, the employees have always upheld their end of the bargain and they continue even now, under the expired agreement, to divert wages for the purpose of receiving the agreed-upon health coverage. Yet, the contractually guaranteed benefits had to be reduced (with a unilaterally imposed increase in deductibles set by the Fund) beginning with the 2018 benefit year because the Company refused to pay the costs required to maintain the contractual benefit.

The Company's view, that it simply is required to keep paying the same amount it contributed in 2017 regardless of whether the amount is sufficient to maintain the contractual benefits, is wrong and its actions constitute a contract violation. By unilaterally deciding not to pay for the increased costs, the Company has essentially forced the Fund to reduce the level of benefits.

What the Company fails to understand or refuses to accept is that its unilateral action also violated the established and historical past practice that was mutually adopted by the parties. That practice has always required the Company, absent a new successor agreement, to continue to be responsible for any increases needed to maintain the health benefits provided in the collective bargaining agreement. Importantly, the existence of such a past practice was underscored by the testimony of Joseph J. Pass, Esq., who served for over thirty (30) years as the Union's chief negotiator. Pass testified that, for that entire time-frame, the Company has always undertaken to pay the cost of any increases in order to maintain the contractual health benefits. The Company never before took the position that it was not required to do so. And significantly, the Company adhered to this practice and to its obligation no matter whether the health benefits were self-insured or fully-insured and no matter whether an increase occurred mid-contract or post-expiration.

Pass noted that the longstanding practice under which the Company picked up any health care cost increases was an essential and necessary ongoing commitment as far as the Union was concerned. It certainly was relied upon by the employees. This was particularly true once concessionary bargaining began long ago and the employees agreed to wage diversions to keep the entire healthcare coverage package intact. The diversions were, essentially, the employees' contribution towards the maintenance of the health benefits guaranteed by Exhibit B of the parties' agreement. And because negotiations always continued well past the expiration of a particular collective bargaining agreement, it was imperative that the Company assume the increased costs so that the benefits could be maintained pending the parties' negotiations.

Pass further noted that, in particular from 2006 forward when employees began to divert wages to help insure the promised delivery of health benefits set forth in Exhibit B, the Company continued willingly to pay for any health cost increases post-expiration subject to continued negotiations between the parties. This post-expiration responsibility was uniquely important to the Union and to employees because negotiations for a successor collective bargaining agreement traditionally took quite some time and always spilled over into subsequent years. In fact, Pass noted, during the give-and-take of negotiations for the 2014-2017 agreement, he specifically emailed Company officials to insure that everyone would be on the same wave length and understood what the parties' respective responsibilities would be in paying for health insurance costs going forward. The Company responded and voluntarily provided a charted "determination of share of benefit costs - 2015 - 2017" attachment that included not just those years, but highlighted as well the Company's obligation in post-expiration year 2018.[4] That obligation was another 5% increase in costs that the Company would be responsible to pay. Without any prompting whatsoever, the Company included this post-expiration obligation in the spreadsheet it prepared. Clearly, therefore, the Company recognized a continuing responsibility to pay for health insurance costs post-expiration of the 2014-2017 agreement.

Pass' graphic description of the unequivocal past practice and the Company's knowing acceptance of its obligations was further supported by the testimony of the Company's former Director of Labor Relations, Ray Burnett.[5] He noted that, when he held that position from 1993 to 2004, the Company maintained a fully-sponsored health insurance program. Whenever there were cost increases, particularly post-expiration, the Company always assumed the increased cost. This was the parties' clear understanding of how the increases were to be handled so as to insure that the level of employees' contractual health benefits could be maintained.

Finally, the Company's claim that Section 302 of the LMRA prohibits it from paying the post-expiration increase in contributions to the Fund should also be rejected. Notably, the Administrative Law Judge in the NLRB proceeding clearly reasoned that a collective bargaining agreement, even post-expiration, satisfies the Section 302 requirements. And importantly, the terms and conditions of the 2014-2017 agreement have actually not expired because Article XXIII provides that "[t]he Agreement shall remain in effect as long as negotiations continue."

### The Company's position

The decision in this case should be made, in the first instance, upon the clear and unambiguous language of the parties' 2014-2017 agreement. Since the agreement does not require the Company to pay any contribution rate increases to the Fund for 2018 or for any year thereafter, the grievance should be summarily dismissed.

Specifically, the contract language sets forth the exact rate for year 2015, and then caps the Company's obligation for 2016

and 2017 at annual 5% increases. Nothing at all is stated or provided for any other year or for any subsequent rate increase. There simply is no ambiguity. In fact, the provision concludes with the statement that the Company will not be liable "for any other payment to the Fund, other than as stated above."

In addition, it should be evident that Exhibit B, the summary of health benefits, does not at all speak to contributions or financial obligations to the Fund. The mere attaching of that information to the collective bargaining agreement, therefore, does not mean that those benefits are guaranteed or that the parties have agreed to pay whatever it costs for those benefits to be maintained.

In that regard, Stephen Spolar, current chief HR officer for Block Communications, testified that he headed the Company's negotiating team for the 2014-2017 agreement. In his view, the contract language negotiated was quite clear. And importantly, the summary of benefits in Exhibit B was merely elucidative of what employees were going to get at that point. Quite frankly, going forward, no one knew what the benefits schedule would look like. In fact, when the 2016 contribution rate increase came in at 5.9%, it was Union officials who suggested modifying the deductibles given that the employees were responsible for .9% of the increase. The Company was "indifferent" to the suggestion, Spolar testified, and the deductibles were changed so that no money was immediately taken from employees to fund the increase. But it was clear or should have been clear that it was not the Company's obligation. The Company's obligation was contractually capped. So too it was clear or should have been clear that nothing in the agreement itself or in the Exhibit B summary of benefits called for the Company to pay whatever it might be necessary thereafter to fund those benefits.

In addition, the previous collective bargaining agreements do not support the Union's past practice argument. Under each of those agreements, the Company's obligation to pay for the cost of health care was rooted in contract language - not past practice - specifically, the evergreen clause which continued the obligation during "hiatus" periods that took place between contracts. The most recent 2014-2017 agreement, however, was quite different. It changed the way health insurance payments were handled. It was the first time the Company participated in a Taft-Hartley multi-employer plan and, for the first time in 2015, the Company's obligation to pay for health insurance was capped. Obviously, no past practice was applicable to this situation. And once the Company's obligation was capped, nothing in the agreement or in any alleged past practice provided for a continued Company obligation in subsequent years.

Finally, as previously noted, the Company maintained that Section 302 of the LMRA prohibited contribution rate increases after 2017. Given the fact that a successor collective bargaining agreement was not negotiated and that no other writing between the parties set forth the basis for increased payments to the Fund, the Company could not legally pay and the Fund could not legally insist upon such payments from the Company.

Moreover, the Union's insistence that the Company must continue to pay whatever contribution rates the Fund established after 2017 based upon a past practice argument is both wrong and misplaced. Even if a past practice existed, such a practice does not satisfy the rigorous requirements of Section 302. That provision strictly requires a particular authorization and a detailed basis set forth in a written agreement between the parties. Here, none exists. There is no contract language and no other written agreement that supports the payments that the Fund sought. Indeed, the proof that the Fund had no authority to increase rates after 2017 is the fact that no collection efforts were undertaken to obtain additional monies from the Company. Instead, the Fund reduced benefits in order to fit the 2017 contribution rate.

For all these reasons, both procedural and substantive, the Company maintained that the grievance should be dismissed. What this grievance-arbitration represents, the Company believed, is merely a proverbial second bite at the apple after the Union's NLRA charge was thrown out. The instant case too should be dismissed.

## DISCUSSION

Upon a thorough review of the entire record presented, the grievance is upheld.

First, the Company's procedural timeliness and laches arguments are rejected, and the grievance is deemed arbitrable. The simple fact is that the parties' agreement does not contain a time limitation on the right to file a grievance. Whether a grievance is filed a week, a month, or a year after the underlying occurrence or incident, it is timely under a strict reading of

the agreement. Notably, Article XVI, section 2 simply provides that, when a dispute is not resolved, "a grievance shall be submitted to the employee's supervisor." Nothing more.

It is true that a prompt adjustment or adjudication of disputes is generally in the best interests of both parties. A quick dispute resolution process may certainly be an objective that parties seek when they negotiate a grievance procedure in a collective bargaining agreement. Yet here, the parties negotiated and prescribed time-frames not for the filing of a grievance but for the steps to be followed after a grievance is filed only. For example, there is a ten (10) day time-frame for a grievant's supervisor to meet with a Union official when a grievance is filed; a further ten (10) day time-frame when the grievance is referred to upper management; and additional time-frames all the way through the grievance process to arbitration. Evidently, the parties were interested in moving a grievance along quickly to an ultimate settlement or arbitral resolution. But they distinctly elected not to place a time-frame on the initial filing of a grievance. The parties' wishes must be respected.

The Company nevertheless argued that, in this case, the parties' intended for a grievance to be promptly filed. That intention and the need for reasonable promptness, the Company argued, should be read into the agreement or inferred from the numerous time limitations that are built into the grievance steps. It should be clear therefore, the Company maintained, that a delay of over one year for the Union to grieve was never contemplated by the parties nor intended by their grievance procedure. The Union certainly should not now be given another opportunity to litigate its position after losing its ULP charge presented to the NLRB, a forum that the Union chose rather than immediately filing a grievance. In addition, the Company cited the doctrine of laches to indicate that a grievance necessarily should be deemed stale where a late or delayed filing is prejudicial to the Company or abusive of the grievance process.

Under the particular facts and circumstances of this case, I cannot agree. Despite its assertions, the Company did not show any evidence of prejudice to its position by the Union's delayed filing. The record reveals that the Company all along was quite aware of the Union's position and what the potential liability would be if the Union's position was upheld. The likelihood also was that the testimony, evidence, and arguments would be markedly similar no matter the forum in which the Union were to advance its contentions. These findings together with the absence of a contractual time-frame within which a grievance has to be filed signifies that the instant grievance is arbitrable.

Turning to the merits, the grievance is sustained on both contractual and past practice grounds. A review of the collective bargaining agreements demonstrates that Article XX and Exhibit B meticulously lay out the health insurance benefits that have been negotiated, fixed, and guaranteed to employees. Stated differently, those are the precise benefits that the employees are entitled to contractually receive, including the exact deductibles and co-pays that were agreed upon by the parties. Exhibit B, therefore, is not merely illustrative or demonstrative of what employees may receive; it is an essential and integral provision of the parties' agreement. The terms and conditions set forth therein must be contractually honored and maintained.

The collective bargaining agreements also detail the respective responsibilities for payment of these contractually guaranteed health care benefits. From the earliest agreements (where the Company picked up the entire cost of employees' health care) to the later agreements (beginning with the 2007-2010 term when employees began to divert a percentage of wages to help out based upon the rising cost of health care), the obligations are clear. And once a wage diversion took place, as negotiated by the parties, the percentage agreed to and diverted by employees became their sole obligation so that they could receive the particular health insurance benefits contractually guaranteed by Article XX and Exhibit B. It is the Company who is then responsible for paying whatever additional sum is required to insure that those exact benefits, absent other arrangements negotiated and agreed to by the parties, are maintained. To this day, wage diversions continue to be paid by employees and the Company continues to enjoy the monetary contributions afforded by such diversions to help pay for the health insurance benefit. But the Company, at the same time, must continue to honor its contractual commitment and pay up to maintain the Exhibit B benefits, as written in the parties' agreement, until and unless changed in future negotiations.[6] Based upon these conclusions, the Company has violated and continues to violate the collective bargaining agreement and the grievance must be sustained.

The Union's past practice argument, as advanced through testimony and argument, also convincingly establishes that absent a successor agreement the Company remains responsible for post-expiration increases in contributions required to maintain the level of Exhibit B health care benefits. There is no dispute that, at least from the 1990s forward, the Company always provided and fully paid (until the 2007-2010 term) for employer-sponsored health care coverage including any increases (during a so-called "hiatus") that were to be implemented in the subsequent renewal years. The Company did so to maintain

the level of health benefits it agreed to provide, as promised in the parties' collective bargaining agreement. Also undisputed is that, historically, the Company absorbed these cost increases - even those implemented post-expiration of the parties' agreement - regardless of whether the health insurance coverage was provided through a fully-insured or self-insured model.

The Company's course of conduct over the years readily bears out the requirements of a binding past practice. Union witness Pass clearly articulated and spoke to the elements necessary, including the unequivocal practice undertaken by the Company and accepted by the Union over many years. It is clear that whatever the employees' contractual obligation may have been, the Company always paid for the increased health care premiums in order to maintain the contractual, guaranteed level of health care benefits as negotiations continued into subsequent years and until a successor agreement could be reached.[7]

Ultimately, there is nothing different about the 2014-2017 agreement that changed or did away with the Company's obligation. The Company requested and was granted additional relief for two contract years only, 2016 and 2017, and it presently remains responsible to pay for the cost of maintaining the contractual Exhibit B benefits, as negotiated.

## AWARD

1) The grievance is arbitrable. The threshold arguments of the Company, the Pittsburgh Post-Gazette, regarding timeliness and the doctrine of laches are rejected.

2) The grievance is upheld. The Company violated the parties' collective bargaining agreement by failing to maintain the agreed-upon health care benefits established in Article XX and as set forth in Exhibit B of the agreement.

3) The Company is directed to pay the amount necessary to maintain the specific health insurance benefit levels set forth therein (ie., all increases that may be required to keep the contractual level of benefits), subject to and until a new collective bargaining agreement is negotiated and reached between the parties.

4) Employees shall be made whole for any out-of-pocket monies paid as a result of the Company's failure to maintain the contractual level of benefits.

5) This Award is final and binding. I shall retain jurisdiction, however, for the limited purpose of resolving any disputes that may arise in the implementation of the remedy granted in paragraph #4 herein.

Dated: Award issued via e-mail December 30, 2019 / Opinion and Award issued January 21, 2020

<<signature>>

JAY NADELBACH

## AFFIRMATION

STATE OF NEW YORK                                                        )

                                                                         :ss.:

COUNTY OF NEW YORK                                                                        )


I, JAY NADELBACH, affirm upon my oath as Arbitrator, that I am the person described in and who executed this instrument which is my Award.

<<signature>>

JAY NADELBACH

### Footnotes

[1]   By arrangement with the parties, the Award in this case was first transmitted to them via email prior to the end of the calendar year on December 30, 2019, with this written Award and Opinion to follow on or before January 21, 2020.

[2]   The Union noted at the arbitration hearing that, since the filing of the grievance, the Teamsters Western Pennsylvania Health and Welfare Fund has indicated that additional contributions (an increase of 10.3%) to maintain the level of benefits would again be required in year 2020. By the grievance, the Union therefore sought an arbitration award directing the Company to continue paying whatever monies are necessary to maintain the contractual level of benefits pending further negotiations and agreement between the parties as well as a make-whole remedy for any employee who suffered a financial loss as a result of the Employer's failure to maintain the contractually entitled benefits.

[3]   Testimony at the arbitration hearing demonstrated that, for many years prior to the 2002 collective bargaining agreement, the Company similarly provided health insurance coverage at no cost to employees.

[4]   See Union exhibits #2 and #3. Pass testified that the collective bargaining agreement was ratified within days after the Company's document was received. In his testimony, Company HR head Stephen Spolar explained that Union exhibit #3 chart was prepared by Elliot Dinkin, a benefits consultant utilized by the Company in negotiations. Dinkin's inclusion of 2018 in the chart was superfluous, Spolar insisted, and not requested by the Company. It was simply part of one of the internal models that Dinkin previously prepared and it had no real meaning in relation to the parties' agreement under which Company obligations were specifically limited to 2016 and 2017 contributions.

Dinkin testified similarly and explained that the 2018 column in the Excel spreadsheet did not signify any further Company obligation. It was simply one of the illustrative models that he had prepared for internal Company purposes to show what could happen over a longer period of time beyond the contract period. The appearance of 2018 in the e-mailed example transmitted to the Union had nothing to do with the cap that had been negotiated for 2016 and 2017. It was the result of a modeling exercise only, not a promise or proposal to pay 2018 rates.

[5]   Burnett testified that he began as an employee for the newspaper in the 1960s. He became the Business Manager in the mid-1970s and thereafter became the Labor Relations Director in 1993 after the Company herein purchased the paper. He then participated in labor negotiations as a Company representative until his retirement in 2004.

6    Based upon this analysis and determination that the Company's obligation to fund the cost of employee health care, beyond the amount of the wage diversions, is rooted in the parties' collective bargaining agreement, there is no need to examine and discuss the Company's Section 302 arguments. The collective bargaining agreement itself is the written commitment that satisfies any possible Section 302 claim.

    Other arguments raised by the Company, although perhaps not fully addressed herein, have also been carefully reviewed and duly considered.

7    Interestingly, the Dinkin chart or spreadsheet provided in negotiations by the Company to the Union highlights the Company's realization of its continuing responsibility post-expiration of the 2014-2017 contract term. The Company's insistence that the inclusion in that document of year 2018 projections was meaningless and irrelevant is not credible.

---

Exhibit 7

PG Publishing Co., Inc. d/b/a Pittsburgh
Post-Gazette
Case 06-CA-248017

## Confidential Witness Affidavit

I, **Zachary Tanner**, under the penalty of perjury, state as follows:

**I have been given assurances by an agent of the National Labor Relations Board (NLRB)
that this Confidential Witness Affidavit will be considered a confidential law enforcement
record by the NLRB and will not be disclosed unless it becomes necessary to produce this
Confidential Witness Affidavit in connection with a formal proceeding.**

I reside at 324 Clover St. Pittsburgh, PA 15210

My cell phone number (including area code) is 724-761-696

My e-mail address is zacktanner.7@gmail.com

I am employed by PG Publishing Co. d/b/a Pittsburgh Post-Gazette

located at 358 North Shore Drive, Pittsburgh PA

1    I have been the President of the Newspaper Guild of Pittsburgh a/w CWA Local 38061

2    ("the Union") since around June 2022. The unfair labor practices in this case involve CBA

3    negotiations with the Pittsburgh Post-Gazette ("the Employer") beginning around February 2017.

4    The Employer bargained in bad faith and, around July 2020, declared impasse and unilaterally

5    imposed part of the terms of its final offer, including a change to our healthcare plan around

6    September 2020. There was one post-impasse bargaining session around September 2020.

7    Because of the imposition of terms and the ULP charges, bargaining did not resume until

8    November 2022. I have been involved in every bargaining session post-impasse. The

9    Employer's conduct at the bargaining table during that time has only gotten worse— when we

**Privacy Act Statement**
The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq.
The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings
or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). Additional
information about these uses is available at the NLRB website, www.nlrb.gov. Providing this information to the NLRB is voluntary. However, if
you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you
a subpoena and seek enforcement of the subpoena in federal court.

- 1 -                    Initials

**ATTACHMENT B**

Case 06-CA-248017

1  came back to the table in November 2022, the Employer's offer was nearly identical to its 2020

2  Final Offer (the only change was the wage scale had been updated to reflect the current wages).

3  There have been around 6-8 bargaining sessions since then, and the Employer has not moved or

4  changed one thing in its proposals. No agreement has been reached by the parties.

5      Around July 27, 2020, the Employer announced that they were ceasing dues check-off.

6  After a few months, the Union was able to get a system set up to collect dues. We gave

7  employees about two or three months sign up for this new dues collection system and get back in

8  good standing. Around 15 people did not sign back up. No one resigned their Union

9  membership until after we went on strike.

10     On October 17, 2022, the Union took a strike authorization vote to go out on strike

11 because of the employer's unfair labor practices. We had about seven hours of Union meetings

12 that day—four hours before the vote, and three hours after. About 70 people attended those

13 meetings, and the vote passed 38-36. There were around 95 bargaining unit members at the

14 time—around 15 were not eligible to vote because they had stopped paying dues. Some

15 employees expressed that they opposed a strike because they couldn't afford to lose income and

16 healthcare. Some employees expressed that they felt going on strike was not going to move the

17 Employer. The Union sent a letter to the Employer announcing our intention to strike, which the

18 Employer did not respond to. I have provided a copy of this letter to the Board Agent.

19     That same day, the Employer sent a letter to the bargaining unit members stating that

20 there would be work for them if they wanted to keep working, and they could resign from the

21 Union to avoid the Union fines. The letter gave instructions on how to revoke their Union

22 membership. I have provided a copy of the letter to the Board Agent

- 2 -

Initials:

Case 06-CA-248017

1       On October 18, 2022 at noon, the strike commenced. During the first week, around 55

2  bargaining unit members went out. The majority of the 45 bargaining unit employees who kept

3  working sent emails or letters resigning from the Union—I have provided copies to the Board

4  Agent. These letters were sent either to the Union email (which I have access to) or to me

5  personally. I also received some phone calls. Bargaining unit employees communicated to me

6  that they believed that the Employer was so dug in that fighting / going on strike was not going

7  to make a difference in the long run. I have heard secondhand that management was verbally

8  encouraging employees to resign their Union memberships. I have provided to the Board Agent

9  copies of Union communications with membership about the purpose of the strike, a Union press

10  release about the strike, and photos of strike signs.

11       As of June 27, 2023, there are 36 bargaining unit employees on strike. Four of the

12  original 55 strikers went back to work for the Employer, and about 15 people left for other

13  employment. Of the strikers who left for other jobs, three reasons were given—(1) can't afford

14  to be on strike anymore, (2) want to get back to work for the sake of their journalism career, and

15  (3) want to leave because of bad experience at the Employer.

16

17       The entire Local meets every quarter and, before the strike, the unit would meet every

18  month or every other month. Pre-covid (i.e. until March 2020) when the Local meetings were in

19  person, almost all of the bargaining unit employees attended. Same deal with the unit meetings,

20  almost everyone attended. When we switched to Zoom meetings around March 2020,

21  attendance was still very high (around 80%) until the Employer unilaterally imposed terms in

22  July 2020. In one of those meetings between March and July 2020, over 100 people attended— I

23  remember because I had to buy a bigger Zoom package. After the Employer unilaterally

- 3 -

Initials:

Case 06-CA-248017

1   imposed terms, attendance at the Union meetings began to steadily drop. At the September 2022

2   Union meeting—the last one before the strike vote—fewer than 40 unit members attended. I will

3   provide the Board Agent with the Union's attendance lists.

4        Since we went on strike, the striking employees have daily check-in meetings and the

5   majority of striking employees attend (around 20-30 people).

6        After the start of the strike, the Union also had two or three meetings specifically for

7   folks who had crossed the picket line and revoked their membership. These meetings were

8   meant to be an open forum and Q&A for the resigned members.

9        Around October 25, 2022 we had the first of these meetings. About 15 picket line

10  crossers attended this meeting.   I was there and a couple of committee heads, and we talked

11  about our strike relief fund, CWA's healthcare coverage, and the actions we were planning to put

12  pressure on the Employer to resolve the strike. We gave an open forum to the resigned members

13  to ask questions and discuss the strike. It was similar to strike vote meeting—the resigned

14  members expressed that they couldn't afford to go without healthcare and income, and that they

15  believed the strike was not going to change anything. We possibly had another similar meeting

16  around this time to catch the people who couldn't make it—I don't recall specifically.

17       Two or three weeks later, around mid-November, the Union had another meeting for

18  resigned members where we gave updates on the strike and bargaining. Less than 10 people

19  attended, and there was very little participation or questions so it was a very short meeting—

20  around 40 minutes.

21

- 4 -                                    Initials: 

Case 06-CA-248017

I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.

I have read this Confidential Witness Affidavit consisting of 5 pages, including this page. I fully understand the Affidavit and I state under penalty of perjury that it is true and correct.

Date: _____6/27/2023_____   Signature: _____

Zachary Tanner

This affidavit was taken by:

_____
Anne E. Tewksbury
Board Agent
National Labor Relations Board

Initials: _____

Exhibit 8

Memo

To:  File

From:  JJP

Date:  February 21, 2024

Re:  Analysis of the Health Care and Wages for the News Guild of Pittsburgh

## Health Care

With regards to health care for 2023 under the imposed conditions employees are subject to the following premiums.

- A family - $8,476.00
- An employee plus one - $5,512.00
- Single - $2,756.00

The plan is a 90/10 plan, meaning that the employee must pay ten (10%) percent of all health care costs before the health care provider pays anything.  The deductibles are 1,500/3,000 for in network and 1,500/3,000 for out of network.  As this is a 90/10 plan, the out of pocket maximums for in network are 3,400/6,800 and out of network 6,350/13,100.

### The Health Insurance Prior to Implementation

The employee deferred eight (8%) percent of their wages up to a maximum of $4,000.00 per year to subside the employers health care obligation.  Once the employee reached $4,000.00 per year the eight (8%) percent was put back into their pay rates.

When the program started the deducible were 750/1,500.  In 2020, prior to implementation, the deductibles were 2,000/4,000 in network and 4,000/8,000 out of network.  Because it was a one-hundred (100%) percent plan there were no out-of-pocket maximums.  The maximum an employee would pay would be $2,000.00 and the family $4,000.00.

**See attached schedule dealing with health contributions and benefits for 2017 and under the Implementation terms in 2020 and 2023**

### Wages Prior to and Subsequent to Implementation

When the employer unilaterally implemented its new terms in July 2020, they took the eight (8%) percent that the employees were paying and put it into their own pockets.  The employer alleged it gave a three (3%) percent increase, two (2%) percent increase the second year and (3%) percent the third year.  In fact, it was a wage decrease because they reduced the wages by eight

**ATTACHMENT C**

(8%) percent before they implemented the alleged wage increases. More importantly, however, the "alleged wage increase" applied only to the top scale minimum pay rates for each classification. Therefore, anyone who was receiving above or below the "top scale" minimum did not receive any wage increases. Those employees got nothing. **Attached is the actual wage scale in the implemented terms and the bold numbers indicate the only place wages were changed-which they alleged to have been a wage increase.**

## Summation

The net result is that the employees never received any raises. What the employer did was place the alleged two (2%) percent, three (3%) percent increases only on one portion of the pay scale which was the top scale minimum rate for each classification. Even then, at the end of those three (3) years, those individuals were not making what they made prior to the unilateral implantation because when you add eight (8%) percent to a lower number it never reaches the eight (8%) percent that was taken from the higher number. (For example, if the employee was getting $100.00 a day and the eight (8%) percent was reduced from the $100.00, that employee would receive $92.00). If you add eight (8%) percent on to the $92.00, that amount would equal $7.36. In adding that to the $92.00, the employee is now making $99.36 rather than 100.00.

In addition, with regards to health care, the majority of the employees were either a family or plus one. In a family situation if you had a significant family issue not only will you be paying $8,476.00 for premiums but you would have out-of-pocket maximum of $6,800.00 for a total health care cost $15,276.00. Under the program immediately prior to the unilateral implementation, the employee was paying maximum of 4,000.00 premium and a maximum deductible of $2,000.00 for a total expense of $6,000.00.

Also, dealing with the health care, the deducible in the unilaterally implemented terms and conditions were "non- embedded" deductibles as opposed to those of the previous health care which had embedded deductible. The difference being that if you have non-embedded deductibles in a family plan with a 1,500/$3,000.00 deductible and anyone member becomes ill he/she must pay up to 3,000.00 before coverage begins. In the embedded deductible the individual in a family plan would pay no more than 1,500.

**2017 Costs**

| Tier | Premium Cost | Deductible | Out-of-pocket max | Maximum exposure |
| --- | --- | --- | --- | --- |
| employee only | N/A | N/A | N/A | N/A |
| employee + 1 | $4,000 | $750 | $0 | $4,750 |
| family | $4,000 | $1,500 | $0 | $5,500 |

**2020 Costs**

| Tier | Premium Cost | Deductible | Out-of-pocket max | Maximum exposure |
| --- | --- | --- | --- | --- |
| employee only | $2,400 | $1,500 | $3,400 | $5,800 |
| employee + 1 | $4,776 | $3,000 | $6,800 | $11,576 |
| family | $7,260 | $3,000 | $6,800 | $14,060 |

**2023 Costs**

| Tier | Premium Cost | Deductible | Out-of-pocket max | Maximum exposure |
| --- | --- | --- | --- | --- |
| employee only | $2,756 | $1,500 | $3,400 | $6,156 |
| employee + 1 | $5,512 | $3,000 | $6,800 | $12,312 |
| family | $8,476 | $3,000 | $6,800 | $15,276 |

**2017**

| Tier | Premium Cost |
| --- | --- |
| employee only | $4,000 |
| employee + 1 | N/A |
| family | $4,000 |

**2020**

| Tier | Premium Cost |
| --- | --- |
| employee only | $2,400 |
| employee + 1 | $4,776 |
| family | $7,260 |

**2023**

| Tier | Premium Cost |
| --- | --- |
| employee only | $2,756 |
| employee + 1 | $5,512 |
| family | $8,476 |

**2017 Minimum Cost**

| | |
| --- | --- |
| Employee only | $4,000 |
| Employee + 1* | N/A |
| Family | $4,000 |

**2017 Maximum Cost**

| | |
| --- | --- |
| Employee only | $4,750 |
| Employee + 1* | N/A |
| Family | $5,500 |

*There was no "employee + 1" tier under the Tear

Exhibits 9–23 omitted, pending the Court's ruling on Petitioner's Motion to Redact

PG Publishing Co., Inc. d/b/a Pittsburgh
Post-Gazette
Case 06-CA-248017

# Confidential Witness Affidavit

**I, <u>Zachary Tanner</u>, under the penalty of perjury, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

I reside at 324 Clover St. Pittsburgh, PA 15210

My cell phone number (including area code) is 724-761-6969

My e-mail address is zacktanner.7@gmail.com

I am employed by PG Publishing Co. d/b/a Pittsburgh Post-Gazette

located at 358 North Shore Drive, Pittsburgh PA

1    I am employed by the Pittsburgh Post-Gazette ("the Employer") as an Interactive

2    Designer.  I have been the President of the Newspaper Guild of Pittsburgh a/w CWA Local

3    38061 ("the Union") since around June 2022.  The Union represents a unit of employees in the

4    Employer's Editorial Department ("the bargaining unit").

5    On October 18, 2022, the Union commenced a strike to protest the Employer's unfair

6    labor practices. At that time, there were 97 employees in the bargaining unit.  Within a week or

7    two of the start of the strike, 44 bargaining unit employees crossed the picket line and resigned

8    their membership with the Union— I believe one of those people has since become a supervisor.

**Privacy Act Statement**

The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation.  The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006).  Additional information about these uses is available at the NLRB website, www.nlrb.gov.  Providing this information to the NLRB is voluntary.  However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

**ATTACHMENT D**

Case 06-CA-248017

1    As of today, December 19, 2024, the strike is ongoing, but the number of striking

2    bargaining unit employees is down to 27.   There have been 3 more people who have crossed the

3    picket line and gone back to work at the Employer, and 33 have left for other jobs.  I have

4    maintained a list tracking the number of strikers, scabs, and resignations, which I is where I am

5    getting these numbers.

6

7

8

**I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.**

**I have read this Confidential Witness Affidavit consisting of 2 pages, including this page. I fully understand the Affidavit and I state under penalty of perjury that it is true and correct.**

**Date: _____    Signature: _____**

**Zachary Tanner**

**This affidavit was taken by:**

**_____**

**ANNE E. TEWKSBURY**
**Board Agent**
**National Labor Relations Board**

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NANCY WILSON, Regional Director of the Sixth Region of the NATIONAL LABOR RELATIONS BOARD, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>     Petitioner<br><br>     v.<br><br>PG PUBLISHING CO., INC. D/B/A PITTSBURGH POST-GAZETTE,<br>     Respondent | Civil No. 2:24-cv-01166-CB |

## AMENDED PETITION FOR INJUNCTION UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT, AS AMENDED

To the Honorable Judges of the United States District Court for the Western District of Pennsylvania:

HERE COMES NOW, Nancy Wilson, Regional Director of the Sixth Region of the National Labor Relations Board (Petitioner), and petitions this Court for and on behalf of the National Labor Relations Board (the Board), pursuant to section 10(j) of the National Labor Relations Act, as amended [61 Stat. 149; 73 Stat. 544; 29 U.S.C. Sec. 160(j)] (the Act), for appropriate injunctive relief pending the final disposition of the matters involved herein pending before the Board on charges alleging that PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette (PPG), has engaged in, and is engaging in, acts and conduct in violation of section 8(a)(1) and (5) of the Act. In support thereof, Petitioner respectfully shows as follows:

1.   Petitioner is the Regional Director of the Sixth Region of the Board, an agency of the United States, and files this Petition for and on behalf of the Board.

1

**ATTACHMENT E**

2.        Jurisdiction of this Court is invoked pursuant to section 10(j) of the Act. [61 Stat. 149; 29 U.S.C. Sec. 160(j)], which provides, *inter alia*, that the Board shall have the power, upon issuance of a complaint charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. PPG's business is situated in Pittsburgh and Clinton, both within Allegheny County, Pennsylvania.

3.        (a)      On March 5, 2021, the Newspaper Guild of Pittsburgh, a/w CWA Local 38061 (the NewsGuild) filed an amended charge with the Board in Case 06-CA-263791, alleging that PPG engaged in, and is engaging in, unfair labor practices within the meaning of section 8(a)(1) and (5) of the Act. (A copy of the amended charge in Case 06-CA-263791 is attached hereto as **Exhibit A**.)[1]

(b)      On April 5, 2021, the NewsGuild filed an amended charge with the Board in Case 06-CA-248017 alleging that PPG engaged in, and is engaging in, unfair labor practices within the meaning of section 8(a)(1) and (5) of the Act. (A copy of the amended charge in Case 06-CA-248017 is attached hereto as **Exhibit B**.)

(c)      On October April 16, 2021, Pittsburgh Newspaper Printing Pressmen's / Paper Handlers Local Union No. 9N, a/w The Graphic Communications Conference / IBT Local 24M/9N (the Pressmen) filed an amended charge with the Board in Case 06-CA-268248 alleging that PPG engaged in, and is engaging in, unfair labor practices within the meaning of section

---

[1] On that same date, March 5, 2021, the NewsGuild also filed a fourth amended charge with the Board in Case 06-CA-269346 alleging that PPG surveilled or created the impression of surveillance in violation of Section 8(a)(1) of the Act; however, Petitioner is not seeking injunctive relief concerning that case, so a copy of the charge has not been included.

2

8(a)(1) and (5) of the Act. (A copy of the amended charge in Case 06-CA-26848 is attached hereto as **Exhibit C**.)[2]

  (d) On October April 16, 2021, Pittsburgh Typographical Union No. 7, a/w CWA Local 14827 (the Advertisers) filed an amended charge with the Board in Case 06-CA-269416 alleging that PPG engaged in, and is engaging in, unfair labor practices within the meaning of section 8(a)(1) and (5) of the Act. (A copy of the amended charge in Case 06-CA-269416 is attached hereto as **Exhibit D**.)[3]

  (e) On October 20, 2021, Pittsburgh Mailers Union No. M-22, a/w CWA Local 14842 (the Mailers) filed a third amended charge with the Board in Case 06-CA-263780, alleging that PPG has engaged in, and is engaging in, unfair labor practices within the meaning of section 8(a)(1) and (5) of the Act. (A copy of the third amended charge in Case 06-CA-263780 is attached hereto as **Exhibit E**.)

  (f) On October 6, 2022, the Pressmen filed an amended charge with the Board in Case 06-CA-302602 alleging that PPG has engaged in, and is engaging in, unfair labor practices within the meaning of section 8(a)(1) and (5) of the Act. (A copy of the amended charge in Case 06-CA-302602 is attached hereto as **Exhibit F**.)

---

[2] The Pressman had filed a prior charge with the Board in Case 06-CA-259157 (amended on December 17, 2020) alleging that PPG violated Section 8(a)(1) and (5) of the Act by unilaterally laying off bargaining unit employees covered by a contractual minimum shift guarantee without notice or opportunity to bargain; however, Petitioner is not seeking injunctive relief concerning that case, so a copy of the charge has not been included.

[3] The Advertisers later filed two other charges with the Board: Case 06-CA-302629 (amended on October 6, 2022) alleging that PPG violated Section 8(a)(1) and (5) of the Act by failing to bargain in good faith, and Case 06-CA-311141 (amended on June 2, 2023) alleging that PPG violated Section 8(a)(1) and (5) of the Act by unilaterally ceasing to honor dues deduction authorizations; however, Petitioner is not seeking injunctive relief concerning those cases, so copies of the charges have not been included.

(g)     On October 6, 2022, the Mailers filed an amended charge with the Board in Case 06-CA-302624 alleging that PPG engaged in, and is engaging in, unfair labor practices within the meaning of section 8(a)(1) and (5) of the Act. (A copy of the amended charge in Case 06-CA-302624 is attached hereto as **Exhibit G**.)

4.     The charges referenced in paragraph 3 (Exhibits A through G) were referred to Petitioner for investigation as Regional Director of the Sixth Region of the Board.

5.     (a)     On April 27, 2022, based upon the charges in Cases 06-CA-248017, 06-CA-263791, and 06-CA-269346, referred to above in paragraph 3, and following a full investigation, during which PPG was given an opportunity to submit evidence and legal arguments, the General Counsel of the Board, on behalf of the Board, by Petitioner, issued an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing (the NewsGuild Complaint), alleging that PPG has engaged in, and is engaging in, unfair labor practices within meaning of section 8(a)(1) and (5) of the Act. On August 18, 2022, Petitioner issued an Amendment to the NewsGuild Complaint, correcting PPG's legal name. (A copy of the NewsGuild Complaint and Amendment to Complaint is attached hereto as **Exhibit H**.)

(b)     On May 17, 2023, based upon the charges in Cases 06-CA-263780 and 06-CA-302624, referred to above in paragraph 3, and following a full investigation, during which PPG was given an opportunity to submit evidence and legal arguments, the General Counsel of the Board, on behalf of the Board, by Petitioner, issued an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing (the Mailers Complaint), alleging that PPG has engaged in, and is engaging in, unfair labor practices within meaning of section 8(a)(1) and (5) of the Act. (A copy of the Mailers Complaint is attached hereto as **Exhibit I**.)

(c)     On July 28, 2023, based upon the charges in Cases 06-CA-259157, 06-CA-268248, and 06-CA-302602, referred to above in paragraph 3, and following a full investigation,

during which PPG was given an opportunity to submit evidence and legal arguments, the General

Counsel of the Board, on behalf of the Board, by Petitioner, issued an Order Further Consolidating

Cases, Second Consolidated Complaint and Notice of Hearing (the Pressmen Complaint), alleging

that PPG has engaged in, and is engaging in, unfair labor practices within meaning of section

8(a)(1) and (5) of the Act. (A copy of the Pressmen Complaint is attached hereto as **Exhibit J**.)

(d)    On June 9, 2023, based upon the charges in Cases 06-CA-269416, 06-CA-

302692, and 06-CA-311141, referred to above in paragraph 3, and following a full investigation,

during which PPG was given an opportunity to submit evidence and legal arguments, the General

Counsel of the Board, on behalf of the Board, by Petitioner, issued an Order Further Consolidating

Cases, Second Consolidated Complaint and Notice of Hearing (the Advertisers Complaint),

alleging that PPG has engaged in, and is engaging in, unfair labor practices within meaning of

section 8(a)(1) and (5) of the Act. (A copy of the Advertisers Complaint is attached hereto as

**Exhibit K**.)

6.    There is a clear likelihood of success in showing that the allegations set forth in

the Complaints referred to above in paragraph 4 are true, and that PPG has engaged in, and is

engaging in, unfair labor practices within the meaning of section 8(a)(1) and (5) of the Act [29

U.S.C. section 158(a)(1) and (5)], thereby affecting commerce within the meaning of section 2(6)

and (7) of the Act [29 U.S.C. Sec. 152(6) and (7)]. More particularly, in support thereof, and of the

request for injunctive relief herein, Petitioner, upon information and belief, shows as follows:

(a)    (1)    At all material times, PPG has been a corporation with offices and

places of business in Clinton, Pennsylvania and Pittsburgh, Pennsylvania, and has been engaged in

the business of publishing The Pittsburgh Post-Gazette, a print and electronic newspaper.

(2)    Annually, in conducting its operations described above in

subparagraph (a)(1), Respondent derived gross revenues in excess of $200,000 and held

membership in and subscribed to various interstate news services, including Associated Press, published various nationally syndicated features, and advertised various nationally sold products.

(3)     During the period of time described above in subparagraph (a)(2), Respondent purchased and received at its Pittsburgh, Pennsylvania facility products, goods, and materials at its Pittsburgh, Pennsylvania facility that were valued in excess of $5,000 and came directly from points outside the Commonwealth of Pennsylvania.

(4)     At all material times, PPG has been an employer engaged in commerce within the meaning of section 2(2), (6) and (7) of the Act.

(b)     (1)     At all material times, the NewsGuild has been a labor organization within the meaning of section 2(5) of the Act.

(2)     At all material times, the Mailers has been a labor organization within the meaning of section 2(5) of the Act.

(3)     At all material times, the Pressmen has been a labor organization within the meaning of section 2(5) of the Act.

(4)     At all material times, the Advertisers has been a labor organization within the meaning of section 2(5) of the Act.

(c)     At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of PPG within the meaning of section 2(11) of the Act and agents of PPG within the meaning of section 2(13) of the Act:

| | |
|---|---|
| John Robinson Block  - | Publisher |
| Rob Weber          - | Director of Operations |
| Linda Guest        - | Senior Human Resources Manager |
| Steven Stockdale   - | Director of Human Resources |
| Carolyn Rice       - | Human Resources Manager |

6

| | | |
|---|---|---|
| Jerry Micco | - | Newsroom Manager |
| Brian Bennick | - | Pressroom Supervisor |
| Mike Bednek | - | Production Manager |
| Adam Bush | - | Director of Advertising & Digital Initiatives |
| Bill Cotter | - | Senior Director of Advertising |

(d)    (1)    The following employees of PPG (the Editorial Unit) constitute a unit appropriate for the purpose of collective bargaining within the meaning of section 9(b) of the Act:

> All Editorial Department employees employed by PPG at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

(2)    At all material times, based on section 9(a) of the Act, the NewsGuild has been the exclusive collective-bargaining representative of the Editorial Unit.

(3)    For many years and at all material times, PPG has recognized the NewsGuild as the exclusive collective bargaining representative of the Editorial Unit. This recognition has been embodied in successive collective-bargaining agreements, the most recent of which was effective from October 15, 2014 until March 31, 2017.

(e)    (1)    The following employees of PPG (the Mailers Full-Time Unit) constitute a unit appropriate for the purpose of collective bargaining within the meaning of section 9(b) of the Act:

> All full-time employees of the Mailing Department, including all full-time journeymen and apprentices, but excluding all other employees, confidential

7

employees, guards, managers, professional employees, and supervisors as defined by the Act.

(2)    At all material times, based on section 9(a) of the Act, the Mailers has been the exclusive collective-bargaining representative of the Mailers Full-Time Unit.

(3)    The following employees of PPG (the Mailers Part-Time Unit) constitute a unit appropriate for the purpose of collective bargaining within the meaning of section 9(b) of the Act:

All part-time employees of the Mailing Department, excluding all other employees, confidential employees, guards, managers, professional employees, and supervisors as defined by the Act.

(4)    At all material times, based on section 9(a) of the Act, the Mailers has been the exclusive collective-bargaining representative of the Mailers Part-Time Unit.

(5)    For many years and at all material times, PPG has recognized the Mailers as the exclusive collective bargaining representative of the Mailers Full-Time and Part-Time Units. This recognition has been embodied in successive collective-bargaining agreements, the most recent of which were each effective from November 13, 2014, through March 31, 2017.

(f)    (1)    The following employees of PPG (the Pressmen Unit) constitute a unit appropriate for the purpose of collective bargaining within the meaning of section 9(b) of the Act:

All journeymen pressmen, paperhandlers, paperhandling pressmen, and apprentice pressmen employed in the Employer's pressroom and paperhandling departments, excluding all other employees, confidential employees, guards, managers, professional employees, and supervisors as defined by the Act.

(2)    At all material times, based on section 9(a) of the Act, the Pressmen has been the exclusive collective-bargaining representative of the Pressmen Unit.

(3)    For many years and at all material times, PPG has recognized the Pressmen as the exclusive collective bargaining representative of the Pressmen Unit. This

8

recognition has been embodied in successive collective-bargaining agreements, the most recent of which was effective from November 26, 2014 until March 31, 2017.

(g)    (1)    The following employees of PPG (the Advertising Unit) constitute a unit appropriate for the purpose of collective bargaining within the meaning of section 9(b) of the Act:

> All regular full time and regular part-time employees of the Advertising Department, excluding all other employees, confidential employees, guards, managers, professional employees, and supervisors as defined by the Act and as named in Article 2 of the most recent collective bargaining agreement.

(2)    At all material times, based on section 9(a) of the Act, the Advertisers has been the exclusive collective-bargaining representative of the Advertising Unit.

(3)    For many years and at all material times, PPG has recognized the Advertisers as the exclusive collective bargaining representative of the Advertising Unit. This recognition has been embodied in successive collective-bargaining agreements, the most recent of which was effective from October 22, 2014 until March 31, 2017.

(h)    (1)    At various times since about March 2017, PPG and the NewsGuild met for the purposes of negotiating a successor collective-bargaining agreement to the agreement described above in paragraph 5(d)(3).

(2)    Since about March 11, 2019, PPG bargained with no intention of reaching agreement by insisting upon proposals that would leave the NewsGuild and the Editorial Unit employees with substantially fewer rights and less protection than provided by law without a contract; and by prematurely declaring impasse.

(3)    By its overall conduct, including the conduct described above in paragraph 5(h)(2), PPG has failed and refused to bargain in good faith with the NewsGuild as the exclusive collective-bargaining representative of the Editorial Unit.

9

(i)    (1)    At various times since about March 2017, PPG and the Mailers met for the purposes of negotiating successor collective-bargaining agreements to the agreements described above in paragraph 5(e)(5).

(2)    Since about January 30, 2020, PPG bargained with no intention of reaching agreement by insisting upon proposals that would leave the Mailers and the Mailers Full-Time and Part-Time Unit employees with substantially fewer rights and less protection than provided by law without a contract.

(3)    By its overall conduct, including the conduct described above in paragraph 5(i)(2), PPG has failed and refused to bargain in good faith with the Mailers as the exclusive collective-bargaining representative of the Mailers Full-Time and Part-Time Units.

(j)    (1)    At various times since about March 2017, PPG and the Pressmen met for the purposes of negotiating a successor collective-bargaining agreement to the agreements described above in paragraph 5(f)(3).

(2)    Since about April 29, 2020, PPG bargained with no intention of reaching agreement by insisting upon proposals that would leave the Pressmen and the Pressmen Unit employees with substantially fewer rights and less protection than provided by law without a contract.

(3)    By its overall conduct, including the conduct described above in paragraph 5(j)(2), PPG has failed and refused to bargain in good faith with the Pressmen as the exclusive collective-bargaining representative of the Pressmen Unit.

(k)    (1)    At various times since about March 2017, PPG and the Advertisers met for the purposes of negotiating a successor collective-bargaining agreement to the agreement described above in paragraph 5(g)(3).

10

(2)     Since about May 25, 2020, PPG bargained with no intention of reaching agreement by insisting upon proposals that would leave the Advertisers and the Advertising Unit employees with substantially fewer rights and less protection than provided by law without a contract.

(3)     By its overall conduct, including the conduct described above in paragraph 5(k)(2), PPG has failed and refused to bargain in good faith with the Advertisers as the exclusive collective-bargaining representative of the Advertising Unit.

(l)     (1)     About July 27, 2020, PPG implemented changes to the following terms and conditions of Editorial Unit employees' employment:

    (i)     the performance of bargaining unit work by non-unit employees;

    (ii)    wages;

    (iii)   hours of work;

    (iv)    overtime;

    (v)     conditions governing part-time and temporary employees;

    (vi)    sick leave;

    (vii)   layoffs;

    (viii)  expenses;

    (ix)    conditions governing internships and two-year associates;

    (x)     vacation;

    (xi)    holidays;

    (xii)   promotion and transfer;

    (xiii)  severance pay;

    (xiv)   leaves of absence;

(xv)  preferential re-employment;

(xvi) payroll services;

(xvii) health, dental, and vision insurance;

(xviii) life insurance; and

(xix) pension.

(2)    The subjects set forth above in paragraph 5(l)(1) relate to wages, hours, and other terms and conditions of employment of the Editorial Unit and are mandatory subjects for the purposes of collective bargaining.

(3)    PPG engaged in the conduct described above in paragraph 5(l)(1) without first bargaining with the NewsGuild to an overall good-faith impasse for a successor collective-bargaining agreement.

(m)    (1)    At various times since about June 7, 2022, the Mailers requested that PPG bargain collectively about the effects of the termination of the Mailers Full-Time Unit employees' health insurance coverage.

(2)    The subject set forth above in paragraph 5(m)(1) relates to the wages, hours, and other terms and conditions of employment of the Mailers Full-Time Unit and is a mandatory subject for the purpose of collective bargaining.

(3)    From about June 7, 2022 to September 27, 2022, PPG unreasonably delayed bargaining about the subject set forth in paragraph 5(m)(1).

(4)    From about September 27, 2022 to October 5, 2022, PPG bargained with no intention of reaching agreement about the subject set forth in paragraph 5(m)(1).

(5)    By its overall conduct, including the conduct described above in paragraphs 5(m)(3)-(4), PPG has failed and refused to bargain in good faith with the Mailers as the exclusive collective-bargaining representative of the Mailers Full-Time Unit.

12

(6)    By its overall conduct, including the conduct described above in paragraph 5(m)(2), PPG has failed and refused to bargain in good faith with the Mailers as the exclusive collective-bargaining representative of the Mailers Full-Time Unit.

(n)    (1)    At various times since about June 7, 2022, the Pressmen requested that PPG bargain collectively about the effects of the termination of the Pressmen Unit employees' health insurance coverage.

(2)    The subject set forth above in paragraph 5(n)(1) relates to the wages, hours, and other terms and conditions of employment of the Pressmen Unit and is a mandatory subject for the purpose of collective bargaining.

(3)    From about June 7, 2022 to September 27, 2022, PPG unreasonably delayed bargaining about the subject set forth in paragraph 5(n)(1).

(4)    From about September 27, 2022 to October 5, 2022, PPG bargained with no intention of reaching agreement about the subject set forth in paragraph 5(n)(1).

(5)    By its overall conduct, including the conduct described above in paragraphs 5(n)(3)-(4), PPG has failed and refused to bargain in good faith with the Pressmen as the exclusive collective-bargaining representative of the Pressmen Unit.

(o)    By the conduct described above in paragraphs 5(h)–(n), PPG has been failing and refusing to bargain collectively and in good faith with the exclusive collective-bargaining representatives of its employees in violation of section 8(a)(1) and (5) of the Act.

(p)    The unfair labor practices of PPG described above affect commerce within the meaning of section 2(6) and (7) of the Act.

7.    Upon information and belief, it may be fairly anticipated that, unless restrained, PPG will continue its aforesaid unlawful acts and conduct in violation of section 8(a)(1) and (5) of the Act. [29 U.S.C. Sec. 158(a)(1) and (5)].

8.      Upon information and belief, unless the continuation or repetition of the above-described unfair labor practices is restrained, a serious flouting of the Act will continue with the result that enforcement of important provisions of the Act and of public policy will be impaired before PPG can be placed under legal restraint through the regular procedures of a Board order and enforcement degree. Unless injunctive relief is immediately obtained, it may fairly be anticipated that PPG will continue its unlawful conduct during the proceedings before the Board and during subsequent proceedings before a court of appeals for an enforcement decree with the result that PPG's employees will continue to be deprived of their rights guaranteed in the Act.

9.      No previous application has been made for the relief requested herein.

10.     Upon information and belief, section 10(j) relief is essential, appropriate and just and proper, for purposes of effectuating the policies of the Act and avoiding substantial, irreparable and immediate injury to Board policies, to the public interest, and to PPG's employees. Accordingly, it is requested that PPG be enjoined and restrained from the commission of the conduct alleged above, similar acts and conduct or repetitions thereof, pending the final disposition of the above-referenced Board charges.

WHEREFORE, Petitioner prays:

1.      that the Court enter an order directing PPG to appear before this Court, at a time and place fixed by the Court, and show cause, if any there be, why an injunction should not issue enjoining and restraining PPG, its officers, representatives, agents, servants, employees, attorneys, successors and assigns and all persons acting in concert or participation with it or them, at its Clinton and Pittsburgh, Pennsylvania facilities, pending final disposition of the matters involved herein pending before the Board,

a) to cease and desist from:

14

   i. failing and refusing to bargain in good faith with the Charging Party Unions as the exclusive collective-bargaining representatives of the various unit employees over successor collective-bargaining agreements, and with the Mailers and Pressmen over interim agreements for health insurance benefits;

   ii. making unilateral changes to the Editorial Unit employees' terms and conditions of employment from the status quo of the most recent collective-bargaining agreement, as construed by the December 2019 arbitration award, absent a valid, good faith impasse in bargaining for a successor agreement; and

   iii. in any other manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them under section 7 of the Act; and,

  b) to take the following affirmative actions:

   i. on the Charging Party Unions' requests, immediately bargain collectively and in good faith with the Unions as the exclusive collective-bargaining representatives of the various unit employees concerning their wages, hours, and other terms and conditions of employment and, if an agreement is reached on a successor agreement or interim agreement on health insurance benefits, embody the understanding in a written, signed agreement;

   ii. on request by the NewsGuild, immediately rescind any or all of the unilateral changes, on a prospective basis, that PPG unlawfully implemented on about July 27, 2020, and restore, honor, and continue the terms of the parties' 2014–2017 collective-bargaining agreement, including with PPG making all prospective increased payments required by the Western Pennsylvania Teamsters and Employers' Welfare Fund, in accordance with the December 2019 arbitration award on this issue;

   iii. make the affected employees in the Pressmen, Advertisers, and Full-Time Mailers Units whole prospectively for any direct or foreseeable pecuniary harms caused by the loss

of health benefits, including prospective reimbursement for out-of-pocket medical and substitute health insurance expenses, suffered as a result of the Employer's unlawful bad-faith bargaining and unilateral changes;

      iv.    within five (5) days, post physical copies of the District Court's Injunction Order setting forth the relief granted at PPG's at its Clinton and Pittsburgh, Pennsylvania facilities in English, as well as translations in other languages as necessary to ensure effective communication to PPG's employees as determined by the Board's Regional Director of Region 6, said translations to be provided by PPG at its own expense and approved by the Regional Director, on the bulletin board, in all breakrooms, and in all other places where PPG typically posts notices to its employees; maintain these postings during the pendency of the Board's administrative proceedings free from all obstructions and defacements; grant all employees free and unrestricted access to said postings; and grant to agents of the Board reasonable access to each worksite to monitor compliance with this posting requirement;

      v.    within five (5) days, distribute electronic copies of the District Court's Injunction Order specifying the relief granted, as well as translations in other languages as necessary to ensure effective communication to PPG's employees as determined by the Board's Regional Director of Region 6, said translations to be provided by the Employer at its own expense and approved by the Regional Director, to all employees employed by PPG at its at its Clinton and Pittsburgh, Pennsylvania facilities at any time since October 1, 2022, via email, and all other intranet or internet sites or apps that PPG uses to communicate with employees;

      vi.    within five (5) days, mail copies of the District Court's Injunction Order specifying the relief granted, as well as translations in other languages as necessary to ensure effective communication to PPG's employees as determined by the Board's Regional Director of Region 6, said translations to be provided by PPG at its own expense and approved by the Regional

16

Director, to all employees employed by PPG at its at its Clinton and Pittsburgh, Pennsylvania facilities at any time since October 1, 2022, via U.S. mail;

      vii.    within seven (7) days of the issuance of the District Court's Injunction Order, convene one or more mandatory meetings, on working time and at times when PPG customarily holds employee meetings and scheduled to ensure the widest possible attendance, at its Clinton and Pittsburgh, Pennsylvania facilities, during which the District Court's Injunction Order specifying the relief granted will be read to the unit employees by a responsible PPG official in the presence of a Board agent, or at PPG's option, by a Board agent in the presence of a responsible PPG official. PPG shall also afford the Unions, through the Regional Director, reasonable notice and opportunity to have representatives present when the Injunction Order is read to employees. Interpreters shall be made available at PPG's expense for any individual whose language of fluency is other than English. The PPG shall announce the meeting(s) for the Injunction Order reading in the same manner it would customarily announce a meeting to employees; the meeting(s) shall be for the above-stated purpose only. Individuals unable to attend the meeting to which they have been assigned will be able to attend a subsequent meeting during which the same reading shall take place under the same conditions. PPG shall allow all employees to attend these meetings without penalty or adverse employment consequences, either financial or otherwise; and

      viii.    within twenty-one (21) days of the issuance of the District Court's Injunction Order, file with the District Court and submit a copy to the Board's Regional Director of Region 6, a sworn affidavit from a responsible PPG official setting forth, with specificity, the manner in which PPG has complied with the terms of the District Court's Injunction Order, including how it has posted the documents required by the Court's decree, including how and where the documents have been posted, and the date(s), time(s), and location(s) that the Injunction Order specifying the relief granted was read to employees and by whom, as required by the Court;

17

2.      that upon return of the order to show cause, the Court issue and order enjoining

and restraining PPG in the manner set forth above; and

3.      that the Court grant such further and other relief as may be just and proper.


Dated at Pittsburgh, Pennsylvania this 10th day of September, 2024.


/s/ Anne E. Tewksbury
_____
Anne E. Tewksbury (Attorney ID: PA 33314)
Attorney for the Petitioner
National Labor Relations Board, Region 6
1000 Liberty Avenue, Room 904
Pittsburgh, PA 15222
Telephone: (412) 690-7115
Fax: (412) 395-5986
Anne.Tewksbury@nlrb.gov

For and on behalf of:

Nancy Wilson, Regional Director
National Labor Relations Board, Region 6
1000 Liberty Avenue, Room 904
Pittsburgh, PA 15222
Telephone: (412) 690-7115


Attachments

# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NANCY WILSON, Regional Director of the Sixth Region of the NATIONAL LABOR RELATIONS BOARD, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>Petitioner<br>v.<br><br>PG PUBLISHING CO., INC. D/B/A PITTSBURGH POST-GAZETTE,<br>Respondent | Civil No. 2:24-cv-01166-CB |

## SECOND AMENDED PETITION FOR INJUNCTION UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT, AS AMENDED

To the Honorable Judge Bissoon of the United States District Court for the Western District of Pennsylvania:

HERE COMES NOW, Nancy Wilson, Regional Director of the Sixth Region of the National Labor Relations Board (Petitioner), and petitions this Court for and on behalf of the National Labor Relations Board (the Board), pursuant to section 10(j) of the National Labor Relations Act, as amended [61 Stat. 149; 73 Stat. 544; 29 U.S.C. Sec. 160(j)] (the Act), for appropriate injunctive relief pending the final disposition of the matters involved herein pending before the Board on charges alleging that PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette (PPG), has engaged in, and is engaging in, acts and conduct in violation of section 8(a)(1) and (5) of the Act. In support thereof, Petitioner respectfully shows as follows:

**ATTACHMENT F**

1.        Petitioner is the Regional Director of the Sixth Region of the Board, an agency of

the United States, and files this Petition for and on behalf of the Board.

2.        Jurisdiction of this Court is invoked pursuant to section 10(j) of the Act. [61 Stat.

149; 29 U.S.C. Sec. 160(j)], which provides, *inter alia*, that the Board shall have the power, upon

issuance of a complaint charging that any person has engaged in or is engaging in an unfair labor

practice, to petition any United States district court wherein the unfair labor practice in question is

alleged to have occurred or wherein such person resides or transacts business, for appropriate

temporary relief or restraining order. PPG's business is situated in Pittsburgh and Clinton, both

within Allegheny County, Pennsylvania.

3.        (a)      On October April 16, 2021, Pittsburgh Newspaper Printing Pressmen's /

Paper Handlers Local Union No. 9N, a/w The Graphic Communications Conference / IBT Local

24M/9N (the Pressmen) filed an amended charge with the Board in Case 06-CA-268248 alleging

that PPG engaged in, and is engaging in, unfair labor practices within the meaning of section

8(a)(1) and (5) of the Act. (A copy of the amended charge in Case 06-CA-268248 is attached

hereto as **Exhibit 1**.)[1]

(b)      On October 20, 2021, Pittsburgh Mailers Union No. M-22, a/w CWA Local

14842 (the Mailers) filed a third amended charge with the Board in Case 06-CA-263780, alleging

that PPG has engaged in, and is engaging in, unfair labor practices within the meaning of section

---

[1] The Pressman filed two other charges with the Board that are part of the same administrative proceeding: 06-CA-302602 (amended on October 6, 2022) alleging that PPG violated Section 8(a)(1) and (5) of the Act by failing to bargain in good faith for an interim healthcare agreement, and 06-CA-259157 (amended on December 17, 2020) alleging that PPG violated Section 8(a)(1) and (5) of the Act by unilaterally laying off bargaining unit employees covered by a contractual minimum shift guarantee without notice or opportunity to bargain; however, Petitioner is not seeking injunctive relief concerning those cases, so copies of the charges have not been included.

8(a)(1) and (5) of the Act. (A copy of the third amended charge in Case 06-CA-263780 is attached hereto as **Exhibit 2**.)[2]

      (c)    On October April 16, 2021, Pittsburgh Typographical Union No. 7, a/w CWA Local 14827 (the Advertisers) filed an amended charge with the Board in Case 06-CA-269416 alleging that PPG engaged in, and is engaging in, unfair labor practices within the meaning of section 8(a)(1) and (5) of the Act. (A copy of the amended charge in Case 06-CA-269416 is attached hereto as **Exhibit 3**.)[3]

    4.    The charges referenced in paragraph 3 (**Exhibits 1–3**) were referred to Petitioner for investigation as Regional Director of the Sixth Region of the Board.

    5.    (a)    On July 28, 2023, based upon  charges in Cases 06-CA-259157, 06-CA-268248, and 06-CA-302602, referred to above in paragraph 3(a), and following a full investigation, during which PPG was given an opportunity to submit evidence and legal arguments, the General Counsel of the Board, on behalf of the Board, by Petitioner, issued an Order Further Consolidating Cases, Second Consolidated Complaint and Notice of Hearing (the Pressmen Complaint), alleging that PPG has engaged in, and is engaging in, unfair labor practices within meaning of section 8(a)(1) and (5) of the Act. (A copy of the Pressmen Complaint is attached hereto as **Exhibit 4**.)

---

[2] The Mailers filed another charge with the Board that is part of the same administrative proceeding: 06-CA-302624 (amended on October 6, 2022) alleging that PPG violated Section 8(a)(1) and (5) of the Act by failing to bargain in good faith for an interim healthcare agreement; however, Petitioner is not seeking injunctive relief concerning that case, so a copy of the charge has not been included.

[3] The Advertisers filed two other charges with the Board that are part of the same administrative proceeding: 06-CA-302629 (amended on October 6, 2022) alleging that PPG violated Section 8(a)(1) and (5) of the Act by failing to bargain in good faith for an interim healthcare agreement, and 06-CA-311141 (amended on June 2, 2023) alleging that PPG violated Section 8(a)(1) and (5) of the Act by unilaterally ceasing to honor dues deduction authorizations; however, Petitioner is not seeking injunctive relief concerning those cases, so copies of the charges have not been included.

(b)    On May 17, 2023, based upon the charges in Cases 06-CA-263780 and 06-CA-302624, referred to above in paragraph 3(b), and following a full investigation, during which PPG was given an opportunity to submit evidence and legal arguments, the General Counsel of the Board, on behalf of the Board, by Petitioner, issued an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing (the Mailers Complaint), alleging that PPG has engaged in, and is engaging in, unfair labor practices within meaning of section 8(a)(1) and (5) of the Act. (A copy of the Mailers Complaint is attached hereto as **Exhibit 5**.)

(c)    On June 9, 2023, based upon the charges in Cases 06-CA-269416, 06-CA-302692, and 06-CA-311141, referred to above in paragraph 3(c), and following a full investigation, during which PPG was given an opportunity to submit evidence and legal arguments, the General Counsel of the Board, on behalf of the Board, by Petitioner, issued an Order Further Consolidating Cases, Second Consolidated Complaint and Notice of Hearing (the Advertisers Complaint), alleging that PPG has engaged in, and is engaging in, unfair labor practices within meaning of section 8(a)(1) and (5) of the Act. (A copy of the Advertisers Complaint is attached hereto as **Exhibit 6**.)

6.    There is a clear likelihood of success in showing that the allegations set forth in the Complaints referred to above in paragraph 5 are true, and that PPG has engaged in, and is engaging in, unfair labor practices within the meaning of section 8(a)(1) and (5) of the Act [29 U.S.C. Sec. 158(a)(1) and (5)], thereby affecting commerce within the meaning of section 2(6) and (7) of the Act [29 U.S.C. Sec. 152(6) and (7)]. More particularly, in support thereof, and of the request for injunctive relief herein, Petitioner, upon information and belief, shows as follows:

(a)    (1)    At all material times, PPG has been a corporation with offices and places of business in Clinton, Pennsylvania and Pittsburgh, Pennsylvania, and has been engaged in the business of publishing The Pittsburgh Post-Gazette, a print and electronic newspaper.

(2)      Annually, in conducting its operations described above in subparagraph (a)(1), Respondent derived gross revenues in excess of $200,000 and held membership in and subscribed to various interstate news services, including Associated Press, published various nationally syndicated features, and advertised various nationally sold products.

(3)      During the period of time described above in subparagraph (a)(2), Respondent purchased and received at its Pittsburgh, Pennsylvania facility products, goods, and materials at its Pittsburgh, Pennsylvania facility that were valued in excess of $5,000 and came directly from points outside the Commonwealth of Pennsylvania.

(4)      At all material times, PPG has been an employer engaged in commerce within the meaning of section 2(2), (6) and (7) of the Act.

(b)      (1)      At all material times, the Mailers has been a labor organization within the meaning of section 2(5) of the Act.

(2)      At all material times, the Pressmen has been a labor organization within the meaning of section 2(5) of the Act.

(3)      At all material times, the Advertisers has been a labor organization within the meaning of section 2(5) of the Act.

(c)      At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of PPG within the meaning of section 2(11) of the Act and agents of PPG within the meaning of section 2(13) of the Act:

| | | |
|---|---|---|
| Rob Weber | - | Director of Operations |
| Linda Guest | - | Senior Human Resources Manager |
| Steven Stockdale | - | Director of Human Resources |
| Carolyn Rice | - | Human Resources Manager |

   (d)  (1)  The following employees of PPG (the Pressmen Unit) constitute a unit appropriate for the purpose of collective bargaining within the meaning of section 9(b) of the Act:

> All journeymen pressmen, paperhandlers, paperhandling pressmen, and apprentice pressmen employed in the Employer's pressroom and paperhandling departments, excluding all other employees, confidential employees, guards, managers, professional employees, and supervisors as defined by the Act.

     (2)  At all material times, based on section 9(a) of the Act, the Pressmen has been the exclusive collective-bargaining representative of the Pressmen Unit.

     (3)  For many years and at all material times, PPG has recognized the Pressmen as the exclusive collective-bargaining representative of the Pressmen Unit. This recognition has been embodied in successive collective-bargaining agreements, the most recent of which was effective from November 26, 2014 until March 31, 2017. (A copy of the collective-bargaining agreement for the Pressmen Unit is attached hereto as **Exhibit 7**.)

   (e)  (1)  The following employees of PPG (the Mailers Full-Time Unit) constitute a unit appropriate for the purpose of collective bargaining within the meaning of section 9(b) of the Act:

> All full-time employees of the Mailing Department, including all full-time journeymen and apprentices, but excluding all other employees, confidential employees, guards, managers, professional employees, and supervisors as defined by the Act.

     (2)  At all material times, based on section 9(a) of the Act, the Mailers has been the exclusive collective-bargaining representative of the Mailers Full-Time Unit.

     (3)  The following employees of PPG (the Mailers Part-Time Unit) constitute a unit appropriate for the purpose of collective bargaining within the meaning of section 9(b) of the Act:

> All part-time employees of the Mailing Department, excluding all other employees, confidential employees, guards, managers, professional employees, and supervisors as defined by the Act.

(4)    At all material times, based on section 9(a) of the Act, the Mailers has been the exclusive collective-bargaining representative of the Mailers Part-Time Unit.

(5)    For many years and at all material times, PPG has recognized the Mailers as the exclusive collective-bargaining representative of the Mailers Full-Time and Part-Time Units. This recognition has been embodied in successive collective-bargaining agreements, the most recent of which were each effective from November 13, 2014, through March 31, 2017. (Copies of the collective-bargaining agreements for the Mailers Full-Time and Part-Time Units are attached hereto as **Exhibit 8** and **Exhibit 9**, respectively.)

(f)    (1)    The following employees of PPG (the Advertising Unit) constitute a unit appropriate for the purpose of collective bargaining within the meaning of section 9(b) of the Act:

> All regular full time and regular part-time employees of the Advertising Department, excluding all other employees, confidential employees, guards, managers, professional employees, and supervisors as defined by the Act and as named in Article 2 of the most recent collective bargaining agreement.

(2)    At all material times, based on section 9(a) of the Act, the Advertisers has been the exclusive collective-bargaining representative of the Advertising Unit.

(3)    For many years and at all material times, PPG has recognized the Advertisers as the exclusive collective-bargaining representative of the Advertising Unit. This recognition has been embodied in successive collective-bargaining agreements, the most recent of which was effective from October 22, 2014 until March 31, 2017. (A copy of the collective-bargaining agreement for the Advertising Unit is attached hereto as **Exhibit 10**.)

(g)    (1)    At various times since about March 2017, PPG and the Pressmen met for the purposes of negotiating a successor collective-bargaining agreement to the agreement described above in paragraph 6(d)(3). During the course of bargaining, PPG and the Pressmen

7

exchanged various contract proposals. (Copies of the proposals exchanged regarding the Pressmen Unit are attached hereto as **Exhibits 11–32**.)

(2)      Since about April 29, 2020, PPG bargained with the Pressmen with no intention of reaching agreement by insisting upon proposals that would leave the Pressmen and the Pressmen Unit employees with substantially fewer rights and less protection than provided by law without a contract. More particularly, from the outset of bargaining up to and including PPG's final offer, dated June 16, 2020 (**Ex. 29**), PPG effectively sought the unfettered ability to unilaterally modify the following terms and conditions of employment, among others, of the Pressmen Unit during the contract term:

(i)    jurisdiction and assignment of work (**Ex. 29**, arts. 5, 47);

(ii)   layoffs and recalls (**Ex. 29**, arts 39.2–3);

(iii)  employee discipline and discharge (**Ex. 29**, art. 43);

(iv)   shifts and hours (**Ex. 29**, arts. 11, 14.3);

(v)    wages (**Ex. 29**, art. 20);

(vi)   health, dental, vision, and life insurance (**Ex. 29**, art. 29);

(vii)  and short-term disability benefits (**Ex. 29**, art. 30).

(3)      The terms set forth above in subparagraph (g)(2) relate to wages, hours, and other terms and conditions of employment of the Pressmen Unit and are mandatory subjects for the purposes of collective bargaining; therefore, absent a contract, section 8(a)(5) of the Act requires PPG to provide notice and negotiate with the Pressmen before making any changes to these terms.[4]

---

[4] *See* **Appendix 1** for a chart showing the relevant proposals contained in PPG's final offer for each bargaining unit, compared to those which the Board relied upon in *PG Publishing Co.*, 373 NLRB No. 93 (Sept. 20, 2024) to support its conclusion that PPG had bargained in bad faith in negotiations for a successor collective-bargaining agreement with the Newspaper Guild of

(4)     PPG's proposals, if implemented, would deny the Pressmen any role in determining, monitoring, or enforcing the terms set forth above in subparagraph (g)(2) during the contract term.

(5)     By its overall conduct, including the conduct described above in subparagraph (g)(2), PPG has failed and refused to bargain in good faith with the Pressmen as the exclusive collective-bargaining representative of the Pressmen Unit.

(h)     (1)     At various times since about March 2017, PPG and the Mailers met for the purposes of negotiating successor collective-bargaining agreements to the agreements described above in paragraph 6(e)(5).  During the course of bargaining, PPG and the Mailers exchanged various contract proposals. (Copies of the proposals exchanged regarding the Mailers Full-Time Unit are attached hereto as **Exhibits 33–40**, and copies of the proposals exchanged regarding the Mailers Part-Time Unit are attached hereto as **Exhibits 41–47**.)

(2)     Since about January 30, 2020, PPG bargained with the Mailers with no intention of reaching agreement by insisting upon proposals that would leave the Mailers and the Mailers Full-Time Unit employees with substantially fewer rights and less protection than provided by law without a contract. More particularly, from the outset of bargaining up to and including PPG's final offer, dated April 30, 2020 (**Ex. 38**), PPG effectively sought the unfettered ability to unilaterally modify the following terms and conditions of employment, among others, of the Mailers Full-Time Unit during the contract term:

(i)     jurisdiction and assignment of work (**Ex. 38**, arts. 4, 5.4, 32);

(ii)     layoffs and recalls (**Ex. 38**, arts. 7, 11.1–2, 32);

(iii)    employee discipline and discharge (**Ex. 38**, art. 11.1);

---

Pittsburgh, a/w CWA Local 38061 (the NewsGuild), a union that represents a bargaining unit of employees in PPG's Editorial Department.

      (iv)  hours of work (**Ex. 38**, art. 14.6, 32);

      (v)  wages (**Ex. 38**, arts. 18.1–2);

      (vi)  health, dental, vision, and life insurance (**Ex. 38**, art. 21);

      (vii)  and short-term disability benefits (**Ex. 38**, art. 29.1).

(3)      Since about January 30, 2020, PPG bargained with the Mailers with no intention of reaching agreement by insisting upon proposals that would leave the Mailers and the Mailers Part-Time Unit employees with substantially fewer rights and less protection than provided by law without a contract. More particularly, from the outset of bargaining up to and including PPG's final offer, dated April 30, 2020 (**Ex. 46**), PPG effectively sought the unfettered ability to unilaterally modify the following terms and conditions of employment, among others, of the Mailers Part-Time Unit during the contract term:

      (i)  jurisdiction and assignment of work (**Ex. 46**, arts. 2, 5, 6.4);

      (ii)  layoffs and recalls (**Ex. 46**, arts. 2, 9.2);

      (iii)  employee discipline and discharge (**Ex. 46**, art. 9.1);

      (iv)  hours of work (**Ex. 46**, arts. 2, 11.4);

      (v)  and wages (**Ex. 46**, art. 12).

(4)      The terms set forth above in subparagraphs (h)(2) and (3) relate to wages, hours, and other terms and conditions of employment of the Mailers Full-Time and Part-Time Units and are mandatory subjects for the purposes of collective bargaining; therefore, absent a contract, section 8(a)(5) of the Act requires PPG to provide notice and negotiate with the Mailers before making any changes to these terms.

(5)     PPG's proposals, if implemented, would deny the Mailers any role in determining, monitoring, or enforcing the terms set forth above in subparagraphs (h)(2) and (3) during the contract term.[5]

(6)     By its overall conduct, including the conduct described above in subparagraphs (h)(2) and (3), PPG has failed and refused to bargain in good faith with the Mailers as the exclusive collective-bargaining representative of the Mailers Full-Time and Part-Time Units.

(i)     (1)     At various times since about March 2017, PPG and the Advertisers met for the purposes of negotiating a successor collective-bargaining agreement to the agreement described above in paragraph 6(f)(3). During the course of bargaining, PPG and the Advertisers exchanged various contract proposals. (Copies of the proposals exchanged regarding the Advertising Unit and tentative agreements reached are attached hereto as **Exhibits 48–69**.)

(2)     Since about May 25, 2020, PPG bargained with the Advertisers with no intention of reaching agreement by insisting upon proposals that would leave the Advertisers and the Advertising Unit employees with substantially fewer rights and less protection than provided by law without a contract. More particularly, from the outset of bargaining up to and including PPG's final offer, dated February 27, 2020 (**Ex. 66**), PPG effectively sought the unfettered ability to unilaterally modify the following terms and conditions of employment, among others, of the Advertising Unit during the contract term:

(i)     jurisdiction and assignment of work (**Ex. 66**, arts. 3, 5);

(ii)     layoffs and recalls (**Ex. 66**, arts. 17.1–2);

(iii)     employee discipline and discharge (**Ex. 66**, art. 37);

(iv)     hours of work (**Ex. 66**, art. 10.5);

---

[5] *See* **App. 1**.

(v)   wages (**Ex. 66**, arts. 8, 9, app. A);

(vi)   health, dental, vision, and life insurance (**Ex. 66**, art. 29);

(vii)  and short-term disability benefits (**Ex. 66**, art. 23).

(3)   The terms set forth above in subparagraph (i)(2) relate to wages, hours, and other terms and conditions of employment of the Advertising Unit and are mandatory subjects for the purposes of collective bargaining; therefore, absent a contract, section 8(a)(5) of the Act requires PPG to provide notice and negotiate with the Advertisers before making any changes to these terms.

(4)   PPG's proposals, if implemented, would deny the Advertisers any role in determining, monitoring, or enforcing the terms set forth above in subparagraph (i)(2) during the contract term.[6]

(5)   By its overall conduct, including the conduct described above in subparagraph (i)(2), PPG has failed and refused to bargain in good faith with the Advertisers as the exclusive collective-bargaining representative of the Advertising Unit.

(j)   (1)   By the conduct described above in paragraphs 6(g)–(i), PPG has been failing and refusing to bargain collectively and in good faith with the exclusive collective-bargaining representatives of its employees in violation of section 8(a)(1) and (5) of the Act.

(k)   The unfair labor practices of PPG described above affect commerce within the meaning of section 2(6) and (7) of the Act.

7.   Upon information and belief, the appropriate remedy for the unfair labor practices described above in paragraphs 6(g)–(i) includes an order that PPG provide reimbursement to the Pressmen, Advertising, and Full-Time Mailers Unit employees for any

---

[6] *See* **App. 1**.

out-of-pocket medical and substitute health insurance expenses incurred as a result of PPG's failure to bargain in good faith during contract negotiations. More particularly:

(a)    By frustrating the possibility of reaching successor collective-bargaining agreements, PPG capped its required healthcare contributions to the "status quo" amount set by the expired contracts, despite the fact that the insurance provider implemented rate increases annually.[7] Accordingly, PPG's contributions were increasingly deficient, which effectively ensured that the provider would terminate its employees' healthcare coverage. (Copies of the insurance provider's August 29, 2022 letter to PPG are attached hereto as **Exhibit 70**.)

(b)    On September 30, 2022, the insurance provider terminated healthcare coverage for the Pressmen, Advertising, and Full-Time Mailers Unit employees as a result of PPG's contribution deficit, which directly and foreseeably caused the affected employees to incur out-of-pocket medical expenses, including the cost of purchasing substitute health insurance.[8]

(c)    The relief described above is encompassed by the remedy ordered by ALJ Geoffrey Carter in *Publishing Co., Inc.*, 06-CA-269416, 06-CA-302692, and 06-CA-311141, JD-41-24, 2024 WL 3355062 (July 9, 2024) (Advertisers). (A copy of ALJ Carter's decision is attached hereto as **Exhibit 71**.)[9]

---

[7] *See PG Publishing Co.*, 368 NLRB No. 41 (Aug. 22, 2019) (finding that, in the absence of successor collective-bargaining agreements, PPG "did not have either a contractual or statutory duty to continue to increase healthcare insurance contributions after 2017").

[8] See, e.g., ECF Nos. 52-1, 52-3, and 52-4; Hearing Testimony of Courtney Fitch, Patricia Robostello, Tim Blair, John Shannon, John Clark, and Joseph Baker (Oct. 28, 2024).

[9] ALJ Carter found that PPG violated section 8(a)(5) of the Act as alleged above in paragraph 6(i) and ordered as a remedy for that violation: "[c]onsistent with *Thryv, Inc.*, 372 NLRB No. 22, slip op. at 14 (2022), enf. denied in part on other grounds, 102 F.4th 727 (5th Cir. 2024), [PPG] shall make the [Advertisers] and bargaining unit employees whole for any direct or foreseeable pecuniary harms incurred as a result of the unfair labor practices found herein." **Ex. 71** at p. 49.

In *Publishing Co., Inc.*, 06-CA-263780 and 06-CA-302624, JD-71-24 (Nov. 19, 2024) (Mailers), ALJ Ira Sandron found that PPG violated section 8(a)(5) of the Act as alleged above in paragraph

8.     Upon information and belief, it may be fairly anticipated that, unless restrained, PPG will continue its above-described unlawful acts and conduct in violation of section 8(a)(1) and (5) of the Act.

9.     Upon information and belief, unless the continuation or repetition of the above-described unfair labor practices is restrained, PPG's serious flouting of the Act will continue with the result that enforcement of important provisions of the Act and of public policy will be impaired before PPG can be placed under legal restraint through the regular procedures of a Board order and enforcement degree. Unless injunctive relief is immediately obtained, it may fairly be anticipated that PPG will continue its unlawful conduct during the proceedings before the Board and during subsequent proceedings before a court of appeals for an enforcement decree, with the result that PPG's employees will continue to be deprived of their rights guaranteed by the Act and risk serious adverse health outcomes and tremendous medical debt.

10.     No previous application has been made for the relief requested herein.

11.     Upon information and belief, section 10(j) relief is essential, appropriate and just and proper, for purposes of effectuating the policies of the Act and avoiding substantial, irreparable and immediate injury to Board policies, to the public interest, and to PPG's employees. Accordingly, it is requested that PPG be enjoined and restrained from the commission of the conduct alleged above, similar acts, and conduct or repetitions thereof, and that PPG be ordered to prospectively provide reimbursement to the Pressmen, Advertising, and Full-Time Mailers Unit employees for any future medical expenses, including the cost of

---

6(h), but he failed to include make-whole relief for direct or foreseeable pecuniary harms incurred by the Mailers and bargaining unit employees as a result of the violation, relying on *Ex-Cell-O-Corp.,* 185 NLRB 107 (1970), rev'd on other grounds, 449 F.2d 1046 (D.C. Cir. 1971), rather than the Board's more recent decision in *Thryv, Inc.*, 372 NLRB No. 22 (Dec. 13, 2022). (A copy of ALJ Sandron's decision is attached hereto as **Exhibit 72**.) Petitioner believes this portion of ALJ Sandron's decision was in error and will be excepting on this basis to the Board.

purchasing substitute health insurance, incurred because of PPG's conduct alleged above,

pending the final disposition of the above-referenced Board charges.

WHEREFORE, Petitioner prays:

1.    that the Court enter an order directing PPG to appear before this Court, at a time

and place fixed by the Court, and show cause, if any there be, why an injunction should not issue

enjoining and restraining PPG, its officers, representatives, agents, servants, employees, attorneys,

successors and assigns and all persons acting in concert or participation with it or them, at its

Clinton and Pittsburgh, Pennsylvania facilities, pending final disposition of the matters involved

herein pending before the Board,

    a)  to cease and desist from:

        i.    failing and refusing to bargain in good faith with the Pittsburgh Newspaper

Printing Pressmen's / Paper Handlers Local Union No. 9N, a/w The Graphic Communications

Conference / IBT Local 24M/9N (the Pressmen), Pittsburgh Mailers Union No. M-22, a/w CWA

Local 14842 (the Mailers), and Pittsburgh Typographical Union No. 7, a/w CWA Local 14827 (the

Advertisers) (collectively referred to as the Unions) as the exclusive collective-bargaining

representatives of the various unit employees over successor collective-bargaining agreements; and

        ii.    in any other manner interfering with, restraining, or coercing employees in

the exercise of the rights guaranteed them under section 7 of the Act; and,

    b)  to take the following affirmative actions:

        i.    on the Unions' requests, immediately bargain collectively and in good faith

with the Unions as the exclusive collective-bargaining representatives of the respective bargaining

unit employees concerning their wages, hours, and other terms and conditions of employment and,

if an agreement is reached on a successor collective-bargaining agreement, embody the understanding in a written, signed agreement;

        ii.      make the affected employees in the Pressmen, Advertising, and Full-Time Mailers Units whole prospectively for any direct or foreseeable pecuniary harms caused by the loss of health benefits, including prospective reimbursement for out-of-pocket medical and substitute health insurance expenses, suffered as a result of PPG's unlawful bad-faith bargaining;

        iii.     within five (5) days, post physical copies of the District Court's Injunction Order setting forth the relief granted at PPG's at its Clinton and Pittsburgh, Pennsylvania facilities in English, as well as translations in other languages as necessary to ensure effective communication to PPG's employees as determined by the Board's Regional Director of Region 6, said translations to be provided by PPG at its own expense and approved by the Regional Director, on the bulletin board, in all breakrooms, and in all other places where PPG typically posts notices to its employees; maintain these postings during the pendency of the Board's administrative proceedings free from all obstructions and defacements; grant all employees free and unrestricted access to said postings; and grant to agents of the Board reasonable access to each worksite to monitor compliance with this posting requirement;

        iv.     within five (5) days, distribute electronic copies of the District Court's Injunction Order specifying the relief granted, as well as translations in other languages as necessary to ensure effective communication to PPG's employees as determined by the Board's Regional Director of Region 6, said translations to be provided by the Employer at its own expense and approved by the Regional Director, to all employees employed by PPG at its at its Clinton and Pittsburgh, Pennsylvania facilities at any time since October 1, 2022, via email, and all other intranet or internet sites or apps that PPG uses to communicate with employees;

v.    within five (5) days, mail copies of the District Court's Injunction Order specifying the relief granted, as well as translations in other languages as necessary to ensure effective communication to PPG's employees as determined by the Board's Regional Director of Region 6, said translations to be provided by PPG at its own expense and approved by the Regional Director, to all employees employed by PPG at its at its Clinton and Pittsburgh, Pennsylvania facilities at any time since October 1, 2022, via U.S. mail;

vi.    within seven (7) days of the issuance of the District Court's Injunction Order, convene one or more mandatory meetings, on working time and at times when PPG customarily holds employee meetings and scheduled to ensure the widest possible attendance, at its Clinton and Pittsburgh, Pennsylvania facilities, during which the District Court's Injunction Order specifying the relief granted will be read to the unit employees by a responsible PPG official in the presence of a Board agent, or at PPG's option, by a Board agent in the presence of a responsible PPG official. PPG shall also afford the Unions, through the Regional Director, reasonable notice and opportunity to have representatives present when the Injunction Order is read to employees. Interpreters shall be made available at PPG's expense for any individual whose language of fluency is other than English. The PPG shall announce the meeting(s) for the Injunction Order reading in the same manner it would customarily announce a meeting to employees; the meeting(s) shall be for the above-stated purpose only. Individuals unable to attend the meeting to which they have been assigned will be able to attend a subsequent meeting during which the same reading shall take place under the same conditions. PPG shall allow all employees to attend these meetings without penalty or adverse employment consequences, either financial or otherwise; and

vii.    within twenty-one (21) days of the issuance of the District Court's Injunction Order, file with the District Court and submit a copy to the Board's Regional Director of Region 6, a sworn affidavit from a responsible PPG official setting forth, with specificity, the manner in

17

which PPG has complied with the terms of the District Court's Injunction Order, including how it has posted the documents required by the Court's decree, including how and where the documents have been posted, and the date(s), time(s), and location(s) that the Injunction Order specifying the relief granted was read to employees and by whom, as required by the Court;

2.      that upon return of the order to show cause, the Court issue and order enjoining and restraining PPG in the manner set forth above; and

3.      that the Court grant such further and other relief as may be just and proper.

Dated at Pittsburgh, Pennsylvania this 22nd day of November, 2024.

/s/ Anne E. Tewksbury

Anne E. Tewksbury (Attorney ID: PA 33314)
Attorney for the Petitioner
National Labor Relations Board, Region 6
1000 Liberty Avenue, Room 904
Pittsburgh, PA 15222
Telephone: (412) 690-7115
Fax: (412) 395-5986
Anne.Tewksbury@nlrb.gov

For and on behalf of:
Nancy Wilson, Regional Director
National Labor Relations Board, Region 6
1000 Liberty Avenue, Room 904
Pittsburgh, PA 15222
Telephone: (412) 690-7115

Attachments

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION SIX**

PG PUBLISHING CO., INC. D/B/A PITTSBURGH
POST-GAZETTE

     **and**                             **Case 06-CA-311136**

NEWSPAPER GUILD OF PITTSBURGH/CWA
LOCAL 38061

     **and**                             **Case 06-CA-326576**

PITTSBURGH MAILERS UNION NO. M-22, A/W
THE PRINTING, PUBLISHING AND MEDIA
WORKERS SECTOR OF THE COMMUNICATIONS
WORKERS OF AMERICA, AFL-CIO

     **and**                             **Case 06-CA-326581**

PRINTING PACKAGING AND PRODUCTION
WORKERS UNION OF NORTH AMERICA
LOCAL 24M/9N

     **and**                             **Case 06-CA-326588**

COMMUNICATION WORKERS OF
AMERICA (CWA) LOCAL 14827

## ORDER CONSOLIDATING CASES, CONSOLIDATED COMPLAINT, AND NOTICE OF HEARING

Pursuant to Section 102.33 of the Rules and Regulations of the National Labor Relations Board (the Board) and to avoid unnecessary costs or delay, IT IS ORDERED THAT Case 06-CA-311136 filed by Newspaper Guild of Pittsburgh/CWA Local 38061 ("Guild Union") is consolidated with Cases 06-CA-326576 filed by Pittsburgh Mailers Union No. M-22, a/w the Printing, Publishing, and Media Workers Sector of the Communication Workers of America, AFL-CIO ("Mailers Union"); 06-CA-326581 filed by Printing, Packaging and Production Workers Union of North America Local 24M/9N ("Pressmen's Union") formerly known as Pittsburgh Newspaper Printing

**ATTACHMENT G**

Pressman's/Paper Handler's Local Union No. 9N, a/w The Graphic Communications Conference/International Brotherhood of Teamsters Local 24M/9N; and 06-CA-326588 filed by Communication Workers of America/Pittsburgh Typographical Union No. 7 (Typos) CWA District 2-13, whose correct name is Communication Workers of America (CWA) Local 14827 ("Advertisers Union") against PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette and Pittsburgh Post-Gazette/BCI, all of which refer to the same entity whose correct name is PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette ("Respondent").

This Order Consolidating Cases, Consolidated Complaint, and Notice of Hearing, which is based on these charges, is issued pursuant to Section 10(b) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 151 et seq., and Section 102.15 of the Rules and Regulations of the National Labor Relations Board ("the Board") and alleges that Respondent has violated the Act as described below.

1.    (a) The charge in Case 06-CA-311136 was filed by the Guild Union on January 27, 2023, and a copy was served on Respondent by U.S. mail on January 30, 2023.

(b)    The charge in Case 06-CA-326576 was filed by the Mailers Union on September 26, 2023, and a copy was served on Respondent by U.S. mail on that same date.

(c)    The charge in Case 06-CA-326581 was filed by the Pressmen's Union on September 26, 2023, and a copy was served on Respondent by U.S. mail on that same date.

(d)    The first amended charge in Case 06-CA-326581 was filed by the Pressmen's Union on April 15, 2024, and a copy was served on Respondent by U.S. mail on April 18, 2024.

(e)    The charge in Case 06-CA-326588 was filed by the Advertisers Union on September 26, 2023, and a copy was served on Respondent by U.S. mail on that same date.

(f)    The first amended charge in Case 06-CA-326588 was filed by the Advertisers Union on April 15, 2024, and a copy was served on Respondent by U.S. mail on April 18, 2024.

2.    (a) At all material times, Respondent has been a corporation with offices and

places of business in Clinton, Pennsylvania and Pittsburgh, Pennsylvania ("Respondent's facilities") and has been engaged in the business of publishing The Pittsburgh Post-Gazette, a print and electronic newspaper.

(b)   Annually, in conducting its operations described above in paragraph 2(a), Respondent derived gross revenues in excess of $200,000 and held membership in and subscribed to various interstate news services, including Associated Press, published various nationally syndicated features, and advertised various nationally sold products.

(c)   During the period of time described above in paragraph 2(b), Respondent purchased and received at Respondent's facilities products, goods, and materials valued in excess of $5,000 directly from points outside the Commonwealth of Pennsylvania.

3.   At all material times, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

4.   (a) At all material times, the Guild Union has been a labor organization within the meaning of Section 2(5) of the Act.

(b)   At all material times, the Mailers Union has been a labor organization within the meaning of Section 2(5) of the Act.

(c)   At all material times, the Pressmen's Union has been a labor organization within the meaning of Section 2(5) of the Act.

(d)   At all material times, the Advertisers Union has been a labor organization within the meaning of Section 2(5) of the Act.

5.   At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act and agents of Respondent within the meaning of Section 2(13) of the Act:

| | | |
|---|---|---|
| John Robinson Block | - | Publisher |
| Rob Weber | - | Director of Operations |
| Carolyn Rice | - | Senior Human Resources Manager |
| Steven Stockdale | - | Director of Human Resources |

6.    (a)  The following employees of Respondent ("the Guild Unit") constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

> All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

(b)  For many years and at all material times, Respondent has recognized the Guild Union as the exclusive collective-bargaining representative of the Guild Unit. This recognition has been embodied in successive collective-bargaining agreements, the most recent of which was effective from October 15, 2015, through March 31, 2017.

(c)  At all material times, based on Section 9(a) of the Act, the Guild Union has been the exclusive collective-bargaining representative of the Guild Unit.

7.    (a)  The following employees of Respondent ("the Full-Time Mailers Unit") constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

> All full-time employees of the Mailing Department, including all full-time journeymen and apprentices, but excluding all other employees, confidential employees, guards, managers, professional employees, and supervisors as defined by the Act.

(b)  The following employees of Respondent (the Part-Time Mailers Unit) constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

> All part-time employees of the Mailing Department, excluding all other employees, confidential employees, guards, managers, professional employees, and supervisors as defined by the Act.

(c)    For many years and at all material times, Respondent has recognized the Mailers Union as the exclusive collective-bargaining representative of the Full-time Mailers Unit and Part-time Mailers Unit. This recognition has been embodied in successive collective-bargaining agreements, the most recent of which was effective from November 13, 2014, through March 31, 2017.

(d)    At all material times, based on Section 9(a) of the Act, the Mailers Union has been the exclusive collective-bargaining representative of the Full-time Mailers Unit and Part-time Mailers Unit.

8.    (a)    The following employees of Respondent ("the Pressmen's Unit") constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

> All journeymen pressmen, paperhandlers, paperhandling pressmen, and apprentice pressmen employed in the Employer's pressroom and paperhandling departments, excluding all other employees, confidential employees, guards, managers, professional employees, and supervisors as defined by the Act.

(b)    For many years and at all material times, Respondent has recognized the Pressmen's Union as the exclusive collective-bargaining representative of the Pressmen's Unit. This recognition has been embodied in successive collective-bargaining agreements, the most recent of which was effective from November 16, 2014, through March 31, 2017.

(c)    At all material times, based on Section 9(a) of the Act, the Pressmen's Union has been the exclusive collective-bargaining representative of the Pressmen's Unit.

9.    (a) The following employees of Respondent ("the Advertisers Unit") constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

> All regular full-time and regular part-time employees of the Advertising Department, excluding all other employees, confidential employees, guards, managers, professional employees, and supervisors as defined by the Act and

as named in Article 2 of the most recent collective bargaining agreement.

(b)    For many years and at all material times, Respondent has recognized the Advertisers Union as the exclusive collective-bargaining representative of the Advertisers Unit. This recognition has been embodied in successive collective-bargaining agreements, the most recent of which was effective from October 22, 2014, through March 31, 2017.

(c)    At all material times, based on Section 9(a) of the Act, the Advertisers Union has been the exclusive collective-bargaining representative of the Advertisers Unit.

10.    (a)    At various times since about March 2017, Respondent and the Guild Union met for the purposes of negotiating a successor collective-bargaining agreement to the agreement described above in paragraph 6(b).

(b)    At various times since about March 2017, Respondent and the Mailers Union met for the purposes of negotiating a successor collective-bargaining agreement to the agreement described above in paragraph 7(c).

(c)    At various times since about March 2017, Respondent and the Pressmen's Union met for the purposes of negotiating a successor collective-bargaining agreement to the agreement described above in paragraph 8(b).

(d)    At various times since about March 2017, Respondent and the Advertisers Union met for the purposes of negotiating a successor collective-bargaining agreement to the agreement described above in paragraph 9(b).

11.    (a)    Since about October 18, 2022, certain employees of Respondent represented by either the Guild Union, Mailers Union, Pressmen's Union or Advertisers Union employed at Respondent's facilities ceased work concertedly and engaged in a strike.

(b)    The strike described above in paragraph 11(a) was caused by Respondent's unfair labor practices as determined by the Administrative Law Judge in Cases 06-CA-248017, 06-

CA-263791 and 06-CA-269346 that were filed by the Guild Union and which caused the employees to lose their contractual terms and conditions of employment, including their health and welfare benefits.

(c)    The strike described above in paragraph 11(a) was caused by Respondent's unfair labor practices as litigated by Region 6 of the Board in Cases 06-CA-259157, 06-CA-268248 and 06-CA-302602 that were filed by the Pressmen's Union; Cases 06-CA-269416, 06-CA-302629 and 06-CA-311141 that were filed by the Advertisers Union; and, Cases 06-CA-263780 and 06-CA-302624 that were filed by the Mailers Union, and which caused the employees to lose their contractual health insurance benefits.

12.  (a)    On various dates since October 18, 2022, Respondent has granted its employees employed in the Guild Unit who did not participate in the strike described above in paragraphs 11(a) and (b), increased vacation allotments, wage rates and bonuses.

(b)    Respondent engaged in the conduct described above in paragraph 12(a) because the employees of Respondent described above in paragraph 12(a) refrained from forming, joining and assisting the Guild Union and engaging in concerted activities, and to encourage employees to refrain from engaging in these activities.

(c)    The conduct described above in paragraph 12(a) is inherently destructive of the rights guaranteed employees under Section 7 of the Act.

13.  (a)    On various dates since October 18, 2022, Respondent granted bonuses to certain employees in the Guild Unit.

(b)    The subject set forth above in paragraph 13(a) relates to wages, hours, and other terms and conditions of employment of the Guild Unit and are mandatory subjects for the purposes of collective bargaining.

(c)    Respondent engaged in the conduct described above in paragraphs 13(a) and (b) without prior notice to the Guild Union and without affording the Guild Union an opportunity to bargain with Respondent with respect to this conduct or without bargaining with the Guild Union to

an overall good-faith impasse for a successor collective-bargaining agreement.

14. (a)    At various times since about February 2023, Respondent and the Mailers Union, Pressmen's Union and Advertisers Union collectively met for the purposes of negotiating an interim agreement concerning health insurance benefits for each of their respective Unit members.

(b)    Since about May 24, 2023, Respondent bargained with no intention of reaching agreement by consistently proffering that it was willing to agree to the health insurance plan maintained by Teamsters Local 261 Fund while refusing to sign the participation agreement required by the Teamster Local 261 Fund.

(c)    By its overall conduct, including the conduct described above in paragraph 14(b), Respondent has failed and refused to bargain in good faith with the Mailers Union, Pressmen's Union and Advertisers Union as the exclusive collective-bargaining representatives of their respective bargaining units.

15.    By the conduct described above in paragraph 12, Respondent has been discriminating in regard to the hire or tenure or terms or conditions of employment of its employees, thereby discouraging membership in a labor organization in violation of Section 8(a)(1) and (3) of the Act.

16.    By the conduct described above in paragraphs 13 and 14, Respondent has been failing and refusing to bargain collectively and in good faith with the exclusive collective- bargaining representative of its employees in violation of Section 8(a)(1) and (5) of the Act.

17.    The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

## **REMEDY**

As part of the remedy for the unfair labor practices alleged above the General Counsel seeks an Order requiring Respondent to: (1) bargain on request within 15 days of a Board Order;

(2) make whole each, the Guild Union, Mailers Union, Pressmen's Union and Advertisers Union for all costs and expenses incurred during negotiations; (3) make whole employee negotiators for any earnings and or leave lost while attending bargaining sessions; (4) make whole the Guild Union, Mailers Union, Pressmen's Union and Advertisers Union for the striker benefits and other expenses each incurred during the unfair labor practice strike; (5) hold a meeting or meetings during work hours to ensure the widest possible attendance at which the Notice will be read to employees by a Respondent official in the presence of a Board agent, and if any of the Charging Parties so desire, a union representative, or, at Respondent's option, by a Board agent in the presence of a Respondent official, and if any of the Charging Parties so desire, a union representative; (5) that each Unit member will be given a copy of the Notice at this reading; and (6) make whole all eligible members of the Guild Unit, Mailers Unit, Pressmen's Unit, and Advertisers Unit for their losses they incurred for not having health insurance, including out-of-pocket medical expenses incurred by the strikers during the period that the Unit member was on strike, and all other direct or foreseeable pecuniary harms suffered as a result of Respondent's bad-faith bargaining regarding health insurance; (7) grant to the Guild Unit members who were on strike comparable wages increases, bonuses and vacation benefits that Respondent unilaterally granted to other Guild members who did not participate in the strike.

The General Counsel further seeks all other relief as may be just and proper to remedy the unfair labor practices alleged.

## **ANSWER REQUIREMENT**

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the consolidated complaint. The answer must be **received by this office on or before May 30, 2024 or postmarked on or before May 29, 2024.** Respondent also must serve a copy of the answer on each of the other parties.

The answer must be filed electronically through the Agency's website. To file

electronically, go to www.nlrb.gov, click on **E-File Documents**, enter the NLRB Case Number, and follow the detailed instructions. Responsibility for the receipt and usability of the answer rests exclusively upon the sender. Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason. The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21. If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office. However, if the electronic version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing. Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations. The answer may not be filed by facsimile transmission. If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the complaint are true.

## NOTICE OF HEARING

PLEASE TAKE NOTICE THAT on **February 10, 2025, 10:00 AM at Region 6, National Labor Relations Board, at William S. Moorhead Federal Building, 1000 Liberty Avenue, Room 904, Pittsburgh, PA 15222**, and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board. At the hearing, Respondent and any other party to this proceeding have the right to appear and present

testimony regarding the allegations in this complaint. The procedures to be followed at the hearing are described in the attached Form NLRB-4668. The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

Dated: May 16, 2024

**/s/ Nancy Wilson**

NANCY WILSON
REGIONAL DIRECTOR
NATIONAL LABOR RELATIONS BOARD
REGION 06
1000 Liberty Ave Rm 904
Pittsburgh, PA 15222-4111

Attachments

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 6

PG PUBLISHING CO., INC. D/B/A PITTSBURGH
POST-GAZETTE

     **and**                                        Case 06-CA-311136

NEWSPAPER GUILD OF PITTSBURGH/CWA
LOCAL 38061

     **and**                                        Case 06-CA-326576

PITTSBURGH MAILERS UNION NO. M-22, A/W
THE PRINTING, PUBLISHING, AND MEDIA
WORKERS SECTOR OF THE COMMUNICATION
WORKERS OF AMERICA, AFL-CIO

     **and**                                        Case 06-CA-326581

PRINTING PACKAGING AND PRODUCTION
WORKERS UNION OF NORTH AMERICA
LOCAL 24M/9N

     **and**                                        Case 06-CA-326588

COMMUNICATION WORKERS OF AMERICA
(CWA) LOCAL 14827


**AFFIDAVIT OF SERVICE OF: Order Consolidating Cases, Consolidated Complaint and
Notice of Hearing (with forms NLRB-4338 and NLRB-4668 attached)**

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on
May 16, 2024, I served the above-entitled document(s) by **electronic or certified mail,** as noted
below, upon the following persons, addressed to them at the following addresses:

Richard C. Lowe, Esq.          **ELECTRONIC MAIL**
King & Ballow
315 Union St Ste 1100
Nashville, TN 37201-1437
  *rlowe@kingballow.com*

Carolyn Rice, Sr. HR Manager
PG Publishing Co., Inc. d/b/a Pittsburgh Post-
  Gazette
2201 Sweeney Drive
Clinton, PA 15026
  *crice@post-gazette.com*

**ELECTRONIC MAIL**

Newspaper Guild of Pittsburgh/
  CWA Local 38061
322 North Shore Drive Suite 250
Pittsburgh, PA 15212-5870

**CERTIFIED MAIL, RETURN RECEIPT
  REQUESTED**

Linda Guest, Senior HR Manager
Pittsburgh Post-Gazette/BCI
2301 Sweeney Drive
Clinton, PA 15026
  *lguest@post-gazette.com*

**ELECTRONIC MAIL**

John Clark
Pittsburgh Mailers Union No. M-22, A/W the
  Printing, Publishing, and Media Workers
  Sector of the Communication Workers of
  America, AFL-CIO
Pittsburgh Mailers Union No. M-22
4454 Birchwood Lane
Allison Park, PA 15101
  *gciuchris@hotmail.com*

**ELECTRONIC MAIL**

Joseph Pass, Attorney
Jubelirer, Pass & Intrieri, P.C.
219 Fort Pitt Blvd.
Pittsburgh, PA 15222
  *jjp@jpilaw.com*

**ELECTRONIC MAIL**

Printing, Packaging and Production Workers
  Union of North America Local 24M/9N
1629 Carmella Drive
Pittsburgh, PA 15227

**CERTIFIED MAIL, RETURN RECEIPT
  REQUESTED**

Steven Stockdale, Human Resources Director
PG PUBLISHING CO., INC. D/B/A
  PITTSBURGH POST-GAZETTE
2201 Sweeney Drive
Clinton, PA 15026
  *sstockdale@buckeyebroadband.com*

**ELECTRONIC MAIL**

Mike Davis                              **ELECTRONIC MAIL**
Communication Workers of America (CWA)
  Local 14827
1370 Washington Pike, Ste. 407
Bridgeville, PA 15017
  *mdavis@cwa-union.org*

| May 16, 2024 | KRISTIN MCGEORGE, Designated Agent of NLRB |
| :---: | :---: |
| Date | Name |

|  | */s/Kristin McGeorge* |
| :---: | :---: |
|  | Signature |

FORM NLRB 4338
(6-90)

**UNITED STATES GOVERNMENT**
**NATIONAL LABOR RELATIONS BOARD**
**NOTICE**

Case 06-CA-311136
Case 06-CA-326576
Case 06-CA-326581
Case 06-CA-326588

The issuance of the notice of formal hearing in this case does not mean that the matter cannot be disposed of by agreement of the parties.  On the contrary, it is the policy of this office to encourage voluntary adjustments.  The examiner or attorney assigned to the case will be pleased to receive and to act promptly upon your suggestions or comments to this end.

An agreement between the parties, approved by the Regional Director, would serve to cancel the hearing.  However, unless otherwise specifically ordered, the hearing will be held at the date, hour, and place indicated.  Postponements ***will not be granted*** unless good and sufficient grounds are shown ***and*** the following requirements are met:

(1)  The request must be in writing. An original and two copies must be filed with the Regional Director when appropriate under 29 CFR 102.16(a) or with the Division of Judges when appropriate under 29 CFR 102.16(b).

(2)  Grounds must be set forth in ***detail***;

(3)  Alternative dates for any rescheduled hearing must be given;

(4)  The positions of all other parties must be ascertained in advance by the requesting party and set forth in the request; and

(5)  Copies must be simultaneously served on all other parties (listed below), and that fact must be noted on the request.

Except under the most extreme conditions, no request for postponement will be granted during the three days immediately preceding the date of hearing.

Richard C. Lowe, Esq.
King & Ballow
315 Union St Ste 1100
Nashville, TN 37201-1437
  *rlowe@kingballow.com*

Carolyn Rice, Sr. HR Manager
PG Publishing Co., Inc. d/b/a Pittsburgh Post-
  Gazette
2201 Sweeney Drive
Clinton, PA 15026
  *crice@post-gazette.com*

Newspaper Guild of Pittsburgh/
  CWA Local 38061
322 North Shore Drive Suite 250
Pittsburgh, PA 15212-5870

Linda Guest, Senior HR Manager
Pittsburgh Post-Gazette/BCI
2301 Sweeney Drive
Clinton, PA 15026

John Clark
Pittsburgh Mailers Union No. M-22, A/W the
  Printing, Publishing, and Media Workers
  Sector of the Communication Workers of
  America, AFL-CIO
Pittsburgh Mailers Union No. M-22
4454 Birchwood Lane
Allison Park, PA 15101

Joseph Pass, Attorney
Jubelirer, Pass & Intrieri, P.C.
219 Fort Pitt Blvd.
Pittsburgh, PA 15222

Printing, Packaging and Production Workers
  Union of North America Local 24M/9N
1629 Carmella Drive
Pittsburgh, PA 15227

Steven Stockdale, Human Resources Director
PG PUBLISHING CO., INC. D/B/A
  PITTSBURGH POST-GAZETTE
2201 Sweeney Drive
Clinton, PA 15026
  *sstockdale@buckeyebroadband.com*

Mike Davis
Communication Workers of America (CWA)
Local 14827
1370 Washington Pike, Ste. 407
Bridgeville, PA 15017
  *mdavis@cwa-union.org*

Form NLRB-4668
(6-2014)

# Procedures in NLRB Unfair Labor Practice Hearings

The attached complaint has scheduled a hearing that will be conducted by an administrative law judge (ALJ) of the National Labor Relations Board who will be an independent, impartial finder of facts and applicable law. **You may be represented at this hearing by an attorney or other representative**. If you are not currently represented by an attorney, and wish to have one represent you at the hearing, you should make such arrangements as soon as possible. A more complete description of the hearing process and the ALJ's role may be found at Sections 102.34, 102.35, and 102.45 of the Board's Rules and Regulations. The Board's Rules and regulations are available at the following link: www.nlrb.gov/sites/default/files/attachments/basic-page/node-1717/rules_and_regs_part_102.pdf.

The NLRB allows you to file certain documents electronically and you are encouraged to do so because it ensures that your government resources are used efficiently. To e-file go to the NLRB's website at www.nlrb.gov, click on "e-file documents," enter the 10-digit case number on the complaint (the first number if there is more than one), and follow the prompts. You will receive a confirmation number and an e-mail notification that the documents were successfully filed.

**Although this matter is set for trial, this does not mean that this matter cannot be resolved through a settlement agreement**. The NLRB recognizes that adjustments or settlements consistent with the policies of the National Labor Relations Act reduce government expenditures and promote amity in labor relations and encourages the parties to engage in settlement efforts.

## I.    BEFORE THE HEARING

The rules pertaining to the Board's pre-hearing procedures, including rules concerning filing an answer, requesting a postponement, filing other motions, and obtaining subpoenas to compel the attendance of witnesses and production of documents from other parties, may be found at Sections 102.20 through 102.32 of the Board's Rules and Regulations. In addition, you should be aware of the following:

- **Special Needs:** If you or any of the witnesses you wish to have testify at the hearing have special needs and require auxiliary aids to participate in the hearing, you should notify the Regional Director as soon as possible and request the necessary assistance. Assistance will be provided to persons who have handicaps falling within the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, and 29 C.F.R. 100.603.

- **Pre-hearing Conference:** One or more weeks before the hearing, the ALJ may conduct a telephonic prehearing conference with the parties. During the conference, the ALJ will explore whether the case may be settled, discuss the issues to be litigated and any logistical issues related to the hearing, and attempt to resolve or narrow outstanding issues, such as disputes relating to subpoenaed witnesses and documents. This conference is usually not recorded, but during the hearing the ALJ or the parties sometimes refer to discussions at the pre-hearing conference. You do not have to wait until the prehearing conference to meet with the other parties to discuss settling this case or any other issues.

## II.    DURING THE HEARING

The rules pertaining to the Board's hearing procedures are found at Sections 102.34 through 102.43 of the Board's Rules and Regulations. Please note in particular the following:

- **Witnesses and Evidence**: At the hearing, you will have the right to call, examine, and cross-examine witnesses and to introduce into the record documents and other evidence.

- **Exhibits: Each exhibit offered in evidence must be provided in duplicate to the court reporter and a copy of each of each exhibit should be supplied to the ALJ and each party when the exhibit is offered in evidence.** If a copy of any exhibit is not available when the original is received, it will be the responsibility

(OVER)

Form NLRB-4668
(6-2014)

of the party offering such exhibit to submit the copy to the ALJ before the close of hearing. If a copy is not submitted, and the filing has not been waived by the ALJ, any ruling receiving the exhibit may be rescinded and the exhibit rejected.

- **Transcripts**: An official court reporter will make the only official transcript of the proceedings, and all citations in briefs and arguments must refer to the official record. The Board will not certify any transcript other than the official transcript for use in any court litigation. Proposed corrections of the transcript should be submitted, either by way of stipulation or motion, to the ALJ for approval. Everything said at the hearing while the hearing is in session will be recorded by the official reporter unless the ALJ specifically directs off-the-record discussion. If any party wishes to make off-the-record statements, a request to go off the record should be directed to the ALJ.

- **Oral Argument:** You are entitled, on request, to a reasonable period of time at the close of the hearing for oral argument, which shall be included in the transcript of the hearing. Alternatively, the ALJ may ask for oral argument if, at the close of the hearing, if it is believed that such argument would be beneficial to the understanding of the contentions of the parties and the factual issues involved.

- **Date for Filing Post-Hearing Brief**: Before the hearing closes, you may request to file a written brief or proposed findings and conclusions, or both, with the ALJ. The ALJ has the discretion to grant this request and to will set a deadline for filing, up to 35 days.

## III.   **AFTER THE HEARING**

The Rules pertaining to filing post-hearing briefs and the procedures after the ALJ issues a decision are found at Sections 102.42 through 102.48 of the Board's Rules and Regulations. Please note in particular the following:

- **Extension of Time for Filing Brief with the ALJ:** If you need an extension of time to file a post-hearing brief, you must follow Section 102.42 of the Board's Rules and Regulations, which requires you to file a request with the appropriate chief or associate chief administrative law judge, depending on where the trial occurred. You must immediately serve a copy of any request for an extension of time on all other parties and furnish proof of that service with your request. You are encouraged to seek the agreement of the other parties and state their positions in your request.

- **ALJ's Decision:** In due course, the ALJ will prepare and file with the Board a decision in this matter. Upon receipt of this decision, the Board will enter an order transferring the case to the Board and specifying when exceptions are due to the ALJ's decision. The Board will serve copies of that order and the ALJ's decision on all parties.

- **Exceptions to the ALJ's Decision**: The procedure to be followed with respect to appealing all or any part of the ALJ's decision (by filing exceptions with the Board), submitting briefs, requests for oral argument before the Board, and related matters is set forth in the Board's Rules and Regulations, particularly in Section 102.46 and following sections. A summary of the more pertinent of these provisions will be provided to the parties with the order transferring the matter to the Board.

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| PG PUBLISHING CO., INC. | ) | |
| d/b/a PITTSBURGH POST-GAZETTE | ) | Nos.  24-2788 |
| | ) | 24-3057 |
| Petitioner/Cross-Respondent | ) | |
| | ) | Board Case Nos. |
| v. | ) | 06-CA-248017 |
| | ) | 06-CA-263791 |
| NATIONAL LABOR RELATIONS BOARD | ) | 06-CA-269346 |
| | ) | |
| Respondent/Cross-Petitioner | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NEWSPAPER GUILD OF PITTSBURGH/ | ) | |
| CWA LOCAL 38061 | ) | |
| | ) | |
| Intervenor | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.  I certify that the foregoing document was served on all parties or their counsel of record through the appellate CM/ECF system.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC  20570
(202) 273-2960

Dated at Washington, DC
this 20th day of December 2024

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| PG PUBLISHING CO., INC. | ) | |
| d/b/a PITTSBURGH POST-GAZETTE | ) | Nos.  24-2788 |
| | ) | 24-3057 |
| Petitioner/Cross-Respondent | ) | |
| | ) | Board Case Nos. |
| v. | ) | 06-CA-248017 |
| | ) | 06-CA-263791 |
| NATIONAL LABOR RELATIONS BOARD | ) | 06-CA-269346 |
| | ) | |
| Respondent/Cross-Petitioner | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NEWSPAPER GUILD OF PITTSBURGH/ | ) | |
| CWA LOCAL 38061 | ) | |
| | ) | |
| Intervenor | ) | |

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the Board

certifies that its motion contains 5,137 words of proportionally-spaced, 14-point

type, and the word processing system used was Microsoft Word 365.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 20th day of December 2024