No. 24-2788 and 24-3057

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

---

PG PUBLISHING CO., INC. d/b/a PITTSBURGH POST-GAZETTE

*Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent*,

and

NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061

*Intervenor.*

---

Petition for Review of National Labor Relations Board Decision and Order

---

**PETITIONER'S BRIEF**

---

Brian M. Hentosz (PA No. 317176)
Morgan S. Dull (PA No. 322712)
LITTLER MENDELSON, P.C.
625 Liberty Avenue, 26th Floor
Pittsburgh, PA 15222
PH: 412-201-7676 / 7622
FX: 412-291-1241
bhentosz@littler.com
mdull@littler.com

Attorneys for Petitioner
*PG Publishing, Inc. d/b/a Pittsburgh
Post-Gazette*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FED. R. APP. P. 26.1 and L.A.R. 26.1.1, petitioner PG Publishing

Co., Inc. d/b/a Pittsburgh Post-Gazette ("Post-Gazette" or the "Company") discloses

that it is a wholly-owned subsidiary of Block Communications, Inc., a privately-held

Ohio corporation.


Dated: January 13, 2025                    /s/ Brian M. Hentosz
                                           Brian M. Hentosz (PA No. 317176)
                                           Morgan S. Dull (PA No. 322712)

                                           Attorneys for Petitioner
                                           *PG Publishing, Inc. d/b/a Pittsburgh
                                           Post-Gazette*

# TABLE OF CONTENTS

**PAGE**

I.   STATEMENT OF JURISDICTION.................................................................1

II.  STATEMENT OF THE ISSUES ................................................................2

III. STATEMENT OF RELATED CASES AND PROCEEDINGS ...................4

IV.  STATEMENT OF THE CASE ...................................................................4

    A.   Relevant Facts ...................................................................................4

        1.   The Post-Gazette's Need for Flexibility to Transition to an "All-Digital Format." ...........................................................4

        2.   The Post-Gazette's Declaration of Impasse and Implementation of the Company's Bargaining Proposals. .......6

        3.   The Guild's Bad Faith Bargaining. ...........................................9

        4.   The Allegedly Unlawful Proposals. ........................................10

        5.   The Guild's Protests at a Private Residence. ...........................13

    B.   Procedural History...........................................................................14

        1.   The Administrative Complaint. ...............................................14

        2.   ALJ Carter's Decision..............................................................14

        3.   The NLRB Decision. ................................................................16

V.   SUMMARY OF THE ARGUMENT ........................................................17

VI.  STANDARD OF REVIEW .....................................................................18

VII. ARGUMENT............................................................................................20

    A.   The Board Erred in Finding Bad Faith Bargaining Based Solely on the Post-Gazette's Bargaining Proposals. .....................................22

        1.   The "Less Rights" Theory Conflicts with Supreme Court and This Court's Precedent.....................................................22

        2.   The "Less Rights" Theory is Inconsistent with the Standard for Bad Faith Bargaining. .........................................26

        3.   The NLRB is Inappropriately Judging the Post-Gazette's Bargaining Proposals. ............................................................27

        4.   The "Less Rights" Theory Conflicts with 10 Roads. ..............29

# TABLE OF CONTENTS
(CONTINUED)

PAGE

5. The "Less Rights" Theory is Contrary to Endurance Environmental. ...........................................................30

6. The "Less Rights" Theory Interferes with the Post-Gazette's Rights Under First National Maintenance. ..............31

7. Any Reliance on Altura is Misplaced. ....................................33

B. The Post-Gazette was Privileged to Declare Impasse and Implement Some of its Bargaining Proposals. ...................34

C. The Decision's Unlawful One Time Surveillance Finding is Not Supported by Substantial Evidence and the Guild's Members Did Not "Shun Identification.". ...........................................39

D. The Board Lacks the Authority to Issue a Thryv Remedy. ...............41

VIII. CONCLUSION. ...........................................................42

4907-5252-7119

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*10 Roads Express*,
372 NLRB No. 105 (July 14, 2023) ..........................................................*passim*

*14 Penn Plaza LLC et al. v. Pyett et al.*,
556 U.S. 247 (2009)...................................................................................12, 13

*Altura Communication Solutions, LLC*,
369 NLRB No. 85 (2000) ...................................................................15, 33, 34

*NLRB v. American National Insurance Company*,
343 U.S. 395 (1952).................................................................................*passim*

*NLRB v. Armcor Industries, Inc.*,
535 F.2d 239 (3d Cir. 1976) ...........................................................................40

*NLRB v. Auto Fast Freight, Inc.*,
793 f.2d 1126 (9th Cir. 1986) .........................................................................39

*Calmat Co.*,
331 NLRB 1084 (2000) ...................................................................................37

*Cincinnati Newspaper Guild, Local 9 v. NLRB*,
938 F.2d 284 (D.C. Cir. 1991).............................................................14, 24, 25

*NLRB v. Computed Time Corp.*,
587 F.2d 790 (5th Cir. 1979) ..........................................................................40

*Endurance Environmental Solutions, LLC*,
373 NLRB No. 141 (Dec. 10, 2024).......................................................3, 30, 31

*First National Maintenance Corporation v. NLRB*,
452 U.S. 666 (1981), S. at 677 ........................................................3, 31, 32, 37

*NLRB v. Greensburg Coca-Cola Bottling Co.*,
40 F.3d 669 (3d Cir. 1994) .............................................................................20

*H.K. Porter Co. v. NLRB*,
397 U.S. 99 (1970).....................................................................................2, 28

4907-5252-7119

*Hendrix Mfg. Co. v. NLRB*,
  321 F.2d 100 (5th Cir. 1963) ............................................................... 40

*Hudson Inst. of Process Rsch. Inc. v. NLRB.*,
  No. 23-60175, 2024 WL 4222177 (5th Cir. Sept. 18, 2024) ............................ 19

*Int'l Bhd. of Elec. Workers, Loc. 803, AFL-CIO v. NLRB.*,
  826 F.2d 1283 (3d Cir. 1987) ............................................................... 18

*Jefferson Smurfit Corp.*,
  311 NLRB 41 (1993) ........................................................................... 38

*Laurel Bay Health & Rehab. Ctr. v. NLRB*,
  666 F.3d 1365 (D.C. Cir. 2012) ........................................................... 36

*Loper Bright Enterprise v. Raimondo*,
  144 S. Ct. 2244 (2024) ....................................................................... 19

*M&M Contractors*,
  262 NLRB 1472 (9th Cir. 1982) ........................................................... 38

*McClatchy Newspapers, Inc. v. NLRB*,
  131 F.2d 1026 (D.C. Cir. 1997) ........................................................... 35

*MV Transportation*,
  368 NLRB No. 66 (2019) ..................................................................... 30

*New Concepts for Living, Inc. v. NLRB*,
  94 F.4th 272 (3d Cir. 2024) ........................................................20, 21, 34

*PG Publishing Co., Inc. v. NLRB*,
  83 F.4th 200 (3d Cir. 2023) ................................................................ 32

*Phillips 66*,
  369 NLRB No. 13 (2020) ................................................................27, 35

*In re Public Service Company of Oklahoma (PSO)*,
  334 NLRB No. 68 (2001) ..................................................................... 34

*Radisson Plaza Minneapolis v. NLRB*,
  987 F.2d 1376 (8th Cir. 1993) ............................................................. 26

iv

*NLRB v. Regency Grand Nursing & Rehab Ctr.*,
    265 Fed.Appx. 74 (3d Cir. 2008)........................................................20

*Rieth-Riley Constr. Co. v. NLRB*,
    No. 23-1899 (6th Cir. August 14, 2024).............................................19

*Rogers Electric, Inc.*,
    346 NLRB 508 (2006) .......................................................................40

*Saunders House v. NLRB*,
    719 F.2d 683 (3d Cir. 1983) ...........................................21, 35, 36, 38

*Serramonte Oldsmobile, Inc. v. NLRB*,
    86 F.3d 227 (D.C. Cir. 1996)...........................................................38

*Sheraton Anchorage*,
    363 N.L.R.B. 53 (2015) .....................................................................40

*NLRB v. Starbucks Corp.*,
    No. 23-1953, ---F.4th---, 2024 WL 5231549 (3d Cir. Dec. 27,
    2024) ...............................................................................4, 18, 41, 42

*Struthers Wells Corporation v. NLRB*,
    721 F.2d 465 (3d Cir. 1983) ......................................................*passim*

*Thryv, Inc.*,
    372 NLRB No. 22, slip op. (2022) .............................................*passim*

*Thryv, Incorporated v. NLRB*,
    102 F.4th 727 (5th Cir. 2024) ..........................................................20

*U.S. Steel Corp. v. NLRB*,
    682 F.2d 98 (3d Cir. 1982) ........................................................40, 41

*Wal-Mart Stores, Inc.*,
    350 NLRB 879 (2007) .......................................................................40

**Statutes**

*National Labor Relations Act* ...........................................................*passim*

# I.    <u>STATEMENT OF JURISDICTION</u>

The National Labor Relations Board ("NLRB" or the "Board") had jurisdiction pursuant to 29 U.S.C. §§ 158(a)(1) and (5), which authorizes the Board to resolve alleged unfair labor practices, to issue its Decision and Order ("Decision") that found the Post-Gazette violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("Act") by (1) bargaining in bad faith by insisting "on provisions that left the Union with fewer rights and less protection than provided by law without a contract" (hereinafter, "less rights" theory), (2) declaring a bargaining impasse and implementing some of its bargaining proposals, and (3) engaging in unlawful surveillance because "company security guards pointed their cell phones at, and appeared to photograph" employees picketing at a private residence. [JA0051-JA0078].  The Decision was based on an administrative complaint issued after the Intervenor Newspaper Guild of Pittsburgh/CWA Local 38061 ("Guild") filed an unfair labor practice charge.  [JA0166-JA0181].

This case is before this Court on the Post-Gazette's Petition for Review and the NLRB's Application for Enforcement (collectively, "Petitions"). [JA0079-JA0144].  This Court has jurisdiction over the Petitions pursuant to 29 U.S.C. §§ 160(e) and (f).  The Petitions are timely because the Act imposes no time limits for the filings.  Venue is proper pursuant to 29 U.S.C. § 160(f) because the Post-Gazette conducts business in this judicial district.  [*Id.*].

## II.     STATEMENT OF THE ISSUES

1.     Did the NLRB err as a matter of law by finding the Post-Gazette engaged in bad faith bargaining in violation of the Act based on its "less rights" theory, despite the theory being contrary to:

(a)     *NLRB v. American National Insurance Company*, 343 U.S. 395 (1952), which held an employer does not violate the Act by "insisting on a clause by which it would maintain exclusive control" over terms and conditions of employment and this Court's decision in *Struthers Wells Corporation v. NLRB*, 721 F.2d 465 (3d Cir. 1983), which held that proposals like those in this matter were lawful?

(b)     The traditional legal standard for bad faith bargaining, which does not look at a parties' proposals (standing alone), but in conjunction with the "totality" of their conduct both at, and away from the bargaining table?

(c)     *H.K. Porter Co. v. NLRB*, 397 U.S. 99 (1970) and *American National*, which forbids the NLRB from judging the Post-Gazette's bargaining proposals?

(d)     The Board's own standard in *10 Roads Express*, 372 NLRB No. 105 (July 14, 2023), which held that a party may bargain for

2

discretion provided they explain their rationale for the proposal?

(e)     The Board's decision in *Endurance Environmental Solutions, LLC*, 373 NLRB No. 141 (Dec. 10, 2024), which requires an employer seeking discretion to act unilaterally during the term of a labor contract to make its proposals "clear and unmistakable" that it has the right to act unilaterally?

(f)     The Post-Gazette's right to make an "entrepreneurial decision" concerning the "scope and direction" of its business under *First National Maintenance Corporation v. NLRB*, 452 U.S. 666 (1981)?

2.     Did the NLRB err as a matter of law by finding the Post-Gazette unlawfully declared a bargaining impasse (and implemented some of its bargaining proposals) despite bargaining with the Guild for 3½ years, the Guild labeling bargaining as "fruitless" and "worthless," the Guild unilaterally terminating negotiations, and the parties remaining far apart on key bargaining proposals?

3.     Did the NLRB err as a matter of law by finding the Post-Gazette engaged in unlawful surveillance one (1) time when the Company's third-party security provider *"appeared"* to take photographs of employees trespassing at a private residence?

4.      Did the NLRB err as a matter of law by ordering the Post-Gazette to "compensate all bargaining unit employees for any other direct or foreseeable pecuniary harms incurred as a result of the unlawful changes" and "to compensate the Union for all bargaining expenses it incurred" while bargaining (*i.e.*, a *Thryv* remedy), despite this Court's decision in *NLRB v. Starbucks Corp.*, No. 23-1953, ---F.4th---, 2024 WL 5231549 (3d Cir. Dec. 27, 2024), which held the Board's "remedial authority" is limited to equitable relief?

## III.    STATEMENT OF RELATED CASES AND PROCEEDINGS

The NLRB has asked this Court to grant injunction relief pursuant to 10(e) of the Act based on the same underlying facts as relevant to the instant matter. [ECF No. 21]. Otherwise, the Post-Gazette is not aware of any cases pending in this Court that are related to this appeal as defined in L.A.R. 28.1(a)(2).

## IV.    STATEMENT OF THE CASE

### A.    Relevant Facts

#### 1.    The Post-Gazette's Need for Flexibility to Transition to an "All-Digital Format."

The Post-Gazette publishes the *Pittsburgh Post-Gazette*, a Pittsburgh, Pennsylvania newspaper. The Guild represents employees in the editorial department of the Post-Gazette's newsroom. [JA1538]. The Post-Gazette and Guild were parties to a collective bargaining agreement that expired on March 31, 2017. [JA0262, JA0542]. The expired agreement contained provisions pertaining to

4907-5252-7119

employee work hours, layoffs and recalls, bargaining unit work, and no-strike (amongst other provisions). [*Id.*]. The expired agreement also called for employees to receive health insurance through the Western Pennsylvania Teamster and Employers Welfare Fund ("Fund"). [*Id.*] In 2017, the Post-Gazette published a printed newspaper seven days per week. [JA0402].

The Post-Gazette and Guild commenced bargaining for a successor agreement on March 10, 2017. [JA0277, 375]. At the first bargaining session, the parties discussed the challenges facing the newspaper industry – specifically, consumers and advertisers were moving away from the printed product and demanding more digital content. [JA375-376]. Neither party disputed that the business model for print newspapers was broken. [*Id.*, JA0377]. The Post-Gazette informed the Guild that the Company lost 18.9 million dollars the prior year. [JA0376]. The Post-Gazette also stated that over the term of a successor agreement, the Company was likely to eliminate print days and transition to an "all-digital format." [JA0280, 0376-0377]. The Guild stated that it was through making concessions and suggested the Post-Gazette just sell the newspaper. [JA0376].

At the commencement of bargaining the Post-Gazette explained to the Guild that it needed flexibility to implement its transition to an "all-digital format," including the ability to obtain content from any source. [JA0288]. The Post-Gazette also explained that the continuance in the Fund was not sustainable due to the cost

5

and the lack of plan options offered by the Fund.  [JA0301-0302, JA0424].   The

Guild also complained about a lack of pay increases in the past.  [JA0303, 0394].

The Post-Gazette reiterated the financial constraints pertaining to the Company and

the industry but stressed that the parties would have to be creative to provide a wage

increase.  [JA0489].

>     2.    The Post-Gazette's Declaration of Impasse and Implementation
>           of the Company's Bargaining Proposals.

After bargaining for approximately 2½ years, on August 6, 2019, the Post-

Gazette sent the Guild its "Best Offer" along with a position statement setting forth

the Company's proposals and positions on all open items.  [JA3043-JA3069].  In

response, on September 6, 2019, the Guild made a counter proposal that

demonstrated the parties were far apart on all material terms such as wages,

bargaining unit work, sick leave, and the use of other news sources.  [JA2235-

JA2295].  Further, the Guild refused to move out of the Fund and onto the Post-

Gazette's health insurance plan.[1]  [*Id.,* JA1652].

The parties met again on February 24, 2020, and finished discussing

substantially all of the Guild's September 6, 2019 proposal.  [JA0384-0389,

JA2443].  The few remaining parts of the Guild's proposal evidenced no changes in

---

[1]     Notably, the Guild never intended to accept the Post-Gazette's proposal to
move the employees onto the Post-Gazette's health insurance plan.  In 2017, the
Guild's President informed the Fund that "[o]f course, we are not going to accept
the company's proposal" to leave the Fund.  [JA1652].

6

the Guild's previous positions. [*Id*., JA3128-JA3180]. After the bargaining session, the Post-Gazette requested additional bargaining dates. [JA2445, JA3154]. The parties agreed to meet again on March 25, 2020. [JA2448]. On March 22, 2020, the Guild sent the Post-Gazette a letter canceling the scheduled March 25 meeting and stated that bargaining was "worthless" and "fruitless." [JA2455-2456]. Further, the Guild terminated negotiations "until the Coronavirus pandemic is completely arrested." [*Id.*]. After the Guild's termination of negotiations, the Post-Gazette sent the Guild a comprehensive response and position statement to the Guild's last proposal (from September 6, 2019). [JA2457-JA2486]. The Guild ignored the Post-Gazette's correspondence.

On June 12, 2020, the Post-Gazette sent the Guild its Final Offer and offered to respond to any questions concerning the same. [JA2298-JA2399]. The Guild did not respond for 10 days and, upon responding, did not address any of the substantive terms of the Final Offer. [JA2487]. Instead, the Guild asked if the Post-Gazette was terminating negotiations and refusing to meet. [*Id.*].

The Guild's response confirmed the futility of continued negotiations. To recap, at the time of the Guild's response to the Post-Gazette's Final Offer, the Guild had agreed to meet *only* once in the past nine months. [JA2298-JA2300]. In fact, between September 6, 2019, and June 12, 2020, the Guild never requested to bargain with the Company. Finally, based on the Guild's March 22, 2020 letter, the Post-

7

Gazette understood the Guild had terminated negotiations. [JA2455-JA2456, JA0500]. As such, on July 16, 2020, the Post-Gazette sent the Guild a letter declaring a bargaining impasse and requesting the Guild explain if it believed negotiations would be fruitful. [JA2496-2498]. At this time, the parties were far apart and entrenched with respect to key proposals, including bargaining unit work, guaranteed work hours, layoffs, and health insurance. [*Id.*].

In response, the Guild stated it was willing to meet *only if* the Post-Gazette made changes to its Final Offer to the satisfaction of the Guild. [JA2499-JA2502]. The Guild *did not* agree to any of the Company's proposals or make a counter proposal. [*Id.*]. Significantly, the Guild never offered to meet. [*Id.*]. As such, on July 27, 2020, the Post-Gazette implemented portions of its Final Offer, including moving the employees from the Fund to the Company's health insurance plan and providing wage increases to the employees (approximately 8% over three (3) years for bargaining unit employees at the top minimum scale in each job classification). [JA2503-JA2528]. The Post-Gazette did not implement any discretionary elements of its Final Offer, nor did the Company implement any provision that was not proposed in bargaining.

In total, negotiations for a successor agreement lasted for 3½ years and included 24 bargaining sessions. [JA1772-JA1777, JA2757-JA3180]. The Post-Gazette explained the reasons and justifications for every proposal it made and

8

offered 35 counter proposals.  [JA0281, JA0779-JA0800, JA0835-JA0845, JA0857-JA0909, JA0963-JA1092, JA1124-JA1126; JA1866-JA2297].

        3.    <u>The Guild's Bad Faith Bargaining</u>.

Throughout bargaining, the Guild engaged in a pattern of behavior designed to frustrate the ability to reach an agreement and prolong the process.  For instance, the Guild refused to meet at "reasonable times" as required by the Act, as set forth through their availability to bargain:

- 2017 – eight sessions.

- 2018 – nine sessions.

- 2019 – five sessions.

- 2020 – one session before the Guild terminated the negotiations.

Notably, after the Post-Gazette submitted its Best Offer and bargained with the Guild on September 6, 2019, the Company requested additional bargaining dates – the Guild responded that it would "get back" to the Company.  [JA3004].  The Guild did not "get back" to the Post-Gazette, and only offered a bargaining date *after* the Company sent the Guild a letter in January 2020.  [JA2441].

The Guild also engaged in regressive bargaining without providing an explanation. For example, on the subject of wages, after bargaining for approximately 2½ years, the Guild for the first time in its September 6, 2020 proposal, demanded retroactivity of its proposed wage increase.  [JA2235-JA2295].

The Guild previously proposed its wage increases would be effective upon ratification. [JA1722-1724]. The Guild also demanded a 35.5% wage increase. [JA2450-JA2479].

The Guild also insisted on bargaining over permissive subjects of bargaining, including the addition of an evergreen provision and a penalty provision requiring payment into a pension fund. [JA0381, JA0390-0391, JA1765-JA1771, JA1976-JA2023]. Finally, the Guild attempted to interfere with the Post-Gazette's selection of its bargaining representatives. [JA1666-JA1670].

4.    The Allegedly Unlawful Proposals.

In its Final Offer, the Post-Gazette proposed contractual terms designed to retain discretion to address operational changes that would occur during the term of the successor agreement as the Company transitioned to an "all-digital format" and address the reality that the business was in financial distress. [JA0400]. Specifically:

- Work Hours: The expired 2014-17 CBA did not contain any language guaranteeing a workday or workweek for full-time employees. [JA1344-1345]. The Post-Gazette proposed to maintain the existing workday and workweek but added language that workdays were not guaranteed. [*Id*.]. The Guild proposed to guarantee the workweek, irrespective of whether there was work to perform. [JA0404]. The Post-Gazette could not guarantee hours of work because it did not know the effects of the future reduction in its print and/or digital publication schedule would have during the term of the successor agreement. [JA0293, JA0400-0401]. Because of the anticipated reduction of print and/or digital publication days during the term of the

successor agreement and the attendant operational changes resulting therefrom, the Post-Gazette proposed clear and unambiguous language so the workweek in the successor agreement could not be interpreted as guaranteed by an arbitrator in the event of a reduction in workdays because of business necessity. [Id.].

- Subcontracting: the Post-Gazette proposed that the Company have the ability to obtain content from third parties. [JA07389, 1385]. This was consistent with the Company's past practice of receiving content from outside sources. This practice, however, was not reflected in the expired agreement. [Id.; JA0710-JA0778]. The need to receive content from third parties would become increasingly more important as the Company transitioned to an "all-digital format" and readers expected content in real-time. [JA1138-JA1162; JA1140].

- Jurisdiction: the expired agreement provided that supervisors could perform bargaining unit work, subject to certain conditions. [Id.; 1139]. During bargaining, the parties disagreed over the extent of bargaining unit work which was performed by supervisors in the past. [JA0379, 0381, 0393, 0385]. As such, the Post-Gazette proposed that supervisors could perform the work, but "[n]o bargaining unit employee will be laid off as a direct result of supervisors or managers performing bargaining unit work." [JA1138-JA1162]. As such, the Post-Gazette's proposal gave the Guild *more* protections than the expired agreement.

- Health Insurance: the Post-Gazette proposed moving employees from the Fund to the Company's self-insured health insurance plan because Company's plan had more options for coverage and could maintain better control over healthcare costs. [JA1162, 1203; ]. The Post-Gazette proposal permitted yearly changes to the plan (a reservation of rights clause). [Id.]. A reservation of rights clause is permissible for "welfare benefit plans" under ERISA. Further, the Guild's counsel confirmed that virtually all welfare benefits plans contain reservation of rights language like what the Post-Gazette proposed. [Id.]. The Post-Gazette's proposed plan was in place for the Company's non-bargaining

11

unit employees, other bargaining units at the newspaper, and employees of the Post-Gazette's parent corporation and covered at least 2,400 people. [JA0377].

- Layoffs: the Post-Gazette proposed to consider seniority, qualifications, performance and skills when selecting employees for a layoff. [JA1138-JA1162]. The Guild insisted on strict seniority even though the Guild recognized that every journalist has strengths and weaknesses. [JA0406-0409, 0412]. Professional journalists are not building "widgets." Each journalist has individual skills, and the Post-Gazette needed the discretion to consider not only seniority but qualifications, performance, and skills for a layoff based on the business needs created by the transition to an "all-digital format." The Company proposed severance pay in the event employees were laid off due to business conditions or the Post-Gazette's entrepreneurial decisions. [JA1138-JA1162].

- Sick Leave: the Post-Gazette proposed moving employees into the Company's short-term disability plan on the same basis as non-represented employees. [JA1148, 1180]. Like the Company's health insurance plan, the STD plan contained a reservation of rights clause. [*Id*.]. Again, under ERISA this is standard and permitted.

- No-Strike: the Post-Gazette proposed adding "sympathy strikes, picketing, boycotts and bannering" to the existing no-strike provision in the expired agreement. [JA1823-1861, RA0417-0418, 0453, 1199]. Nothing under the provision prohibited employees from handbilling, appeals to the media, or engaging in public rallies. *[Id.]*. In exchange, the Post-Gazette agreed to a broad grievance and arbitration provision. [JA1159, 1195-96, 1199]; *see 14 Penn Plaza LLC et al. v. Pyett et al.*, 556 U.S. 247, 256 (2009) (recognizing that the agreement to arbitrate disputes is the *quid pro quo* for an agreement not to strike).

- Wages: the Post-Gazette proposed to continue the established job classification minimum wage scales from the expired CBA under which employees received increases in wages based on length of service. [JA1142-1143, 1172-1175].

12

The NLRB alleges that each of these proposals is somehow unlawful. However, during the same time the Post-Gazette was negotiating with the Guild, the Company was also negotiating with the International Brotherhood of Electrical Workers, the Operating Engineers, and the International Association of Machinists & Aerospace Workers. [JA3177-JA3339]. Each of these labor unions accepted proposals that were substantially like the work hours, healthcare, bargaining unit work, layoffs, and no-strike provisions that the NLRB alleges are unlawful in this matter. *[Id.].*

5.    <u>The Guild's Protests at a Private Residence.</u>

On two dates in late October 2020, Guild members amassed in front of John Block's ("Block") private family residence (Block is the publisher of the Post-Gazette). [JA0506]. The Guild engaged in similar actions at other Post-Gazette executive's homes around the same time, including blocking ingress and egress, and publicized one protest as a "funeral". [JA0239, JA0366, JA1699-1707]. As such, the Post-Gazette retained private security to guard Block's residence. [JA3171-3176]. During the rallies, the Guild publicized photographs which show their members trespassing on Block's private property (driveway, sidewalk to front entrance, and grass strip). [JA1497-1515, JA1673-]. Further, the Guild in another labor demonstration utilized an airplane to fly above Pittsburgh with messaging concerning their labor dispute with the Post-Gazette. [JA1681].

13

The Guild alleges that the private security guards took a photograph of the picketers. However, the only evidence in support of the allegation are isolated photograph taken by the *Guild*, which shows the security officers standing on the sidewalk in front of Block's property looking at a cell phone, while the other individual faces Block's home. [JA1507-JA1513]. There is no evidence of what the security officer was looking at, or whether he actually took a photograph of anything. Further, it is undisputed that the Post-Gazette "did not ask the security guards to photograph the rallies" or receive and view any photographs. [JA0506, JA0511].

### B.  Procedural History

#### 1.  The Administrative Complaint.

On April 27, 2022, the regional director of NLRB Region 6 issued an administrative complaint alleging that the Post-Gazette bargained in bad faith by (1) "insisting upon proposals that are predictably unacceptable to the Union," (2) "failing to provide explanations to the Union regarding the Employer's proposals," and (3) prematurely declaring impasse and implementing some of its bargaining proposals. [JA0166-JA0181]. The complaint also alleged the Post-Gazette violated the Act by engaging in unlawful surveillance of employees. [*Id.*].

#### 2.  ALJ Carter's Decision.

On January 26, 2023, ALJ Carter issued his decision, in which he held "I do not find merit to the argument that Respondent failed to explain its proposals to the

Union." [JA0001-JA0050]. ALJ Carter also rejected the regional director's allegation that the Post-Gazette's proposals were "predictably unacceptable." [JA0028-0029]. Instead, ALJ Carter found that "[a]n inference of bad faith is appropriate when the employer's proposals, taken a [*sic*] whole, would leave the union … with substantially fewer rights than provided by law without a contract." [*Id.*]. In reaching his decision, ALJ Carter relied on *Altura Communication Solutions, LLC*, 369 NLRB No. 85 (2000).

With respect to the impasse allegations, ALJ Carter found that "the Board has long held that a finding of impasse is precluded if that outcome is reached in the context of serious unremedied unfair labor practices." [JA0031]. Additionally, ALJ Carter found that the parties had not met to discuss the Post-Gazette's Final Offer before the Company declared an impasse. [*Id.;* JA0032-0033]. Concerning the allegation of unlawful surveillance, ALJ Carter found that the Post-Gazette violated the Act because the Company "had security guards present to ensure that the rallies did not get out of control. The security guards … *appeared* to take photographs of rally participants." [JA0036 (emphasis added)].

ALJ Carter ordered the Post-Gazette to "make its employees whole for any loss of earning and other benefits that resulted from its unlawful unilateral changes." [JA0037]. He also ordered that "[c]onsistent with *Thryv, Inc.*, 372 NLRB No. 22, slip op. at 14 (2022), Respondent shall also compensate all bargaining unit

employees for any other direct or foreseeable pecuniary harms incurred as a result of the unlawful unilateral changes." [*Id.*].  However, he refused "the extraordinary remedy of requiring Respondent to reimburse the Union for negotiating costs and expenses" because "the General Counsel did not demonstrate that Respondent engaged in unusually aggravated misconduct*."* [JA0040].

      3.    <u>The NLRB Decision</u>.

Approximately 20 months later, on September 20, 2024, the Board adopted ALJ Carter's decision in a two-page opinion.  The Board agreed that the Post-Gazette violated the Act because it "insisted on provisions that left the Union with fewer rights and less protection than provided by law without a contract." [JA0051-JA0078]. In essence, the Board held that the Post-Gazette bargained in bad faith based *solely* on the Company's bargaining proposals.

The Board also endorsed ALJ Carter's impasse analysis and his surveillance finding*. [Id.].*  However, the Board disagreed with ALJ Carter's remedies:

> In addition to the remedies ordered by the judge, we shall order the Respondent to compensate the Union for all bargaining expenses it incurred during the time the Respondent engaged in bad-faith bargaining through the parties' final bargaining session on September 8, 2020, including any lost wages the Union paid to bargaining committee members for bargaining conducted during working hours.

[JA0052].

## V.    SUMMARY OF THE ARGUMENT

The NLRB appears to loathe any type of discretionary proposal.  However, the Supreme Court and this Court have held there is nothing unlawful about an employer proposing a discretionary contractual term.  As such, the NLRB concocted its "less rights" theory to trick a reviewing court.  Unfortunately for the NLRB, the "less rights" theory simply makes no sense.

At the outset, the "less rights" theory is *contrary* to Supreme Court and this Court's precedent, which holds that employers do not violate the Act by "insisting on a clause by which it would maintain exclusive control" over terms and conditions of employment.  In addition, the theory is incompatible with the Board's own standards and the Post-Gazette's right to make "entrepreneurial decisions" concerning the "scope and direction" of its business as the Company transitions to an "all-digital format."  The Board is attempting to change the law and asking this Court to endorse a theory that a party bargains in bad faith based *solely* on the substance of their bargaining proposals.

Likewise, the NLRB's refusal to find a lawful bargaining impasse is flawed.  Despite the fact the Post-Gazette and the Guild bargaining for 3½ years before the Guild terminated negotiations and labeled negotiations as "fruitless" and "worthless," the NLRB found the parties were not at a bargaining impasse because they had not finished discussing a proposal the Guild made nine months prior and

the Guild proposed scheduling additional bargaining sessions.   The NLRB's Decision is contradicted by the law and the facts.  The Post-Gazette responded to the entirety of the Guild's September 6, 2019 proposal and provided a comprehensive written response to the Guild's proposal because the Guild *terminated* negotiations. Further, in response to the Post-Gazette's Final Offer, the Guild did nothing besides insisting the Post-Gazette change its proposals to the Guild's satisfaction.  Finally, the distance between the parties' proposals was hardened and pertained to issues critical to the continued viability of the Post-Gazette.

Finally, the NLRB's finding of unlawful surveillance is not supported by *any* facts.  Indeed, the ALJ only stated that it "appeared" that a third-party security officer took a photograph with his cellular phone.  Further, the Guild publicized its own photographs of members engaging in the picketing – thus, the employees were clearly unafraid of retaliation.

## VI.   <u>STANDARD OF REVIEW</u>

"An order of the Board is customarily entitled to enforcement if its findings are supported by substantial evidence and the order is consistent with the policies of the NLRA."  *Int'l Bhd. of Elec. Workers, Loc. 803, AFL-CIO v. NLRB.*, 826 F.2d 1283, 1287 (3d Cir. 1987).  "When the Board adopts an ALJ's decision, we review the ALJ's determinations; when it adopts the ALJ's decision in part, we review both the Board's and ALJ's decisions."  *Starbucks*, 2024 WL 5231549, at *3.

18

With respect to the Board's interpretation of the Act, *Loper Bright Enterprise v. Raimondo*, 144 S. Ct. 2244 (2024), made clear that the Board is entitled to *no deference*. Rather, this Court must decide the Act's "best interpretation." 144 S. Ct. at 2262. Indeed, *Loper* holds that:

> Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires. Careful attention to the judgment of the Executive Branch may help form that inquiry. And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it. But courts need not and under the APA *may not defer* to an agency interpretation of the law simply because the statute is ambiguous.

*Id*. at 2273 (emphasis added); *see also Rieth-Riley Constr. Co. v. NLRB*, No. 23-1899, at *6 (6th Cir. August 14, 2024) ("We do not defer to the NLRB's interpretation of the NLRA but exercise independent judgment in deciding whether an agency acted within its statutory authority. We pay 'careful attention' to the judgment of the agency to inform that inquiry, *id*. at 2273, and we also review de novo the NLRB's interpretation of non-NLRA legal conclusions") (quoting *Loper*, 144 S. Ct. at 2262); *Hudson Inst. of Process Rsch. Inc. v. NLRB.*, No. 23-60175, 2024 WL 4222177, at *4 (5th Cir. Sept. 18, 2024) ("We will affirm the NLRB's legal conclusions if they have a reasonable basis in the law and are not inconsistent with the NLRA. The Supreme Court has recently clarified that we use traditional tools of statutory interpretation when so assessing; we do not simply defer to an agency's

19

interpretation of 'ambiguous' provisions of their enabling acts") (internal quotations and citations omitted).

"[T]he Board's power to fashion remedies for unfair labor practices is a 'broad and discretionary one, subject to limited review." *NLRB v. Regency Grand Nursing & Rehab Ctr.,* 265 Fed.Appx. 74, 78 (3d Cir. 2008) (quotations omitted). "Our review of the Board's choice of remedy is limited to asking whether the remedy goes beyond the Board's scope of authority." *Id.*

## VII.  ARGUMENT

In *NLRB v. Greensburg Coca-Cola Bottling Co.*, 40 F.3d 669 (3d Cir. 1994), this Court noted that the Act requires employers to bargain in good faith with unions, yet "[n]either party is legally obligated to yield to the other on … mandatory subjects of bargaining," which are "wages, hours, and other terms and conditions of employment." *Id.* at 673; *see also Thryv, Incorporated v. NLRB*, 102 F.4th 727, 733 (5th Cir. 2024) ("the NLRA compels only bargaining; it *does not* obligate employers and unions to reach any form of agreement.   Thus, employees must bargain in good faith, but they are never required to agree to any particular terms").

In *New Concepts for Living, Inc. v. NLRB*, 94 F.4th 272 (3d Cir. 2024), this Court explained that "Section 8(a)(5) of the Act prohibits an employer from refusing to bargain collectively with the representatives of its employees.  This is not simply a duty to participate in negotiations, but rather imposes a mutual duty upon the

parties to confer in good faith with a desire to reach agreement." *Id.* at 286 (internal quotations and citations omitted).  In assessing whether a party bargains in good faith, this Court looks at conduct "both at and away from the bargaining table" and determines whether the party's conduct "confirms that it was more focused intently on eliminating its bargaining obligation than on successfully negotiating a collective-bargaining agreement." *Id.* at 286-84 (internal quotations omitted).

With respect to bargaining impasses, this Court defined the impasse doctrine in *Saunders House v. NLRB*, 719 F.2d 683 (3d Cir. 1983), stating that the term "may be used to describe that point in labor negotiations in which there is sufficient disagreement over a mandatory subject of bargaining to permit unilateral action on the subject by one of the parties." *Id.* at 687.  In a recent decision, the Fifth Circuit explained:

> So what happens when an employer insists on a term that is a nonstarter for the union?  The NLRA does not encourage a party to engage in fruitless marathon discussions.  So if the employer demands a term that the union refuses to accept, labor law must provide a tool to pretermit an endless cycle of go-nowhere negotiations.
>
> That tool is the impasse doctrine.  Under that doctrine. Employers can declare with a union if there is no realistic possibility that continuation of discussions would be fruitful.

*Thryv,* 94 F.4th at 733.

Here, the Decision is erroneous because (1) the "less rights" theory is contrary

to Supreme Court and this Court's precedent and incompatible with existing Board law, and (2) the Post-Gazette was privileged to declare a bargaining impasse and implement its proposals since continued negotiations were "worthless" and "fruitless."

A.    **The Board Erred in Finding Bad Faith Bargaining Based *Solely* on the Post-Gazette's Bargaining Proposals.**

1.    The "Less Rights" Theory Conflicts with Supreme Court and This Court's Precedent.

In *American National*, the Board argued that the following clause was a *per se* violation of the Act because it stripped the union of its right to bargain over certain terms and conditions of employment:

> The right to select and hire, to promote to a better position, to discharge, demote or discipline for cause, and to maintain discipline and efficiency of employees and to determine the schedules of work is recognized by both union and company as the proper responsibility and prerogative of management to be held and exercised by the company, and while it is agreed that an employee feeling himself to have been aggrieved by any decision of the company in respect to such matters, or the union in his behalf, shall have the right to have such decision reviewed by top management officials of the company under the grievance machinery hereinafter set forth, it is further agreed that the final decision of the company made by such top management officials shall not be further reviewable by arbitration.

343 U.S. at 398. The Court objected to the same flawed logic asserted by the NLRB in this matter:

> [W]e reject the Board's holding that bargaining for the
> management functions clause proposed by respondent
> was, per se, an unfair labor practice.  Any fears the Board
> may entertain that use of management functions clauses
> will lead to evasion of an employer's duty to bargain
> collectively as to 'rates of pay, wages, hours and
> conditions of employment' do not justify condemning all
> bargaining for management functions clauses covering
> any 'condition of employment' as per se violations of the
> Act.

*Id.* at 409.

In *Struthers*, a matter on all-fours with the "less rights" theory, the employer proposed (1) a wage proposal based on merit at "management's 'sole discretion,'" (2) the removal of a posting and bidding procedure for open positions, and (3) eliminating the "work jurisdiction clause" and permitting non-bargaining unit employees to perform bargaining unit work.  721 F.2d at 467-68.  Like the instant matter, the Board asserted that the bargaining proposals, standing alone, constituted bad faith bargaining.  *Id.* at 469.  This Court disagreed, and citing *American National*, held:

> The company here did not violate the Act by insisting on
> a clause by which it would maintain exclusive control over
> merit increases.  Because there was no violation of the Act,
> the Board's basis for finding bad faith in bargaining with
> regard to merit review clause fails.
>
> *   *   *
>
> The Board also found that the company's demand for
> unilateral control of promotional opportunities by
> proposing elimination of the posting and bidding

> provisions was evidence of bad faith bargaining. A similar analysis controls this issue, and again, *American National* is dispositive. There is no per se violation of the Act in attempting to obtain control over conditions of employment during the bargaining process.

*Id.* at 470.

*Cincinnati Newspaper Guild, Local 9 v. NLRB*, 938 F.2d 284 (D.C. Cir. 1991) is also instructive. There, the general counsel argued that "it is our position ... that [the Enquirer's] insistence-the proposals they made with respect to wages, arbitration, and a strike, amounted to a per se refusal to bargain on their part … Per se violative, because they were insisting on the unilateral right to determine employees' wages." *Id.* at 288. The circuit court was dismayed by the argument, noting:

> This should be the end of the matter, for the courts have held that the Act precludes almost any argument that a particular bargaining position constitutes an unfair labor practice per se. As the Board and the ALJ recognized in this case, the Supreme Court has long held that the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.'
>
> *      *      *
>
> Apart from its bargaining position, the complaint against the Enquirer alleged no action evidencing bad faith. Nor does the record disclose any other evidence that the Enquirer bargained in bad faith. The Board was clearly correct, therefore, in refusing to find that the Enquirer committed no unfair labor practice, and in rejecting the Guild's implicit argument that the NLRA requires an

24

> employer to accede to a union's demand for wage scales and job classifications. Accordingly, the petition for review is Denied.

*Id.* at 288, 290 (quoting *American National*, 343 U.S. at 404). The court went on to state that when confronted with any argument that "an employer's bargaining position amounted to a per se refusal to bargain in good faith, the courts of appeal have been skeptical at best." *Id.* at 288-89 (internal page number omitted) (citing cases from multiple circuits, including *Struthers*).

Applying the law to the instant matter, the answer is clear: there is *nothing* unlawful about the Post-Gazette's proposals. *American National* and *Struthers* teach that an employer *may* propose language that gives the employer discretion over mandatory subjects of bargaining. Indeed, the work jurisdiction provisions in *Struthers* are identical to the proposals the NLRB alleges are unlawful here. Further, the discretion to select candidates for promotion at issue in *Struthers* is identical to the discretion that the Post-Gazette sought with its layoff proposal.

*Struthers* is also instructive because, like the instant matter, other labor unions representing the company's employees *accepted* the proposals the NLRB alleged were unlawful. 721 F.2d at 470 ("Moreover, the company's proposal should not be deemed to be beyond the bounds of reasonable bargaining because a similar proposal *was accepted by the technical unit*") (emphasis added). The Post-Gazette's proposals, alleged to be bad faith bargaining here, were nearly identical to proposals

*accepted* by the International Brotherhood of Electrical Workers, the Operating Engineers, and the International Association of Machinists & Aerospace Workers. Indeed, the Post-Gazette's proposals (or substantially similar language) on work hours, bargaining unit work, layoffs, and no-strike provisions, were accepted by the unions in 2018-2021 during the same time the Post-Gazette negotiated with the Guild.

  2. <u>The "Less Rights" Theory is Inconsistent with the Standard for Bad Faith Bargaining.</u>

  The traditional standard for determining bad faith bargaining looks at the "totality of the circumstances" to determine if the party "participate[d] actively in the deliberations so as to indicate a present *intention* to find a basis for agreement." *The Developing Labor Law: The Board, the Courts, and the National Labor Relations Act*, Chapter 13. Duty to Bargain (2023) (emphasis in original); *see also Radisson Plaza Minneapolis v. NLRB*, 987 F.2d 1376, 1381 (8th Cir. 1993) ("In determining the existence of bad faith bargaining, we examine the employer's conduct in the totality of the circumstances in which the bargaining took place. Moreover, we have noted that the Board not only looks to the employer's behavior at the bargaining table but also to its conduct away from the table that may affect the negotiations"). The "totality of the circumstances" standard was recently reiterated by the Board in *10 Roads Express*, 372 NLRB No. 105, slip op at *5 (July 14, 2023), which held that:

> [t]o determine whether a party has violated its duty to bargain in good faith, the Board 'looks to the totality of the circumstances in which the bargaining took place.' Based on those circumstances, it must be decided whether the employer engaged in hard but lawful bargaining or crossed the line and unlawfully frustrated the possibility of arriving at any agreement.

*Id.* at *5 (internal citations omitted).  Indeed, in *Phillips 66*, 369 NLRB No. 13 (2020), the Board held that a "judge's findings that an employer bargains in bad faith based solely on its substantive proposals … cannot be reconciled with [the *American National*] principles." *Id.* at *4.

The "less rights" theory is flawed because it *only* looks at the Post-Gazette's bargaining proposals.[2]  It fails to consider the totality of circumstances including the number of bargaining sessions, the Guild's conduct and positions in bargaining, and the Company's conduct away from the table.  Indeed, there are *no* allegations that the Post-Gazette did anything, outside of its proposals, to frustrate the bargaining process.

    3.    The NLRB is Inappropriately Judging the Post-Gazette's Bargaining Proposals.

---

[2]    The "less rights" theory doesn't make sense.  The exchange of rights is the premise of contractual law and "consideration" – to gain a right, a party must give up a right.  Based on the NLRB's logic *every* employer that proposes a "no-strike" clause violates the Act.  Similarly, a union security and dues check-off provision would be unlawful because it strips the employees' of a right (the right to not join the union and the right not to pay union dues).

In *American National*, the Court held that "it is … clear that the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." *Id.* at 404.  Further, in *H.K. Porter*, the Court warned:

> [T]he object of the [Act] was not to allow governmental regulation of the terms and conditions of employment, but rather to ensure that employers and their employees [can] work together to establish mutually satisfactory conditions …[A]greement might in some cases be impossible, and it was *never intended* that the Government would in such cases step in, become a party to the negotiations and impose its own view of a desirable settlement.

397 U.S. at 103-04 (emphasis added).  This Court recognized this issue in *Struthers*:

> It appears that the Board, by finding bad faith in these lawful proposals, is doing exactly what it may not do.  The Supreme Court has stated that 'the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements.'  The Court has further stated that § 8(d) was meant to prevent the Board from controlling the settling of the terms of collective bargaining agreements.  We conclude, therefore, that here the Board has improperly injected itself into the bargaining process.

721 F.2d at 470 (quoting *American Nat.*, 343 U.S. at 404).

Despite these warnings, this is precisely what the NLRB has done in this case.  Because of the anticipated operational changes at the Company as print days were anticipated to be eliminated and the unknown business environment the Post-Gazette was entering by transitioning to a digital newspaper, the Company proposed

28

discretion in proposals where it believed the transition to a digital newspaper would affect future operations during the successor contract. The Post-Gazette fully explained the reasons for, and justifications for its proposals, and the ALJ and Board found that the Company did so. The Post-Gazette's proposals are legally permissible, and the NLRB does not get to second guess the proposals.

    4.    The "Less Rights" Theory Conflicts with *10 Roads*.

*10 Roads* establishes that a party does not engage in "bad faith" bargaining if it explains the basis for its proposals, even if the proposal is "predictably unacceptable." The Board explained:

> The Respondent also articulated specific reasons for seeking to retain discretion to amend the 'emergency' wage increase--namely, to address labor shortages and to make adjustments as market conditions changed. We note that even the Union admits in its briefing that, at the time of the offer, there was 'a record industry labor shortage' and otherwise volatile economic conditions. The Respondent's explanation of legitimate and bona fide reasons for the condition behind its proposal, in the circumstances here, thus tends to evince good faith rather than bad faith bargaining.
>
>        \*      \*      \*
>
> Under the circumstances presented, the Respondent's action does not reflect … a 'take it or leave it' tactic inconsistent with good-faith bargaining.

372 NLRB No. 105, slip op at \*5-6. Here, ALJ Carter acknowledged "I do not find merit to the argument that Respondent failed to explain its proposals to the Union."

[JA0025]. Indeed, while bargaining, the Company provided position statements setting forth at length its reasoning for the proposals.

Despite *10 Roads* instructing employers that it bargains in good faith if it explains its bargaining proposals and there is a rationale for the proposals, the NLRB asks this Court to ignore the Board's own precedent and find bad faith bargaining based *solely* on the Post-Gazette's bargaining proposals.

5.     The "Less Rights" Theory is Contrary to *Endurance Environmental*.

Last month, the NLRB changed its standard for determining whether a union waives its right to bargain during the term of a contract. The NLRB overturned the "contract coverage" standard announced in *MV Transportation*, 368 NLRB No. 66 (2019) and adopted the "clear and unmistakable" waiver standard. *Endurance Environment*, 373 NLRB No. 141, at *1. The Board held: "As we have explained, nothing about the waiver standard disfavors management-rights provisions. Instead, the waiver standard requires parties seeking to displace the statutory duty to bargain to do so clearly and unmistakably." *Id.* at *24. The NLRB explained:

> The waiver standard … effectively requires the parties to focus on particular subjects over which the employer seeks the right to act unilaterally. Such a narrow focus has two clear benefits. First, it encourages the parties to bargain only over subjects of importance at the time and to leave other subjects to future bargaining. Second, if a waiver is won – in clear and unmistakable language – the employer's right to take future unilateral action should be apparent to all concerned.

*Id.* at *15.  The NLRB reasoned that "negotiators – who must be presumed to be aware of the Act – know how to draft language that clearly and unmistakably waives the statutory right to bargain over particular employment terms." *Id.* at *12.  The NLRB's new standard means that if an employer wants discretion to make unilateral changes, its bargaining proposals *must* make the discretion crystal clear.  It also highlights that discretion is permissible provided the union has full knowledge of what it is agreeing to.

The "less rights" theory attacks the Post-Gazette for doing precisely what *Endurance Environment* teaches employers to do – if you need discretion, you better make it clear.  The NLRB cannot have it both ways – the Board cannot require a bargaining proposal granting an employer discretion to act unilaterally to be "clear and unmistakable," and then assert that by doing just that, the employer violates the Act.

> 6.    The "Less Rights" Theory Interferes with the Post-Gazette's Rights Under *First National Maintenance*.

Under *First National Maintenance*, an employer's decision to change the scope and direction of its business is nonbargainable because it "is akin to the decision whether to be in business at all, not in itself primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment." 452 U.S. at 677 (quotations omitted).  The Post-Gazette's decision to

transition to an "all-digital format" is one of these decisions.

In *PG Publishing Co., Inc. v. NLRB*, 83 F.4th 200 (3d Cir. 2023), a unanimous panel recognized this right and rejected the NLRB's argument that the Post-Gazette was somehow prohibited from laying off employees as part of its transition to an "all-digital format" based on the terms of an expired agreement. In reaching its holding, this Court noted '[t]he elimination of a line of business often results in redundancies … reinstating employees who were once needed and had done fine work still makes no sense when there is little or no work for them to do." *Id.* at 222.

*First National Maintenance* is relevant to the "less rights" theory because the Post-Gazette understood at the commencement of successor bargaining that it needed discretion to assign work, assign hours, and lay off employees as work opportunities declined because of the operational changes it anticipated during the term of the successor contract due to the termination of print and digital publication days as it transitioned to an uncertain digital future. If the Post-Gazette could not retain discretion in some of its proposals in the successor agreement, the Company would be contractually prohibited from transitioning to an "all-digital format," which is its right under *First National Maintenance* and would be saddled with fixed terms and conditions of employment in a contract. The inability to retain discretion would preclude the Post-Gazette's ability to make operational decisions based on effects of its entrepreneurial decision to sunset print and digital publication days.

32

Indeed, how could the Post-Gazette guarantee work hours if there was no work to perform?

       7.    <u>Any Reliance on *Altura* is Misplaced</u>.

In support of his "less rights" holding, ALJ Carter cited positively to *Altura*. However, the case does not support the "less rights" theory. First, the theory of liability in *Altura* demonstrates the distinction from "less rights:"

> The General Counsel's case for bad-faith bargaining does not rest solely, or even primarily, on the nature of the proposals advanced by the Respondent. Rather, the General Counsel argues that--apart from the nature of proposals insisted upon by the Respondent--the Respondent's bargaining conduct also supports a finding of bad-faith bargaining. Specifically, the General Counsel contends that the Employer repeatedly and prematurely declared impasse, bargained with no intention of reaching an agreement, refused to meet at reasonable times and/or places, and insisted that the union provide advance contract proposals as a condition of further bargaining. Finally, the General Counsel contends that the Employer unilaterally and unlawfully implemented portions of its bargaining proposal on January 1, 2016.

369 NLRB No. 85 (pin citations omitted in the opinion). In contrast, the "less rights" theory rests *solely* on the Post-Gazette's bargaining proposals. Second, in *Altura*, the NLRB applied the correct standard for bad faith bargaining. *Id.* ("The essence of bad-faith bargaining is a purpose to frustrate the possibility of arriving at any agreement, and the Board looks to the totality of the employer's conduct"). Third, the employer's conduct in *Altura* was extreme and included a refusal to meet at

reasonable times to bargain. *Id.* Fourth, unlike the instant matter, in *Altura*, there was no evidence the labor union bargained in bad faith.

Finally, this Court has not approved of a case like *Altura*. In *New Concepts*, this Court rejected the NLRB's argument that an employer bargained in bad faith by proposing "a wage freeze, elimination of dues checkoff and union security, and elimination of arbitration." 94 F.4th at 287. This Court reasoned that the employer did not bargain in bad faith because, like the Post-Gazette, the employer provided reasoning for each of its proposals. *Id.* at 287-88. Based on *New Concepts*, the "less rights" theory is non-starter.[3]

## B.    The Post-Gazette was Privileged to Declare Impasse and Implement Some of its Bargaining Proposals.

The Board asserts that the parties were not at impasse, despite 3½ years of negotiations and 24 bargaining sessions, because (1) the Company's bargaining proposals violated the "less rights" theory, rendering an impasse impossible, (2) "[w]hen the parties concluded their February 24, 2020 bargaining session, they had

---

[3]    The NLRB appears to argue that its "less rights" theory was blessed in *In re Public Service Company of Oklahoma (PSO)*, 334 NLRB No. 68 (2001), however, in that case the Board only utilized this theory as *part* of its "totality of the circumstances" analysis. *Id.* at *487-48. The case was not based *solely* on the bargaining proposals, as the NLRB noted the "Respondent's conduct away from the bargaining table confirms that it was focused more intently on eliminating its bargaining obligation" since it sent employees an email "soliciting them to notify the Respondent that they no longer wished to be represented by the Union." *Id.* at 489-90. No such allegations are present here.

not yet finished discussing the Union's contract proposal from September 2019," (3) the "parties did not have a bargaining session to discuss Respondent's last, best, and final offer," and (4) the Guild "had attempted to schedule further bargaining." [JA0083-0084]. The NLRB's conclusions are contradicted by the facts and the law.[4]

In *Saunders House*, this Court instructed that impasse is examined through the (1) bargaining history, (2) good faith of the party claiming impasse, (3) length of negotiations, (4) importance of the issues upon which there is disagreement, and (5) understandings of the parties at the time impasse is declared. 719 F.2d at 687.

The Board's decision in *Phillips 66* is instructive. In *Phillips 66*, after bargaining "11 times over approximately 7 months," the employer implemented its final offer. 369 NLRB No. 13, at *7. At the time of the final offer, both sides indicated a general "willingness to compromise," but "each side stood firm on its proposals regarding the critical issues." *Id.* at *7-8. First, the Board held that it "is clear [the parties] took the necessary time to understand each other's positions and attempt to bridge the gaps" based on the length of negotiations. *Id.* at *7. Second,

---

[4]     In its Decision, the NLRB stated that the Post-Gazette "implemented terms that differed from its final offer." [JA0117]. This is red herring. First, the ALJ explicitly did not address this allegation, dismissing it as "moot." [JA0034]. As such, the allegation was not before the Board. Second, the Post-Gazette refrained from implementing the *discretionary* aspects of its proposals because doing so would violate the law. *See McClatchy Newspapers, Inc. v. NLRB*, 131 F.2d 1026 (D.C. Cir. 1997). ("an employer cannot implement (i.e., take action) pursuant to a clause that gives it unfettered discretion to act, even if the clause itself was placed into effect after impasse").

the Board found the parties' vague statements about a "willingness to compromise"

to be insufficient to break an impasse, holding:

> A party's bare assertions of 'flexibility' on open issues and its generalized promises of 'new' proposals" do not, without more, demonstrate a significant change in bargaining position. Rather, there must be substantial evidence in the record that establishes changed circumstances sufficient to suggest that future bargaining would be fruitful.
>
> *    *    *
>
> Neither party made specific proposals or counterproposals, or indeed, statements with any substance whatsoever.

*Id.* at *13 (internal quotations and citations omitted).  Finally, the Board stressed that

the parties were deadlocked on the key issue:

> In sum, despite assertions of flexibility devoid of substance and minor movement on issues of secondary importance, the parties took opposing positions on the critical issues, all of which related to the consequences of removing the incident commander function from the HSS specialists. The parties bargained in good faith but were unable to reach agreement on the key issues. The Act requires nothing more.

*Id.* at *9.

Applying the law to the facts, here an impasse is clear:

- *Bargaining history and length of negotiations.*  The Post-Gazette and Guild bargained 24 times over the course of 3½ years – thus, the bargaining history and length of negotiations clearly supports an impasse. *See Laurel Bay Health & Rehab. Ctr. v. NLRB*, 666 F.3d 1365, 1374-75 (D.C. Cir. 2012) (finding impasse after six

months of negotiations when the parties remained far apart); *Calmat Co.*, 331 NLRB 1084, 1099 (2000) (finding impasse after seven months and 10 bargaining sessions when neither party would modify its position on a critical issue).

- *The Post-Gazette's bargaining conduct.*  The only allegation of bad faith bargaining against the Post-Gazette is that its proposals violated the "less rights" theory – thus, the Company bargained in good faith.

- *Importance of issues on which the parties disagreed.*  Critically, the Post-Gazette and Guild were far apart on *key* issues that were instrumental to the continued viability of the Company. Specifically, with respect to health insurance – the Post-Gazette insisted on moving the employees to the Company's plan and the Guild refused (even stating "[o]f course, we are not going to accept the company's proposal" to leave the Fund).  [JA1652]. With respect to guaranteed work hours – the Post-Gazette could not guarantee hours because it didn't know how much work would be needed during and after its transition to an "all-digital format," while the Guild insisted on a guarantee.  Concerning layoffs, the Post-Gazette wanted to consider an employee's skill set, while the Guild was only interested in straight seniority. Finally, the parties disagreed on who was eligible to perform bargaining unit work.

- *The understanding of the parties.*  At the time the Post-Gazette declared impasse, the Guild had terminated negotiations and labeled the negotiations "worthless" and "fruitless."  In response to the Post-Gazette's Final Offer, the Guild made *no movement* and offered *no counter proposal*.  Indeed, the Guild would only meet if the Post-Gazette amended its Final Offer to the Guild's satisfaction.  This is not surprising because from the beginning of negotiations the Guild made clear it was "done making concessions."

Turning to the NLRB's arguments:

- *First*, the Post-Gazette could not respond *in person* to the Guild's September 2019 offer because the Guild *terminated* negotiations.

Instead, after the Guild refused to meet, the Post-Gazette provided a comprehensive position statement and response to the Guild's September 2019 offer (which the Guild ignored).

- *Second*, the parties did not have a bargaining session concerning the Post-Gazette's Final Offer because the Guild never offered to meet. Again, the Guild would only meet if the Post-Gazette amended its Final Offer to the Guild's satisfaction.

- *Finally*, the fact the Guild expressed a willingness to meet is irrelevant because the Guild never changed its bargaining proposals, never agreed to the Post-Gazette's proposals nor did it request to meet. *See Saunders House*, 719 F.2d at 688-89 ("We conclude that a mere shift from a position off the record to one on the record is not a concession sufficient to preclude a finding of impasse. The union did not propose anything on April 15 that it had not presented to the employer at an earlier date"). The Guild's bald statement: "we believe further negotiations would be fruitful if the Employer comes to the table with an open mind and a willingness to discuss proposals" does not break an impasse. Indeed, the Guild's statement is like the facts in *Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227 (D.C. Cir. 1996), in which the court held that an impasse was not avoided where "not a single one of the Union's statements … actually committed the Union to a new position or contained any specific proposals … the Union's attorney offered only vague generalities and neither explicitly agreed to any of the employer's proposals nor offered any specific counterproposals." *Id.* at 233. Here, the Guild showed no indication it was willing to move off its proposals – instead, it instructed the Post-Gazette to change its position.

In addition, the NLRB's argument ignores the Guild's bad faith bargaining tactics. *See Jefferson Smurfit Corp.*, 311 NLRB 41, 60 (1993); *M&M Contractors*, 262 NLRB 1472, 1472 (9th Cir. 1982). Notwithstanding the lawful impasse, courts have recognized a defense permitting implementation of an employer's final offer in

the absence of impasse based on a union's bad faith bargaining tactics. As the court noted in *NLRB v. Auto Fast Freight, Inc.,* 793 f.2d 1126 (9th Cir. 1986):

> There exists a narrow exception to the bargain to impasse rule: where, upon expiration of a collective-bargaining agreement, the union has avoided or delayed bargaining, and the employer has given notice to the Union of the specific proposals the employer intends to implement, the employer may unilaterally implement the proposals without first bargaining to impasse.

*Id.* at 1129. Here, the Guild's bad faith was rampant. The Guild only agreed to meet *one time* between September 2019 and the Post-Gazette's Final Offer (approximately nine months later). Further, the Guild made repeated regressive proposals throughout bargaining without any justification. Finally, the Guild insisted upon permissive subjects of bargaining.

The NLRB's failure to find an impasse is erroneous.

**C.    The Decision's Unlawful One Time Surveillance Finding is Not Supported by Substantial Evidence and the Guild's Members Did Not "Shun Identification."**

At the outset, the surveillance finding is not supported by the facts. There is no evidence that the security officers photographed Guild members at Block's private residence. There is no photograph taken by any security officer in the record. Moreover, the only evidence is a photograph taken *by a Guild member* showing a security officer looking at his phone. Indeed, ALJ Carter only found that the officer "*appeared*" to take a photograph. Further, it is undisputed that the Post-Gazette did

not instruct the security officers to photograph the employees.  As such, the Decision's finding is not supported by *any* evidence, let alone *substantial* evidence.

The one-time surveillance finding is not supported by the law either.  It is well-settled that management officials do not create an unlawful impression of surveillance when monitoring activity that is conducted openly, especially where it is conducted on company premises, unless the officials act in an out-of-the-ordinary surreptitious manner.  *See Wal-Mart Stores, Inc.*, 350 NLRB 879, 883 (2007); *Rogers Electric, Inc.*, 346 NLRB 508, 509 (2006).  Unlawful surveillance is found when, under the totality of the circumstances the surveillance has a reasonable tendency to interfere with, coerce, or restrain employees in the exercise of their rights.  *See NLRB v. Armcor Industries, Inc.*, 535 F.2d 239 (3d Cir. 1976).  As such, an employee must believe that they will be retaliated against for engaging in the protected activity.  *See Sheraton Anchorage*, 363 N.L.R.B. 53, 57 (2015); *NLRB v. Computed Time Corp.*, 587 F.2d 790, 794 (5th Cir. 1979); *Hendrix Mfg. Co. v. NLRB,* 321 F.2d 100, 104-05 n.7 (5th Cir. 1963).

In *U.S. Steel Corp. v. NLRB*, 682 F.2d 98 (3d Cir. 1982), this Court noted that a key issue in unlawful surveillance cases is whether the employees were attempting to "shun identification." *Id.* at 103 fn. 17.  Specifically:

> Indeed, the employees and the Union actively sought publicity of the demonstration. Through the efforts of a publicity committee formed for this purpose, the public and the media were given advance notice of the

> demonstration. As a result of these efforts, 1) a local newspaper publicized the demonstration nine days beforehand; 2) a Chicago area television station broadcast a film of the demonstration within one hour after it ended; 3) photographers from two Chicago area newspapers photographed the demonstrators; and 4) the newspaper of Local 65, which represents the employees involved, carried on the front page of its December 1979 issue photographs depicting identifiable demonstrators at the event, with an accompanying description . . . The Board argues that picture-taking by third parties does not justify picture-taking by the employer, since the latter has the exclusive power to discipline. We need not confront this issue. We simply note that the seeking of publicity may be a relevant factor in determining whether, under the circumstances, employees feared future reprisals.

*Id.* Likewise, here the Guild chose to conduct its demonstration at Block's family residence and published photographs of the same. Based on the Guild's publication of the photographs it is unclear how employees were concerned about any "reprisals" under these circumstances. The unlawful surveillance finding lacks merit.

### D.    The Board Lacks the Authority to Issue a *Thryv* Remedy.

In *Starbucks*, this Court addressed an employer's argument that the Act "only authorizes equitable relief and the *Thryv* remedy allows legal relief in the form of damages." 2024 WL 5231549, at *11. The Court agreed, stating the Act "limits the Board's remedial authority to equitable, not legal relief." *Id.* The court reasoned: "Simply put, the Board's current order exceeds its authority under the NLRA." *Id.* at *12. Further, the court concluded:

> We vacate, however, the portion of the Board's order that requires Starbucks to 'compensate Bussiere and Nowakowska for any direct or foreseeable pecuniary harms incurred as a result of the unlawful adverse actions against them … That portion exceeds the Board's authority under the NLRA.

*Id.* Here, the Board's *Thryv* remedy is dead-on-arrival for the same reason. The Board lacks the authority to order the Post-Gazette to "compensate all bargaining unit employees for any other direct or foreseeable pecuniary harms incurred as a result of the unlawful changes" and "to compensate the Union for all bargaining expenses it incurred" while bargaining.

## VIII.  **CONCLUSION**

This is a case of the Board attempting to dictate the Post-Gazette's bargaining proposals and put its finger on the scale in favor of the Guild. In doing so, the NLRB goes well beyond its statutory authority. The Post-Gazette's Petition should be granted.

Respectfully submitted,

*/s/ Brian M. Hentosz*
Brian M. Hentosz (PA No. 317176)
Morgan S. Dull (PA No. 322712)
LITTLER MENDELSON, P.C.
625 Liberty Avenue, 26th Floor
Pittsburgh, PA 15222
PH: 412-201-7676 / 7657
FX: 412-291-1241
bhentosz@littler.com
mdull@littler.com

Dated: January 13, 2025

Attorneys for Petitioner
*PG Publishing, Inc. d/b/a Pittsburgh*
*Post-Gazette*

## CERTIFICATE OF BAR MEMBERSHIP, COMPLIANCE WITH TYPE-VOLUME LIMITATION AND TYPEFACE REQUIREMENTS, AND VIRUS CHECK

I, Brian M. Hentosz, counsel for Petitioner PG Publishing Co, Inc. d/b/a Pittsburgh Post-Gazette, certify, pursuant to Local Appellate Rule 28.3(d) that I am a member in good standing of the Bar of the Court of Appeals for the Third Circuit. I further certify, pursuant to Federal Rules of Appellate Procedure 32(a)(5)-(7), and Local Appellate Rules 31.1(c) and 32.1(c), that the foregoing Petitioner's Brief is proportionately spaced and has a typeface of 14-point Times New Roman, contains 10,199 words (not counting those portions excluded from the word count by Rule 32(a)(7)(B)(iii)), and that the text of the electronic brief is identical to the text of the paper copies. I further certify, pursuant to Local Appellate Rule 31.1(c), that Windows Defender has been run on this Brief before filing and that no virus was detected.

Dated: January 13, 2025

*/s/ Brian M. Hentosz*
Brian M. Hentosz (PA No. 317176)
Morgan S. Dull (PA No. 322712)

Attorneys for Petitioner,
*PG Publishing, Inc. d/b/a Pittsburgh Post-Gazette*

## <u>CERTIFICATE OF SERVICE</u>

I, Brian M. Hentosz, counsel for Petitioner Pittsburgh Post-Gazette, certify that on January 13, 2025, I filed the foregoing Petitioner's Brief with Joint Appendix Volume I via the Court's CM/ECF system, causing a Notice of Docket Activity to be served upon the following counsel of record who are registered CM/ECF Filing Users, along with a paper copy via Federal Express:

Joseph J. Pass
219 Fort Pitt Boulevard
Pittsburgh, PA 15222
jjp@jpilaw.com

Ruth E. Burdick
David Seid
Milakshmi V. Rajapakse
Meredith Jason
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
ruth.burdick@nlrb.gov
david.seid@nlrb.gov
milakshmi.rajapakse@nlrb.gov
meredith.jason@nlrb.gov

Pursuant to Local Appellate Rule 31.1(a), seven (7) identical copies of this Petitioner's Brief with Joint Appendix Volume I were sent to the Clerk of the Court via Federal Express:

Patricia S. Dodszuweit, Clerk
Office of the Clerk
United States Court of Appeals for the Third Circuit
21400 United States Courthouse
601 Market Street
Philadelphia, PA 19106-1790

Dated: January 13, 2025

*/s/ Brian M. Hentosz*
Brian M. Hentosz
Morgan S. Dull
Attorneys for Petitioner,
*PG Publishing, Inc. d/b/a Pittsburgh
Post-Gazette*

4910-5060-2251.1 / 105601-1009

2

4907-5252-7119