**No. 24-2788 and 24-3057**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

---

PG PUBLISHING CO., INC. d/b/a PITTSBURGH POST-GAZETTE

*Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent*,

and

NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061

*Intervenor- Respondent.*

---

Petition for Review of National Labor Relations Board Decision and Order

---

**JOINT APPENDIX - VOLUME I, PP. JA0001 – JA0144**

---

Brian M. Hentosz (PA No. 317176)
Morgan S. Dull (PA No. 322712)
LITTLER MENDELSON, P.C.
1 PPG Pl., Ste 24
Pittsburgh, PA 15222
PH: 412-201-7676 / 7622
FX: 412-291-1241
bhentosz@littler.com
mdull@littler.com

*Attorneys for Petitioner
PG Publishing, Inc. d/b/a Pittsburgh
Post-Gazette*

# **<u>TABLE OF CONTENTS</u>**

1.    January 26, 2024 Administrative Law Judge's Decision ....... JA0001-JA0050

2.    September 20, 2024 Board's Decision and Order .................. JA0051-JA0078

3.    September 27, 2024 Petition for Review
      (24-2788, Doc 1-1) ................................................................. JA0079-JA0110

4.    October 31, 2024 NLRB's Cross-Application
      for Enforcement (24-3057, Doc 1-1)..................................... JA0111-JA0144

JD-05-23
Pittsburgh, PA

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES

PG PUBLISHING CO., INC.,
d/b/a PITTSBURGH POST-GAZETTE

    and

NEWSPAPER GUILD OF PITTSBURGH/CWA
LOCAL 38061

Cases  06–CA–248017
06–CA–263791
06–CA–269346

*Julie Stern, Esq.*,
    for the General Counsel.
*Mark Hunt, Michael Oesterle,* and *Jennifer Sherman, Esqs.*,
    for the Respondent.
*Joseph Pass, Esq.*,
    for the Charging Party.

DECISION

GEOFFREY CARTER, Administrative Law Judge.  The General Counsel alleges that PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette (Respondent) violated the National Labor Relations Act (the Act) by: failing and refusing to bargain in good faith with the Newspaper Guild of Pittsburgh/CWA Local 38061 (Union or Charging Party) since about March 11, 2019; unilaterally implementing terms and conditions of employment on about July 27, 2020, when the parties had not yet reached an overall good-faith impasse in negotiations for a successor collective-bargaining agreement; and unlawfully surveilling employees in September and October 2020, while they engaged in union activities, or creating the impression among employees that their union activities were under surveillance.  As explained below, I have found that apart from a few limited exceptions, Respondent violated the Act as alleged.

STATEMENT OF THE CASE

This case was tried in Pittsburgh, Pennsylvania, on September 19–22 and October 12, 2022.  The Union filed the unfair labor practice charges in this case on the following dates:

| Case | Filing Date | Amendment Date(s) |
|------|-------------|-------------------|
| 06–CA–248017 | September 11, 2019 | April 7, 2021 |
| 06–CA–263791 | July 29, 2020 | March 9, 2021 |
| 06–CA–269346 | November 20 , 2020 | February 23, 2021, June 22, 2021, June 28, 2021, and October 20, 2021 |

1

JD-05-23

On April 27, 2022, the General Counsel issued a consolidated complaint in which it alleged that Respondent violated Section 8(a)(5) and (1) of the Act by failing and refusing to bargain collectively and in good faith with the Union as the exclusive collective-bargaining representative of employees in the bargaining unit. Specifically, the General Counsel alleged

5   Respondent:

(a) by its overall conduct since about March 11, 2019, failed and refused to bargain in good faith with the Union as the exclusive collective-bargaining representative of the bargaining unit;

10

(b) on about July 27, 2020, unilaterally implemented terms and conditions of employment for employees in the bargaining unit without first bargaining with the Union to an overall good-faith impasse for a successor collective-bargaining agreement, or alternatively (if it is determined that the parties bargained to an overall good-faith impasse) implementing

15   terms and conditions of employment that were not reasonably comprehended by Respondent's pre-impasse proposals without affording the Union an opportunity to bargain; and

(c) on about July 27, 2020, implementing a discretionary proposal concerning the

20   performance of bargaining unit work by non-Unit employees, and thereby retaining unilateral discretion over the performance of bargaining unit work by non-Unit employees and undermining the status of the Union as the employees' exclusive collective-bargaining representative.

25   The General Counsel also alleged that Respondent violated Section 8(a)(1) of the Act by interfering with, restraining, and coercing employees in the exercise of rights guaranteed in Section 7 of the Act. Specifically, the General Counsel alleged that Respondent engaged in surveillance of employees who were engaged in union activities and/or created an impression among its employees that their union activities were under surveillance by taking pictures and/or

30   video recordings on September 25, October 24 and 31, 2020. Respondent filed a timely answer denying the alleged violations in the consolidated complaint.

On the entire record,[1] including my observation of the demeanor of the witnesses, and after considering the briefs filed by the General Counsel, Charging Party, and Respondent, I

35   make the following

---

[1] The transcripts and exhibits in this case generally are accurate. During my review of the record, however, I identified transcript corrections that are warranted. In addition, both the General Counsel and Respondent proposed corrections to the transcripts. For the most part, the parties did not oppose each other's suggested corrections. For disputed proposed corrections and a handful of unopposed proposed corrections, I allowed the transcripts to stand unless I could confirm the correction through my memory of the testimony and/or other information in the evidentiary record. The transcript corrections that I have identified, along with proposed corrections that I have accepted, are set forth in Appendix B to this decision. I have denied any requests for transcript corrections that do not appear in Appendix B.

FINDINGS OF FACT[2]

I. JURISDICTION

5

At all material times Respondent, a Pennsylvania corporation with an office and place of business in Pittsburgh, Pennsylvania, has been engaged in the business of publishing the Pittsburgh Post-Gazette, a print and electronic newspaper.  Respondent annually derived gross revenues in excess of $200,000 and: held membership in and subscribed to various interstate
10    news services, including Associated Press; published various nationally syndicated features; and advertised various nationally sold products.  During the same time period Respondent also purchased and received products, goods, and materials at its Pittsburgh, Pennsylvania facility that were valued in excess of $5,000 and came directly from points outside the Commonwealth of Pennsylvania.   Respondent admits, and I find, that Respondent has at all material times been
15    an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act. Respondent also admits, and I find, that the Union at all material times has been a labor organization within the meaning of Section 2(5) of the Act.

II. ALLEGED UNFAIR LABOR PRACTICES

20

*A. Background*

For several years, Respondent has recognized the Union as the exclusive collective-bargaining representative of employees in the following appropriate bargaining unit:

25

All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy
30    Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

35

(Jt. Exh. 1.)  Consistent with that recognition, Respondent and the Union have executed successive collective-bargaining agreements, the most recent of which was effective from October 15, 2014, through March 31, 2017.  (GC Exh. 2; see also Tr. 75–77.)

40        In contract negotiations between about 1992 and 2014, Respondent bargained with representatives of several bargaining units[3] (collectively referred to as the "unity council") about

---

[2]  Although I have included several citations in this decision to highlight particular testimony or exhibits in the evidentiary record, I emphasize that my findings and conclusions are not based solely on those specific citations, but rather are based on my review and consideration of the entire record for this case.
[3]  In addition to the bargaining unit represented by the Union, other bargaining units included: Advertising; Circulation and Distribution; Electricians; Finance; Machinists; Mailers (two units);

wages and healthcare. After those initial negotiations concluded, the Union and representatives of each of the other bargaining units negotiated separately with Respondent for their own contracts. The separate contracts incorporated the jointly negotiated wage and healthcare provisions. (Tr. 79–80.)

5

### B. January 10, 2017: Respondent Requests Bargaining for a Successor Collective-Bargaining Agreement

10    On January 10, 2017, Respondent sent a letter to the Union to advise that it wished to open negotiations for a successor collective-bargaining agreement. Respondent also provided the Union with a copy of Respondent's initial contract proposal. Upon noticing that Respondent's initial contract proposal did not include any markings to show the changes that Respondent was proposing for terms and conditions of employment (in comparison to the expiring contract), the Union asked Respondent to provide a redlined version of the initial

15    proposal. Respondent subsequently sent the Union a copy of the initial proposal that highlighted new language in yellow and struck through language that Respondent proposed to eliminate. (GC Exhs. 3–4; Tr. 82–86, 701–702.) On about February 8, 2017, the Union sent Respondent a copy of the Union's initial contract proposal. (Tr. 802–803; GC Exh. 5; R. Exh. 69.)

20    At some point on or before February 12, 2017, Respondent notified the Union that Respondent planned to negotiate individually with each bargaining unit and therefore would not be bargaining with the unity council about wages and healthcare. (Tr. 81, 195; R. Exh. 31; see also GC Exh. 10 (par. 1).) There is no evidence that the Union objected to bargaining separately as Respondent proposed.

25

### C. March 10, 2017: First Bargaining Session

On March 10, 2017, Respondent and the Union met for their first bargaining session. Attorney Richard Lowe served as Respondent's chief negotiator, and was joined on the

30    bargaining team by senior human resources manager Linda Guest and newsroom manager Jerry Micco. Respondent hoped to negotiate concessions from the Union during bargaining because the newspaper was struggling financially due to competition from internet-based media and the resulting decline in print newspaper circulation and print advertising revenue. Among other concessions, Respondent indicated that the benefits under the current Teamsters Fund healthcare

35    plan were "too rich" and that Respondent wanted more staffing flexibility (such as allowing Respondent to use more freelance reporters and permitting managers to perform bargaining unit work) to adjust to changes that might arise due to Respondent's expectation that it would be moving towards a digital media business model in the future. (Tr. 91, 94, 96–97, 296, 298–299, 301, 303, 682, 685, 697, 803; R. Exh. 196 (pp. 1–2); see also Tr. 722–723 (noting that

40    Respondent was not claiming an inability to pay for increases in wages or benefits).)

Attorney Joseph Pass served as the Union's chief negotiator, and was joined on the bargaining team by Ed Blazina, Michael Fuoco, Jonathan Silver, Joe Smydo, and Melissa Tkach. The Union believed that it had made several concessions in previous years and was not inclined

45    to make additional concessions in the new contract. In particular, the Union noted that

---

Operating Engineers; and Pressmen. (Tr. 211–213, 296–297.)

JD-05-23

bargaining unit employees had not received a wage increase over the previous 11 years.  (Tr. 92, 179, 299, 302, 339–340, 688–689; R. Exhs. 189 (p. 1), 196 (p. 1); see also Tr. 802 (noting that with the exception of Pass, all members of the Union's bargaining team were working for Respondent as full-time journalists).)

5

Turning to specific aspects of its initial contract proposal, Respondent proposed that the bargaining unit switch from the Teamsters healthcare plan to the healthcare plan that Respondent provided for non-bargaining unit employees, with Respondent having the right to change or terminate the healthcare plan at its discretion.  Regarding the bargaining unit's jurisdiction and staffing, Respondent sought (among other changes from the expiring contract) the right to: assign bargaining unit work to supervisors, non-bargaining unit employees, and "stringers" (journalists working as independent contractors); change the length of employee work hours and work days; and consider performance, attendance, and qualifications (in addition to seniority) when selecting employees for layoffs.  Respondent also proposed: eliminating employees' ability to "bank" unused sick leave and instead covering employees under the company's short term disability policy (which Respondent reserved the right to modify in any way); and requiring grievances to be filed in writing within 10 days of the underlying event.  Respondent did not propose any increases to wages.  (Tr. 118–119, 128–129, 303, 338, 352–353, 366–367, 380–381, 697–698; GC Exh. 4.)

20

As for the Union's initial contract proposal, the Union sought wage increases of 7 percent each year, and also proposed eliminating all pension and wage "diversions" that existed in the expiring contract.[4]  On bargaining unit jurisdiction and staffing, the Union proposed: eliminating the use of stringers; and limiting the total number of 2–year associates, paid interns, and employees averaging less than 35 hours per week to 15 percent of the bargaining unit membership.  The Union also proposed (among other changes): increasing the amount of sick leave that employees accrued each year, as well as the amount of unused sick leave that employees could "bank"; and requiring Respondent to pay out unused sick leave when employees terminated their employment or retired.  (GC Exh. 5.)

30

### D.  Summary of Bargaining from April 6, 2017, through July 15, 2019

After their initial bargaining session, the parties met on 19 more occasions between April 6, 2017, and July 15, 2019, with each session lasting 4.5 to 6 hours.[5]  (Tr. 93; R. Exhs. 188, 190,

---

[4] Under the expiring contract, employees did not receive their full base wages because of a 2–percent pension "diversion" and an additional 8–percent wage "diversion" (it is not clear how Respondent actually used the diverted payments).  Thus, an employee earning $1000 per week would lose $20 as a pension diversion, and an additional $78.40 (8 percent of $980) as a wage diversion, leaving the employee with $901.60 for the week, before taxes and other deductions.  The total diversion amount was capped each calendar year at $4,000.  (GC Exh. 2, Art. III (describing the diversion percentages and caps that took effect on January 1, 2017); Tr. 137.)

[5] The bargaining sessions in this timeframe occurred on the following dates: April 6, 2017; May 3, 2017; June 12, 2017; September 1, 20, 2017; November 1, 28, 2017; January 4, 2018; February 9, 28, 2018; April 4, 11, 2018; May 3, 2018; September 18, 2018; November 14, 2018; December 13, 2018; January 31, 2019; May 20, 2019; and July 15, 2019.  (See R. Exhs. 188, 190, 192.)

5

JD-05-23

192.) As bargaining progressed, certain issues continued to be points of contention. The most prominent issues, and the parties' bargaining about them in this timeframe, are discussed below.[6]

## 1. Wages

5      The Union maintained that bargaining unit members needed a wage increase since wage rates had not changed for about 11 years. Respondent did not dispute that point, but took the position that the parties would need to "be creative" to come up with a workable wage increase due to the financial challenges that the newspaper was facing. (Tr. 339–340, 685.) With that backdrop, the parties made the following proposals about wages in this timeframe:

10

| Bargaining Session Date | Respondent Wage Proposal | Union Wage Proposal |
|---|---|---|
| March 10, 2017 | No increases to base wages<br><br>2% pension diversion<br><br>Wage diversion to be determined<br><br>(GC Exh. 4 (Art. III).) | 7 percent wage increase per year<br><br>Eliminate pension and wage diversions<br><br>(GC Exh. 5 (Art. III).) |
| June 12, 2017 | No increases to base wages<br><br>2% pension diversion<br><br>8% wage diversion<br><br>$4,000 annual cap on total diversion<br><br>(R. Exh. 73.) | |
| January 31, 2019 | Package proposal: Respondent will eliminate the 2% pension diversion <u>if</u> the Union accepts Respondent's proposal to change bargaining unit members' healthcare plan from the Teamsters plan to Respondent's plan<br><br>(GC 21; Tr. 557.) | |

## 2. Health and welfare

In the expired contract, all bargaining unit employees who averaged more than 30 hours
15      per week annually were covered under the Teamsters healthcare plan. Respondent paid all

---

[6] In the discussion below I only identify bargaining dates on which one or both of the parties substantively changed its proposal. I also note that the discussion here is not meant to be exhaustive. The parties made several proposals that, in the interest of brevity, I do not summarize in this section.

premiums for the plan,[7] including annal increases up to 5 percent.  Bargaining unit employees
paid for any premium increases that exceeded the 5–percent threshold.  (GC Exh. 2 (Art. XX).)

5

In bargaining for a successor collective-bargaining agreement, Respondent proposed to
cover bargaining unit employees under Respondent's healthcare plan, for which Respondent
would pay 70 percent of the cost and employees would pay 30 percent.  Respondent would also
retain the right to change or terminate the healthcare plan in its sole discretion.  The Union, by
contrast, proposed that employees continue to be covered under the Teamsters plan.  (Tr. 128–
130, 172, 366–367, 369; R. Exh. 14 at 2; R. Exh. 142 (par. 2).)  The specific proposals proceeded

10 as follows:

| Bargaining Session Date | Respondent Health/Welfare Proposal | Union Health/Welfare Proposal |
| --- | --- | --- |
| March 10, 2017 | Bargaining unit employees will be covered by Respondent's health, dental, vision and life insurance plans.  The plans may be changed or terminated at Respondent's discretion.<br><br>(GC Exh. 4 (Art. XX).) | Bargaining unit employees will be covered by the Teamsters healthcare plan. Respondent shall pay for any annual increases in premiums up to 25 percent. Bargaining unit employees will pay for annual premium increases over the 25–percent threshold.<br><br>(GC Exh. 5 (Art. XX).) |
| February 9, 2018 | | Respondent shall pay the entire premium for the Teamsters healthcare plan for 2018.  In subsequent years Respondent will pay for the annual insurance premium plus any increases up to 25 percent.  For those years Respondent and bargaining unit employees will equally split the amount of any premium increases over 25 percent.<br><br>(GC Exh. 13 (Art. XX).) |

The Union did, on January 31, 2019, verbally suggest exploring tiered rates available under the
Teamsters healthcare plan (i.e., separate premiums for covering an individual, an individual plus

---

[7]  The 8–percent wage diversion from bargaining unit employee paychecks may have been intended
to offset the cost that Respondent paid for the healthcare plan, but the record is unclear on the point.  (See
Tr. 209–210, 687–688.)

one, or a family), but did not pursue that possibility after Respondent (through Lowe) indicated that it was not interested in continuing to offer the Teamsters plan.[8]  (R. Exh. 142 (par. 7); Tr. 131, 172–173, 555–556, 805–806.)

5                                     3.   Bargaining unit jurisdiction

Many of the disputed proposals related to the bargaining unit's jurisdiction, including when Respondent could subcontract bargaining unit work or have other individuals (such as managers or stringers) do bargaining unit work.  The proposals related to bargaining unit
10    jurisdiction proceeded as follows:

| Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals |
|---|---|---|
| March 10, 2017 | The work of bargaining unit employees will be work normally performed by bargaining unit employees and new or additional work that the company assigns. However, nothing in the Agreement shall be construed as giving the Union exclusive jurisdiction over or an exclusive right to perform any work.

Respondent shall have the exclusive right to assign bargaining unit work to non-bargaining unit employees, to individuals employed by any other company, or to contract out work

Supervisors/managers may do bargaining unit work without restriction.

No restrictions on Respondent's use of stringers

Delete language from expired contract that the number of managers may not exceed 30 percent of the number of full | Exempt employees cannot do bargaining unit work as performed in the past nor do similar work that may result from the introduction of new print, electronic or other products.

Respondent will stop using stringers

The company may obtain content from commercial vendors for traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

The number of managers may not exceed 5 percent of the full-time employees represented by the Union

(GC Exh. 5 at pp. 1–3.) |

[8]  In a May 25, 2017 email, the Union asked the Teamsters healthcare plan administrator about tiered rates.  (R. Exh. 15; Tr. 234.)  The record does not establish what happened after that initial inquiry.

8

JD-05-23

| Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals |
|---|---|---|
| | time employees represented by the Union[9]<br><br>(GC Exh. 4 at p. 1–2.) | |
| June 12, 2017 | Respondent recognizes that the work normally performed by bargaining unit employees is the Union's jurisdiction, but subject to the following exceptions:<br>(a) Supervisors/managers may do bargaining unit work; (b) Non-bargaining unit employees may do bargaining unit work on an occasional basis; (c) Respondent may subcontract work;<br>(d) Respondent may use stringers up to 40 percent of annual bargaining unit payroll<br><br>(R. Exh. 71 at pp. 1–2.) | |
| February 9, 2018 | | Exempt employees can do bargaining unit work in breaking news situations only if a [Union] member in the same classification in the work required is not available.<br><br>The Union recognizes that Respondent may use stringers.  Upon ratification, the maximum amount of money paid to stringers will be 7.5 percent of the annual bargaining unit payroll.  If Respondent exceeds the limit on annual stringer expenses then Respondent will match the excess with a payment that will be distributed |

---

[9] Respondent viewed any proposed limit to the number of managers it could have as a permissive subject of bargaining that Respondent would not agree to.  On July 15, 2019, the Union stated that it would not go to impasse over the issue.  (See GC Exh. 23 (position statement at p. 1).)

9

| Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals |
|---|---|---|
| | | equally to bargaining unit members.<br><br>Respondent may obtain content from commercial vendors for traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics only to the extent currently used and without displacing any bargaining unit employees.<br><br>The number of managers may not exceed 20 percent of the full-time employees represented by the Union<br><br>(GC Exh. 13 at pp. 1–3.) |
| February 28, 2018 | Respondent recognizes that the work normally performed by bargaining unit employees is the Union's jurisdiction, but subject to the following exceptions: (a) Supervisors/managers may do bargaining unit work, but no bargaining unit employee will be laid off as a direct result of this practice; (b) Non-bargaining unit employees may do bargaining unit work on an occasional basis; (c) Respondent may subcontract work; (d) Respondent may use stringers up to 20 percent of annual bargaining unit payroll<br><br>No person under the Union's jurisdiction will be arbitrarily named as a manager and thereby excluded from the agreement<br><br>(R. Exh. 107 at pp. 1–2.) | |
| November 14, 2018 | | Exempt employees cannot do bargaining unit work as |

| Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals |
|---|---|---|
| | | performed in the past nor do similar work that may result from the introduction of new print, electronic or other products.<br><br>Respondent cannot use stringers to perform bargaining unit work without first bargaining with the Union and reaching a mutual agreement about whether and how stringers can be used.<br><br>Respondent may obtain content from commercial vendors for traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.<br><br>The number of managers may not exceed 10 percent of the full-time employees represented by the Union<br><br>(GC Exh. 19 at pp. 1–3.) |
| July 15, 2019 | | The Union recognizes that Respondent may use stringers.  The maximum amount of money paid to stringers will be 15 percent of the annual bargaining unit payroll.  If Respondent exceeds the limit on annual stringer expenses then Respondent will match the excess with a payment into the pension fund.<br><br>The number of managers may not exceed 20 percent of the full-time employees represented by the Union |

11

JD-05-23

| Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals |
|---|---|---|
| | | (GC Exh. 22 at pp. 1–2.) |

### 4. Bargaining progress on other topics

The parties made limited progress on other issues in this timeframe.  Generally speaking, the parties did not reach any tentative agreements on any issues because they never established a ground rule on what would constitute a tentative agreement (e.g., agreement on an entire contract article vs. agreement on a specific paragraph within an article).  (Tr. 324, 419, 510–511, 541, 801–802.)  As for substantive topics where the parties disagreed, the parties were not able to find common ground in the following areas (among others):

(a) Sick leave and short term disability: Under the expired contract bargaining unit employees received 8 days of sick leave each year and also could bank unused sick leave up to a maximum of 90 days.  Under an extended short term disability plan, employees could receive 26 weeks[10] of additional sick leave (at a reduced rate of pay) if they exhausted their sick leave and banked hours, plus additional sick leave up to a maximum based on years of service.  (GC Exh. 2 (Art. VII).)  Respondent proposed to eliminate the sick leave "bank" and awards of additional sick leave and instead simply cover employees under Respondent's short term disability policy, which Respondent retained the discretion to modify but would be the same policy provided to nonrepresented employees.  The Union, by contrast, proposed: increasing the number of sick leave days that employees received annually; increasing employees' ability to bank unused sick leave and receive additional sick leave; and requiring Respondent to pay out banked sick leave (up to a maximum of 120 days) when employees retired or separated from the company.  (GC Exhs. 4, 12 (Art. VII); GC Exh. 7 at p. 20.)

(b) Grievance filing deadlines: The expired contract did not specify a deadline by which an employee needed to file a grievance.  (See GC Exh. 2 (Art. XVI, Sec. 1).)  Respondent proposed that a grievance must be filed in writing within 10 or 15 days of the events giving rise to the grievance.  The Union proposed various alternative deadlines that, in Respondent's view, fell short of setting a fixed time limit for filing a grievance.  (GC Exhs. 4, 12 (Art. XVI, Sec. 1); Tr. 415, 501; see also, e.g., GC Exh. 13 (Art. XVI, Sec. 2) (Union proposal that it or the employee must file written grievance within 30 days of bringing the dispute to management's attention); GC Exh. 15 (Art. XVI, Sec. 2) (Union proposal that the Union must file written grievance within 30 days after the Union president or chairman becomes aware of a dispute).)

(c) Employee work schedule and work week: The expired contract did not address whether bargaining unit employees were guaranteed 40 hours of work each week, but the established practice was for full-time employees to work 40 hours weekly.  (GC Exh. 2 (Art. IV); Tr. 120.)  Respondent initially proposed contract language stating that the

---

[10] Employees with less than 2 years of service were only eligible for an additional 13 weeks of sick leave.  (GC Exh. 2 (Art. VII).)

JA0012

company did not guarantee any specified hours of work per day or week, and stating that Respondent reserved the right to enlarge or shorten the workday or workweek based on business need.  The Union countered by proposing that Respondent guarantee a regular schedule of 5 consecutive days and 40 hours per week for full-time employees, and that the parties reach a mutual agreement in writing about any changes to the guaranteed work week.  On February 28, 2018, Respondent modified its proposal to state that it does not guarantee any specified hours of work per day or week but would provide the Union with 10 days' notice if Respondent sought to reduce an employee's workday or workweek due to a reduction in the company's print and/or digital publication schedule.  Respondent reserved the right to implement the reduction in hours after the 10–day notice period.  (GC Exhs. 4, 13 (Art. IV); R. Exh. 108; Tr. 495.)

(d) No-strike clause: The expired contract states that "[n]o strike, slowdown, work stoppage or any other interference with or interruption of work shall be permitted" during the term of the agreement.  (GC Exh. 2 (Art. XIX, Sec. 7).)  Respondent initially proposed to expand the no-strike clause to also prohibit sympathy strikes, bannering, boycotts against Respondent, boycotts of Respondent's advertisers that result from a dispute with Respondent, picketing, and any other acts that would interfere with Respondent's operations or the production or sale of its products.  On November 14, 2018, however, Respondent revised its no-strike clause request by proposing a more limited expansion of the clause that would add sympathy strikes, picketing, boycotts, and bannering to the expired contract's list of conduct prohibited by the no-strike clause.  The Union proposed maintaining the no-strike clause from the expired contract.  (GC Exhs. 4, 18 (Art. XIX, Sec. 6); R. Exh. 101 (Art. XIX, Sec. 5); Tr. 363–365.)

(e) Layoffs and recalls:  Under the expired contract, layoffs proceeded in inverse seniority order in the affected work group.  Recalls, by contrast, proceeded by seniority in the affected work group.  (GC Exh. 2 (Art. VIII, Sec. 4(C), 5).)  The Union proposed to continue using seniority for layoffs and recalls.  Respondent initially proposed that it would determine layoffs after considering seniority, performance, attendance, individual employee qualifications, special abilities or qualifications for the particular function, and the efficient operation of the company.  Recalls, meanwhile, would proceed according to seniority, provided that efficiency, skill and ability to do the job are equal in Respondent's opinion.  (GC Exh. 4 (Art. VIII, Sec. 3(B), 5); GC Exh. 5 (Art. VIII, Sec. 4(C), 5); see also Tr. 124–127.)   On June 12, 2017, Respondent revised its proposals such that for layoffs, Respondent would consider seniority, qualifications, performance and skills when selecting employees for layoffs, and would follow seniority for recalls provided that skills and qualifications were equal in Respondent's opinion.  (R. Exh. 78 (pars. 4(B)(2), 5).)

## 5.  Other bargaining issues

The parties did not meet for bargaining on consecutive days in the April 6, 2017, to July 15, 2019 timeframe.  Because of that practice, after each session the parties needed to arrange the next date(s) for bargaining.  Respondent was generally able to offer proposed meeting dates fairly quickly.  The Union, by contrast, generally took more time to identify workable meeting dates, citing the challenge of finding dates that worked for all five members of its negotiating

13

JD-05-23

team and the time that it took to compare Respondent's proposals to the expired contract and identify newly proposed contract language. On several occasions Respondent prompted the Union (usually via email) about scheduling the next bargaining session. For the most part, the Union responded in a timely manner to Respondent's inquiries but only offered limited available dates.[11] (Tr. 87–88, 94, 166–169, 171–172, 361–362, 587–588, 591–600, 802; R. Exhs. 61, 140–141, 143–152.) In July 2018 and July 2019, however, the Union did take the initiative to suggest that the parties bargain over contract terms after concluding effects bargaining sessions on other matters. Respondent declined that request in 2018 (citing its preference to reserve the entire day for effects bargaining), but agreed to the request in 2019. (GC Exhs 63–64; R. Exhs. 61, 153–154; Tr. 173, 348, 526–527, 599–600, 806–808; see also R. Exh. 61 (Respondent's request for bargaining dates in July 2018 that prompted the Union to suggest, in GC Exh. 63, that the parties bargain over the contract after effects bargaining on July 24, 2018).)

In mid-May 2017, Respondent scheduled a series of information presentations about its proposed healthcare plan. Although the presentations would be similar (if not identical), Respondent scheduled separate presentations for each union representing one of the bargaining units, with the presentation for the Union scheduled for May 17, 2017. On May 16, 2017, believing that they had received permission from Respondent, representatives of the Union (Fuoco and Silver) sought to attend the healthcare plan presentation for the Mailers bargaining unit. Respondent (Lowe and attorney Michael Oesterle) objected, and a heated discussion ensued about whether the Union's representatives should be allowed to stay for the presentation. The dispute was resolved when a representative of the Mailers bargaining unit stated that the Union's representatives could attend as temporary members of the Mailers' negotiating team (i.e., temporary members for the limited purpose of being authorized to attend the May 16 healthcare plan presentation). The presentation then proceeded without further incident, but the Union and Respondent did exchange letters to express their objections about the other side's conduct. (Tr. 192–199, 228–231, 254–255, 373–375; R. Exhs. 8, 10–14.)

On February 1, 2018, the Union sent a letter to Respondent to object to a "Negotiations Update" that the company posted in the newsroom. The Union also took issue with Lowe's conduct during negotiations and asserted that Respondent should jettison Lowe's law firm and find a different firm to handle negotiations. In an April 13, 2018 letter to the executive vice president of Block Communications Inc. (BCI, Respondent's parent company), the Union again objected to Lowe's approach to bargaining and asserted that BCI should replace Lowe as Respondent's lead negotiator. (R. Exhs. 23-24.)

*E. Bargaining Session: August 6, 2019*

At the August 6, 2019 bargaining session Respondent presented the Union with a "Position Statement" that summarized Respondent's view of where the parties stood with bargaining and provided/reiterated Respondent's rationale for its bargaining proposals. Among other points, Respondent emphasized that it needed flexibility with staffing decisions and

---

[11] On April 8, 2019, the parties began working with a mediator from the Federal Mediation and Conciliation Service to assist with bargaining. Accordingly, from that date forward, the parties also needed to consider the mediator's availability when scheduling bargaining sessions. (Tr. 300–301, 591–592; R. Exh. 144.)

14

employee work hours because Respondent was moving towards only publishing the newspaper on a digital platform.  (GC Exh. 23 (Position Statement at 2, 6); R. 193 at p. 33; Tr. 566–567.)

Respondent also presented the Union with a "best offer" contract proposal.  Respondent held to its prior offers on most issues, but for wages proposed to increase the minimum pay rate for employees with the highest level of experience[12] by: 3 percent on the effective date of the new contract; an additional 2 percent on the first contract anniversary date; and an additional 3 percent on the second contract anniversary date.  The pay rates that Respondent used for its proposal included the pension and wage diversions from the old contract, and thus the wage increases essentially returned portions of the diversions to employees over the proposed 3–year contract period.[13]  The wage increases also removed the annual $4,000 cap on wage and pension diversion payments.  (GC Exh. 23 (p. 2 and Art. III) (noting that Respondent was not offering retroactive wage increases); R. Exh. 193 at p. 33; R. 196 at p. 20; Tr. 140–143, 340–341, 567–569, 685–686.)  Respondent also added contract language stating that: employees would pay 30 percent of the premium costs for Respondent's health, dental, and vision insurance plans; and if Respondent changed the short term disability policy it would do so on the same basis as for its nonrepresented employees.  (GC Exh. 23 (Art. VII, XX); Tr. 369–371, 568.)

The Union stated that it would take a while to review Respondent's proposal and asked for a version of the proposal that included strikethrough language to show the language from the expired contract that was deleted, and bold language to indicate the parts of the proposal that were new additions.  Respondent declined, stating that it did not have time to do that.  Towards the end of the session, the Union also asked whether Respondent had accepted any of the Union's proposals.  (Tr. 88–89; R. Exh. 192 at p. 15; R. Exh. 193 at p. 34; R. Exh. 196 at pp. 20–21 (noting that the parties continued to disagree about the healthcare plan).)

### F.  Bargaining Session: September 6, 2019

After exchanging a few emails about potential dates, the parties agreed to meet on September 6, 2019, for their next bargaining session.  (R. Exhs. 155–159.)  At that session, the Union presented a counterproposal that included the following changes:

(a) Bargaining unit jurisdiction: Exempt employees can do bargaining unit work in breaking news situations only if a bargaining unit member in the same classification in the work required is not available.  (GC Exh. 24 at p. 2; see also Tr. 319–320, 571 (noting that the Union made a similar proposal on February 9, 2018).)  The Union also deleted its proposal to limit the number of Respondent's managers to a percentage of the full-time employees represented by the Union.  (GC Exh. 24 at p. 1; compare GC Exhs. 2 and 22 at p. 1; see also R. Exh. 193 at p. 112; Tr. 335–336).)

---

[12] For each job classification, wages max out after a certain number of years of service (in most instances between 3 and 5 years).  Respondent's wage proposal only increased wages for employees who had passed the years-of-service threshold for maxing out wages.  (See, e.g., GC Exh. 23 (Art. III).)

[13] To illustrate, as previously noted, an employee with a wage rate of $1000/week would only receive $901.60 each week after the pension and wage diversions.  (See Findings of Fact (FOF), Sec. II(C), supra.)  For the wage increases in its August 6, 2019 proposal, Respondent used the post-diversion rates to calculate the proposed wage increases (i.e., for our example, Respondent used $901.60 instead of $1000 to calculate the wage increase).

15

(b) Stringers: The Union recognized that Respondent may use stringers.  Upon ratification, the maximum amount of money paid to stringers will be 15 percent of the annual bargaining unit payroll.  If Respondent exceeds the limit on annual stringer expenses then Respondent will match the excess with a payment that will be distributed equally to bargaining unit members.[14]  (GC Exh. 24 at p. 2; Tr. 571.)

(c) Wages: starting with and retroactive to April 1, 2017, bargaining unit employees will receive annual wage increases of 7.5 percent, 6 percent, 5.5 percent, 6.5 percent, and 6 percent.  All wage and pension diversions will be eliminated.  (GC Exh. 24 (Art. III); Tr. 572.)

(d) Sick leave and short term disability: Any employee with at least one year of service shall have 20 days of disability coverage and can bank unused sick leave up to a maximum of 90 days.  (GC Exh. 24 (Art. VII).)

In the discussion that followed, the parties disagreed on various issues, including whether/when managers should perform bargaining unit work and the extent that Respondent should be permitted to use stringers.  Respondent also rejected the Union's proposal that Respondent pay a matching amount to the bargaining unit if Respondent exceeded the agreed limit for stringer expenses.  Regarding wages, Respondent stated that the Union's proposal was an economic concession that Respondent was not willing to make.  The Union responded that bargaining unit members had gone 13 years without a raise and had also been giving up wages due to the ongoing wage and pension diversions.  The parties did not review the entire union proposal in the September 6, bargaining session.  (R. Exh. 193 at pp. 112–116; Tr. 141–144.)

*G.  Bargaining Session: February 24, 2020*

1.  Delay between bargaining sessions

There is no evidence that the parties communicated between September 6, 2019, and mid–January 2020, about scheduling another bargaining session.  On January 17, 2020, Respondent wrote a letter to the Union to assert that the Union had been deliberately avoiding negotiations and to request suggested dates for further bargaining.  In a January 23, 2020 letter, the Union dismissed Respondent's assertions in the January 17 letter as self-serving.  The Union did offer to bargain on February 24, 2020, which Respondent accepted.[15]  (GC Exhs. 26–28; Tr. 154–155.)

---

[14]  The Union also proposed that Respondent could use stringers to cover high school sports and "SEEN" events as long as at least one of those events per shift was covered by a bargaining unit member. (GC Exh. 24 at p. 2.)

[15]  I give little weight to the emails that Respondent submitted that show members of the Union's bargaining team had scheduling conflicts in January/February 2020.  Fuoco took a leave of absence from working for Respondent from January 12 to February 17, 2020, to begin writing a book, but explicitly stated that he would continue to serve as union president and be available for meetings on union matters if the need arose.  (See R. Exhs. 1–4; Tr. 179.)  Silver, meanwhile, was only unavailable on February 3–7, 2020.  (See R. Exh. 3.)

16

2.  The February 24, 2020 bargaining session

On February 24, 2020, the parties resumed discussing aspects of Respondent's August 6, 2019 best offer and the Union's September 6, 2019 counterproposal.  The parties agreed to three minor changes to Respondent's August 6, 2019 proposal, but disagreed on several other points, including: whether employees should be guaranteed 40 hours of work per week; the amount of sick leave that employees should earn each year; and whether employees should be able to bank unused sick leave.  (Tr. 142, 578–580; R. Exh. 138 (noting minor changes to Art. VII (sick leave) and Art. IX (expenses); R. 194 at pp. 1, 5; R. Exh. 195 at pp. 1–3.)  There is no evidence that the parties bargained in any detail over disputed topics such as wages, healthcare, or bargaining unit jurisdiction.  Further, both the Union and Respondent subsequently acknowledged that they had not yet finished discussing the Union's September 6, 2019 counterproposal.  (See FOF, Sec. II(I)(2), infra.)

*H.  Communications Between March 6 and May 22, 2020*

1.  Efforts to schedule the next bargaining session

On March 6, 2020, Respondent sent a letter to the Union to follow up on three proposed future bargaining dates that the mediator offered at the end of the February 24 bargaining session.  The Union replied on March 10, confirming that it could meet for bargaining on March 25, 2020.  Respondent subsequently re-confirmed that it was available on March 25.  (GC Exhs. 29–31;  R. Exh. 195 at p. 5; see also GC Exh. 31 (noting that Respondent was also available on March 23–24, 2020, the other two dates that the mediator offered).

2.  March 22, 2020: Union cancels March 25 session due to Covid–19 pandemic

On March 22, 2020, Pass sent a letter to Respondent to cancel the March 25, 2020 bargaining session in light of the Covid–19 pandemic.  Pass stated, in pertinent part, as follows in his letter:

As I am sure you must be aware, the current Coronavirus pandemic is unlike anything we have ever experienced.  The Federal Government, and more significantly the Governor of the State of Pennsylvania has ordered all non-essential services to be shuttered effective 8 a.m. March 23.  The aim is to limit contact amongst individuals.  Obviously the need for us to meet pales in comparison to the needs of the people.  . . .

When weighing the benefits of meeting and simply going through the worthless motions that for three plus years have proved the employer has no intention on reaching an amicable resolution to the various CBA's versus saving the lives of those of us involved in these fruitless meetings, makes our decision very easy.

The [Union bargaining session] scheduled for the 25th will not be going forward, nor will there be any future meetings scheduled for any of the [unity council] bargaining units at the Post-Gazette until the Coronavirus pandemic is completely arrested.

17

JD-05-23

Finally, despite the obvious acrimony that has transpired over more than three years of wasted time and energy, I urge you and your family to keep safe.

5   (GC Exh. 32; see also R. Exh. 166 at 1–2 (indicating that Pass emailed the letter to Respondent and ten other individuals).)

On March 23, 2020, Pass emailed Lowe to confirm that Respondent received the letter canceling the March 25, 2020 bargaining session.  Lowe replied on March 24, 2020, stating "Thanks for the heads up Joe.  Stay safe and stay well."  (GC Exhs. 33–34.)

10

3.  May 22, 2020: Respondent sends a written response to the Union's September 6, 2019 contract proposal

On May 22, 2020, Respondent sent the Union a letter urging the Union to accept
15   Respondent's August 6, 2019 best offer (as subsequently modified).  Respondent also attached a written response to the Union's September 6, 2019 contract proposal, in which Respondent summarized the parties' positions on various issues that remained unresolved in bargaining. There is no evidence that the Union replied to Respondent's May 22, 2020 letter and written response.  (Tr. 110–111, 706; GC Exh. 35.)

20
*I.  June 12, 2020: Respondent Sends its Last, Best, and Final Offer*

1.  The last, best, and final offer

25   On June 12, 2020, Respondent sent a letter to the Union to convey Respondent's last, best, and final offer.  Respondent stated as follows in the letter:

Dear Joe,

30   On August 6, 2019, the Union was presented with the Company's Best Offer.  The Union responded with a counterproposal on September 6, 2019.  The parties discussed the Union's counterproposal on September 6, 2019 and again on February 24, 2020.  The Union cancelled the scheduled March 25, 2020 meeting date because of the pandemic. . . .

35   On May 22, 2020, the Company provided the Union with a comprehensive, written response to the Union's September 6, 2019 counterproposal.  The Company received no response from the Union.

40   Attached hereto is the Company's Final Offer to the Union.  We have included a "clean" version and a "red-lined" version to show the changes which have been made by the Company from its August 6, 2019 Best Offer.  . . .

The Company is proposing a three (3) year contract, effective on the signing date of the
45   new Agreement.  . . .

18

We believe the Company's Final Offer is fair and in the best interest of both parties. We respectfully urge acceptance of this offer.

(GC Exh. 36 (pp. 1–2); Tr. 112–113, 581; see also Tr. 169–171 (noting that the redlined version of Respondent's last, best, and final offer did not show, via strikeouts or other means, what expired contract language Respondent deleted).)

Most of the proposals in Respondent's last, best, and final offer were largely the same as what Respondent offered on August 6, 2019. Respondent did, however, change its health and welfare proposal by adding language committing to provide a health, dental, vision and life insurance plan during the length of the contract (to address the Union's concern that Respondent might, if the new contract allowed it the discretion to do so, stop providing health and welfare benefits altogether). (GC Exh. 36 (Art. XX, Sec. 1); Tr. 128–129, 371–372; see also, e.g., GC Exh. 36 (Art. II - striking an indemnification clause related to claims about union dues and dues checkoff; Art. III, Sec. 1 – adding a clause stating that wage increases would not apply to employees on extended sick leave until those employees returned to work); compare GC Exh. 24 (Respondent's Aug. 6, 2019 proposal).)

2. Communications after Respondent's last, best, and final offer

After Respondent sent its last, best, and final offer, the parties exchanged a series of letters and emails about the status of bargaining. The Union began the exchange on June 22, 2020, by questioning why Respondent was sending a final offer when the parties had not finished going through the Union's September 6, 2019 proposal. The Union also stated that before it addressed the final offer, the Union needed to know if Respondent was taking the position that negotiations were terminated and that no further bargaining sessions would occur. (GC Exh. 37.)

In a letter dated July 14, 2020, Respondent asserted that the Union failed to respond to the substance of Respondent's final offer, noting that the Union did not offer a counterproposal or offer to discuss the final offer. Respondent also stated its belief that negotiations were at impasse and invited the Union, if it believed the parties were not at impasse, to explain why it believed further bargaining would be fruitful. (GC Exh. 38.)

Later on July 14, 2020, the Union sent an email and letter to Respondent. The Union reiterated that it had not heard Respondent's position on two-thirds of the Union's September 6, 2019 proposal, and questioned how the parties could be at impasse under those circumstances. The Union also asserted (again) that before it replied to the final offer Respondent first needed to specify whether negotiations were terminated. (R. Exh. 170.)

On July 16, 2020, Respondent sent a letter to again state its belief that negotiations were at impasse. In support of that position, Respondent asserted that no agreement had been reached despite over 3 years of bargaining, and also asserted that the Union employed strategies of avoiding and delaying negotiations and making regressive proposals without justification. As for the Union's September 6, 2019 proposal, Respondent asserted that the parties discussed 75 percent of the proposal during bargaining on September 6, 2019, and February 24, 2020. Respondent then sent a written response to the Union's proposal in May 2022 after the March 25, 2020 bargaining session was canceled due to the Covid–19 pandemic. Finally, Respondent

19

stated that its final offer did not terminate contract negotiations.  In Respondent's view, the Union announced on March 22, 2020, that it would not meet with Respondent, and subsequently did not engage with Respondent about the terms of the final offer or explain why further bargaining would be fruitful.  (GC Exh. 41.)

5

The Union replied in a July 20, 2020 letter.  Regarding the bargaining history, the Union maintained that Respondent made regressive proposals and did not accept a single proposal that the Union offered.  The Union also denied delaying or avoiding negotiations and emphasized that it canceled the March 25, 2022 bargaining session to ensure everyone's safety during the

10   Covid–19 pandemic.  As for why further bargaining would be fruitful, the Union indicated that bargaining was necessary for discussing, among other topics: whether the Union's September 19, 2019 proposal was acceptable (particularly as to two-thirds of the proposal that had not yet been addressed in a bargaining session); Respondent's rationale for seeking more money to hire stringers when Respondent was not using the amount permitted in the expired contract; and

15   Respondent's healthcare plan and proposal language that would give Respondent the right to cancel the plan immediately after the parties signed a new agreement.  The Union closed by stating that it was willing to meet to go through the Union's September 19, 2019 proposal and Respondent's final offer and suggest changes in an attempt to reach a mutual agreement, and asking Respondent for available dates to resume bargaining.  (GC Exh. 42.)

20

*J.  July 27, 2020: Respondent Declares Impasse*
*and Implements Terms and Conditions of Employment*

1.  Impasse letter

25

On July 27, 2020, Respondent declared impasse and implemented terms and conditions of employment.  Respondent stated as follows in its letter:

After over three years of negotiations, the Company believes the parties are at impasse.

30   Therefore, negotiations are terminated.  The Company has implemented the following Articles and/or provisions of the Company's Final Offer:

[Agreement Paragraph C and Paragraph D (Sec. 1–7);
Art. III (excluding Sec. 4);

35   Art. IV (excluding everything in Sec. 11 except for the first sentence);
Art. V–VI;
Art. VII (excluding the second sentence of Sec. 3);
Art. VIII (excluding the phrase "in the Company's discretion" in Sec. 15);
Arts. IX – XVIII;

40   Art. XIX (Sec. 24 only); and
Art. XX (as set forth in the addendum, excluding Secs. 2–3)]

The specific language of each Article and/or provision of the implemented terms and conditions referenced above is contained in the attached Addendum to this letter.  The

45   above implemented new terms and conditions supersedes and replaces the applicable Articles and/or provisions of the expired agreement.

JD-05-23

Because of the impasse in these negotiations, the collective bargaining agreement is terminated.  The evergreen provision in Article XXII provides that "[t]he terms and conditions of this Agreement shall remain in effect as long as negotiations continue." Negotiations are now terminated because of the impasse.  The contractual terms and conditions of the collective bargaining agreement have expired, along with the evergreen provision.  Article XXII is deleted and has no further force and effect.

The Company will continue to observe the established terms and conditions of the expired collective bargaining agreement as required by the National Labor Relations Act, except as otherwise modified by the implemented terms and conditions in this letter and except those terms and conditions recognized as strictly contractual.  Additionally, the Company will no longer check off Union dues, including assessments.  . . .

(GC Exh. 43 (pp. 1–3); see also Tr. 113, 690–691.)

### 2.  Implemented terms

As indicated above, most of the terms and conditions that Respondent unilaterally implemented were the same as what Respondent set forth in its June 12, 2020 last, best, and final offer.  The following implemented terms, however, included modifications that Respondent made after its last, best, and final offer:

Wages: deleted paragraph 4, which stated "Nothing in this agreement shall prevent employees from bargaining individually for pay increases.  The minimum wage rates established herein are minimums only.  Individual merit shall be acknowledged by increases above the minimums."  (Compare GC Exh. 36 (Art. III, Sec. 4) with GC Exh. 43 (Art. III).)[16]

Work hours:  Respondent deleted the following language after a sentence stating that Respondent does not guarantee any specified hours of work per day or per week: "In the event the Company reduces its print and/or digital publication schedule from its current schedule, the Company will give the Guild at least ten (10) days' notice prior to reducing an employee's workday or workweek.  The parties shall meet during this ten (10) day notice period to discuss the effects of any planned reduction in hours.  After the ten (10) day notice period has expired, the Company may implement the reduction in hours." (Compare GC Exh. 36 (Art. IV, Sec. 11) with GC Exh. 43 (Art. IV, Sec. 11)

Short term disability:  Respondent deleted the following language after a sentence stating that bargaining unit employees would be covered by Respondent's short term disability (STD) policy: "The Company reserves the right to modify or change the Company's STD policy on the same basis as nonrepresented employees of the Company."  (Compare GC Exh. 36 (Art. VII, Sec. 3) with GC Exh. 43 (Art. VII, Sec. 3).)

Transfers due to workplace changes: Respondent deleted the phrase "in the Company's discretion" that followed a sentence stating that an employee who could be dismissed by

---

[16] The paragraph that Respondent deleted was in the expired contract.  (GC Exh. 2 (Art. III, Sec. 6).)

21

JD-05-23

the introduction of new or modified equipment, machines, apparatus or processes may be
afforded the opportunity to transfer to other available positions. (Compare GC Exh. 36
(Art. VIII, Sec. 15) with GC Exh. 43 (Art. VIII, Sec. 15).)

5      Health and welfare: Respondent deleted the following language after a sentence stating
that bargaining unit employees will be covered by the Company health, dental, vision,
and life insurance plans: "Such plans may be amended, changed, replaced or terminated,
in whole or in part . . . at the Company's sole discretion. . . . The Company agrees to
provide a health, dental, vision and life insurance plan during the term of this
10     Agreement." (Compare GC Exh. 36 (Art. XX, Sec. 1) with GC Exh. 43 (Art. XX, Sec.
1).)

(GC Exh. 43 (Addendum); see also Tr. 113, 144–145.)

15                    3. Communications after Respondent implemented terms

On July 30–31, 2020, Respondent and the Union exchanged letters about the bargaining
dispute. Respondent maintained that it lawfully implemented portions of its final offer after the
parties bargained to a good-faith impasse, and took the position that it had no obligation to
20     negotiate further until the impasse was broken. The Union, meanwhile, asserted that the parties
were not at impasse and asked Respondent to provide dates to resume bargaining.[17] (GC Exhs.
45–47.)

*K.  September/October 2020: Union Rallies*
25

1. September 25, 2020: rally in front of Respondent's facility

On September 25, 2020, the Union held a rally in front of the North Shore Drive building
where Respondent's offices are located. The Union organized the rally to, among other things,
30     protest Respondent's decision to declare impasse and unilaterally implement terms and
conditions of employment. Many rally attendees chanted and held signs with phrases such as
"[Respondent] Declares Unlawful Impasse!" and "[Respondent] Bargains in Bad Faith!" In
addition, an airplane flying overhead displayed a banner stating "Fair Contract Now.
#NoPGWithoutMe." Various individuals spoke with a microphone at the rally, including (now
35     former) Pennsylvania Lieutenant Governor John Fetterman, and some individuals at the rally
were taking photographs. (Tr. 50–52, 248–249, 275, 278–279, 740–742; GC Exhs. 52, 54; R.
Exhs. 26–27, 33–36, 39–40; see also Tr. 51–52 (estimating that around 125 people attended the
rally).)

40     Chief photo editor Arturo Fernandez was working inside Respondent's facility when he
heard the rally occurring outside. Thinking that the rally could be a "spot news" event (i.e., a

---

[17] The parties met for a bargaining session on September 8, 2020 (see GC Exhs. 48–49), but I do not
find that session to be relevant to whether the parties were at a good-faith impasse when Respondent
unilaterally implemented terms and conditions of employment on July 27, 2020. See *Mike-Sell's Potato
Chip Co.*, 360 NLRB 131, 131 fn. 1 (2014) (declining to consider the union's offers of bargaining
concessions that occurred after the employer declared impasse and unilaterally implemented its final
contract offers), enfd. 807 F.3d 318 (D.C. Cir. 2015).

news event occurring spontaneously), Fernandez used his cell phone and his professional camera to take photographs of the rally while standing at different windows on the third floor. Rally participants, including bargaining unit members, could see Fernandez as he took photographs.
Fernandez saved the photographs on his computer and then notified the night editor that the photographs were not publishable because the photographs included disparaging signs and posters. (Tr. 53–58, 771, 788–796, 798; GC Exhs. 52–54; see also GC Exh. 59 (p. 2).)
Respondent's director of operations, Rob Weber, who is in charge of facilities and security (among other responsibilities) also observed the rally from inside the building.[18] (Tr. 55, 725–726, 740–741; see also GC Exh. 59 (p. 2); GC Exh. 60 (pp. 1–3).)

### 2. October 24 and 31, 2020: rallies in front of John Block's home

On October 24, 2020, the Union held a rally and informational picket, this time in front of Respondent's publisher, John Block's home. Seeking to call attention to the labor dispute and pressure Respondent to return to the bargaining table, some rally participants held signs with phrases such as "[Respondent] Declares Unlawful Impasse!" and "[Respondent] Illegally Imposes Horrible Working Conditions." Other participants used a bullhorn to give speeches, and a few participants had cameras with them and were taking photos. For the most part, rally participants stood on the sidewalk in front of the home, on or across the street, on the driveway entrance (between the street and sidewalk), or on a strip of grass between the street and the sidewalk. (Tr. 39–42, 46–49, 59–61, 725–726; GC Exh. 51, 55; see also Tr. 59 (estimating that around 50 people, a majority of whom were bargaining unit members, attended the rally).)

The Union held another rally and informational picket in front of John Block's home on October 31, 2020, this time with a Halloween funeral theme. Rally participants placed a mock coffin on the sidewalk along with cardboard tombstones with phrases such as "Here Lies Local News" and "RIP Staff Morale." Other participants used a bullhorn to give speeches. Rally participants for the most part stood on the sidewalk in front of the home, on the street, or on the driveway entrance (between the street and sidewalk). Occasionally, however, a rally participant stood a few feet closer to the home on the walkway leading to the front door or the portion of the driveway leading from the sidewalk to the home. (Tr. 64–65, 67–68, 281–286; GC Exh. 57; R. Exhs. 41–46; see also Tr. 65 (estimating that around 60 people, a majority of whom were bargaining unit members, attended the rally) .)

In an effort to ensure that the October 24 and 31 rallies did not get out of control, Respondent asked Kellington Protection, LLC to provide security guards to be present during both of the rallies in front of John Block's home. Two security guards (Steve Cain and Charles Sansky) attended each rally and took photographs of rally participants, including bargaining unit members when they were located across the street from John Block's home. Respondent did not ask the security guards to photograph the rallies, but also did not provide any instructions that

---

[18] I do not find that Weber took (or gave the appearance of taking) photos of the September 25 rally. The General Counsel presented limited evidence on this point, as only one witness at a distance (from the street while Weber was at a third-floor window) stated that he saw Weber point his cell phone at rally participants. (See Tr. 53.) That testimony, which was not corroborated by any other evidence (e.g., testimony by another witness, photographs), is too thin for me to conclude that Weber was or gave the appearance that he was photographing employees as they engaged in union activities. I also note that Weber credibly denied that he took photos of the rally. (See Tr. 742.)

prohibited the security guards from taking photographs. (Tr. 40–41, 43, 60–63, 65–68, 726–727, 729–730, 736, 739, 771–773; GC Exhs. 50, 58 (Oct. 24 rally); GC Exh. 56 (Oct. 31 rally); R. Exh. 197 (indicating that Respondent signed a contract with Kellington Protection in December 2018); see also Tr. 61–62 (explaining that the security guard shown aiming his phone in GC Exh.
5   58 was aiming at October 24 rally participants who were located across the street from John Block's home), 66–67 (explaining that the security guard shown aiming his phone in GC Exh. 56 was aiming at October 31 rally participants who were located across the street from John Block's home); GC Exh. 59 (p. 3); GC Exh. 60 (pp. 3–5).)

10                              DISCUSSION AND ANALYSIS

                                  *A. Credibility Findings*

        A credibility determination may rely on a variety of factors, including the context of the
15   witness' testimony, the witness' demeanor, the weight of the respective evidence, established or
     admitted facts, inherent probabilities and reasonable inferences that may be drawn from the
     record as a whole. Credibility findings need not be all-or-nothing propositions — indeed,
     nothing is more common in all kinds of judicial decisions than to believe some, but not all, of a
     witness' testimony. *Farm Fresh Co., Target One, LLC*, 361 NLRB 848, 860 (2014) (noting that
20   an administrative law judge may draw an adverse inference from a party's failure to call a
     witness who may reasonably be assumed to be favorably disposed to a party, and who could
     reasonably be expected to corroborate its version of events, particularly when the witness is the
     party's agent). To the extent that credibility issues arose in this case, I have stated my credibility
     findings in the Findings of Fact above.

25

        *B. Did Respondent Violate the Act by Failing and Refusing to Bargain in Good Faith with the
                                            Union?*

                                  1. Complaint allegations

30
        The General Counsel alleges that Respondent violated Section 8(a)(5) and (1) of the Act
     by, through its overall conduct since about March 11, 2019, failing and refusing to bargain in
     good faith with the Union as the exclusive collective-bargaining representative of the bargaining
     unit. In particular, the General Counsel alleges that Respondent bargained with no intention of
35   reaching an agreement by: (a) insisting on proposals that are predictably unacceptable to the
     Union, including unilateral control over wage rates, hours and numbers of hours worked,
     subcontracting bargaining unit work, provisions of health insurance, layoffs, and a broadly
     worded no-strike clause; (b) failing to provide explanations to the Union regarding Respondent's
     proposals; and (c) prematurely declaring impasse.

40
                                  2. Applicable legal standard

        The Supreme Court has held that the statutory duty to "meet . . . and confer in good faith"
     is not fulfilled by "purely formal meetings between management and labor, while each maintains
45   an attitude of 'take it or leave it.'" Instead, "[c]ollective bargaining . . . presupposes a desire to
     reach an ultimate agreement, to enter into a collective-bargaining contract." *NLRB v. Insurance*

                                         24

*Agents' International Union*, 361 U.S. 477, 485 (1960); see also National Labor Relations Act, Sec. 8(d).

The touchstone of bad-faith bargaining is a purpose to frustrate the very possibility of reaching an agreement. *Phillips 66*, 369 NLRB No. 13, slip op. at 6 (2020).  In assessing whether a party has failed or refused to bargain in good faith, the Board considers the totality of the circumstances, including conduct both at and away from the bargaining table.  From the context of an employer's total conduct, it must be decided whether the employer is engaging in hard but lawful bargaining to achieve a contract that it considers desirable or is unlawfully endeavoring to frustrate the possibility of arriving at any agreement.  Although the Board does not evaluate whether particular proposals are acceptable or unacceptable, it will examine proposals when appropriate and consider whether, on the basis of objective factors, bargaining demands constitute evidence of bad-faith bargaining. *Altura Communication Solutions, LLC*, 369 NLRB No. 85, slip op. at 3 (2020), enfd. 848 Fed.Appx. 344 (9th Cir. 2021); *Audio Visual Services Group, Inc. d/b/a PSAV Presentation Services*, 367 NLRB No. 103, slip op. at 5 (2019), affd. 957 F.3d 1006 (9th Cir. 2020).

### 3.  Analysis

The General Counsel contends that Respondent engaged in overall bad-faith bargaining by presenting contract proposals that, when considered as a whole, evidence an intent not to reach agreement; failing to explain its proposals to the Union; and prematurely declaring impasse.  I do not find merit to the argument that Respondent failed to explain its proposals to the Union.  The General Counsel presented limited evidence on this point, as due to the number of bargaining sessions witnesses generally offered testimony in broad strokes and did not go into detail about what each party said during their 22 bargaining sessions before Respondent declared impasse.  Further, during the August 6, 2019 bargaining session, Respondent provided a position statement to the Union that described Respondent's positions on each of the areas where the parties disagreed about contract terms.  (See FOF, Sec. II(E).)

With that stated, I do find merit to the arguments that Respondent prematurely declared impasse (see Discussion and Analysis, Sec. C(3), infra) and presented proposals that, viewed as a whole, evidence an intent not to reach an agreement.[19]  I discuss Respondent's proposals below.

---

[19] The General Counsel has asserted that Respondent's proposals were "predictably unacceptable to the Union."  While the Board has used that phrasing in a few decisions I do not do so here because I do not find it to be helpful in analyzing the facts of this particular case.

On a related point, I note that I stand by my rulings during trial to exclude several exhibits (mostly proposals and contracts involving other bargaining units) that Respondent offered to rebut the argument that its proposals here were predictably unacceptable to the Union.  (See, e.g., Tr. 646, 651, 770 (rejecting R. Exhs. 178–187, 198–204); see also Tr. 748 (explaining that my ruling did not preclude Respondent from presenting testimony about its state of mind in making contract proposals to the Union).)  Specifically, Respondent maintained that if a different union accepted a contract proposal, the General Counsel could not claim that a similar proposal to the Union was "predictably unacceptable."  (See Tr. 625.)  It suffices to say that I found Respondent's proffered evidence to be too remote from the issues at hand in this case.  Every bargaining unit has its own priorities, goals, and interests, and I do not have a basis to conclude that a bargaining proposal or concession accepted by one unit would (or should) be palatable for an entirely different unit.

The last, best, and final offer that Respondent communicated to the Union on June 12, 2020, included the following proposals,[20] in pertinent part:

5      Bargaining unit jurisdiction: The Union's jurisdiction includes work normally performed by bargaining unit employees but is subject to the following exceptions: (a) Supervisors and managerial employees may perform bargaining unit work. No bargaining unit employee will be laid off as a direct result of that practice; (b) Non-bargaining unit employees may perform bargaining unit work on an occasional basis; (c) Respondent
10     may subcontract work; and (d) Respondent may use stringers but the maximum amount paid to stringers will not exceed 20 percent of the annual bargaining unit payroll. (GC Exh. 36 at pp. 2–3; FOF, Sec. II(D)(3).)

       Wages: Increase the minimum pay rate for employees with the highest level of
15     experience by: 3 percent on the effective date of the new contract; an additional 2 percent on the first contract anniversary date; and an additional 3 percent on the second contract anniversary date. The baseline pay rates for the wage proposal incorporate the pension and wage diversions from the old contract (i.e., if an employee's wage rate was $1000 under the old contract and $901.60 after subtracting diversions, Respondent used the
20     $901.60 amount as the baseline wage for its proposal). (GC Exh. 36 (Art. III); FOF, Sec. II(E).)

       Work hours: Respondent "does not guarantee any specified hours of work per day or per week" but will provide the Union with 10 days' notice if Respondent seeks to reduce an
25     employee's workday or workweek due to a reduction in the company's print and/or digital publication schedule. Respondent reserves the right to implement the reduction in hours after the 10–day notice period. (GC Exh. 36 (Art. IV, Sec. 11); FOF, Sec. II(D)(4)(c).)[21]

30     Sick leave: Bargaining unit employees will be covered by Respondent's short term disability policy (STD). Respondent reserves the right to modify or change the Company's STD policy on the same basis as Respondent's nonrepresented employees. Sick leave payments shall terminate upon termination of employment or death of the employee. (GC Exh. 36 (Art. VII, Sec. 3, 6); FOF, Sec. II(E).)

35     Layoffs/recalls: To select employees for layoffs, Respondent will give consideration to seniority, qualifications, performance, and skills in the affected work group. Recalls shall

---

[20] This list is not intended to be exhaustive. I have only highlighted a selection of the proposals from Respondent's last, best, and final offer.

[21] Although there was an established past practice of bargaining unit employees working 40 hours per week, Respondent's last, best, and final offer included a proposal that the new contract would supersede all past practices. (See FOF, Sec. II(D)(4)(c); GC Exh. 36 (Art. XIX, Sec. 23) (proposing that the collective-bargaining agreement supersedes all prior agreements between Respondent and the Union, including any letters of interpretation, verbal understandings and/or past practices).

be in order of seniority if skill and qualifications are equal in Respondent's opinion.  (GC Exh. 36 (Art. VII, Sec. 4(B), 5); FOF, Sec. II(D)(4)(e).)

No-strike clause: No strike, sympathy strike, slowdown, work stoppage, picketing, boycotts, bannering, or any other interference with or interruption of work shall be permitted during the term of the contract.  (GC Exh. 36 (Art. XIX, Sec. 6); FOF, Sec. II(D)(4)(d).)

Health and welfare: Bargaining unit employees will be covered by Respondent's health, dental, vision, and life insurance plans.  Respondent may amend, change, replace or terminate those plans in its sole discretion.  Respondent agrees to provide a health, dental, vision and life insurance plan during the term of the contract.  Bargaining unit employees shall pay 30 percent of the premium costs for Respondent's health, vision, and dental insurance programs.  (GC Exh. 36 (Art. XX, Sec. 1); FOF, Sec. II(E), (I)(1).)

It bears repeating that these proposals were part of Respondent's best offer.  Respondent's proposals in these areas in earlier bargaining sessions were identical or less favorable to the Union.

The Board has explained that "proposals that would authorize an employer to make unilateral changes to a broad range of significant terms and conditions of employment, or that would amount to a 'perpetual reopener clause' as to those terms during the life of the contract, are [] 'at odds with the basic concept of a collective-bargaining agreement.'"  *Altura Communication Solutions, LLC*, 369 NLRB No. 85, slip op. at 4 (quoting *Radisson Plaza Minneapolis*, 307 NLRB 94, 95 (1992), enfd. 987 F.2d 1376 (8th Cir. 1993)).  The proposals in Respondent's last, best, and final offer fit that description.

First, Respondent's proposals would have enabled it to unilaterally encroach upon the Union's jurisdiction by subcontracting work and by assigning bargaining unit work to employees outside of the bargaining unit.  The Union would have no recourse if Respondent took action under the proposal that infringed on the Union's jurisdiction and/or reduced the size of the bargaining unit.

Second, Respondent's proposals would have granted it discretion over hours of work.  As the Board has explained, a contractual provision that affords an employer complete discretion over work hours also affords the employer unilateral control over employees' pay.  See *Altura Communication Solutions, LLC*, 369 NLRB No. 85, slip op. at 5 (discussing an employer's proposal that nothing in the agreement should be construed as a guarantee of hours of work per shift, per day or per week); compare GC Exh. 36, Sec. 11 ("The Company does not guarantee any specified hours or work per day or per week.").

Third, Respondent proposed having the ability to unilaterally alter or scale back its bargaining unit employees' healthcare, dental, vision, and life insurance plans.  Respondent also sought unilateral control over bargaining unit employees' short term disability plan, up to and including the right to eliminate the plan (though any changes to the short term disability plan would also have to apply to non-unit employees).  Bargaining unit employees therefore could not count on any of these benefits under Respondent's proposals, as Respondent would have the

right to change the benefits at any time. Such proposals are at odds with the basic concept of a collective-bargaining agreement. *Altura Communication Solutions, LLC*, 369 NLRB No. 85, slip op. at 5.

5        Fourth, Respondent proposed to have discretion to select employees for layoffs and recalls, with seniority being only one of several factors regarding layoffs, and merely a tiebreaking factor regarding recalls. Through the proposal, the Union would lose any meaningful way to monitor or enforce the layoff/recall provisions in the contract, as Respondent would be able to justify its layoff and recall decisions as discretionary decisions about employee skills and
10      qualifications.[22]

        Considering the proposals in Respondent's last, best, and final offer in combination, I find that Respondent failed to bargain in good faith. An inference of bad faith is appropriate when the employer's proposals, taken a whole, would leave the union and the employees it
15      represents with substantially fewer rights than provided by law without a contract. That is what we have here, as Respondent's proposals effectively sought the discretion to limit the Union's jurisdiction (via subcontracting and assigning bargaining unit work to non-unit employees) and remove the Union from representing bargaining unit members interests concerning: work hours; health, dental, vision, and life insurance plans; the short term disability plan; and layoffs/recalls.
20      *Kitsap Tenant Support Services, Inc.*, 366 NLRB No. 98, slip op. at 8–9 (2018) (finding bad faith bargaining where the employer's proposals sought to deny the union any role in determining wages and benefits during the contract term, and also sought to afford the employer unfettered discretion regarding discipline and discharge), enfd. 2019 U.S.App. LEXIS 13055 (D.C. Cir. 2019); *Public Service Co. of Oklahoma (PSO)*, 334 NLRB 487, 487–489 (2001) (noting that
25      without a contract, the union would have the statutory right to prior notice and bargaining over changes or modifications in terms and conditions of employment, and would retain the right to strike in protest of such actions), enfd. 318 F.3d 1173 (10th Cir. 2003).

        I am not persuaded by the defenses that Respondent offered in response to the bad-faith
30      bargaining allegation in the complaint. Respondent maintains that the complaint allegation that it (Respondent) insisted upon proposals that were "predictably unacceptable" to the Union should be dismissed under Section 10(b) of the Act because the Union should have filed unfair labor practice charges regarding any such proposals within 6 months of the date that Respondent

---

[22] I would be remiss if I did not also point out that there is no evidence that Respondent offered any meaningful economic concessions or benefits to the bargaining unit in exchange for the broad discretion that it proposed in the areas discussed above. See *Sweeney & Co.*, 176 NLRB 208, 211–212 (1969) (finding that the employer's rigid refusal to make any meaningful concessions on critical economic issues supported a finding that the employer bargained in bad faith), enfd. in pertinent part, 437 F.2d 1127 (5th Cir. 1971). The wage increases that Respondent offered are offset by several factors, including but not limited to: the new obligation for bargaining unit employees to pay 30 percent of the premium costs for Respondent's health, vision, and dental insurance programs; the removal of the annual $4,000 cap on pension and wage diversions which were incorporated into wage rates before any wage increases; and the loss of all sick leave that bargaining unit employees banked under the sick leave provisions in the expired contract. There is no evidence that Respondent offered any other increased financial compensation or benefits to the bargaining unit during negotiations. (See FOF, Sec. II(D)(4)(a), (E); Tr. 688–690 (Lowe, Respondent's chief negotiator, could not identify any financial benefit that Respondent offered to the bargaining unit besides wage increases).)

28

JD-05-23

made the proposal (generally in 2017).  (See R. Posttrial Br. at 25–27; see also GC Exh. 1(a) (unfair labor practice charge alleging that Respondent bargained in bad faith, filed on September 11, 2019).  The Board has indicated that a union should not assume that an employer's initial proposals are fixed positions and should test the employer's willingness to bargain before filing a
5   bad-faith bargaining charge.  See *District Hospital Partners, L.P. d/b/a The George Washington University Hospital*, 370 NLRB No. 118, slip op. at 6 (2021).[23]  Based on that authority, I find that the Union filed its bad-faith bargaining charge at an appropriate time (i.e. after it tested Respondent's willingness to bargain), and I also find that Section 10(b) of the Act does not bar the General Counsel's allegation that Respondent engaged in bad-faith bargaining by (among
10   other conduct) insisting on predictably unacceptable proposals since March 11, 2019.[24]

Respondent also contends that the General Counsel did not present evidence of bad-faith bargaining in the form of delaying tactics, unilateral changes in mandatory subjects of bargaining, efforts to bypass the Union, failure to designate an agent with sufficient bargaining
15   authority, withdrawal of already agreed-upon provisions, or arbitrary scheduling of meetings. (R. Posttrial Br. at 27–28.)  That argument misses the mark because the General Counsel presented other evidence of bad-faith bargaining, including evidence that Respondent prematurely declared impasse and made a combination of contract proposals in its final offer that demonstrate an intent to frustrate arriving at an agreement.  See *Altura Communications*
20   *Solutions, LLC*, 369 NLRB No. 85, slip op. at 6 (finding bad-faith bargaining based in part on the employer's contract proposals);  *South Carolina Baptist Ministries*, 310 NLRB 156, 157 (1993) (finding bad-faith bargaining based on, among other misconduct, the employer's premature declaration of impasse and employer's insistence on proposals that would have left the union with fewer rights than imposed by law without a contract).
25

In sum, I find that since about March 11, 2019, Respondent, by its overall conduct in negotiations for a successor collective-bargaining agreement (including prematurely declaring impasse and insisting on proposals that, viewed as a whole, would leave the union and bargaining unit employees with substantially fewer rights and less protection than provided by
30   law without a contract), failed and refused to bargain in good faith with the Union as the exclusive collective-bargaining representative of the bargaining unit and thereby violated Section 8(a)(5) and (1) of the Act.

*C.  Did Respondent Violate the Act when it Unilaterally Implemented Terms and Conditions of*
35   *Employment on July 27, 2020?*

1.  Complaint allegations

The General Counsel alleges that Respondent violated Section 8(a)(5) and (1) of the Act
40   by, on or about July 27, 2020, implementing changes to bargaining unit employees' terms and

---

[23] The General Counsel maintains that the Board should overrule its decision in *District Hospital Partners, L.P. d/b/a The George Washington University Hospital*, 370 NLRB No. 118 (2021), albeit for reasons that do not relate to my citation here.  (See GC Posttrial Br. at 50–51.)  I leave that request for the Board to consider.

[24] As an aside, I note that bargaining conduct before March 11, 2019, remains relevant as it sheds light on bargaining conduct within the 10(b) period.  See *Regency Service Carts*, 345 NLRB 671, 672 fn. 3 (2005); *Rescar, Inc.*, 274 NLRB 1, 2 (1985).

conditions of employment without first bargaining with the Union to an overall good-faith impasse for a successor collective-bargaining agreement.

## 2. Applicable legal standard

5

Under the unilateral change doctrine, an employer's duty to bargain under the Act includes the obligation to refrain from changing its employees' terms and conditions of employment without first bargaining to impasse with the employees' collective-bargaining representative concerning the contemplated changes.[25]  The Act prohibits employers from taking

10     unilateral action regarding mandatory subjects of bargaining such as rates of pay, wages, hours of employment and other conditions of employment.  An employer's regular and longstanding practices that are neither random nor intermittent become terms and conditions of employment even if those practices are not required by a collective-bargaining agreement.  The party asserting the existence of a past practice bears the burden of proof on the issue and must show

15     that the practice occurred with such regularity and frequency that employees could reasonably expect the practice to continue or reoccur on a regular and consistent basis.  *Raytheon Network Centric Systems*, 365 NLRB No. 161, slip op. at 5, 8, 16, 20 (2017); *Howard Industries, Inc.*, 365 NLRB No. 4, slip op. at 3–4 (2016).

20     On the issue of whether the parties bargained to an impasse, the Board defines a bargaining impasse as the point in time of negotiations when the parties are warranted in assuming that further bargaining would be futile because both parties believe they are at the end of their rope.  The question of whether an impasse exists is a matter of judgment based on several factors, including: the bargaining history; the good faith of the parties in negotiations; the

25     length of the negotiations; the importance of the issue or issues as to which there is disagreement; and the contemporaneous understanding of the parties as to the state of negotiations.  The party asserting impasse bears the burden of proof on the issue.  *Phillips 66*, 369 NLRB No. 13, slip op. at 7 (2020); *Taft Broadcasting Co.*, 163 NLRB 475, 478 (1967), review denied sub nom. *American Federation of Television & Radio Artists v. NLRB*, 395 F.2d

30     622 (D.C. Cir. 1968).

If an employer makes a unilateral change to a term and condition of employment, it may still assert certain defenses.  For example, the employer may assert that the change: did not alter the status quo (e.g., because the change in question was part of a regular and consistent past

35     pattern); did not involve a mandatory subject of bargaining; was not material, substantial and significant; or did not vary in kind or degree from what has been customary in the past.  *MV Transportation, Inc.*, 368 NLRB No. 66, slip op. at 11 (2019); *Raytheon Network Centric Systems*, 365 NLRB No. 161, slip op. at 5, 8, 16, 20.  In addition, the employer may assert that the contractual language privileged it to make the disputed change without further bargaining

40     (the "contract coverage" defense).  Under the contract coverage defense, the Board will determine whether the parties' collective-bargaining agreement covers the disputed unilateral change.  In making that determination, the Board will give effect to the plain meaning of the

---

[25] Separate and apart from the unilateral change doctrine, an employer also has a "duty to engage in bargaining regarding any and all mandatory bargaining subjects *upon the union's request* to bargain," unless an exception to that duty applies.  *Raytheon Network Centric Systems*, 365 NLRB No. 161, slip op. at 11–12, 16–17, 20 (emphasis in original).

30

relevant contractual language, applying ordinary principles of contract interpretation, and the Board will find that the agreement covers the challenged unilateral act if the act falls within the compass or scope of contract language that grants the employer the right to act unilaterally. Since a collective-bargaining agreement establishes principles that govern a myriad of fact patterns, the Board will not require (as a prerequisite to the defense) that the agreement specifically mention, refer to or address the employer decision at issue. If the contract coverage defense is not met, then the Board will determine whether the union waived its right to bargain about a challenged unilateral change. *MV Transportation, Inc.*, 368 NLRB No. 66, slip op. at 11–12.

### 3. Analysis

There is no dispute that on July 27, 2020, Respondent declared that the parties were at impasse and unilaterally implemented terms and conditions of employment for the bargaining unit. Many of the terms that Respondent implemented were the same as what Respondent set forth in its June 12, 2020 last, best, and final offer. Some of the terms that Respondent implemented, however, differed from the last, best, and final offer, including: wages, work hours, short term disability, transfers due to workplace changes, and health and welfare. (FOF, Sec. II(J)(1)–(2).)

Respondent contends that it was permitted to implement terms and conditions of employment because the parties reached an impasse in their negotiations for a successor collective-bargaining agreement. Respondent's argument fails on this point. First, the Board has long held that a finding of impasse is precluded if that outcome is reached in the context of serious unremedied unfair labor practices that affect the negotiations. *Royal Motor Sales*, 329 NLRB 760, 762, 764 (1999), enfd. 2 Fed.Appx. 1 (D.C. Cir. 2001). That is the situation here, as I have found that Respondent engaged in overall bad-faith bargaining since about March 11, 2019, in part because Respondent's contract proposals demonstrate Respondent's intent to frustrate arriving at an agreement. (See Discussion and Analysis, Sec. B(3), supra.)

Second, Respondent declared impasse at a time in negotiations when neither party would have been warranted in assuming that further bargaining would be futile and when neither party could have reasonably believed that they were at the end of their rope. When the parties concluded their February 24, 2020 bargaining session, they had not yet finished discussing the Union's contract proposal from September 2019. Presumably the parties would have continued that discussion at the next bargaining session, but the Covid–19 pandemic began and the Union canceled the March 25, 2020 session. Respondent did not object to the cancellation when it occurred. When bargaining continued to be on hold and Respondent's May 22, 2020 written response to the Union's September 2019 proposal did not prompt a reply, Respondent sent the Union a last, best, and final offer on June 12, 2020. The last, best, and final offer included a handful of updated proposals, including a health and welfare proposal in which Respondent committed to providing health, dental, vision, and life insurance plans to the bargaining unit for the length of the contract. The parties did not have a bargaining session to discuss Respondent's last, best, and final offer, nor did they have a bargaining session to discuss the additional updated proposals that Respondent used when it declared impasse and unilaterally implemented terms

31

and conditions of employment on July 27, 2020.[26]  In short, Respondent declared impasse when the parties still needed to bargain about the Union's September 2019 proposal, Respondent's June 12, 2020 last, best, and final offer, and the terms that Respondent implemented on July 27, 2020.  Those checkpoints included movement on key issues such as wages, health and welfare, work hours, and short term disability coverage.  (See FOF, Sec. II(G)(2), H(2)–(3), (I)(1)–(2); see also FOF, Sec. II(I)(2) (noting that on July 20, 2020, the Union explicitly offered to meet and bargain over its September 2019 proposal and Respondent's last, best, and final offer).)

Third, I am not persuaded by Respondent's argument that the Union engaged in bad-faith bargaining that supported Respondent's declaration of impasse.[27]  Specifically, Respondent contends that the Union improperly: avoided or delayed in meeting to negotiate; engaged in regressive bargaining; insisted on permissive subjects of bargaining; attempted to interfere with Respondent's choice of its bargaining representatives; and refused to reach tentative agreements on proposals unless the tentative agreement covered an entire contract article.  (See. R. Posttrial Br. at 34–36.)  While I would not say that the Union's conduct during bargaining was beyond reproach, I do not find that any of the conduct that Respondent identified demonstrates that additional bargaining would have been futile.  For example, while it is true that Respondent was more proactive and flexible than the Union with scheduling bargaining dates, the fact remains that the parties agreed to multiple bargaining dates throughout negotiations.[28]  (See FOF, Sec. II(D)(5).)  As for Respondent's assertion that the Union made regressive (or permissive) proposals concerning when Respondent could use stringers, when managers could perform

[26] Respondent's actions on July 27, 2020, were inherently contradictory.  Specifically, Respondent declared that the parties were at impasse, but simultaneously announced that it was implementing terms and conditions of employment that differed from what Respondent set forth in its last, best, and final offer.  By implementing new terms, Respondent demonstrated that it had room to move from what it characterized as its last, best and final offer on June 12, 2020, and thus demonstrated that the parties were not at impasse.

[27] I do not find that the Board has recognized a defense that would permit an employer to implement its final offer based on a union's alleged bad-faith bargaining tactics (but in the absence of an impasse).  To the contrary, when one party asserts that it may act unilaterally because another party has acted in bad-faith during bargaining, that issue is addressed in the context of evaluating whether the parties have reached a good-faith impasse and whether it would be futile to engage in additional bargaining.  I have followed that approach here.  See, e.g., *Jefferson Smurfit Corp.*, 311 NLRB 41, 60 (1993) (finding that an employer reasonably concluded that further bargaining would not be fruitful, in part because the union was engaging in conduct that was preventing the parties from reaching an agreement or a genuine impasse); *M & M Contractors*, 262 NLRB 1472, 1472 (1982) (same, where the union "over a period of 7 months had clearly manifested its aversion to bargaining" with the employer), petition for review denied, 707 F.2d 516 (9th Cir. 1983); see also *Wilkes-Barre Behavioral Hospital Co., LLC d/b/a First Hospital Wyoming Valley*, 370 NLRB No. 17, slip op. at 17–18 (2020) (rejecting a "union acted in bad faith" defense to an allegation that the employer unlawfully implemented its final offer in the absence of a good-faith impasse).)

[28] To the extent that Respondent takes issue with the fact that no bargaining sessions were scheduled between September 2019 and February 2020 (see R. Posttrial Br. at 37–38), I note that neither party reached out in Fall 2019 to schedule the next bargaining session.  When Respondent did reach out in mid–January 2020, the Union proposed February 24, 2020, as the next date for bargaining and Respondent accepted.  The parties planned to meet again on March 25, 2020, but the Union canceled that session (without objection from Respondent) due to the onset of the Covid–19 pandemic.  (FOF, Sec. II(G)(1), (H)(1)–(2).)

32

bargaining unit work, and the number of managers that Respondent could have in relation to the size of the bargaining unit, I note that the Union corrected or withdrew the majority of those proposals during bargaining.  Perhaps more important, none of the Union's proposals that Respondent flagged as regressive or permissive was so problematic that Respondent could
5    reasonably conclude that further bargaining would be fruitless.  (See FOF, Sec. II(D)(3), (F).) [29]

Viewing the dispute as a whole, I find that the parties had not bargained to a good-faith impasse when Respondent unilaterally implemented terms and conditions of employment on July 27, 2020.  As noted above, Respondent violated the Act by failing and refusing to bargain in
10    good faith during negotiations, and that unfair labor practice had not been remedied when Respondent declared impasse.  In addition, Respondent was aware that there was still room to bargain, as the parties had not yet finished discussing the Union's September 2019 proposal, the Union stated that it was willing to continue bargaining, and Respondent demonstrated its potential flexibility by modifying its proposals shortly before (and on the same day) it declared
15    impasse.  Those factors outweigh the fact that negotiations were lengthy and the fact that the parties' disagreement centered around critical issues such as wages, health and welfare benefits, and the Union's jurisdiction.[30]  Since the parties were not at an overall good-faith impasse in their negotiations for a successor collective-bargaining agreement and no other defenses apply, I find that Respondent violated Section 8(a)(5) and (1) of the Act when it, on July 27, 2020,
20    unilaterally implemented changes to bargaining unit employees' terms and conditions of employment.

*D.  If the Parties Were at a Valid Impasse, Did Respondent Nonetheless Violate the Act by Unilaterally Implementing Improper Terms and Conditions of Employment on July 27, 2020?*
25

1.  Complaint allegations

The General Counsel alleges, as an alternative theory if it is determined that the parties bargained to an overall good-faith impasse before July 27, 2020, that Respondent violated
30    Section 8(a)(5) and (1) of the Act by unilaterally implementing various terms and conditions of employment on or about July 27, 2020, that were not reasonably comprehended by its pre-impasse proposals.

The General Counsel also alleges that Respondent violated Section 8(a)(5) and (1) of the
35    Act by, on or about July 27, 2020, unilaterally implementing a discretionary proposal concerning the performance of bargaining unit work by non-unit employees, and thereby undermining the status of the Union as the employees' exclusive collective-bargaining representative.

---

[29] I do not discuss each of Respondent's assertions of Union misconduct here because many of the assertions lack merit insofar as the alleged misconduct had little to no effect on negotiations.  For example, the Union's statements that Respondent should change its bargaining representative arose briefly in early 2018 and did not arise again afterwards.  (FOF, Sec. II(D)(5).)  Similarly, regarding whether the parties should have reached tentative agreements on subsections of Articles, there is no evidence that the parties agreed on any ground rules for locking in areas of agreement (see FOF, Sec. II(D)(4)), nor is there evidence that the Union's practices on tentative agreements became a material point of contention during negotiations.
[30] I find that the bargaining history factor is neutral as to whether the parties reached a good faith impasse.

33

### 2. Applicable legal standard

It is well established that an employer may not, unilaterally and without first notifying the
union and affording an opportunity to bargain, implement more generous terms and conditions of
employment than what the employer offered during negotiations. *NLRB v. Crompton-Highland
Mills, Inc.*, 337 U.S. 217, 225 (1949). That principle applies not only while the parties are
actively bargaining, but also when the parties reach a valid impasse. See *Cleveland Cinemas
Management Co.*, 346 NLRB 785, 785 & fn. 3, 788–789 (2006).

The Board has recognized a narrow exception to an employer's right to unilaterally
implement contract proposals after bargaining to a good-faith impasse. Specifically, in
*McClatchy Newspapers*, the Board held that the employer violated the Act when, after reaching
impasse, the employer unilaterally implemented a merit wage increase proposal that gave the
employer carte blanche authority over wage increases without limitation by time, standards,
criteria, or the need to secure the union's agreement. The implemented wage proposal was
unlawful because it excluded the union from any meaningful bargaining about merit wage
increases and thereby demonstrated the union's incapacity to act as the employees'
representative and was inherently destructive of the fundamental principles of collective
bargaining. 321 NLRB 1386, 1389–1391 (1996), enfd. 131 F.3d 1026 (D.C. Cir. 1997); see also
*KSM Industries*, 336 NLRB 133, 134–135 (2001) (applying *McClatchy Newspapers* to a health
benefits proposal).

### 3. Analysis

The evidentiary record shows that the terms and conditions of employment that
Respondent unilaterally implemented on July 27, 2020, were different from (and arguably more
favorable than) what Respondent offered at the bargaining table or in its June 12, 2020 last, best,
and final offer. (FOF, Sec. II(J)(2) (describing modifications that Respondent made to its
position on work hours, short term disability benefits, and health and welfare benefits, among
other areas).) The General Counsel maintains that these unilateral changes violate the Act even
if the parties reached a good-faith impasse. (GC Posttrial Br. at 48–50.)

The record also establishes that when Respondent unilaterally implemented terms and
conditions of employment on July 27, 2020, those terms stated exceptions to the Union's
jurisdiction that permitted Respondent to subcontract work, have supervisors and managerial
employees perform bargaining unit work (as long as no bargaining unit employee was laid off as
a direct result), and have non-bargaining unit employees perform bargaining unit work on an
occasional basis. (See FOF, Sec. II(D)(3), (E), (I)(1), (J)(2).) The General Counsel maintains
that these implemented terms violate the Act as explained in *McClatchy Newspapers*. (GC
Posttrial Br. at 47–48.)

I recommend that each of these complaint allegations be dismissed as moot since I have
found that the parties were not at a good-faith impasse on July 27, 2020, and thus found that it
was unlawful for Respondent to unilaterally implement terms and conditions of employment

JD-05-23

(including the terms described above).  Given those findings there is no need to address legal theories that would only apply here if the parties reached a good-faith impasse.

*E.  Did Respondent Violate the Act by Surveilling Employees' Union Activities and/or Creating the Impression of Surveillance?*

5

### 1.  Complaint allegations

10
The General Counsel alleges that Respondent violated Section 8(a)(1) of the Act by, on or about September 25, October 24 and 31, 2020, taking pictures and/or video recordings and thereby engaging in surveillance of employees who were engaged in union activities or creating an impression among employees that their union activities were under surveillance.[31]

### 2.  Applicable legal standard

15
An employer's routine observation of employees engaged in open Section 7 activity on or near the employer's property does not constitute unlawful surveillance.  However, an employer violates Section 8(a)(1) when it surveils employees engaged in Section 7 activity by observing them in a way that is out of the ordinary and thereby coercive.  Indicia of coerciveness include
20
the duration of the observation, the employer's distance from its employees while observing them, and whether the employer engaged in other coercive behavior during its observation. *NCRNC, LLC d/b/a Northeast Center for Rehabilitation*, 372 NLRB No. 35, slip op. at 3–4, 6–7 (2022); *Aladdin Gaming, LLC*, 345 NLRB 585, 585–586 (2005), petition for review denied 515 F.3d 942 (9th Cir. 2008).

25
The Board's test for determining whether an employer has unlawfully created an impression of surveillance is whether, under all the relevant circumstances, reasonable employees would assume from the statement or conduct in question that their union or other protected activities have been placed under surveillance.  The standard is an objective one, based
30
on the rationale that employees should be free to participate in union activities without the fear that members of management are peering over their shoulders, taking note of who is involved in union activities, and in what particular ways. *Metro One Loss Prevention Services*, 356 NLRB 89, 102 (2010).

35
### 3.  Analysis

The evidentiary record shows that on September 25, 2020, the Union held a public rally on the street in front of Respondent's facility.  Hearing the noise from the rally, Respondent's chief photo editor, Arturo Fernandez, took photographs from the third floor (near where his desk

---

[31] The General Counsel withdrew its complaint allegation that Respondent also unlawfully engaged in surveillance or created the impression of surveillance on October 3, 2020.  (Tr. 14–15.)

35

was located) because he believed the rally could be a "spot news" event that the newspaper should cover.[32]  (FOF, Sec. II(K)(1).)

5    The General Counsel maintains that Respondent, through Fernandez' actions, unlawfully engaged in surveillance or created the impression of surveillance.  I disagree.  Regarding alleged surveillance, I find that due to the public nature of the rally and Fernandez' role as a journalist, it was not out of the ordinary for Fernandez to take photographs of the rally in case the event proved to be newsworthy.  Moreover, there is no evidence that Fernandez engaged in any other behavior while taking photographs that could be deemed coercive.  As for allegedly creating the
10   impression of surveillance, I do not find that a reasonable employee, knowing Fernandez' role as chief photo editor and understanding that the rally was a public event, would assume from Fernandez' conduct that Respondent had placed employees' union activities under surveillance.

15   I take a different view of Respondent's actions at the October 24 and 31, 2020 rallies outside of publisher John Block's home.  At each of those rallies, Respondent had security guards present to ensure that the rallies did not get out of control.  The security guards took photographs at each rally, and in particular appeared to take photographs of rally participants (including employees) when the participants were across the street from Block's home.  Because the security guards gave the impression that they were photographing employees when they were
20   not near the property line for Block's home, I do not find that the security guards were simply documenting intrusions onto the Blocks' private property.  There is also no evidence that the security guards were attempting to document unlawful conduct that rally participants engaged in while they were located across the street from the Blocks' home.  Under those circumstances, a reasonable employee would conclude that Respondent, through security guards serving as its
25   agents, had placed employees' union activities under surveillance.

In sum, I find that Respondent violated Section 8(a)(1) of the Act by, on October 24 and 31, 2020, appearing to take photographs of employees across the street from John Block's home and thereby creating an impression among its employees that their union activities were under
30   surveillance.  I recommend that the complaint allegations regarding alleged surveillance and creating the impression of surveillance on September 25, 2020, be dismissed.

CONCLUSIONS OF LAW

35   1.  Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2.  The Union is a labor organization within the meaning of Section 2(5) of the Act.

40   3.  By its overall conduct in negotiations for a successor collective-bargaining agreement since about March 11, 2019, including prematurely declaring impasse and insisting on proposals that, viewed as a whole, would leave the Union and bargaining unit employees with substantially fewer rights and less protection than provided by law without a contract, Respondent failed and

---

[32] Robert Weber also observed the rally but the General Counsel did not prove that Weber took or appeared to take photographs or video recordings.  (FOF, Sec. II(K)(1).)

refused to bargain in good faith with the Union as the exclusive collective-bargaining representative of the bargaining unit and thereby violated Section 8(a)(5) and (1) of the Act.

4. By, on July 27, 2020, unilaterally implementing changes to bargaining unit
5 employees' terms and conditions of employment without first bargaining with the Union to an overall good-faith impasse for a successor collective-bargaining agreement, Respondent violated Section 8(a)(5) and (1) of the Act.

5. By, on October 24 and 31, 2020, appearing to take photographs of bargaining unit
10 employees while they engaged in union activities across the street from publisher John Block's residence and thereby creating the impression among its employees that their union activities were under surveillance, Respondent violated Section 8(a)(1) of the Act.

6. The unfair labor practices stated in Conclusions of Law 3–5, above, affect commerce
15 within the meaning of Section 2(6) and (7) of the Act.

REMEDY

*A.  Standard Remedies*

20
Having found that Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act.

25 Upon request of the Union, Respondent shall rescind the unlawful unilateral changes and put into effect the corresponding terms and conditions of employment set forth in the collective-bargaining agreement that expired on March 31, 2017, and shall maintain those terms in effect until the parties have bargained to agreement or a valid impasse, or the Union has agreed to changes.  In addition, Respondent must make its employees whole for any loss of earnings and
30 other benefits that resulted from its unlawful unilateral changes.  Backpay for these violations shall be computed in accordance with *Ogle Protection Service*, 183 NLRB 682 (1970), enfd. 444 F.2d 502 (6th Cir. 1971), with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010). This includes reimbursing unit employees for any expenses resulting from Respondent's
35 unlawful changes to their contractual benefits (including changes to health insurance benefits), as set forth in *Kraft Plumbing & Heating*, 252 NLRB 891 fn. 2 (1980), affd. 661 F.2d 940 (9th Cir. 1981), with interest as set forth in *New Horizons* and *Kentucky River Medical Center*, supra.  I further recommend that Respondent be ordered to make all contributions to any fund established by the expired collective-bargaining agreement, which contributions the Respondent would have
40 made but for the unlawful unilateral changes, in accordance with *Merryweather Optical Co*., 240 NLRB 1213, 1216 (1979).

Consistent with *Thryv, Inc.*, 372 NLRB No. 22, slip op. at 14 (2022), Respondent shall also compensate all bargaining unit employees for any other direct or foreseeable pecuniary
45 harms incurred as a result of the unlawful unilateral changes.  Compensation for these harms shall be calculated separately from taxable net backpay, with interest at the rate prescribed in *New Horizons*, supra, compounded daily as prescribed in *Kentucky River Medical Center*, supra.

In accordance with *Don Chavas, LLC d/b/a Tortillas Don Chavas,* 361 NLRB 101 (2014), Respondent shall compensate all bargaining unit employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award. In addition, in accordance with *AdvoServ of New Jersey, Inc.*, 363 NLRB 1324 (2016) and *Cascades Containerboard Packaging–Niagara*, 370 NLRB No. 76 (2021), as modified in 371 NLRB No. 25 (2021), Respondent shall, within 21 days of the date the amount of backpay is fixed either by agreement or Board order, file with the Regional Director for Region 6 a report allocating backpay to the appropriate calendar year(s). Respondent shall also, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, file a copy of each backpay recipient's W–2 form(s) reflecting the backpay award. The Regional Director will then assume responsibility for transmitting the report and W–2 form(s) to the Social Security Administration at the appropriate time and in the appropriate manner.

### B. Special Remedies

#### 1. Bargaining order

The General Counsel requests an order requiring Respondent, within 15 days of the Union's request, to meet with the Union at reasonable times and bargain in good with the Union concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement. The General Counsel also requests that the order provide that upon the Union's request, bargaining sessions should be held for a minimum of 15 hours per week (or according to a different schedule to which the Union agrees), and that Respondent submit a written bargaining progress report every 15 days to the compliance officer for Region 6, with copies served on the Union.

The Board has a long-established practice of relying on bargaining orders to remedy the vast majority of bad-faith bargaining violations. See *Frontier Hotel & Casino*, 318 NLRB 857, 859 (1995), enfd. in relevant part sub nom. *Unbelievable, Inc. v. NLRB*, 118 F.3d 795 (D.C. Cir. 1997); see also *Caterair International*, 322 NLRB 64, 67 (1996) (explaining that an affirmative bargaining order serves the interests of an incumbent union by restoring the bargaining opportunity that it should have had in the absence of unlawful conduct). However, the U.S. Court of Appeals for the District of Columbia Circuit has required the Board to justify, on the facts of each case, the imposition of an affirmative bargaining order. See, e.g., *Vincent Industrial Plastics, Inc. v. NLRB*, 209 F.3d 727, 738–739 (D.C. Cir. 2000). In *Vincent*, supra at 738, the court stated that an affirmative bargaining order must be justified by a reasoned analysis that includes an explicit balancing of three considerations: (1) the employees' Section 7 rights; (2) whether other purposes of the Act override the rights of employees to choose their bargaining representative; and (3) whether alternative remedies are adequate to remedy the violations of the Act. Although the Board has indicated that it disagrees with the requirements that the court identified in *Vincent*, the Board has followed a practice of examining whether an affirmative bargaining order is justified according to the standard set forth in *Vincent*. See, e.g., *Wyman Gordon Pennsylvania, LLC*, 368 NLRB No. 150, slip op. at 10–11 (2019), enfd. 836 Fed.Appx. 1 (D.C. Cir. 2020).

38

JD-05-23

Following the Board's approach, I have analyzed the facts of this case under the three-factor balancing test outlined by the U.S. Court of Appeals for the District of Columbia Circuit.

(1)  An affirmative bargaining order in this case will vindicate the Section 7 rights of the unit employees who were denied the benefits of collective bargaining through their designated representative by Respondent's failure and refusal to bargain in good faith with the Union.  While an affirmative bargaining order comes with an attendant bar to raising a question concerning the Union's majority status for a reasonable time, that bar does not unduly prejudice the Section 7 rights of employees who may oppose representation by the Union because the duration of the order is no longer than is reasonably necessary to remedy the ill effects of the violation.  Since Respondent's unlawful bargaining practices prevented an agreement since March 11, 2019 (a period of nearly 4 years), it is only by restoring the status quo ante and requiring Respondent to bargain with the Union for a reasonable period of time that the employees will be able to fairly assess the Union's effectiveness as a bargaining representative free of Respondent's unlawful conduct.  The employees can then determine whether continued representation by the Union is in their best interest.

(2)  An affirmative bargaining order also serves the policies of the Act by fostering meaningful collective bargaining and industrial peace.  It removes Respondent's incentive to delay bargaining in the hope of discouraging support for the Union and ensures that the Union will not be pressured (e.g., by a decertification petition or withdrawal of recognition) to achieve immediate results at the bargaining table following the Board's resolution of its unfair labor practice charges and the issuance of a cease-and-desist order.

(3)  A cease-and-desist order alone would be inadequate to remedy Respondent's failure and refusal to bargain with the Union in good faith because it would permit a challenge to the Union's majority status before the taint of Respondent's misconduct has dissipated.  Allowing a challenge to the Union's majority status without a reasonable period for bargaining would be unjust in circumstances such as those here, where given the passage of time the Union needs an opportunity to reestablish its role as the exclusive collective-bargaining representative of unit employees without, for example, the employee disaffection that may have resulted from unpopular terms and conditions of employment that Respondent unlawfully implemented in the absence of a good-faith impasse.  Permitting a decertification petition to be filed immediately might very well allow Respondent to profit from its own unlawful conduct.  I find that those concerns outweigh the temporary impact that the affirmative bargaining order will have on the rights of employees who oppose union representation.

For all of the foregoing reasons, I find that an affirmative bargaining order with its temporary decertification bar is necessary to fully remedy the violations in this case, and I shall include such an order as a remedy here.  I shall also require Respondent to submit written bargaining progress reports every 30 days to the compliance officer for Region 6.[33]

---

[33] I decline the General Counsel's request that I order bargaining sessions to be held, upon the Union's request, for a minimum of 15 hours per week.  Respondent has generally made itself available for

39

2.   Reimbursement of Union's negotiating costs and expenses

The Board has held that in the vast majority of cases involving bad-faith bargaining
violations, a bargaining order accompanied by the usual cease-and-desist order and the posting of
a notice will suffice to induce a respondent to fulfill its statutory obligations.  However, "[i]n
cases of unusually aggravated misconduct [] where it may fairly be said that a respondent's
substantial unfair labor practices have infected the core of a bargaining process to such an extent
that their 'effects cannot be eliminated by the application of traditional remedies,' an order
requiring the respondent to reimburse the charging party for negotiation expenses is warranted
both to make the charging party whole for the resources that were wasted because of the
unlawful conduct, and to restore the economic strength that is necessary to ensure a return to the
status quo ante at the bargaining table." *Frontier Hotel & Casino*, 318 NLRB at 859; see also
*Nexstar Broadcasting, Inc. d/b/a KOIN-TV*, 371 NLRB No. 118, slip op. at 2 & fn. 5 (2022);
*Regency Service Carts*, 345 NLRB 671, 676 (2005).[34]

I do not find that Respondent engaged in unusually aggravated misconduct in this case
that would support ordering Respondent to reimburse the Union for negotiating costs and
expenses.  While Respondent did engage in bad-faith bargaining, the General Counsel has not
maintained (or established) that Respondent has a history of violating the Act.  The General
Counsel also has not identified any other aggravated misconduct by Respondent that might
justify the extraordinary remedy of requiring Respondent to reimburse the Union for negotiating
costs and expenses.  Given the lack of evidence on those points, I decline the General Counsel's
request that I order Respondent to reimburse the Union for its negotiating costs and expenses.

3.   Reimbursement of employee negotiators' lost earnings and/or leave while attending
bargaining sessions

The General Counsel also requests that I order Respondent to reimburse employee
negotiators for any earnings and/or leave lost while attending bargaining sessions during the time
Respondent engaged in bad-faith bargaining (if the Union did not reimburse the employee
negotiators for those expenses).  In so arguing, the General Counsel relies on the Board's
decision in *Nexstar Broadcasting*, in which the Board stated that "reimbursement of employee-
negotiators lost wages serves the same purpose as the reimbursement of bargaining expenses – to
make parties whole for any losses that occurred as a result of the [r]espondent's bad-faith
bargaining."  371 NLRB No. 118, slip op. at 2–3 & fn. 6.

Since the Board has indicated that an award of employee negotiators' lost earnings and/or
leave serves the same purpose as an award of bargaining expenses, I find that the same showing
of unusually aggravated misconduct is required to justify the award.  Indeed, that is consistent

---

bargaining sessions upon request, and thus I leave it to the Union and Respondent to make arrangements
for regular bargaining sessions.
   [34] The General Counsel has asked the Board to clarify its precedent regarding when an award of
bargaining expenses and costs is appropriate.  (See GC Posttrial Br. at 55–56 (asserting that bargaining
costs and expenses should not be an extraordinary remedy).)  I leave that question to the Board and rely
here on the legal standard set forth in *Frontier Hotel & Casino*, 318 NLRB 857, 859, which the Board did
not modify or overrule in *Nexstar Broadcasting*, 371 NLRB No. 118, slip op. at 2 & fn. 5.

with the Board's analysis in *Frontier Hotel & Casino*, which did not include an award of employee negotiators' lost earnings and/or leave among the standard remedies that apply in cases involving bad-faith bargaining violations. 318 NLRB at 859. As the General Counsel did not demonstrate that Respondent engaged in unusually aggravated misconduct in this case, I decline

5   the General Counsel's request that I order Respondent to reimburse employee negotiators for any earnings and/or leave lost during the time period when Respondent engaged in bad-faith bargaining.

### 4. Notice reading

10

  The General Counsel has requested that I require Respondent to have a representative read the notice aloud to employees on worktime in the presence of a Board agent at a meeting or meetings that are scheduled to ensure the widest possible attendance of employees. The General Counsel also requested that I require Respondent to distribute a copy of the notice to each

15   employee who attends the notice reading. The Board has found a notice-reading remedy appropriate where the employer's violations are sufficiently numerous and serious that a reading of the notice is warranted to dissipate the chilling effect of the violations on employees' willingness to exercise their Section 7 rights. *Amerinox Processing, Inc.*, 371 NLRB No. 105, slip op. at 2 (2022); *Gavilon Grain, LLC*, 371 NLRB No. 79, slip op. at 1 (2022).

20

  I do not find that a notice-reading (or accompanying notice distribution) remedy is warranted in this case. While Respondent committed serious unfair labor practices, I do not find that the violations were so widespread that a notice reading is necessary. The other remedies that I have ordered will reset the bargaining relationship between Respondent and the Union, and the

25   standard notice posting remedy will accomplish the goal of ensuring employees that they may exercise their Section 7 rights free of coercion and that Respondent and its managers are bound by the requirements of the Act.

  On these findings of fact and conclusions of law and on the entire record, I issue the

30   following recommended[35]

### ORDER

  Respondent, PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette, Pittsburgh,

35   Pennsylvania, its officers, agents, successors, and assigns, shall

  1. Cease and desist from

  (a) Failing and refusing to bargain with the Newspaper Guild of Pittsburgh/CWA Local

40   38061 (Union) in good faith as the exclusive collective-bargaining representative of the employees in the following appropriate bargaining unit:

---

[35] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

(b) Making unilateral changes to bargaining unit employees' terms and conditions of employment by implementing portions of its last, best, and final offer at a time when the parties had not reached a valid impasse in bargaining for a successor collective-bargaining agreement.

(c) Creating the impression among bargaining unit employees that their union activities are under surveillance.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Beginning within 15 days of the Union's request, meet with the Union at reasonable times and bargain in good faith with the Union as the exclusive representative of employees in the above-described bargaining unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement.  Respondent shall submit written bargaining progress reports every 30 days to the compliance officer for Region 6, and shall serve copies of the reports on the Union.

(b) On request by the Union, rescind the changes to terms and conditions of employment for bargaining unit employees that Respondent unilaterally implemented on about July 27, 2020, and restore, honor, and continue the terms of the bargaining unit's collective-bargaining agreement that expired on March 31, 2017.

(c) Make bargaining unit employees whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the unlawful unilateral changes to terms and conditions of employment that Respondent made on about July 27, 2020, with interest, as provided for in the remedy section of this decision.

(d) Make all delinquent contributions to the applicable benefit funds on behalf of bargaining unit employees that have not been paid since July 27, 2020, including any additional amounts due to the funds, as provided for in the remedy section of this decision.

(e) Make bargaining unit employees whole for any expenses ensuing from the failure to make the required contributions to the applicable benefit funds, with interest, as provided for in the remedy section of this decision

42

JD-05-23

(f) Compensate bargaining unit employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

5

(g) File with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each bargaining unit employee's W–2 form(s) reflecting the employee's backpay award.

10

(h) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in

15    electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(i) Within 14 days after service by the Region, post at its facility in Pittsburgh, Pennsylvania, a copy of the attached notice marked "Appendix A."  Copies of the notice, on forms provided by the Regional Director for Region 6, after being signed by Respondent's

20    authorized representative, shall be posted by Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted.  In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if Respondent customarily communicates with its employees by such means.  Reasonable steps

25    shall be taken by Respondent to ensure that the notices are not altered, defaced, or covered by any other material.  In the event that, during the pendency of these proceedings, Respondent has gone out of business or closed the facility involved in these proceedings, Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by Respondent at the facility at any time since March 11, 2019.

30

(j) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

35

Dated, Washington, D.C., January 26, 2023

40

_____
Geoffrey Carter
Administrative Law Judge

43

JD-05-23

## APPENDIX A

NOTICE TO EMPLOYEES

Posted by Order of the
National Labor Relations Board
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT fail and refuse to bargain with the Newspaper Guild of Pittsburgh/CWA Local 38061 (Union) in good faith as the exclusive collective-bargaining representative of the employees in the following appropriate bargaining unit:

All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

WE WILL NOT make unilateral changes to bargaining unit employees' terms and conditions of employment by implementing portions of our last, best, and final offer at a time when we and the Union have not reached a valid impasse in bargaining for a successor collective-bargaining agreement.

WE WILL NOT create the impression among bargaining unit employees that their union activities are under surveillance.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce employees in the exercise of the rights guaranteed them by Section 7 of the Act.

WE WILL, beginning within 15 days of the Union's request, meet with the Union at reasonable times and bargain in good faith with the Union as the exclusive representative of employees in the above-described bargaining unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement.  WE WILL submit

JD-05-23

written bargaining progress reports every 30 days to the compliance officer for Region 6, and shall serve copies of the reports on the Union.

WE WILL, on request by the Union, rescind the changes to terms and conditions of employment for bargaining unit employees that we unilaterally implemented on about July 27, 2020, and restore, honor, and continue the terms of the bargaining unit's collective-bargaining agreement that expired on March 31, 2017.

WE WILL make bargaining unit employees whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the unlawful unilateral changes to terms and conditions of employment that we made on about July 27, 2020, with interest.

WE WILL make all delinquent contributions to the applicable benefit funds on behalf of bargaining unit employees that have not been paid since July 27, 2020, including any additional amounts due to the funds.

WE WILL make bargaining unit employees whole for any expenses ensuing from the failure to make the required contributions to the applicable benefit funds, with interest.

WE WILL compensate bargaining unit employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file with the Regional Director for Region 6, within 21 days of the date that the amount of backpay is fixed, either by agreement or Board order, a report allocating each backpay award to the appropriate calendar year(s).

WE WILL file with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each bargaining unit employee's W–2 form(s) reflecting the employee's backpay award.

PG PUBLISHING CO., INC. d/b/a PITTSBURGH POST-GAZETTE
_____
(Employer)

Dated _____ By _____

                                       (Representative)                    (Title)

The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. It conducts secret-ballot elections to determine whether employees want union representation and it investigates and remedies unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below.  You may also obtain information from the Board's website:  www.nlrb.gov

William S. Moorhead Federal Building, Room 904, Pittsburgh, PA 15222-4111
(412) 395-4400, Hours: 8:30 a.m. to 5 p.m.

JA0045

JD-05-23

The Administrative Law Judge's decision can be found at https://www.nlrb.gov/case/06-CA-248017 or by using the QR code below.  Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE**
THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED, DEFACED, OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO THE ABOVE REGIONAL OFFICE'S COMPLIANCE OFFICER (412) 690-7117.

## APPENDIX B

Corrections to Transcript
PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette, 6–CA–248017, et al.

P. 10, l. 20: "of" should be "off"
P. 12, l. 1: "John" should be "Jon"
P. 14, l. 2: "withdrawal" should be "withdraw"
P. 15, l. 1: "so we reflect" should be "so reflect"
P. 22, l. 8: "fertility" should be "futility"
P. 22, l. 13: "Analog" should be "NLRB"
P. 23, l. 11: "it's" should be "its"
P. 28, l. 13: "past" should be "passed"
P. 32, l. 15: "party's" should be "parties"
P. 55, l. 9: "Webber" should be "Weber"
P. 60, l. 10: "we're" should be "were"
P. 61, l. 19: "Blocks" should be "Block's"
P. 64, l. 16: "return" should be "returned"
P. 70, l. 9: "printout" should be "print out"
P. 70, l. 21: "first" should be "for us"
P. 117, l. 20: "this" should be "his" (2 instances)
P. 130, l. 20: "Teacher's" should be "Teamsters"
P. 131, l. 11: "at plus" should be "a plus"
P. 133, l. 10: "obtain" should be "maintain"
P. 133, l. 11: "eliminated" should be "eliminating"
P. 134, l. 6: "a numeration" should be "remuneration"
P. 136, ll. 8–9: "extensively" should be "essentially"
P. 140, l. 16: "Council" should be "Counsel"
P. 147, l. 14: "Blazine" should be "Blazina"
P. 156, l. 17: "Emitted" should be "admitted"
P. 175, l. 8: "failure" should be "familiar"
P. 184, l. 13: "inadequacy's" should be "inadequacies"
P. 185, l. 19: "John" should be "Jon"
P. 186, l. 7: "unit" should be "union"
P. 189, l. 21: "fires" should be "files"
P. 191, l. 9: "inadequacy's" should be "inadequacies"
P. 198, l. 15: "mating" should be "meeting"
P. 235, l. 7: "simple" should be "similar"
P. 263, l. 8: Mr. Pass was the speaker
P. 269, l. 17: "no –" should be "no claim?"
P. 273, l. 4: "DIRECT" should be "CROSS"
P. 289, l. 2: "trail" should be "trial"
P. 289, l. 3: "missioned" should be "admissions"
P. 296, l. 20: "goner" should be "gone over"
P. 289, l. 4: "property" should be "party"
P. 298, l. 6: "handed" should be "handled"
P. 299, l. 17: "John" should be "Jon"

P. 303, l. 9: "hold" should be "hole"
P. 303, l. 17: "write" should be "right"
P. 305, l. 2: "of" should be "from"
P. 307, l. 10: "about" should be "without"
P. 309, l. 6: "lick" should be "wink"
P. 309, l. 6: a quotation mark should appear after the period
P. 309, l. 18: "without" should be "with"
P. 313, l. 10: "John" should be "Jon"
P. 315, l. 25: a quotation mark should appear after the first comma
P. 318, l. 25: "doling" should be "doing"
P. 320, l. 1: a quotation mark should appear before the word "it"
P. 321, l. 13: "workplace ability" should be "work flexibility"
P. 323, l. 6: "permissible" should be "permissive"
P. 323, l. 6: "were not opposing" should be "were opposing"
P. 325, l. 23: "I didn't have" should be "I have"
P. 333, l. 2: "an aggressive" should be "a regressive"
P. 338, l. 14: "costs" should be "scales"
P. 341, l. 4: "o" should be "on"
P. 345, l. 24: "no more" should be "normal"
P. 346, l. 16: "techs" should be "days"
P. 347, l. 17: "gauge" should be "engage"
P. 349, l. 19: "waned" should be "wanted"
P. 349, l. 23: "our" should be "their"
P. 354, l. 22: "slipped" should be "split"
P. 355, ll. 21, 24: "Signing" should be "Assignment"
P. 356, l. 2: "Signing" should be "Assignment"
P. 362, l. 3: "you" should be "they"
P. 365, l. 19: "Yes, sir." should be "No, sir."
P. 374, l. 4: "gone" should be "going"
P. 374, l. 6: "John" should be "Jon"
P. 380, l. 21: a quotation mark should appear after the comma
P. 382, l. 12: a quotation mark should appear before the word "no"
P. 387, l. 6: "profit" should be "problem"
P. 407, l. 17: [Indiscernible] should be "and Washington"
P. 428, l. 1: "approve" should be "accrue"
P. 428, l. 18: "on vacation" should be "on termination"
P. 430, l. 6: "of" should be "from"
P. 434, l. 7: "two" should be "to"
P. 438, l. 17: no quotation mark should appear on this line
P. 439, l. 1: "maybe" should be "may be"
P. 439 l . 19: "off or" should be "off for"
P. 441, l. 5: a quotation mark should appear after the comma
P. 442, l. 1: "affects" should be "effects"
P. 480, l. 24: a quotation mark should appear before "whenever" and after "possible"
P. 483, l. 1: a quotation mark should appear before the word "the"
P. 483, l. 3: a quotation mark should appear after the comma
P. 483, l. 6: a quotation mark should appear before the word "Company"

P. 483, l. 7: a quotation mark should appear after the comma
P. 483, l. 22: a quotation mark should appear before the word "one"
P. 483, l. 23: a quotation mark should appear after the period
P. 495, l. 15: "guarantee" should be "guaranteed"
P. 501, l. 2: "at writing" should be "in writing"
P. 503, l. 12: "John" should be "Jon"
P. 507, l. 23: "I" should be "one"
P. 510, l. 13: "set to reject" should be "accept"
P. 511, l. 21: "well agreed" should be "we'll agree"
P. 512, l. 9: "vowed to be" should be "agreed to the"
P. 513, l. 8: "did" should be "did not"
P. 515, l. 21: "arbitrations" should be "arbitrators"
P. 516, l. 22: "percent" should be "present"
P. 517, l. 11: "eight" should be "weight"
P. 518, l. 13: "object of" should be "objective"
P. 523, l. 9: "consisted" should be "consistent"
P. 525, l. 1: "they" should be "the"
P. 529, l. 20: "bantering" should be "bannering"
P. 534, l. 4: a quotation mark should appear before the word "including" and after the word "to"
P. 539, l. 11: the words "requirements" and "needs" should each be in quotation marks
P. 542, l. 24: "they're" should be "their"
P. 547, l. 13: "aggressive" should be "regressive"
P. 548, l. 12: a quotation mark should appear before the word "no"
P. 548, l. 15: a quotation mark should appear after the period
P. 554, l. 7: "vain" should be "vein"
P. 561, l. 10: Ms. Stern was the speaker
P. 567, l. 1: "John" should be "Jon"
P. 571, l. 7: "screen" should be "scheme"
P. 571, l. 16: "working new" should be "breaking news"
P. 571, l. 25: "worst" should be "word"
P. 574, l. 9: "they're" should be "their"
P. 583, l. 10: "identification" should be "indemnification"
P. 590, l. 20: "bargain" should be "bargaining"
P. 610, l. 15: "John" should be "Jon"
P. 649, l. 4: "perceive" should be "proceed"
P. 652, l. 3: "Lewis" should be "Lowe"
P. 657, l. 9: "right" should be "write"
P. 668, l. 21: "CVA" should be "CBA"
P. 669, l. 24: "company" should be "copy"
P. 712, l. 4: Ms. Stern was the speaker
P. 722, l. 13: "EOC" should be "EEOC"
P. 755, l. 14: "Gest" should be "Guest"
P. 758, ll. 19–20: "predicably" should be "predictably"
P. 784, l. 8: "RESUMED DIRECT" should be "DIRECT"
P. 786, l. 19: Mr. Oesterle was the speaker
P. 786, l. 20: "motions dismissed" should be "motion to dismiss"
P. 786, l. 24: "divisional judges" should be "Division of Judges"

P. 787, l. 3: "motions" should be "motion"
P. 788, l. 3: Mr. Hunt was the speaker
P. 792, l. 17: "peaked" should be "piqued"
P. 800, l. 9: "11(vi)" should be "11(b)(i)"
P. 813, l. 21: "UCPR" should be "gallery"
P. 815, l. 10: "trail" should be "trial"

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette *and* Newspaper Guild of Pittsburgh/CWA Local 38061.** Cases 06–CA–248017, 06–CA–263791, and 06–CA–269346

September 20, 2024

DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS PROUTY AND WILCOX

On January 26, 2023, Administrative Law Judge Geoffrey Carter issued the attached decision. The Respondent filed exceptions and a supporting brief. The General Counsel and the Charging Party filed answering briefs, and the Respondent filed reply briefs. The General Counsel and the Charging Party each filed limited exceptions and supporting briefs, the Respondent filed answering briefs to both, and the General Counsel and Charging Party filed reply briefs.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[1] and conclusions, to amend the remedy, and to adopt the recommended Order as modified and set forth in full below.

---

[1] The Respondent has implicitly excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

We adopt the judge's findings, for the reasons he states, that the Respondent, by its overall conduct in negotiations for a successor collective-bargaining agreement, violated Sec. 8(a)(5) of the Act by failing and refusing to bargain in good faith with the Union.

In addition, we adopt the judge's finding that the Respondent violated Sec. 8(a)(5) when, on July 27, 2020, it unilaterally implemented changes to bargaining unit employees' terms and conditions of employment, including many terms from the Respondent's June 12, 2020 last, best, and final offer (LBFO) and some terms from that LBFO that the Respondent subsequently modified, without first bargaining to a good-faith impasse. In doing so, we note that there are no exceptions to the judge's finding that the Respondent implemented its LBFO, with some terms modified, on July 27, 2020. We also note that, in finding that the parties had not reached a valid impasse at the time it implemented these changes, the judge relied on the Respondent's failure and refusal to bargain in good faith during negotiations for the successor collective-bargaining agreement, as well as the fact that the Respondent understood that there was still room to bargain with the Union. For the reasons stated by the judge, we adopt his finding of this 8(a)(5) violation. We note, however, that, even absent the Respondent's failure and refusal to bargain in good faith with the Union during the negotiations for the successor collective-bargaining agreement, we would still find that the Respondent had not reached a valid impasse prior to implementing the changes to the employees' terms and conditions of employment on July 27, 2020. In this regard, as the judge explained: (1) the parties' written communications reflected substantive movement in the Union's September 6, 2019 and the Respondent's June 12, 2020 proposals that had not been discussed at the time of the Respondent's July 27 unilateral implementation; (2) the Union had attempted to schedule further bargaining; and (3) the Respondent implemented terms that differed from its final offer, thus demonstrating that it had additional room to move from what it had previously termed its "final" negotiating positions.

Having found, in agreement with the judge, that the Respondent violated Sec. 8(a)(5) on July 27, 2020, by unilaterally implementing changes to bargaining unit employees' terms and conditions of employment without first bargaining to a good-faith impasse, we find it unnecessary to reach the General Counsel's and the Charging Party's exceptions to the judge's dismissal of the General Counsel's alternative allegation that even if the parties had reached a valid impasse, the Respondent nevertheless violated Sec. 8(a)(5) by implementing proposals that differed from its LBFO.

We rely on *Audio Visual Services Group, Inc. d/b/a PSAV Presentation Services*, 367 NLRB No. 103, slip op. at 6–8 (2019), affd. sub nom.

*Theatrical Stage Employees, Local 15 v. NLRB*, 957 F.3d 1006 (9th Cir. 2020), instead of *District Hospital Partners, L.P. d/b/a The George Washington University Hospital*, 370 NLRB No. 118 (2021), vacated by 372 NLRB No. 109 (2023), which the judge relied on for the principle that a union should not assume that an employer's initial proposals are fixed positions and should test the employer's willingness to bargain. We deny, as moot, the General Counsel's request to overrule *District Hospital* (for reasons unrelated to the above principle) because the case has already been reconsidered and reported as *District Hospital Partners, L.P. d/b/a The George Washington University Hospital, a Limited Partnership & UHS of D.C. Inc., General Partner*, 373 NLRB No. 55 (2024).

We affirm the judge's dismissal of the allegation that the Respondent violated Sec. 8(a)(1) by surveilling employees and/or creating the impression of surveillance when its chief photo editor photographed employees publicly protesting its bargaining conduct outside its offices on September 25, 2020. Accordingly, we find it unnecessary to reach the Respondent's argument that it had a First Amendment right to do so.

We agree with the judge that during the Union's October 24 and 31, 2020 rallies, the Respondent violated Sec. 8(a)(1) by creating an impression of surveillance through two security guards hired from Kellington Protection, LLC. Stationed outside the house of the Respondent's publisher, John Block, the guards pointed their cell phones at rally participants, including employees, appearing to photograph them as they peacefully protested the Respondent's bargaining conduct on a public sidewalk on the opposite side of the street from Block's house. It is well settled that "absent proper justification, the photographing of employees engaged in protected concerted activities violates the Act because it has a tendency to intimidate." *F. W. Woolworth Co.*, 310 NLRB 1197, 1197 (1993). "[T]he Board requires an employer engaging in such photographing or videotaping to demonstrate that it had a reasonable basis to have anticipated misconduct by the employees." *National Steel & Shipbuilding Co.*, 324 NLRB 499, 499 (1997), enfd. 156 F.3d 1268 (D.C. Cir. 1998); see also *Waco, Inc.*, 273 NLRB 746, 747 (1984).

In finding the impression of surveillance violations related to the October 2020 rallies, we rely primarily on the Respondent's failure to justify photographing bargaining unit employees standing across the street and away from Block's property line by showing that it had reason to anticipate unlawful behavior. There was no evidence of unlawful behavior at the prior September 25 rally—nor did the Respondent show that any unlawful conduct actually occurred on October 24 and 31. Instead, the Respondent claims only that this was a time of "contentious protests throughout the United States that often turned violent," without showing that it had reason to believe that the particular protests involved in this proceeding would be of that nature. While the Respondent claims that employees trespassed and blocked access to the property, the record shows only an occasional protester positioned close to the property line, which would not justify photographing them when on the opposite side of the street. Indeed, even an "isolated" incident of "temporary blocking of entrances" does not justify photographic surveillance of protected concerted activity that "d[oes] not involve any arguable blocking." *Chester*

AMENDED REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, we shall order it to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act. We agree with the judge that the Respondent violated Section 8(a)(5) and (1) by failing and refusing to bargain in good faith with the exclusive collective-bargaining representative of its employees, and with the judge's recommended remedies of an affirmative bargaining order, the rescission of unilateral changes,[2] and the submission of bargaining progress reports every 30 days, but we disagree that these recommended remedies suffice to restore the Union and its negotiators to the position they would have been in had the Respondent bargained in good faith. Accordingly, we grant the Union's partial exception to the judge's recommended remedy, and amend it in the following respects.

In addition to the remedies ordered by the judge, we shall order the Respondent to compensate the Union for all bargaining expenses it incurred during the time the Respondent engaged in bad-faith bargaining through the parties' final bargaining session on September 8, 2020, including any lost wages the Union paid to bargaining committee members for bargaining conducted during working hours. See *Frontier Hotel & Casino*, 318 NLRB 857, 857–859 (1995), enfd. in relevant part sub nom. *Unbelievable, Inc. v. NLRB*, 118 F.3d 795 (D.C. Cir. 1997); see also *Troy Grove*, 372 NLRB No. 94, slip op. at 7 (2023); *Columbus Electric Cooperative*, 372 NLRB No. 89, slip op. at 2 (2023). We find this award necessary to make the Union whole and to ensure a return to the status quo ante at the bargaining table because the Union expended significant time and expense bargaining with a respondent that bargained in bad faith, insisted on provisions that left the Union with fewer rights and less protection than provided by law without a contract, *Public Service Co. of Oklahoma (PSO)*, 334 NLRB 487, 487–488, 489 (2001), enfd. 318 F.3d 1173 (10th Cir. 2003), and unilaterally implemented a modified version of certain of its final proposals without bargaining to a valid impasse.

We shall also order the Respondent to make whole any affected employee negotiators for any earnings and/or

leave lost while attending bargaining sessions, plus interest, to the extent that these losses were not reimbursed by the Union. See *M.F.A. Milling Co.*, 170 NLRB 1079, 1080 (1968), enfd. sub nom. *Laborers Local 676 v. NLRB*, 463 F.2d 953 (D.C. Cir. 1972). In this regard, backpay shall be computed in the manner set forth in the remedy section of the judge's decision.[3]

We shall also modify the judge's recommended Order to provide for the posting of the notice in accordance with *Paragon Systems, Inc.*, 371 NLRB No. 104 (2022), and to conform to the Board's standard remedial language, and we shall substitute a new notice to conform to the Order as modified and set forth in full below.

ORDER

The National Labor Relations Board orders that the Respondent, PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette, Pittsburgh, Pennsylvania, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Failing and refusing to bargain with the Newspaper Guild of Pittsburgh/CWA Local 38061 (the Union) as the exclusive collective-bargaining representative of the employees in the bargaining unit.

(b) Unilaterally changing the terms and conditions of employment of its unit employees by implementing portions of its last, best, and final offer without first bargaining to a good-faith impasse.

(c) Creating the impression that it is engaged in surveillance of its employees' union or other protected concerted activities.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) On request, bargain with the Union as the exclusive collective-bargaining representative of the employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement:

---

*County Hospital*, 320 NLRB 604, 619–620 (1995), enfd. mem. 116 F.3d 469 (3d Cir. 1997). Nor does the fact that the Union sought publicity for these rallies mitigate the Respondent's unlawful behavior. See, e.g., *John Ascuaga's Nugget*, 298 NLRB 524, 524 fn. 3, 554 (1990), enfd. in rel. part sub nom. *Sparks Nugget v. NLRB*, 968 F.2d 991 (9th Cir. 1992) (finding it unlawful for an employer to photograph employees handbilling while attending union press conference in public park). Furthermore, we reject the Respondent's arguments that the guards may have been using their phones for purposes other than photographing, that it had no knowledge of Kellington's protocol of photographing events, and that it never saw any photographs, as these defenses are not relevant to the Board's objective test, which asks whether "employees would reasonably assume from the statement or actions that their union activities had been placed under surveillance, based on the perspective of a reasonable employee." *Acme Bus Corp.*, 357 NLRB 902, 923 (2011). We find that standard satisfied here.

[2] The judge recommended ordering the Respondent to rescind the unlawful unilateral changes implemented in the absence of a valid impasse. To the extent that the unlawful unilateral changes have improved the terms and conditions of unit employees, the Order set forth below shall not be construed as requiring or authorizing the Respondent to rescind such improvements unless requested to do so by the Union. See *Fresno Bee*, 339 NLRB 1214, 1216 fn. 6 (2003).

[3] We deny the General Counsel's and the Union's exceptions to the judge's failure to order notice reading and distribution. For the reasons stated in his concurrence in *CP Anchorage 2 d/b/a Hilton Anchorage*, 371 NLRB No. 151, slip op. at 9–15 (2022), enfd. 98 F.4th 314 (D.C. Cir. 2024), Member Prouty would make a reading of the notice to employees at a group meeting, accompanied by the distribution of the notice at the meeting, a part of the remedy in this case and a standard remedy for all unfair labor practices found by the Board.

All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

(b)  Submit written bargaining progress reports every 30 days to the compliance officer for Region 6 of the National Labor Relations Board, and serve copies of the reports on the Union.

(c)  On request by the Union, rescind the changes in the terms and conditions of employment for its unit employees that were unilaterally implemented on about July 27, 2020.

(d)  Before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of employees in the bargaining unit described above.

(e)  Compensate the Union for all bargaining expenses it incurred during the time it engaged in bad-faith bargaining through September 8, 2020, including any lost wages the Union paid to employee bargaining committee members for bargaining conducted during working hours. Upon receipt of a verified statement of costs and expenses from the Union, the Respondent promptly shall submit a reimbursement payment, in the amount of those costs and expenses, to the compliance officer for Region 6, who will document receipt and forward the payment to the Union.

(f)  Make whole any affected employee negotiators for any earnings lost while attending bargaining sessions during the time it engaged in bad-faith bargaining through September 8, 2020, with interest, in the manner set forth in the remedy section of the judge's decision, to the extent those earnings were not reimbursed by the Union.

(g)  Make bargaining unit employees whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the unlawful unilateral changes to terms and conditions of employment that the Respondent made on about July 27, 2020, with interest, as provided for in the remedy section of the judge's decision.

(h)  Make all delinquent contributions to the applicable benefit funds on behalf of bargaining unit employees that have not been paid since July 27, 2020, including any additional amounts due to the funds, as provided for in the remedy section of the judge's decision.

(i)  Make bargaining unit employees whole for any expenses ensuing from the failure to make the required contributions to the applicable benefit funds, with interest, as provided for in the remedy section of the judge's decision.

(j)  Compensate affected employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award(s) to the appropriate calendar year(s) for each employee.

(k)  File with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each backpay recipient's corresponding W–2 form(s) reflecting the backpay award.

(l)  Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(m)  Post at its Pittsburgh, Pennsylvania facility copies of the attached notice marked "Appendix."[4]  Copies of the notice, on forms provided by the Regional Director for Region 6, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted.  In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means.  The

---

[4]  If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notice must be posted within 14 days after service by the Region.  If the facility involved in these proceedings is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work.  If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region.  If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]."  If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

Respondent shall take reasonable steps to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since March 11, 2019.

(n) Within 21 days after service by the Region, file with the Regional Director for Region 6 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that the complaint is dismissed insofar as it alleges violations of the Act not specifically found.

Dated, Washington, D.C.  September 20, 2024

_____
Lauren McFerran,                    Chairman

_____
David M. Prouty,                    Member

_____
Gwynne A. Wilcox,                    Member

(SEAL)        NATIONAL LABOR RELATIONS BOARD
APPENDIX
NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT fail and refuse to bargain with the Newspaper Guild of Pittsburgh/CWA Local 38061 (the Union) as the exclusive collective-bargaining representative of our employees in the bargaining unit.

WE WILL NOT change your terms and conditions of employment by implementing portions of our last, best, and final offer without first bargaining to a good-faith impasse.

WE WILL NOT create the impression that we are engaging in surveillance of your union or other protected concerted activity.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, on request, bargain with the Union as the exclusive collective-bargaining representative of our employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement.

All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

WE WILL submit written bargaining progress reports every 30 days to the compliance officer for Region 6 of the National Labor Relations Board, and serve copies of the reports on the Union.

WE WILL, on request by the Union, rescind the changes in the terms and conditions of employment for our unit employees that were unilaterally implemented on about July 27, 2020.

WE WILL, before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of our employees in the unit described above.

WE WILL compensate the Union for all bargaining expenses it incurred during the time we engaged in bad-faith bargaining through September 8, 2020, including any lost wages the Union paid to employee bargaining committee members for bargaining conducted during working hours.

WE WILL make whole any affected employee negotiators for any earnings lost while attending bargaining sessions during the time we engaged in bad-faith bargaining through September 8, 2020, with interest, to the extent those earnings were not reimbursed by the Union.

WE WILL make bargaining unit employees whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the unlawful unilateral changes to terms and conditions

of employment that we made on about July 27, 2020, with interest.

WE WILL make all delinquent contributions to the applicable benefit funds on behalf of bargaining unit employees that have not been paid since July 27, 2020, including any additional amounts due to the funds.

WE WILL make bargaining unit employees whole for any expenses ensuing from the failure to make the required contributions to the applicable benefit funds, with interest.

WE WILL compensate affected employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating each backpay award to the appropriate calendar year(s) for each employee.

WE WILL file with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each bargaining unit employee's W–2 form(s) reflecting the employee's backpay award.

PG PUBLISHING CO., INC. D/B/A PITTSBURGH POST-GAZETTE

The Board's decision can be found at www.nlrb.gov/case/06-CA-248017 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



*Julie Stern, Esq.,* for the General Counsel.
*Mark Hunt, Michael Oesterle,* and *Jennifer Sherman, Esqs.,* for the Respondent.
*Joseph Pass, Esq.,* for the Charging Party.

DECISION

GEOFFREY CARTER, Administrative Law Judge. The General Counsel alleges that PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette (Respondent) violated the National Labor Relations Act (the Act) by: failing and refusing to bargain in good faith with the Newspaper Guild of Pittsburgh/CWA Local 38061 (Union or Charging Party) since about March 11, 2019; unilaterally implementing terms and conditions of employment on about July 27, 2020, when the parties had not yet reached an overall good-faith impasse in negotiations for a successor collective-bargaining agreement; and unlawfully surveilling employees in

September and October 2020, while they engaged in union activities, or creating the impression among employees that their union activities were under surveillance. As explained below, I have found that apart from a few limited exceptions, Respondent violated the Act as alleged.

STATEMENT OF THE CASE

This case was tried in Pittsburgh, Pennsylvania, on September 19–22 and October 12, 2022. The Union filed the unfair labor practice charges in this case on the following dates:

| Case | Filing Date | Amendment Date(s) |
|------|-------------|-------------------|
| 06–CA–248017 | September 11, 2019 | April 7, 2021 |
| 06–CA–263791 | July 29, 2020 | March 9, 2021 |
| 06–CA–269346 | November 20, 2020 | February 23, 2021, June 22, 2021, June 28, 2021, and October 20, 2021 |

On April 27, 2022, the General Counsel issued a consolidated complaint in which it alleged that Respondent violated Section 8(a)(5) and (1) of the Act by failing and refusing to bargain collectively and in good faith with the Union as the exclusive collective-bargaining representative of employees in the bargaining unit. Specifically, the General Counsel alleged Respondent:

(a) by its overall conduct since about March 11, 2019, failed and refused to bargain in good faith with the Union as the exclusive collective-bargaining representative of the bargaining unit;

(b) on about July 27, 2020, unilaterally implemented terms and conditions of employment for employees in the bargaining unit without first bargaining with the Union to an overall good-faith impasse for a successor collective-bargaining agreement, or alternatively (if it is determined that the parties bargained to an overall good-faith impasse) implementing terms and conditions of employment that were not reasonably comprehended by Respondent's pre-impasse proposals without affording the Union an opportunity to bargain; and

(c) on about July 27, 2020, implementing a discretionary proposal concerning the performance of bargaining unit work by non-Unit employees, and thereby retaining unilateral discretion over the performance of bargaining unit work by non-Unit employees and undermining the status of the Union as the employees' exclusive collective-bargaining representative.

The General Counsel also alleged that Respondent violated Section 8(a)(1) of the Act by interfering with, restraining, and coercing employees in the exercise of rights guaranteed in Section 7 of the Act. Specifically, the General Counsel alleged that Respondent engaged in surveillance of employees who were engaged in union activities and/or created an impression among its employees that their union activities were under surveillance by taking pictures and/or video recordings on September 25, October 24 and 31, 2020. Respondent filed a timely answer denying the alleged violations in the consolidated complaint.

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

On the entire record,[1] including my observation of the demeanor of the witnesses, and after considering the briefs filed by the General Counsel, Charging Party, and Respondent, I make the following

FINDINGS OF FACT[2]

I. JURISDICTION

At all material times Respondent, a Pennsylvania corporation with an office and place of business in Pittsburgh, Pennsylvania, has been engaged in the business of publishing the Pittsburgh Post-Gazette, a print and electronic newspaper. Respondent annually derived gross revenues in excess of $200,000 and: held membership in and subscribed to various interstate news services, including Associated Press; published various nationally syndicated features; and advertised various nationally sold products. During the same time period Respondent also purchased and received products, goods, and materials at its Pittsburgh, Pennsylvania facility that were valued in excess of $5,000 and came directly from points outside the Commonwealth of Pennsylvania. Respondent admits, and I find, that Respondent has at all material times been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act. Respondent also admits, and I find, that the Union at all material times has been a labor organization within the meaning of Section 2(5) of the Act.

II. ALLEGED UNFAIR LABOR PRACTICES

A. Background

For several years, Respondent has recognized the Union as the exclusive collective-bargaining representative of employees in the following appropriate bargaining unit:

> All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

(Jt. Exh. 1.) Consistent with that recognition, Respondent and the Union have executed successive collective-bargaining agreements, the most recent of which was effective from October 15, 2014, through March 31, 2017. (GC Exh. 2; see also Tr. 75–77.)

In contract negotiations between about 1992 and 2014, Respondent bargained with representatives of several bargaining units[3] (collectively referred to as the "unity council") about wages and healthcare. After those initial negotiations concluded, the Union and representatives of each of the other bargaining units negotiated separately with Respondent for their own contracts. The separate contracts incorporated the jointly negotiated wage and healthcare provisions. (Tr. 79–80.)

B. January 10, 2017: Respondent Requests Bargaining for a Successor

Collective-Bargaining Agreement

On January 10, 2017, Respondent sent a letter to the Union to advise that it wished to open negotiations for a successor collective-bargaining agreement. Respondent also provided the Union with a copy of Respondent's initial contract proposal. Upon noticing that Respondent's initial contract proposal did not include any markings to show the changes that Respondent was proposing for terms and conditions of employment (in comparison to the expiring contract), the Union asked Respondent to provide a redlined version of the initial proposal. Respondent subsequently sent the Union a copy of the initial proposal that highlighted new language in yellow and struck through language that Respondent proposed to eliminate. (GC Exhs. 3–4; Tr. 82–86, 701–702.) On about February 8, 2017, the Union sent Respondent a copy of the Union's initial contract proposal. (Tr. 802–803; GC Exh. 5; R. Exh. 69.)

At some point on or before February 12, 2017, Respondent notified the Union that Respondent planned to negotiate individually with each bargaining unit and therefore would not be bargaining with the unity council about wages and healthcare. (Tr. 81, 195; R. Exh. 31; see also GC Exh. 10 (par. 1).) There is no evidence that the Union objected to bargaining separately as Respondent proposed.

C. March 10, 2017: First Bargaining Session

On March 10, 2017, Respondent and the Union met for their first bargaining session. Attorney Richard Lowe served as Respondent's chief negotiator and was joined on the bargaining team by senior human resources manager Linda Guest and newsroom manager Jerry Micco. Respondent hoped to negotiate concessions from the Union during bargaining because the newspaper was struggling financially due to competition from internet-based media and the resulting decline in print newspaper circulation and print advertising revenue. Among other concessions, Respondent indicated that the benefits under the current Teamsters Fund healthcare plan were "too rich" and that Respondent wanted more staffing flexibility (such as allowing Respondent to use more freelance reporters and permitting managers to perform bargaining unit work) to adjust to changes that might arise due to Respondent's expectation that it would be moving towards a digital media business model in the future. (Tr. 91, 94, 96–97, 296, 298–299, 301, 303, 682, 685, 697, 803; R. Exh. 196 (pp. 1–2); see also Tr. 722–723 (noting that Respondent was not

---

[1] The transcripts and exhibits in this case generally are accurate. During my review of the record, however, I identified transcript corrections that are warranted. In addition, both the General Counsel and Respondent proposed corrections to the transcripts. For the most part, the parties did not oppose each other's suggested corrections. For disputed proposed corrections and a handful of unopposed proposed corrections, I allowed the transcripts to stand unless I could confirm the correction through my memory of the testimony and/or other information in the evidentiary record. The transcript corrections that I have identified, along with proposed corrections that I have accepted, are set forth in Appendix

[2] Although I have included several citations in this decision to highlight particular testimony or exhibits in the evidentiary record, I emphasize that my findings and conclusions are not based solely on those specific citations, but rather are based on my review and consideration of the entire record for this case.

[3] In addition to the bargaining unit represented by the Union, other bargaining units included: Advertising; Circulation and Distribution; Electricians; Finance; Machinists; Mailers (two units); Operating Engineers; and Pressmen. (Tr. 211–213, 296–297.)

B to this decision. I have denied any requests for transcript corrections that do not appear in Appendix B.

claiming an inability to pay for increases in wages or benefits).)

Attorney Joseph Pass served as the Union's chief negotiator, and was joined on the bargaining team by Ed Blazina, Michael Fuoco, Jonathan Silver, Joe Smydo, and Melissa Tkach. The Union believed that it had made several concessions in previous years and was not inclined to make additional concessions in the new contract. In particular, the Union noted that bargaining unit employees had not received a wage increase over the previous 11 years. (Tr. 92, 179, 299, 302, 339–340, 688–689; R. Exhs. 189 (p. 1), 196 (p. 1); see also Tr. 802 (noting that with the exception of Pass, all members of the Union's bargaining team were working for Respondent as full-time journalists).)

Turning to specific aspects of its initial contract proposal, Respondent proposed that the bargaining unit switch from the Teamsters healthcare plan to the healthcare plan that Respondent provided for non-bargaining unit employees, with Respondent having the right to change or terminate the healthcare plan at its discretion. Regarding the bargaining unit's jurisdiction and staffing, Respondent sought (among other changes from the expiring contract) the right to: assign bargaining unit work to supervisors, non-bargaining unit employees, and "stringers" (journalists working as independent contractors); change the length of employee work hours and work days; and consider performance, attendance, and qualifications (in addition to seniority) when selecting employees for layoffs. Respondent also proposed: eliminating employees' ability to "bank" unused sick leave and instead covering employees under the company's short term disability policy (which Respondent reserved the right to modify in any way); and requiring grievances to be filed in writing within 10 days of the underlying event. Respondent did not propose any increases to wages. (Tr. 118–119, 128–129, 303, 338, 352–353, 366–367, 380–381, 697–698; GC Exh. 4.)

As for the Union's initial contract proposal, the Union sought wage increases of 7 percent each year, and also proposed eliminating all pension and wage "diversions" that existed in the expiring contract.[4] On bargaining unit jurisdiction and staffing, the Union proposed: eliminating the use of stringers; and limiting the total number of 2–year associates, paid interns, and employees averaging less than 35 hours per week to 15 percent of the bargaining unit membership. The Union also proposed (among other changes): increasing the amount of sick leave that employees accrued each year, as well as the amount of unused sick leave that employees could "bank"; and requiring Respondent to pay out unused sick leave when employees terminated their employment or retired. (GC Exh. 5.)

### D. Summary of Bargaining from April 6, 2017, through July 15, 2019

After their initial bargaining session, the parties met on 19 more occasions between April 6, 2017, and July 15, 2019, with each session lasting 4.5 to 6 hours.[5] (Tr. 93; R. Exhs. 188, 190,

192.) As bargaining progressed, certain issues continued to be points of contention. The most prominent issues, and the parties' bargaining about them in this timeframe, are discussed below.[6]

#### 1. Wages

The Union maintained that bargaining unit members needed a wage increase since wage rates had not changed for about 11 years. Respondent did not dispute that point, but took the position that the parties would need to "be creative" to come up with a workable wage increase due to the financial challenges that the newspaper was facing. (Tr. 339–340, 685.) With that backdrop, the parties made the following proposals about wages in this timeframe:

| Bargaining Session Date | Respondent Wage Proposal | Union Wage Proposal |
|---|---|---|
| March 10, 2017 | No increases to base wages<br><br>2% pension diversion<br><br>Wage diversion to be determined<br><br>(GC Exh. 4 (Art. III).) | 7 percent wage increase per year<br><br>Eliminate pension and wage diversions<br><br>(GC Exh. 5 (Art. III).) |
| June 12, 2017 | No increases to base wages<br><br>2% pension diversion<br><br>8% wage diversion<br><br>$4,000 annual cap on total diversion<br><br>(R. Exh. 73.) | |
| January 31, 2019 | Package proposal: Respondent will eliminate the 2% pension diversion _if_ the Union accepts Respondent's proposal to change bargaining unit members' healthcare plan from the Teamsters plan to Respondent's plan | |

<hr>

[4] Under the expiring contract, employees did not receive their full base wages because of a 2–percent pension "diversion" and an additional 8–percent wage "diversion" (it is not clear how Respondent actually used the diverted payments). Thus, an employee earning $1000 per week would lose $20 as a pension diversion, and an additional $78.40 (8 percent of $980) as a wage diversion, leaving the employee with $901.60 for the week, before taxes and other deductions. The total diversion amount was capped each calendar year at $4,000. (GC Exh. 2, Art. III (describing the diversion percentages and caps that took effect on January 1, 2017); Tr. 137.)

[5] The bargaining sessions in this timeframe occurred on the following dates: April 6, 2017; May 3, 2017; June 12, 2017; September 1, 20, 2017; November 1, 28, 2017; January 4, 2018; February 9, 28, 2018; April 4, 11, 2018; May 3, 2018; September 18, 2018; November 14, 2018; December 13, 2018; January 31, 2019; May 20, 2019; and July 15, 2019. (See R. Exhs. 188, 190, 192.)

[6] In the discussion below I only identify bargaining dates on which one or both of the parties substantively changed its proposal. I also note that the discussion here is not meant to be exhaustive. The parties made several proposals that, in the interest of brevity, I do not summarize in this section.

| Bargaining Session Date | Respondent Wage Proposal | Union Wage Proposal |
|---|---|---|
| | (GC 21; Tr. 557.) | |

### 1. Health and welfare

In the expired contract, all bargaining unit employees who averaged more than 30 hours per week annually were covered under the Teamsters healthcare plan. Respondent paid all premiums for the plan,[7] including annal increases up to 5 percent. Bargaining unit employees paid for any premium increases that exceeded the 5–percent threshold. (GC Exh. 2 (Art. XX).)

In bargaining for a successor collective-bargaining agreement, Respondent proposed to cover bargaining unit employees under Respondent's healthcare plan, for which Respondent would pay 70 percent of the cost and employees would pay 30 percent. Respondent would also retain the right to change or terminate the healthcare plan in its sole discretion. The Union, by contrast, proposed that employees continue to be covered under the Teamsters plan. (Tr. 128–130, 172, 366–367, 369; R. Exh. 14 at 2; R. Exh. 142 (par. 2).) The specific proposals proceeded as follows:

| Bargaining Session Date | Respondent Health/Welfare Proposal | Union Health/Welfare Proposal |
|---|---|---|
| March 10, 2017 | Bargaining unit employees will be covered by Respondent's health, dental, vision and life insurance plans. The plans may be changed or terminated at Respondent's discretion.<br><br>(GC Exh. 4 (Art. XX).) | Bargaining unit employees will be covered by the Teamsters healthcare plan. Respondent shall pay for any annual increases in premiums up to 25 percent. Bargaining unit employees will pay for annual premium increases over the 25–percent threshold.<br><br>(GC Exh. 5 (Art. XX).) |
| February 9, 2018 | | Respondent shall pay the entire premium for the Teamsters healthcare plan for 2018. In subsequent years Respondent will pay for the annual insurance premium plus any increases up to 25 percent. For those years Respondent and bargaining unit employees will equally split the amount of any premium increases over 25 percent.<br><br>(GC Exh. 13 (Art. XX).) |

The Union did, on January 31, 2019, verbally suggest exploring tiered rates available under the Teamsters healthcare plan (i.e., separate premiums for covering an individual, an individual plus one, or a family), but did not pursue that possibility after Respondent (through Lowe) indicated that it was not interested in continuing to offer the Teamsters plan.[8] (R. Exh. 142 (par. 7); Tr. 131, 172–173, 555–556, 805–806.)

### 2. Bargaining unit jurisdiction

Many of the disputed proposals related to the bargaining unit's jurisdiction, including when Respondent could subcontract bargaining unit work or have other individuals (such as managers or stringers) do bargaining unit work. The proposals related to bargaining unit jurisdiction proceeded as follows:

| Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals |
|---|---|---|
| March 10, 2017 | The work of bargaining unit employees will be work normally performed by bargaining unit employees and new or additional work that the company assigns. However, nothing in the Agreement shall be construed as giving the Union exclusive jurisdiction over or an exclusive right to perform any work.<br><br>Respondent shall have the exclusive right to assign bargaining unit work to non-bargaining unit employees, to individuals employed by any other company, or to contract out work | Exempt employees cannot do bargaining unit work as performed in the past nor do similar work that may result from the introduction of new print, electronic or other products.<br><br>Respondent will stop using stringers<br><br>The company may obtain content from commercial vendors for traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics. |

---

[7]  The 8–percent wage diversion from bargaining unit employee paychecks may have been intended to offset the cost that Respondent paid for the healthcare plan, but the record is unclear on the point. (See Tr. 209–210, 687–688.)

[8]  In a May 25, 2017 email, the Union asked the Teamsters healthcare plan administrator about tiered rates. (R. Exh. 15; Tr. 234.) The record does not establish what happened after that initial inquiry.

| Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals | Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals |
|---|---|---|---|---|---|
|  | Supervisors/managers may do bargaining unit work without restriction.<br><br>No restrictions on Respondent's use of stringers<br><br>Delete language from expired contract that the number of managers may not exceed 30 percent of the number of full time employees represented by the Union[9]<br><br>(GC Exh. 4 at p. 1–2.) | The number of managers may not exceed 5 percent of the full-time employees represented by the Union<br><br>(GC Exh. 5 at pp. 1–3.) |  |  | classification in the work required is not available.<br><br>The Union recognizes that Respondent may use stringers. Upon ratification, the maximum amount of money paid to stringers will be 7.5 percent of the annual bargaining unit payroll. If Respondent exceeds the limit on annual stringer expenses then Respondent will match the excess with a payment that will be distributed equally to bargaining unit members.<br><br>Respondent may obtain content from commercial vendors for traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics only to the extent currently used and without displacing any bargaining unit employees.<br><br>The number of managers may not exceed 20 percent of the full-time employees represented by the Union<br><br>(GC Exh. 13 at pp. 1–3.) |
| June 12, 2017 | Respondent recognizes that the work normally performed by bargaining unit employees is the Union's jurisdiction, but subject to the following exceptions: (a) Supervisors/managers may do bargaining unit work; (b) Non-bargaining unit employees may do bargaining unit work on an occasional basis; (c) Respondent may subcontract work; (d) Respondent may use stringers up to 40 percent of annual bargaining unit payroll<br><br>(R. Exh. 71 at pp. 1–2.) |  |  |  |  |
| February 9, 2018 |  | Exempt employees can do bargaining unit work in breaking news situations only if a [Union] member in the same |  |  |  |

[9] Respondent viewed any proposed limit to the number of managers it could have as a permissive subject of bargaining that Respondent would not agree to. On July 15, 2019, the Union stated that it would not go to impasse over the issue. (See GC Exh. 23 (position statement at p. 1).)

| Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals |
|---|---|---|
| February 28, 2018 | Respondent recognizes that the work normally performed by bargaining unit employees is the Union's jurisdiction, but subject to the following exceptions: (a) Supervisors/managers may do bargaining unit work, but no bargaining unit employee will be laid off as a direct result of this practice; (b) Non-bargaining unit employees may do bargaining unit work on an occasional basis; (c) Respondent may subcontract work; (d) Respondent may use stringers up to 20 percent of annual bargaining unit payroll<br><br>No person under the Union's jurisdiction will be arbitrarily named as a manager and thereby excluded from the agreement<br><br>(R. Exh. 107 at pp. 1–2.) | |
| November 14, 2018 | | Exempt employees cannot do bargaining unit work as performed in the past nor do similar work that may result from the introduction of new print, electronic or other products.<br><br>Respondent cannot use stringers to perform bargaining unit work without first bargaining with the Union and |

| Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals |
|---|---|---|
| | | reaching a mutual agreement about whether and how stringers can be used.<br><br>Respondent may obtain content from commercial vendors for traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.<br><br>The number of managers may not exceed 10 percent of the full-time employees represented by the Union<br><br>(GC Exh. 19 at pp. 1–3.) |
| July 15, 2019 | | The Union recognizes that Respondent may use stringers. The maximum amount of money paid to stringers will be 15 percent of the annual bargaining unit payroll. If Respondent exceeds the limit on annual stringer expenses then Respondent will match the excess with a payment into the pension fund.<br><br>The number of managers may not exceed 20 percent of the full-time employees represented by the Union<br><br>(GC Exh. 22 at pp. 1–2.) |

4. Bargaining progress on other topics

The parties made limited progress on other issues in this timeframe. Generally speaking, the parties did not reach any

tentative agreements on any issues because they never established a ground rule on what would constitute a tentative agreement (e.g., agreement on an entire contract article vs. agreement on a specific paragraph within an article). (Tr. 324, 419, 510–511, 541, 801–802.) As for substantive topics where the parties disagreed, the parties were not able to find common ground in the following areas (among others):

(a) Sick leave and short term disability: Under the expired contract bargaining unit employees received 8 days of sick leave each year and also could bank unused sick leave up to a maximum of 90 days. Under an extended short term disability plan, employees could receive 26 weeks[10] of additional sick leave (at a reduced rate of pay) if they exhausted their sick leave and banked hours, plus additional sick leave up to a maximum based on years of service. (GC Exh. 2 (Art. VII).) Respondent proposed to eliminate the sick leave "bank" and awards of additional sick leave and instead simply cover employees under Respondent's short term disability policy, which Respondent retained the discretion to modify but would be the same policy provided to nonrepresented employees. The Union, by contrast, proposed: increasing the number of sick leave days that employees received annually; increasing employees' ability to bank unused sick leave and receive additional sick leave; and requiring Respondent to pay out banked sick leave (up to a maximum of 120 days) when employees retired or separated from the company. (GC Exhs. 4, 12 (Art. VII); GC Exh. 7 at p. 20.)

(b) Grievance filing deadlines: The expired contract did not specify a deadline by which an employee needed to file a grievance. (See GC Exh. 2 (Art. XVI, Sec. 1).) Respondent proposed that a grievance must be filed in writing within 10 or 15 days of the events giving rise to the grievance. The Union proposed various alternative deadlines that, in Respondent's view, fell short of setting a fixed time limit for filing a grievance. (GC Exhs. 4, 12 (Art. XVI, Sec. 1); Tr. 415, 501; see also, e.g., GC Exh. 13 (Art. XVI, Sec. 2) (Union proposal that it or the employee must file written grievance within 30 days of bringing the dispute to management's attention); GC Exh. 15 (Art. XVI, Sec. 2) (Union proposal that the Union must file written grievance within 30 days after the Union president or chairman becomes aware of a dispute).)

(c) Employee work schedule and work week: The expired contract did not address whether bargaining unit employees were guaranteed 40 hours of work each week, but the established practice was for full-time employees to work 40 hours weekly. (GC Exh. 2 (Art. IV); Tr. 120.) Respondent initially proposed contract language stating that the company did not guarantee any specified hours of work per day or week, and stating that Respondent reserved the right to enlarge or shorten the workday or workweek based on business need. The Union countered by proposing that Respondent guarantee a regular schedule of 5 consecutive days and 40 hours per week for full-time employees, and that the parties reach a mutual agreement in writing about any changes to the guaranteed work week. On February 28, 2018, Respondent modified its proposal to state that it does not guarantee any specified hours of work per day or week but would provide the Union with 10 days' notice if Respondent sought to reduce an employee's workday or workweek due to a reduction in the company's print and/or digital publication schedule. Respondent reserved the right to implement the reduction in hours after the 10–day notice period. (GC Exhs. 4, 13 (Art. IV); R. Exh. 108; Tr. 495.)

(d) No-strike clause: The expired contract states that "[n]o strike, slowdown, work stoppage or any other interference with or interruption of work shall be permitted" during the term of the agreement. (GC Exh. 2 (Art. XIX, Sec. 7).) Respondent initially proposed to expand the no-strike clause to also prohibit sympathy strikes, bannering, boycotts against Respondent, boycotts of Respondent's advertisers that result from a dispute with Respondent, picketing, and any other acts that would interfere with Respondent's operations or the production or sale of its products. On November 14, 2018, however, Respondent revised its no-strike clause by proposing a more limited expansion of the clause that would add sympathy strikes, picketing, boycotts, and bannering to the expired contract's list of conduct prohibited by the no-strike clause. The Union proposed maintaining the no-strike clause from the expired contract. (GC Exhs. 4, 18 (Art. XIX, Sec. 6); R. Exh. 101 (Art. XIX, Sec. 5); Tr. 363–365.)

(e) Layoffs and recalls: Under the expired contract, layoffs proceeded in inverse seniority order in the affected work group. Recalls, by contrast, proceeded by seniority in the affected work group. (GC Exh. 2 (Art. VIII, Sec. 4(C), 5).) The Union proposed to continue using seniority for layoffs and recalls. Respondent initially proposed that it would determine layoffs after considering seniority, performance, attendance, individual employee qualifications, special abilities or qualifications for the particular function, and the efficient operation of the company. Recalls, meanwhile, would proceed according to seniority, provided that efficiency, skill and ability to do the job are equal in Respondent's opinion. (GC Exh. 4 (Art. VIII, Sec. 3(B), 5); GC Exh. 5 (Art. VIII, Sec. 4(C), 5); see also Tr. 124–127.) On June 12, 2017, Respondent revised its proposals such that for layoffs, Respondent would consider seniority, qualifications, performance and skills when selecting employees for layoffs, and would follow seniority for recalls provided that skills and qualifications were equal in Respondent's opinion. (R. Exh. 78 (pars. 4(B)(2), 5).)

5. Other bargaining issues

The parties did not meet for bargaining on consecutive days in the April 6, 2017, to July 15, 2019 timeframe. Because of that practice, after each session the parties needed to arrange the next date(s) for bargaining. Respondent was generally able to offer proposed meeting dates fairly quickly. The Union, by contrast, generally took more time to identify workable meeting dates, citing the challenge of finding dates that worked for all five members of its negotiating team and the time that it took to compare Respondent's proposals to the expired contract and identify newly proposed contract language. On several occasions Respondent prompted the Union (usually via email) about scheduling the next bargaining session. For the most part, the Union responded in a timely manner to Respondent's inquiries but only offered limited available dates.[11] (Tr. 87–88, 94, 166–169, 171–

---

[10] Employees with less than 2 years of service were only eligible for an additional 13 weeks of sick leave. (GC Exh. 2 (Art. VII).)

[11] On April 8, 2019, the parties began working with a mediator from the Federal Mediation and Conciliation Service to assist with bargaining. Accordingly, from that date forward, the parties also needed to consider

172, 361–362, 587–588, 591–600, 802; R. Exhs. 61, 140–141, 143–152.) In July 2018 and July 2019, however, the Union did take the initiative to suggest that the parties bargain over contract terms after concluding effects bargaining sessions on other matters. Respondent declined that request in 2018 (citing its preference to reserve the entire day for effects bargaining), but agreed to the request in 2019. (GC Exhs 63–64; R. Exhs. 61, 153–154; Tr. 173, 348, 526–527, 599–600, 806–808; see also R. Exh. 61 (Respondent's request for bargaining dates in July 2018 that prompted the Union to suggest, in GC Exh. 63, that the parties bargain over the contract after effects bargaining on July 24, 2018).)

In mid-May 2017, Respondent scheduled a series of information presentations about its proposed healthcare plan. Although the presentations would be similar (if not identical), Respondent scheduled separate presentations for each union representing one of the bargaining units, with the presentation for the Union scheduled for May 17, 2017. On May 16, 2017, believing that they had received permission from Respondent, representatives of the Union (Fuoco and Silver) sought to attend the healthcare plan presentation for the Mailers bargaining unit. Respondent (Lowe and attorney Michael Oesterle) objected, and a heated discussion ensued about whether the Union's representatives should be allowed to stay for the presentation. The dispute was resolved when a representative of the Mailers bargaining unit stated that the Union's representatives could attend as temporary members of the Mailers' negotiating team (i.e., temporary members for the limited purpose of being authorized to attend the May 16 healthcare plan presentation). The presentation then proceeded without further incident, but the Union and Respondent did exchange letters to express their objections about the other side's conduct. (Tr. 192–199, 228–231, 254–255, 373–375; R. Exhs. 8, 10–14.)

On February 1, 2018, the Union sent a letter to Respondent to object to a "Negotiations Update" that the company posted in the newsroom. The Union also took issue with Lowe's conduct during negotiations and asserted that Respondent should jettison Lowe's law firm and find a different firm to handle negotiations. In an April 13, 2018 letter to the executive vice president of Block Communications Inc. (BCI, Respondent's parent company), the Union again objected to Lowe's approach to bargaining and asserted that BCI should replace Lowe as Respondent's lead negotiator. (R. Exhs. 23–24.)

*E. Bargaining Session: August 6, 2019*

At the August 6, 2019, bargaining session Respondent presented the Union with a "Position Statement" that summarized Respondent's view of where the parties stood with bargaining and provided/reiterated Respondent's rationale for its bargaining proposals. Among other points, Respondent emphasized that it needed flexibility with staffing decisions and employee work hours because Respondent was moving towards only publishing the newspaper on a digital platform. (GC Exh. 23 (Position Statement at 2, 6); R. Exh. 193 at p. 33; Tr. 566–567.)

Respondent also presented the Union with a "best offer" contract proposal. Respondent held to its prior offers on most issues, but for wages proposed to increase the minimum pay rate for employees with the highest level of experience[12] by: 3 percent on the effective date of the new contract; an additional 2 percent on the first contract anniversary date; and an additional 3 percent on the second contract anniversary date. The pay rates that Respondent used for its proposal included the pension and wage diversions from the old contract, and thus the wage increases essentially returned portions of the diversions to employees over the proposed 3–year contract period.[13] The wage increases also removed the annual $4,000 cap on wage and pension diversion payments. (GC Exh. 23 (p. 2 and Art. III) (noting that Respondent was not offering retroactive wage increases); R. Exh. 193 at p. 33; R. 196 at p. 20; Tr. 140–143, 340–341, 567–569, 685–686.) Respondent also added contract language stating that: employees would pay 30 percent of the premium costs for Respondent's health, dental, and vision insurance plans; and if Respondent changed the short-term disability policy it would do so on the same basis as for its nonrepresented employees. (GC Exh. 23 (Art. VII, XX); Tr. 369–371, 568.)

The Union stated that it would take a while to review Respondent's proposal and asked for a version of the proposal that included strikethrough language to show the language from the expired contract that was deleted, and bold language to indicate the parts of the proposal that were new additions. Respondent declined, stating that it did not have time to do that. Towards the end of the session, the Union also asked whether Respondent had accepted any of the Union's proposals. (Tr. 88–89; R. Exh. 192 at p. 15; R. Exh. 193 at p. 34; R. Exh. 196 at pp. 20–21 (noting that the parties continued to disagree about the healthcare plan).)

*F. Bargaining Session: September 6, 2019*

After exchanging a few emails about potential dates, the parties agreed to meet on September 6, 2019, for their next bargaining session. (R. Exhs. 155–159.) At that session, the Union presented a counterproposal that included the following changes:

(a) Bargaining unit jurisdiction: Exempt employees can do bargaining unit work in breaking news situations only if a bargaining unit member in the same classification in the work required is not available. (GC Exh. 24 at p. 2; see also Tr. 319–320, 571 (noting that the Union made a similar proposal on February 9, 2018).) The Union also deleted its proposal to limit the number of Respondent's managers to a percentage of the full-time employees represented by the Union. (GC Exh. 24 at p. 1; compare GC Exhs. 2 and 22 at p. 1; see also R. Exh. 193 at p. 112; Tr. 335–336).)

(b) Stringers: The Union recognized that Respondent may use stringers. Upon ratification, the maximum amount of money paid to stringers will be 15 percent of the annual bargaining unit payroll. If Respondent exceeds the limit on annual stringer expenses then Respondent will match the excess with a payment

---

the mediator's availability when scheduling bargaining sessions. (Tr. 300–301, 591–592; R. Exh. 144.)

[12] For each job classification, wages max out after a certain number of years of service (in most instances between 3 and 5 years). Respondent's wage proposal only increased wages for employees who had passed the years-of-service threshold for maxing out wages. (See, e.g., GC Exh. 23 (Art. III).)

[13] To illustrate, as previously noted, an employee with a wage rate of $1000/week would only receive $901.60 each week after the pension and wage diversions. (See Findings of Fact (FOF), Sec. II(C), supra.) For the wage increases in its August 6, 2019 proposal, Respondent used the post-diversion rates to calculate the proposed wage increases (i.e., for our example, Respondent used $901.60 instead of $1000 to calculate the wage increase).

that will be distributed equally to bargaining unit members.[14] (GC Exh. 24 at p. 2; Tr. 571.)

(c) Wages: starting with and retroactive to April 1, 2017, bargaining unit employees will receive annual wage increases of 7.5 percent, 6 percent, 5.5 percent, 6.5 percent, and 6 percent. All wage and pension diversions will be eliminated. (GC Exh. 24 (Art. III); Tr. 572.)

(d) Sick leave and short term disability: Any employee with at least one year of service shall have 20 days of disability coverage and can bank unused sick leave up to a maximum of 90 days. (GC Exh. 24 (Art. VII).)

In the discussion that followed, the parties disagreed on various issues, including whether/when managers should perform bargaining unit work and the extent that Respondent should be permitted to use stringers. Respondent also rejected the Union's proposal that Respondent pay a matching amount to the bargaining unit if Respondent exceeded the agreed limit for stringer expenses. Regarding wages, Respondent stated that the Union's proposal was an economic concession that Respondent was not willing to make. The Union responded that bargaining unit members had gone 13 years without a raise and had also been giving up wages due to the ongoing wage and pension diversions. The parties did not review the entire union proposal in the September 6, bargaining session. (R. Exh. 193 at pp. 112–116; Tr. 141–144.)

### G. Bargaining Session: February 24, 2020

#### 1. Delay between bargaining sessions

There is no evidence that the parties communicated between September 6, 2019, and mid–January 2020, about scheduling another bargaining session. On January 17, 2020, Respondent wrote a letter to the Union to assert that the Union had been deliberately avoiding negotiations and to request suggested dates for further bargaining. In a January 23, 2020 letter, the Union dismissed Respondent's assertions in the January 17 letter as self-serving. The Union did offer to bargain on February 24, 2020, which Respondent accepted.[15] (GC Exhs. 26–28; Tr. 154–155.)

#### 2. The February 24, 2020 bargaining session

On February 24, 2020, the parties resumed discussing aspects of Respondent's August 6, 2019 best offer and the Union's September 6, 2019 counterproposal. The parties agreed to three minor changes to Respondent's August 6, 2019 proposal, but disagreed on several other issues, including: whether employees should be guaranteed 40 hours of work per week; the amount of sick leave that employees should earn each year; and whether employees should be able to bank unused sick leave. (Tr. 142, 578–580; R. Exh. 138 (noting minor changes to Art. VII (sick leave) and Art. IX (expenses); R. 194 at pp. 1, 5; R. Exh. 195 at pp. 1–3.) There is no evidence that the parties bargained in any detail over disputed topics such as wages, healthcare, or bargaining unit jurisdiction. Further, both the Union and Respondent subsequently acknowledged that they had not yet finished discussing the Union's September 6, 2019 counterproposal. (See

FOF, Sec. II(I)(2), infra.)

### H. Communications Between March 6 and May 22, 2020

#### 1. Efforts to schedule the next bargaining session

On March 6, 2020, Respondent sent a letter to the Union to follow up on three proposed future bargaining dates that the mediator offered at the end of the February 24 bargaining session. The Union replied on March 10, confirming that it could meet for bargaining on March 25, 2020. Respondent subsequently reconfirmed that it was available on March 25. (GC Exhs. 29–31; R. Exh. 195 at p. 5; see also GC Exh. 31 (noting that Respondent was also available on March 23–24, 2020, the other two dates that the mediator offered).)

#### 2. March 22, 2020: Union cancels March 25 session due to Covid–19 pandemic

On March 22, 2020, Pass sent a letter to Respondent to cancel the March 25, 2020 bargaining session in light of the Covid–19 pandemic. Pass stated, in pertinent part, as follows in his letter:

> As I am sure you must be aware, the current Coronavirus pandemic is unlike anything we have ever experienced. The Federal Government, and more significantly the Governor of the State of Pennsylvania has ordered all non-essential services to be shuttered effective 8 a.m. March 23. The aim is to limit contact amongst individuals. Obviously the need for us to meet pales in comparison to the needs of the people. . . .

> When weighing the benefits of meeting and simply going through the worthless motions that for three plus years have proved the employer has no intention on reaching an amicable resolution to the various CBA's versus saving the lives of those of us involved in these fruitless meetings, makes our decision very easy.

> The [Union bargaining session] scheduled for the 25th will not be going forward, nor will there be any future meetings scheduled for any of the [unity council] bargaining units at the Post-Gazette until the Coronavirus pandemic is completely arrested.

> Finally, despite the obvious acrimony that has transpired over more than three years of wasted time and energy, I urge you and your family to keep safe.

(GC Exh. 32; see also R. Exh. 166 at 1–2 (indicating that Pass emailed the letter to Respondent and ten other individuals).)

On March 23, 2020, Pass emailed Lowe to confirm that Respondent received the letter canceling the March 25, 2020 bargaining session. Lowe replied on March 24, 2020, stating "Thanks for the heads up Joe. Stay safe and stay well." (GC Exhs. 33–34.)

#### 3. May 22, 2020: Respondent sends a written response to the Union's September 6, 2019 contract proposal

On May 22, 2020, Respondent sent the Union a letter urging the Union to accept Respondent's August 6, 2019 best offer (as subsequently modified). Respondent also attached a written response to the Union's September 6, 2019 contract proposal, in which Respondent summarized the parties' positions on various

---

[14] The Union also proposed that Respondent could use stringers to cover high school sports and "SEEN" events as long as at least one of those events per shift was covered by a bargaining unit member. (GC Exh. 24 at 2.)

[15] I give little weight to the emails that Respondent submitted that show members of the Union's bargaining team had scheduling conflicts

in January/February 2020. Fuoco took a leave of absence from working for Respondent from January 12 to February 17, 2020, to begin writing a book, but explicitly stated that he would continue to serve as union president and be available for meetings on union matters if the need arose. (See R. Exhs. 1–4; Tr. 179.) Silver, meanwhile, was only unavailable on February 3–7, 2020. (See R. Exh. 3.)

issues that remained unresolved in bargaining. There is no evidence that the Union replied to Respondent's May 22, 2020 letter and written response. (Tr. 110–111, 706; GC Exh. 35.)

### I. June 12, 2020: Respondent Sends its Last, Best, and Final Offer

#### 1. The last, best, and final offer

On June 12, 2020, Respondent sent a letter to the Union to convey Respondent's last, best, and final offer. Respondent stated as follows in the letter:

Dear Joe,

On August 6, 2019, the Union was presented with the Company's Best Offer. The Union responded with a counterproposal on September 6, 2019. The parties discussed the Union's counterproposal on September 6, 2019 and again on February 24, 2020. The Union cancelled the scheduled March 25, 2020 meeting date because of the pandemic. . . .

On May 22, 2020, the Company provided the Union with a comprehensive, written response to the Union's September 6, 2019 counterproposal. The Company received no response from the Union.

Attached hereto is the Company's Final Offer to the Union. We have included a "clean" version and a "red-lined" version to show the changes which have been made by the Company from its August 6, 2019 Best Offer. . . .

The Company is proposing a three (3) year contract, effective on the signing date of the new Agreement. . . .

We believe the Company's Final Offer is fair and in the best interest of both parties. We respectfully urge acceptance of this offer.

(GC Exh. 36 (pp. 1–2); Tr. 112–113, 581; see also Tr. 169–171 (noting that the redlined version of Respondent's last, best, and final offer did not show, via strikeouts or other means, what expired contract language Respondent deleted).)

Most of the proposals in Respondent's last, best, and final offer were largely the same as what Respondent offered on August 6, 2019. Respondent did, however, change its health and welfare proposal by adding language committing to provide a health, dental, vision and life insurance plan during the length of the contract (to address the Union's concern that Respondent might, if the new contract allowed it the discretion to do so, stop providing health and welfare benefits altogether). (GC Exh. 36 (Art. XX, Sec. 1); Tr. 128–129, 371–372; see also, e.g., GC Exh. 36 (Art. II - striking an indemnification clause related to claims about union dues and dues checkoff; Art. III, Sec. 1 – adding a clause stating that wage increases would not apply to employees on extended sick leave until those employees returned to work); compare GC Exh. 24 (Respondent's Aug. 6, 2019 proposal).)

#### 2. Communications after Respondent's last, best, and final offer

After Respondent sent its last, best, and final offer, the parties exchanged a series of letters and emails about the status of bargaining. The Union began the exchange on June 22, 2020, by questioning why Respondent was sending a final offer when the parties had not finished going through the Union's September 6, 2019 proposal. The Union also stated that before it addressed the final offer, the Union needed to know if Respondent was taking the position that negotiations were terminated and that no

further bargaining sessions would occur. (GC Exh. 37.)

In a letter dated July 14, 2020, Respondent asserted that the Union failed to respond to the substance of Respondent's final offer, noting that the Union did not offer a counterproposal or offer to discuss the final offer. Respondent also stated its belief that negotiations were at impasse and invited the Union, if it believed the parties were not at impasse, to explain why it believed further bargaining would be fruitful. (GC Exh. 38.)

Later on July 14, 2020, the Union sent an email and letter to Respondent. The Union reiterated that it had not heard Respondent's position on two-thirds of the Union's September 6, 2019 proposal, and questioned how the parties could be at impasse under those circumstances. The Union also asserted (again) that before it replied to the final offer Respondent first needed to specify whether negotiations were terminated. (R. Exh. 170.)

On July 16, 2020, Respondent sent a letter to again state its belief that negotiations were at impasse. In support of that position, Respondent asserted that no agreement had been reached despite over 3 years of bargaining, and also asserted that the Union employed strategies of avoiding and delaying negotiations and making regressive proposals without justification. As for the Union's September 6, 2019 proposal, Respondent asserted that the parties discussed 75 percent of the proposal during bargaining on September 6, 2019, and February 24, 2020. Respondent then sent a written response to the Union's proposal in May 2020 after the March 25, 2020 bargaining session was canceled due to the Covid–19 pandemic. Finally, Respondent stated that its final offer did not terminate contract negotiations. In Respondent's view, the Union announced on March 22, 2020, that it would not meet with Respondent, and subsequently did not engage with Respondent about the terms of the final offer or explain why further bargaining would be fruitful. (GC Exh. 41.)

The Union replied in a July 20, 2020 letter. Regarding the bargaining history, the Union maintained that Respondent made regressive proposals and did not accept a single proposal that the Union offered. The Union also denied delaying or avoiding negotiations and emphasized that it canceled the March 25, 2022 bargaining session to ensure everyone's safety during the Covid–19 pandemic. As for why further bargaining would be fruitful, the Union indicated that bargaining was necessary for discussing, among other topics: whether the Union's September 19, 2019 proposal was acceptable (particularly as to two-thirds of the proposal that had not yet been addressed in a bargaining session); Respondent's rationale for seeking more money to hire stringers when Respondent was not using the amount permitted in the expired contract; and Respondent's healthcare plan and proposal language that would give Respondent the right to cancel the plan immediately after the parties signed a new agreement. The Union closed by stating that it was willing to meet to go through the Union's September 19, 2019 proposal and Respondent's final offer and suggest changes in an attempt to reach a mutual agreement, and asking Respondent for available dates to resume bargaining. (GC Exh. 42.)

### J. July 27, 2020: Respondent Declares Impasse and Implements Terms and Conditions of Employment

#### 1. Impasse letter

On July 27, 2020, Respondent declared impasse and implemented terms and conditions of employment. Respondent stated as follows in its letter:

After over three years of negotiations, the Company believes the parties are at impasse. Therefore, negotiations are

terminated. The Company has implemented the following Articles and/or provisions of the Company's Final Offer:

> [Agreement Paragraph C and Paragraph D (Sec. 1–7);
> Art. III (excluding Sec. 4);
> Art. IV (excluding everything in Sec. 11 except for the first sentence);
> Art. V—VI;
> Art. VII (excluding the second sentence of Sec. 3);
> Art. VIII (excluding the phrase "in the Company's discretion" in Sec. 15);
> Arts. IX—XVIII;
> Art. XIX (Sec. 24 only); and
> Art. XX (as set forth in the addendum, excluding Secs. 2–3)]

The specific language of each Article and/or provision of the implemented terms and conditions referenced above is contained in the attached Addendum to this letter. The above implemented new terms and conditions supersedes and replaces the applicable Articles and/or provisions of the expired agreement.

Because of the impasse in these negotiations, the collective bargaining agreement is terminated. The evergreen provision in Article XXII provides that "[t]he terms and conditions of this Agreement shall remain in effect as long as negotiations continue." Negotiations are now terminated because of the impasse. The contractual terms and conditions of the collective bargaining agreement have expired, along with the evergreen provision. Article XXII is deleted and has no further force and effect.

The Company will continue to observe the established terms and conditions of the expired collective bargaining agreement as required by the National Labor Relations Act, except as otherwise modified by the implemented terms and conditions in this letter and except those terms and conditions recognized as strictly contractual. Additionally, the Company will no longer check off Union dues, including assessments. . . .

(GC Exh. 43 (pp. 1–3); see also Tr. 113, 690–691.)

### 2. Implemented terms

As indicated above, most of the terms and conditions that Respondent unilaterally implemented were the same as what Respondent set forth in its June 12, 2020 last, best, and final offer. The following implemented terms, however, included modifications that Respondent made after its last, best, and final offer:

Wages: deleted paragraph 4, which stated "Nothing in this agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established herein are minimums only. Individual merit shall be acknowledged by increases above the minimums." (Compare GC Exh. 36 (Art. III, Sec. 4) with GC Exh. 43 (Art. III).)[16]

Work hours: Respondent deleted the following language after a sentence stating that Respondent does not guarantee any specified hours of work per day or per week: "In the event the Company reduces its print and/or digital publication schedule from its current schedule, the Company will give the Guild at least ten (10) days' notice prior to reducing an employee's workday or workweek. The parties shall meet during this ten (10) day notice period to discuss the effects of any planned reduction in hours. After the ten (10) day notice period has expired, the Company may implement the reduction in hours." (Compare GC Exh. 36 (Art. IV, Sec. 11) with GC Exh. 43 (Art. IV, Sec. 11)

Short term disability: Respondent deleted the following language after a sentence stating that bargaining unit employees would be covered by Respondent's short term disability (STD) policy: "The Company reserves the right to modify or change the Company's STD policy on the same basis as nonrepresented employees of the Company." (Compare GC Exh. 36 (Art. VII, Sec. 3) with GC Exh. 43 (Art. VII, Sec. 3).)

Transfers due to workplace changes: Respondent deleted the phrase "in the Company's discretion" that followed a sentence stating that an employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes may be afforded the opportunity to transfer to other available positions. (Compare GC Exh. 36 (Art. VIII, Sec. 15) with GC Exh. 43 (Art. VIII, Sec. 15).)

Health and welfare: Respondent deleted the following language after a sentence stating that bargaining unit employees will be covered by the Company health, dental, vision, and life insurance plans: "Such plans may be amended, changed, replaced or terminated, in whole or in part . . . at the Company's sole discretion. . . . The Company agrees to provide a health, dental, vision and life insurance plan during the term of this Agreement." (Compare GC Exh. 36 (Art. XX, Sec. 1) with GC Exh. 43 (Art. XX, Sec. 1).)

(GC Exh. 43 (Addendum); see also Tr. 113, 144–145.)

### 3. Communications after Respondent implemented terms

On July 30–31, 2020, Respondent and the Union exchanged letters about the bargaining dispute. Respondent maintained that it lawfully implemented portions of its final offer after the parties bargained to a good-faith impasse, and took the position that it had no obligation to negotiate further until the impasse was broken. The Union, meanwhile, asserted that the parties were not at impasse and asked Respondent to provide dates to resume bargaining.[17] (GC Exhs. 45–47.)

### K. September/October 2020: Union Rallies

#### 1. September 25, 2020: rally in front of Respondent's facility

On September 25, 2020, the Union held a rally in front of the North Shore Drive building where Respondent's offices are located. The Union organized the rally to, among other things, protest Respondent's decision to declare impasse and unilaterally implement terms and conditions of employment. Many rally attendees chanted and held signs with phrases such as "[Respondent] Declares Unlawful Impasse!" and "[Respondent] Bargains in Bad Faith!" In addition, an airplane flying overhead displayed a banner stating "Fair Contract Now. #NoPGWithoutMe." Various individuals spoke with a microphone at the

---

[16] The paragraph that Respondent deleted was in the expired contract. (GC Exh. 2 (Art. III, Sec. 6).)

[17] The parties met for a bargaining session on September 8, 2020 (see GC Exhs. 48–49), but I do not find that session to be relevant to whether the parties were at a good-faith impasse when Respondent unilaterally implemented terms and conditions of employment on July 27, 2020. See *Mike-Sell's Potato Chip Co.*, 360 NLRB 131, 131 fn. 1 (2014) (declining to consider the union's offers of bargaining concessions that occurred after the employer declared impasse and unilaterally implemented its final contract offers), enfd. 807 F.3d 318 (D.C. Cir. 2015).

rally, including (now former) Pennsylvania Lieutenant Governor John Fetterman, and some individuals at the rally were taking photographs. (Tr. 50–52, 248–249, 275, 278–279, 740–742; GC Exhs. 52, 54; R. Exhs. 26–27, 33–36, 39–40; see also Tr. 51–52 (estimating that around 125 people attended the rally).)

Chief photo editor Arturo Fernandez was working inside Respondent's facility when he heard the rally occurring outside. Thinking that the rally could be a "spot news" event (i.e., a news event occurring spontaneously), Fernandez used his cell phone and his professional camera to take photographs of the rally while standing at different windows on the third floor. Rally participants, including bargaining unit members, could see Fernandez as he took photographs. Fernandez saved the photographs on his computer and then notified the night editor that the photographs were not publishable because the photographs included disparaging signs and posters. (Tr. 53–58, 771, 788–796, 798; GC Exhs. 52–54; see also GC Exh. 59 (p. 2).) Respondent's director of operations, Rob Weber, who is in charge of facilities and security (among other responsibilities) also observed the rally from inside the building.[18] (Tr. 55, 725–726, 740–741; see also GC Exh. 59 (p. 2); GC Exh. 60 (pp. 1–3).)

2. October 24 and 31, 2020: rallies in front of John Block's home

On October 24, 2020, the Union held a rally and informational picket, this time in front of Respondent's publisher, John Block's home. Seeking to call attention to the labor dispute and pressure Respondent to return to the bargaining table, some rally participants held signs with phrases such as "[Respondent] Declares Unlawful Impasse!" and "[Respondent] Illegally Imposes Horrible Working Conditions." Other participants used a bullhorn to give speeches, and a few participants had cameras with them and were taking photos. For the most part, rally participants stood on the sidewalk in front of the home, on or across the street, on the driveway entrance (between the street and sidewalk), or on a strip of grass between the street and the sidewalk. (Tr. 39–42, 46–49, 59–61, 725–726; GC Exh. 51, 55; see also Tr. 59 (estimating that around 50 people, a majority of whom were bargaining unit members, attended the rally).)

The Union held another rally and informational picket in front of John Block's home on October 31, 2020, this time with a Halloween funeral theme. Rally participants placed a mock coffin on the sidewalk along with cardboard tombstones with phrases such as "Here Lies Local News" and "RIP Staff Morale." Other participants used a bullhorn to give speeches. Rally participants for the most part stood on the sidewalk in front of the home, on the street, or on the driveway entrance (between the street and sidewalk). Occasionally, however, a rally participant stood a few feet closer to the home on the walkway leading to the front door or the portion of the driveway leading from the sidewalk to the home. (Tr. 64–65, 67–68, 281–286; GC Exh. 57; R. Exhs. 41–46; see also Tr. 65 (estimating that around 60 people, a majority of whom were bargaining unit members, attended the rally) .)

In an effort to ensure that the October 24 and 31 rallies did not get out of control, Respondent asked Kellington Protection, LLC to provide security guards to be present during both of the rallies

in front of John Block's home. Two security guards (Steve Cain and Charles Sansky) attended each rally and took photographs of rally participants, including bargaining unit members when they were located across the street from John Block's home. Respondent did not ask the security guards to photograph the rallies, but also did not provide any instructions that prohibited the security guards from taking photographs. (Tr. 40–41, 43, 60–63, 65–68, 726–727, 729–730, 736, 739, 771–773; GC Exhs. 50, 58 (Oct. 24 rally); GC Exh. 56 (Oct. 31 rally); R. Exh. 197 (indicating that Respondent signed a contract with Kellington Protection in December 2018); see also Tr. 61–62 (explaining that the security guard shown aiming his phone in GC Exh. 58 was aiming at October 24 rally participants who were located across the street from John Block's home), 66–67 (explaining that the security guard shown aiming his phone in GC Exh. 56 was aiming at October 31 rally participants who were located across the street from John Block's home); GC Exh. 59 (p. 3); GC Exh. 60 (pp. 3–5).)

### DISCUSSION AND ANALYSIS

#### A. Credibility Findings

A credibility determination may rely on a variety of factors, including the context of the witness' testimony, the witness' demeanor, the weight of the respective evidence, established or admitted facts, inherent probabilities and reasonable inferences that may be drawn from the record as a whole. Credibility findings need not be all-or-nothing propositions — indeed, nothing is more common in all kinds of judicial decisions than to believe some, but not all, of a witness's testimony. *Farm Fresh Co., Target One, LLC*, 361 NLRB 848, 860 (2014) (noting that an administrative law judge may draw an adverse inference from a party's failure to call a witness who may reasonably be assumed to be favorably disposed to a party, and who could reasonably be expected to corroborate its version of events, particularly when the witness is the party's agent). To the extent that credibility issues arose in this case, I have stated my credibility findings in the Findings of Fact above.

#### B. Did Respondent Violate the Act by Failing and Refusing to Bargain in Good Faith with the Union?

##### 1. Complaint allegations

The General Counsel alleges that Respondent violated Section 8(a)(5) and (1) of the Act by, through its overall conduct since about March 11, 2019, failing and refusing to bargain in good faith with the Union as the exclusive collective-bargaining representative of the bargaining unit. In particular, the General Counsel alleges that Respondent bargained with no intention of reaching an agreement by: (a) insisting on proposals that are predictably unacceptable to the Union, including unilateral control over wage rates, hours and numbers of hours worked, subcontracting bargaining unit work, provisions of health insurance, layoffs, and a broadly worded no-strike clause; (b) failing to provide explanations to the Union regarding Respondent's proposals; and (c) prematurely declaring impasse.

##### 1. Applicable legal standard

The Supreme Court has held that the statutory duty to "meet .

---

[18] I do not find that Weber took (or gave the appearance of taking) photos of the September 25 rally. The General Counsel presented limited evidence on this point, as only one witness at a distance (from the street while Weber was at a third-floor window) stated that he saw Weber point his cell phone at rally participants.[18] (See Tr. 53.) That testimony, which

was not corroborated by any other evidence (e.g., testimony by another witness, photographs), is too thin for me to conclude that Weber was or gave the appearance that he was photographing employees as they engaged in union activities. I also note that Weber credibly denied that he took photos of the rally. (See Tr. 742.)

. . and confer in good faith" is not fulfilled by "purely formal meetings between management and labor, while each maintains an attitude of 'take it or leave it.'" Instead, "[c]ollective bargaining. . . presupposes a desire to reach an ultimate agreement, to enter into a collective-bargaining contract." *NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 485 (1960); see also National Labor Relations Act, Sec. 8(d).

The touchstone of bad-faith bargaining is a purpose to frustrate the very possibility of reaching an agreement. *Phillips 66*, 369 NLRB No. 13, slip op. at 6 (2020). In assessing whether a party has failed or refused to bargain in good faith, the Board considers the totality of the circumstances, including conduct both at and away from the bargaining table. From the context of an employer's total conduct, it must be decided whether the employer is engaging in hard but lawful bargaining to achieve a contract that it considers desirable or is unlawfully endeavoring to frustrate the possibility of arriving at any agreement. Although the Board does not evaluate whether particular proposals are acceptable or unacceptable, it will examine proposals when appropriate and consider whether, on the basis of objective factors, bargaining demands constitute evidence of bad-faith bargaining. *Altura Communication Solutions, LLC*, 369 NLRB No. 85, slip op. at 3 (2020), enfd. 848 Fed.Appx. 344 (9th Cir. 2021); *Audio Visual Services Group, Inc. d/b/a PSAV Presentation Services*, 367 NLRB No. 103, slip op. at 5 (2019), affd. 957 F.3d 1006 (9th Cir. 2020).

### 3. Analysis

The General Counsel contends that Respondent engaged in overall bad-faith bargaining by presenting contract proposals that, when considered as a whole, evidence an intent not to reach agreement; failing to explain its proposals to the Union; and prematurely declaring impasse. I do not find merit to the argument that Respondent failed to explain its proposals to the Union. The General Counsel presented limited evidence on this point, as due to the number of bargaining sessions witnesses generally offered testimony in broad strokes and did not go into detail about what each party said during their 22 bargaining sessions before Respondent declared impasse. Further, during the August 6, 2019 bargaining session, Respondent provided a position statement to the Union that described Respondent's positions on each of the areas where the parties disagreed about contract terms. (See FOF, Sec. II(E).)

With that stated, I do find merit to the arguments that Respondent prematurely declared impasse (see Discussion and Analysis, Sec. C(3), infra) and presented proposals that, viewed as a whole, evidence an intent not to reach an agreement.[19] I discuss Respondent's proposals below.

The last, best and final offer that Respondent communicated to the Union on June 12, 2020, included the following proposals,[20]

Bargaining unit jurisdiction: The Union's jurisdiction includes work normally performed by bargaining unit employees but is subject to the following exceptions: (a) Supervisors and managerial employees may perform bargaining unit work. No bargaining unit employee will be laid off as a direct result of that practice; (b) Non-bargaining unit employees may perform bargaining unit work on an occasional basis; (c) Respondent may subcontract work; and (d) Respondent may use stringers but the maximum amount paid to stringers will not exceed 20 percent of the annual bargaining unit payroll. (GC Exh. 36 at pp. 2–3; FOF, Sec. II(D)(3).)

Wages: Increase the minimum pay rate for employees with the highest level of experience by: 3 percent on the effective date of the new contract; an additional 2 percent on the first contract anniversary date; and an additional 3 percent on the second contract anniversary date. The baseline pay rates for the wage proposal incorporate the pension and wage diversions from the old contract (i.e., if an employee's wage rate was $1000 under the old contract and $901.60 after subtracting diversions, Respondent used the $901.60 amount as the baseline wage for its proposal). (GC Exh. 36 (Art. III); FOF, Sec. II(E).)

Work hours: Respondent "does not guarantee any specified hours of work per day or per week" but will provide the Union with 10 days' notice if Respondent seeks to reduce an employee's workday or workweek due to a reduction in the company's print and/or digital publication schedule. Respondent reserves the right to implement the reduction in hours after the 10–day notice period. (GC Exh. 36 (Art. IV, Sec. 11); FOF, Sec. II(D)(4)(c).)[21]

Sick leave: Bargaining unit employees will be covered by Respondent's short term disability policy (STD). Respondent reserves the right to modify or change the Company's STD policy on the same basis as Respondent's nonrepresented employees. Sick leave payments shall terminate upon termination of employment or death of the employee. (GC Exh. 36 (Art. VII, Sec. 3, 6); FOF, Sec. II(E).)

Layoffs/recalls: To select employees for layoffs, Respondent will give consideration to seniority, qualifications, performance, and skills in the affected work group. Recalls shall be in order of seniority if skill and qualifications are equal in Respondent's opinion. (GC Exh. 36 (Art. VII, Sec. 4(B), 5); FOF, Sec. II(D)(4)(e).)

No-strike clause: No strike, sympathy strike, slowdown, work stoppage, picketing, boycotts, bannering, or any other

---

[19] The General Counsel has asserted that Respondent's proposals were "predictably unacceptable to the Union." While the Board has used that phrasing in a few decisions I do not do so here because I do not find it to be helpful in analyzing the facts of this particular case.

On a related point, I note that I stand by my rulings during trial to exclude several exhibits (mostly proposals and contracts involving other bargaining units) that Respondent offered to rebut the argument that its proposals here were predictably unacceptable to the Union. (See, e.g., Tr. 646, 651, 770 (rejecting R. Exhs. 178–187, 198–204); see also Tr. 748 (explaining that my ruling did not preclude Respondent from presenting testimony about its state of mind in making contract proposals to the Union).) Specifically, Respondent maintained that if a different union accepted a contract proposal, the General Counsel could not claim that a similar proposal to the Union was "predictably unacceptable."

(See Tr. 625.) It suffices to say that I found Respondent's proffered evidence to be too remote from the issues at hand in this case. Every bargaining unit has its own priorities, goals, and interests, and I do not have a basis to conclude that a bargaining proposal or concession accepted by one unit would (or should) be palatable for an entirely different unit.

[20] This list is not intended to be exhaustive. I have only highlighted a selection of the proposals from Respondent's last, best, and final offer.

[21] Although there was an established past practice of bargaining unit employees working 40 hours per week, Respondent's last, best, and final offer included a proposal that the new contract would supersede all past practices. (See FOF, Sec. II(D)(4)(c); GC Exh. 36 (Art. XIX, Sec. 23) (proposing that the collective-bargaining agreement supersedes all prior agreements between Respondent and the Union, including any letters of interpretation, verbal understandings and/or past practices).)

interference with or interruption of work shall be permitted during the term of the contract. (GC Exh. 36 (Art. XIX, Sec. 6); FOF, Sec. II(D)(4)(d).)

Health and welfare: Bargaining unit employees will be covered by Respondent's health, dental, vision, and life insurance plans. Respondent may amend, change, replace or terminate those plans in its sole discretion. Respondent agrees to provide a health, dental, vision and life insurance plan during the term of the contract. Bargaining unit employees shall pay 30 percent of the premium costs for Respondent's health, vision, and dental insurance programs. (GC Exh. 36 (Art. XX, Sec. 1); FOF, Sec. II(E), (I)(1).)

It bears repeating that these proposals were part of Respondent's best offer. Respondent's proposals in these areas in earlier bargaining sessions were identical or less favorable to the Union.

The Board has explained that "proposals that would authorize an employer to make unilateral changes to a broad range of significant terms and conditions of employment, or that would amount to a 'perpetual reopener clause' as to those terms during the life of the contract, are [] 'at odds with the basic concept of a collective-bargaining agreement.'" *Altura Communication Solutions, LLC*, 369 NLRB No. 85, slip op. at 4 (quoting *Radisson Plaza Minneapolis*, 307 NLRB 94, 95 (1992), enfd. 987 F.2d 1376 (8th Cir. 1993)). The proposals in Respondent's last, best, and final offer fit that description.

First, Respondent's proposals would have enabled it to unilaterally encroach upon the Union's jurisdiction by subcontracting work and by assigning bargaining unit work to employees outside of the bargaining unit. The Union would have no recourse if Respondent took action under the proposal that infringed on the Union's jurisdiction and/or reduced the size of the bargaining unit.

Second, Respondent's proposals would have granted it discretion over hours of work. As the Board has explained, a contractual provision that affords an employer complete discretion over work hours also affords the employer unilateral control over employees' pay. See *Altura Communication Solutions, LLC*, 369 NLRB No. 85, slip op. at 5 (discussing an employer's proposal that nothing in the agreement should be construed as a guarantee of hours of work per shift, per day or per week); compare GC Exh. 36, Sec. 11 ("The Company does not guarantee any specified hours or work per day or per week.").

Third, Respondent proposed having the ability to unilaterally alter or scale back its bargaining unit employees' healthcare, dental, vision, and life insurance plans. Respondent also sought unilateral control over bargaining unit employees' short term disability plan, up to and including the right to eliminate the plan (though any changes to the short-term disability plan would also have to apply to non-unit employees). Bargaining unit employees therefore could not count on any of these benefits under Respondent's proposals, as Respondent would have the right to

change the benefits at any time. Such proposals are at odds with the basic concept of a collective-bargaining agreement. *Altura Communication Solutions, LLC*, 369 NLRB No. 85, slip op. at 5.

Fourth, Respondent proposed to have discretion to select employees for layoffs and recalls, with seniority being only one of several factors regarding layoffs, and merely a tiebreaking factor regarding recalls. Through the proposal, the Union would lose any meaningful way to monitor or enforce the layoff/recall provisions in the contract, as Respondent would be able to justify its layoff and recall decisions as discretionary decisions about employee skills and qualifications.[22]

Considering the proposals in Respondent's last, best, and final offer in combination, I find that Respondent failed to bargain in good faith. An inference of bad faith is appropriate when the employer's proposals, taken a whole, would leave the union and the employees it represents with substantially fewer rights than provided by law without a contract. That is what we have here, as Respondent's proposals effectively sought the discretion to limit the Union's jurisdiction (via subcontracting and assigning bargaining unit work to nonunit employees) and remove the Union from representing bargaining unit members interests concerning: work hours; health, dental, vision, and life insurance plans; the short-term disability plan; and layoffs/recalls. *Kitsap Tenant Support Services, Inc.*, 366 NLRB No. 98, slip op. at 8–9 (2018) (finding bad faith bargaining where the employer's proposals sought to deny the union any role in determining wages and benefits during the contract term, and also sought to afford the employer unfettered discretion regarding discipline and discharge), enfd. 2019 U.S.App. LEXIS 13055 (D.C. Cir. 2019); *Public Service Co. of Oklahoma (PSO)*, 334 NLRB 487, 487–489 (2001) (noting that without a contract, the union would have the statutory right to prior notice and bargaining over changes or modifications in terms and conditions of employment and would retain the right to strike in protest of such actions), enfd. 318 F.3d 1173 (10th Cir. 2003).

I am not persuaded by the defenses that Respondent offered in response to the bad-faith bargaining allegation in the complaint. Respondent maintains that the complaint allegation that it (Respondent) insisted upon proposals that were "predictably unacceptable" to the Union should be dismissed under Section 10(b) of the Act because the Union should have filed unfair labor practice charges regarding any such proposals within 6 months of the date that Respondent made the proposal (generally in 2017). (See R. Posttrial Br. at 25–27; see also GC Exh. 1(a) (unfair labor practice charge alleging that Respondent bargained in bad faith, filed on September 11, 2019). The Board has indicated that a union should not assume that an employer's initial proposals are fixed positions and should test the employer's willingness to bargain before filing a bad-faith bargaining charge. See *District Hospital Partners, L.P. d/b/a The George Washington*

---

[22] I would be remiss if I did not also point out that there is no evidence that Respondent offered any meaningful economic concessions or benefits to the bargaining unit in exchange for the broad discretion that it proposed in the areas discussed above. See *Sweeney & Co.*, 176 NLRB 208, 211–212 (1969) (finding that the employer's rigid refusal to make any meaningful concessions on critical economic issues supported a finding that the employer bargained in bad faith), enfd. in pertinent part, 437 F.2d 1127 (5th Cir. 1971). The wage increases that Respondent offered are offset by several factors, including but not limited to: the new obligation for bargaining unit employees to pay 30 percent of the premium costs for

Respondent's health, vision, and dental insurance programs; the removal of the annual $4,000 cap on pension and wage diversions which were incorporated into wage rates before any wage increases; and the loss of all sick leave that bargaining unit employees banked under the sick leave provisions in the expired contract. There is no evidence that Respondent offered any other increased financial compensation or benefits to the bargaining unit during negotiations. (See FOF, Sec. II(D)(4)(a), (E); Tr. 688–690 (Lowe, Respondent's chief negotiator, could not identify any financial benefit that Respondent offered to the bargaining unit besides wage increases).)

*University Hospital*, 370 NLRB No. 118, slip op. at 6 (2021).[23] Based on that authority, I find that the Union filed its bad-faith bargaining charge at an appropriate time (i.e. after it tested Respondent's willingness to bargain), and I also find that Section 10(b) of the Act does not bar the General Counsel's allegation that Respondent engaged in bad-faith bargaining by (among other conduct) insisting on predictably unacceptable proposals since March 11, 2019.[24]

Respondent also contends that the General Counsel did not present evidence of bad-faith bargaining in the form of delaying tactics, unilateral changes in mandatory subjects of bargaining, efforts to bypass the Union, failure to designate an agent with sufficient bargaining authority, withdrawal of already agreed-upon provisions, or arbitrary scheduling of meetings. (R. Posttrial Br. at 27–28.) That argument misses the mark because the General Counsel presented other evidence of bad-faith bargaining, including evidence that Respondent prematurely declared impasse and made a combination of contract proposals in its final offer that demonstrate an intent to frustrate arriving at an agreement. See *Altura Communications Solutions, LLC*, 369 NLRB No. 85, slip op. at 6 (finding bad-faith bargaining based in part on the employer's contract proposals); *South Carolina Baptist Ministries*, 310 NLRB 156, 157 (1993) (finding bad-faith bargaining based on, among other misconduct, the employer's premature declaration of impasse and employer's insistence on proposals that would have left the union with fewer rights than imposed by law without a contract).

In sum, I find that since about March 11, 2019, Respondent, by its overall conduct in negotiations for a successor collective-bargaining agreement (including prematurely declaring impasse and insisting on proposals that, viewed as a whole, would leave the union and bargaining unit employees with substantially fewer rights and less protection than provided by law without a contract), failed and refused to bargain in good faith with the Union as the exclusive collective-bargaining representative of the bargaining unit and thereby violated Section 8(a)(5) and (1) of the Act.

### C. Did Respondent Violate the Act when it Unilaterally Implemented Terms and Conditions of Employment on July 27, 2020?

#### 1. Complaint allegations

The General Counsel alleges that Respondent violated Section 8(a)(5) and (1) of the Act by, on or about July 27, 2020, implementing changes to bargaining unit employees' terms and conditions of employment without first bargaining with the Union to an overall good-faith impasse for a successor collective-bargaining agreement.

#### 2. Applicable legal standard

Under the unilateral change doctrine, an employer's duty to bargain under the Act includes the obligation to refrain from changing its employees' terms and conditions of employment without first bargaining to impasse with the employees' collective-bargaining representative concerning the contemplated changes.[25] The Act prohibits employers from taking unilateral action regarding mandatory subjects of bargaining such as rates of pay, wages, hours of employment and other conditions of employment. An employer's regular and longstanding practices that are neither random nor intermittent become terms and conditions of employment even if those practices are not required by a collective-bargaining agreement. The party asserting the existence of a past practice bears the burden of proof on the issue and must show that the practice occurred with such regularity and frequency that employees could reasonably expect the practice to continue or reoccur on a regular and consistent basis. *Raytheon Network Centric Systems*, 365 NLRB 1722, 1726, 1729, 1737, 1741 (2017); *Howard Industries, Inc.*, 365 NLRB 28, 30–31 (2016).

On the issue of whether the parties bargained to an impasse, the Board defines a bargaining impasse as the point in time of negotiations when the parties are warranted in assuming that further bargaining would be futile because both parties believe they are at the end of their rope. The question of whether an impasse exists is a matter of judgment based on several factors, including: the bargaining history; the good faith of the parties in negotiations; the length of the negotiations; the importance of the issue or issues as to which there is disagreement; and the contemporaneous understanding of the parties as to the state of negotiations. The party asserting impasse bears the burden of proof on the issue. *Phillips 66*, 369 NLRB No. 13, slip op. at 7 (2020); *Taft Broadcasting Co.*, 163 NLRB 475, 478 (1967), review denied sub nom. *American Federation of Television & Radio Artists v. NLRB*, 395 F.2d 622 (D.C. Cir. 1968).

If an employer makes a unilateral change to a term and condition of employment, it may still assert certain defenses. For example, the employer may assert that the change: did not alter the status quo (e.g., because the change in question was part of a regular and consistent past pattern); did not involve a mandatory subject of bargaining; was not material, substantial and significant; or did not vary in kind or degree from what has been customary in the past. *MV Transportation, Inc.*, 368 NLRB No. 66, slip op. at 11 (2019); *Raytheon Network Centric Systems*, 365 NLRB 1722, 1726, 1729, 1737, 1741. In addition, the employer may assert that the contractual language privileged it to make the disputed change without further bargaining (the "contract coverage" defense). Under the contract coverage defense, the Board will determine whether the parties' collective-bargaining agreement covers the disputed unilateral change. In making that determination, the Board will give effect to the plain meaning of the relevant contractual language, applying ordinary principles of contract interpretation, and the Board will find that the agreement covers the challenged unilateral act if the act falls within the compass or scope of contract language that grants the employer the right to act unilaterally. Since a collective-bargaining agreement establishes principles that govern a myriad of fact patterns, the Board will not require (as a prerequisite to the defense) that the agreement specifically mention, refer to or address the employer decision at issue. If the contract coverage defense is not met, then the Board will determine whether the union waived

---

[23] The General Counsel maintains that the Board should overrule its decision in *District Hospital Partners, L.P. d/b/a The George Washington University Hospital*, 370 NLRB No. 118 (2021), albeit for reasons that do not relate to my citation here. (See GC Posttrial Br. at 50–51.) I leave that request for the Board to consider.

[24] As an aside, I note that bargaining conduct before March 11, 2019, remains relevant as it sheds light on bargaining conduct within the 10(b) period. See *Regency Service Carts*, 345 NLRB 671, 672 fn. 3 (2005); *Rescar, Inc.*, 274 NLRB 1, 2 (1985).

[25] Separate and apart from the unilateral change doctrine, an employer also has a "duty to engage in bargaining regarding any and all mandatory bargaining subjects *upon the union's request* to bargain," unless an exception to that duty applies. *Raytheon Network Centric Systems*, 365 NLRB 1722, 1732–1733, 1737–1738, 1741 (emphasis in original).

its right to bargain about a challenged unilateral change. *MV Transportation, Inc.*, 368 NLRB No. 66, slip op. at 11–12.

### 3. Analysis

There is no dispute that on July 27, 2020, Respondent declared that the parties were at impasse and unilaterally implemented terms and conditions of employment for the bargaining unit. Many of the terms that Respondent implemented were the same as what Respondent set forth in its June 12, 2020 last, best, and final offer. Some of the terms that Respondent implemented, however, differed from the last, best, and final offer, including: wages, work hours, short term disability, transfers due to work-place changes, and health and welfare. (FOF, Sec. II(J)(1)–(2).)

Respondent contends that it was permitted to implement terms and conditions of employment because the parties reached an impasse in their negotiations for a successor collective-bargaining agreement. Respondent's argument fails on this point. First, the Board has long held that a finding of impasse is precluded if that outcome is reached in the context of serious unremedied unfair labor practices that affect the negotiations. *Royal Motor Sales*, 329 NLRB 760, 762, 764 (1999), enfd. 2 Fed.Appx. 1 (D.C. Cir. 2001). That is the situation here, as I have found that Respondent engaged in overall bad-faith bargaining since about March 11, 2019, in part because Respondent's contract proposals demonstrate Respondent's intent to frustrate arriving at an agreement. (See Discussion and Analysis, Sec. B(3), supra.)

Second, Respondent declared impasse at a time in negotiations when neither party would have been warranted in assuming that further bargaining would be futile and when neither party could have reasonably believed that they were at the end of their rope. When the parties concluded their February 24, 2020 bargaining session, they had not yet finished discussing the Union's contract proposal from September 2019. Presumably the parties would have continued that discussion at the next bargaining session, but the Covid–19 pandemic began and the Union canceled the March 25, 2020 session. Respondent did not object to the cancellation when it occurred. When bargaining continued to be on hold and Respondent's May 22, 2020 written response to the Union's September 2019 proposal did not prompt a reply, Respondent sent the Union a last, best, and final offer on June 12, 2020. The last, best, and final offer included a handful of updated proposals, including a health and welfare proposal in which Respondent committed to providing health, dental, vision,

and life insurance plans to the bargaining unit for the length of the contract. The parties did not have a bargaining session to discuss Respondent's last, best, and final offer, nor did they have a bargaining session to discuss the additional updated proposals that Respondent used when it declared impasse and unilaterally implemented terms and conditions of employment on July 27, 2020.[26] In short, Respondent declared impasse when the parties still needed to bargain about the Union's September 2019 proposal, Respondent's June 12, 2020 last, best, and final offer, and the terms that Respondent implemented on July 27, 2020. Those checkpoints included movement on key issues such as wages, health and welfare, work hours, and short term disability coverage. (See FOF, Sec. II(G)(2), H(2)–(3), (I)(1)–(2); see also FOF, Sec. II(I)(2) (noting that on July 20, 2020, the Union explicitly offered to meet and bargain over its September 2019 proposal and Respondent's last, best, and final offer).)

Third, I am not persuaded by Respondent's argument that the Union engaged in bad-faith bargaining that supported Respondent's declaration of impasse.[27] Specifically, Respondent contends that the Union improperly: avoided or delayed in meeting to negotiate; engaged in regressive bargaining; insisted on permissive subjects of bargaining; attempted to interfere with Respondent's choice of its bargaining representatives; and refused to reach tentative agreements on proposals unless the tentative agreement covered an entire contract article. (See R. Posttrial Br. at 34–36.) While I would not say that the Union's conduct during bargaining was beyond reproach, I do not find that any of the conduct that Respondent identified demonstrates that additional bargaining would have been futile. For example, while it is true that Respondent was more proactive and flexible than the Union with scheduling bargaining dates, the fact remains that the parties agreed to multiple bargaining dates throughout negotiations.[28] (See FOF, Sec. II(D)(5).) As for Respondent's assertion that the Union made regressive (or permissive) proposals concerning when Respondent could use stringers, when managers could perform bargaining unit work, and the number of managers that Respondent could have in relation to the size of the bargaining unit, I note that the Union corrected or withdrew the majority of those proposals during bargaining. Perhaps more important, none of the Union's proposals that Respondent flagged as regressive or permissive was so problematic that Respondent could reasonably conclude that further bargaining would be fruitless. (See FOF, Sec. II(D)(3), (F).)[29]

---

[26] Respondent's actions on July 27, 2020, were inherently contradictory. Specifically, Respondent declared that the parties were at impasse, but simultaneously announced that it was implementing terms and conditions of employment that differed from what Respondent set forth in its last, best, and final offer. By implementing new terms, Respondent demonstrated that it had room to move from what it characterized as its last, best and final offer on June 12, 2020, and thus demonstrated that the parties were not at impasse.

[27] I do not find that the Board has recognized a defense that would permit an employer to implement its final offer based on a union's alleged bad-faith bargaining tactics (but in the absence of an impasse). To the contrary, when one party asserts that it may act unilaterally because another party has acted in bad-faith during bargaining, that issue is addressed in the context of evaluating whether the parties have reached a good-faith impasse and whether it would be futile to engage in additional bargaining. I have followed that approach here. See, e.g., *Jefferson Smurfit Corp.*, 311 NLRB 41, 60 (1993) (finding that an employer reasonably concluded that further bargaining would not be fruitful, in part because the union was engaging in conduct that was preventing the parties from reaching an agreement or a genuine impasse); *M & M*

*Contractors*, 262 NLRB 1472, 1472 (1982) (same, where the union "over a period of 7 months had clearly manifested its aversion to bargaining" with the employer), petition for review denied, 707 F.2d 516 (9th Cir. 1983); see also *Wilkes-Barre Behavioral Hospital Co., LLC d/b/a First Hospital Wyoming Valley*, 370 NLRB No. 17, slip op. at 17–18 (2020) (rejecting a "union acted in bad faith" defense to an allegation that the employer unlawfully implemented its final offer in the absence of a good-faith impasse).)

[28] To the extent that Respondent takes issue with the fact that no bargaining sessions were scheduled between September 2019 and February 2020 (see R. Posttrial Br. at 37–38), I note that neither party reached out in Fall 2019 to schedule the next bargaining session. When Respondent did reach out in mid–January 2020, the Union proposed February 24, 2020, as the next date for bargaining and Respondent accepted. The parties planned to meet again on March 25, 2020, but the Union canceled that session (without objection from Respondent) due to the onset of the Covid–19 pandemic. (FOF, Sec. II(G)(1), (H)(1)–(2).)

[29] I do not discuss each of Respondent's assertions of Union misconduct here because many of the assertions lack merit insofar as the alleged misconduct had little to no effect on negotiations. For example, the

Viewing the dispute as a whole, I find that the parties had not bargained to a good-faith impasse when Respondent unilaterally implemented terms and conditions of employment on July 27, 2020. As noted above, Respondent violated the Act by failing and refusing to bargain in good faith during negotiations, and that unfair labor practice had not been remedied when Respondent declared impasse. In addition, Respondent was aware that there was still room to bargain, as the parties had not yet finished discussing the Union's September 2019 proposal, the Union stated that it was willing to continue bargaining, and Respondent demonstrated its potential flexibility by modifying its proposals shortly before (and on the same day) it declared impasse. Those factors outweigh the fact that negotiations were lengthy and the fact that the parties' disagreement centered around critical issues such as wages, health and welfare benefits, and the Union's jurisdiction.[30] Since the parties were not at an overall good-faith impasse in their negotiations for a successor collective-bargaining agreement and no other defenses apply, I find that Respondent violated Section 8(a)(5) and (1) of the Act when it, on July 27, 2020, unilaterally implemented changes to bargaining unit employees' terms and conditions of employment.

*D. If the Parties Were at a Valid Impasse, Did Respondent Nonetheless Violate the Act by Unilaterally Implementing Improper Terms and Conditions of Employment on July 27, 2020?*

### 1. Complaint allegations

The General Counsel alleges, as an alternative theory if it is determined that the parties bargained to an overall good-faith impasse before July 27, 2020, that Respondent violated Section 8(a)(5) and (1) of the Act by unilaterally implementing various terms and conditions of employment on or about July 27, 2020, that were not reasonably comprehended by its pre-impasse proposals.

The General Counsel also alleges that Respondent violated Section 8(a)(5) and (1) of the Act by, on or about July 27, 2020, unilaterally implementing a discretionary proposal concerning the performance of bargaining unit work by non-unit employees, and thereby undermining the status of the Union as the employees' exclusive collective-bargaining representative.

### 2. Applicable legal standard

It is well established that an employer may not, unilaterally and without first notifying the union and affording an opportunity to bargain, implement more generous terms and conditions of employment than what the employer offered during negotiations. *NLRB v. Crompton-Highland Mills, Inc.*, 337 U.S. 217, 225 (1949). That principle applies not only while the parties are actively bargaining, but also when the parties reach a valid impasse. See *Cleveland Cinemas Management Co.*, 346 NLRB 785, 785 & fn. 3, 788–789 (2006).

The Board has recognized a narrow exception to an employer's right to unilaterally implement contract proposals after bargaining to a good-faith impasse. Specifically, in *McClatchy Newspapers*, the Board held that the employer violated the Act when, after reaching impasse, the employer unilaterally implemented a merit wage increase proposal that gave the employer carte blanche authority over wage increases without limitation by time, standards, criteria, or the need to secure the union's agreement. The implemented wage proposal was unlawful because it excluded the union from any meaningful bargaining about merit wage increases and thereby demonstrated the union's incapacity to act as the employees' representative and was inherently destructive of the fundamental principles of collective bargaining. 321 NLRB 1386, 1389–1391 (1996), enfd. 131 F.3d 1026 (D.C. Cir. 1997); see also *KSM Industries*, 336 NLRB 133, 134–135 (2001) (applying *McClatchy Newspapers* to a health benefits proposal).

### 3. Analysis

The evidentiary record shows that the terms and conditions of employment that Respondent unilaterally implemented on July 27, 2020, were different from (and arguably more favorable than) what Respondent offered at the bargaining table or in its June 12, 2020 last, best, and final offer. (FOF, Sec. II(J)(2) (describing modifications that Respondent made to its position on work hours, short term disability benefits, and health and welfare benefits, among other areas).) The General Counsel maintains that these unilateral changes violate the Act even if the parties reached a good-faith impasse. (GC Posttrial Br. at 48–50.)

The record also establishes that when Respondent unilaterally implemented terms and conditions of employment on July 27, 2020, those terms stated exceptions to the Union's jurisdiction that permitted Respondent to subcontract work, have supervisors and managerial employees perform bargaining unit work (as long as no bargaining unit employee was laid off as a direct result), and have non-bargaining unit employees perform bargaining unit work on an occasional basis. (See FOF, Sec. II(D)(3), (E), (I)(1), (J)(2).) The General Counsel maintains that these implemented terms violate the Act as explained in *McClatchy Newspapers*. (GC Posttrial Br. at 47–48.)

I recommend that each of these complaint allegations be dismissed as moot since I have found that the parties were not at a good-faith impasse on July 27, 2020, and thus found that it was unlawful for Respondent to unilaterally implement terms and conditions of employment (including the terms described above). Given those findings there is no need to address legal theories that would only apply here if the parties reached a good-faith impasse.

*E. Did Respondent Violate the Act by Surveilling Employees' Union Activities and/or Creating the Impression of Surveillance?*

### 1. Complaint allegations

The General Counsel alleges that Respondent violated Section 8(a)(1) of the Act by, on or about September 25, October 24 and 31, 2020, taking pictures and/or video recordings and thereby engaging in surveillance of employees who were engaged in union activities or creating an impression among employees that their union activities were under surveillance.[31]

---

Union's statements that Respondent should change its bargaining representative arose briefly in early 2018 and did not arise again afterwards. (FOF, Sec. II(D)(5).) Similarly, regarding whether the parties should have reached tentative agreements on subsections of Articles, there is no evidence that the parties agreed on any ground rules for locking in areas of agreement (see FOF, Sec. II(D)(4)), nor is there evidence that the

Union's practices on tentative agreements became a material point of contention during negotiations.

[30] I find that the bargaining history factor is neutral as to whether the parties reached a good faith impasse.

[31] The General Counsel withdrew its complaint allegation that Respondent also unlawfully engaged in surveillance or created the impression of surveillance on October 3, 2020. (Tr. 14–15.)

### 2. Applicable legal standard

An employer's routine observation of employees engaged in open Section 7 activity on or near the employer's property does not constitute unlawful surveillance. However, an employer violates Section 8(a)(1) when it surveils employees engaged in Section 7 activity by observing them in a way that is out of the ordinary and thereby coercive. Indicia of coerciveness include the duration of the observation, the employer's distance from its employees while observing them, and whether the employer engaged in other coercive behavior during its observation. *NCRNC, LLC d/b/a Northeast Center for Rehabilitation*, 372 NLRB No. 35, slip op. at 3–4, 6–7 (2022); *Aladdin Gaming, LLC*, 345 NLRB 585, 585–586 (2005), petition for review denied 515 F.3d 942 (9th Cir. 2008).

The Board's test for determining whether an employer has unlawfully created an impression of surveillance is whether, under all the relevant circumstances, reasonable employees would assume from the statement or conduct in question that their union or other protected activities have been placed under surveillance. The standard is an objective one, based on the rationale that employees should be free to participate in union activities without the fear that members of management are peering over their shoulders, taking note of who is involved in union activities, and in what particular ways. *Metro One Loss Prevention Services*, 356 NLRB 89, 102 (2010).

### 3. Analysis

The evidentiary record shows that on September 25, 2020, the Union held a public rally on the street in front of Respondent's facility. Hearing the noise from the rally, Respondent's chief photo editor, Arturo Fernandez, took photographs from the third floor (near where his desk was located) because he believed the rally could be a "spot news" event that the newspaper should cover.[32] (FOF, Sec. II(K)(1).)

The General Counsel maintains that Respondent, through Fernandez' actions, unlawfully engaged in surveillance or created the impression of surveillance. I disagree. Regarding alleged surveillance, I find that due to the public nature of the rally and Fernandez' role as a journalist, it was not out of the ordinary for Fernandez to take photographs of the rally in case the event proved to be newsworthy. Moreover, there is no evidence that Fernandez engaged in any other behavior while taking photographs that could be deemed coercive. As for allegedly creating the impression of surveillance, I do not find that a reasonable employee, knowing Fernandez' role as chief photo editor and understanding that the rally was a public event, would assume from Fernandez' conduct that Respondent had placed employees' union activities under surveillance.

I take a different view of Respondent's actions at the October 24 and 31, 2020 rallies outside of publisher John Block's home. At each of those rallies, Respondent had security guards present to ensure that the rallies did not get out of control. The security guards took photographs at each rally, and in particular appeared to take photographs of rally participants (including employees) when the participants were across the street from Block's home. Because the security guards gave the impression that they were photographing employees when they were not near the property line for Block's home, I do not find that the security guards were

simply documenting intrusions onto the Blocks' private property. There is also no evidence that the security guards were attempting to document unlawful conduct that rally participants engaged in while they were located across the street from the Blocks' home. Under those circumstances, a reasonable employee would conclude that Respondent, through security guards serving as its agents, had placed employees' union activities under surveillance.

In sum, I find that Respondent violated Section 8(a)(1) of the Act by, on October 24 and 31, 2020, appearing to take photographs of employees across the street from John Block's home and thereby creating an impression among its employees that their union activities were under surveillance. I recommend that the complaint allegations regarding alleged surveillance and creating the impression of surveillance on September 25, 2020, be dismissed.

### Conclusions of Law

1. Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. The Union is a labor organization within the meaning of Section 2(5) of the Act.

3. By its overall conduct in negotiations for a successor collective-bargaining agreement since about March 11, 2019, including prematurely declaring impasse and insisting on proposals that, viewed as a whole, would leave the Union and bargaining unit employees with substantially fewer rights and less protection than provided by law without a contract, Respondent failed and refused to bargain in good faith with the Union as the exclusive collective-bargaining representative of the bargaining unit and thereby violated Section 8(a)(5) and (1) of the Act.

4. By, on July 27, 2020, unilaterally implementing changes to bargaining unit employees' terms and conditions of employment without first bargaining with the Union to an overall good-faith impasse for a successor collective-bargaining agreement, Respondent violated Section 8(a)(5) and (1) of the Act.

5. By, on October 24 and 31, 2020, appearing to take photographs of bargaining unit employees while they engaged in union activities across the street from publisher John Block's residence and thereby creating the impression among its employees that their union activities were under surveillance, Respondent violated Section 8(a)(1) of the Act.

6. The unfair labor practices stated in Conclusions of Law 3–5, above, affect commerce within the meaning of Section 2(6) and (7) of the Act.

### Remedy

#### A. Standard Remedies

Having found that Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act.

Upon request of the Union, Respondent shall rescind the unlawful unilateral changes and put into effect the corresponding terms and conditions of employment set forth in the collective-bargaining agreement that expired on March 31, 2017, and shall maintain those terms in effect until the parties have bargained to agreement or a valid impasse, or the Union has agreed to

---

[32] Robert Weber also observed the rally but the General Counsel did not prove that Weber took or appeared to take photographs or video recordings. (FOF, Sec. II(K)(1).)

changes. In addition, Respondent must make its employees
whole for any loss of earnings and other benefits that resulted
from its unlawful unilateral changes. Backpay for these viola-
tions shall be computed in accordance with *Ogle Protection Ser-
vice*, 183 NLRB 682 (1970), enfd. 444 F.2d 502 (6th Cir. 1971),
with interest at the rate prescribed in *New Horizons*, 283 NLRB
1173 (1987), compounded daily as prescribed in *Kentucky River
Medical Center*, 356 NLRB 6 (2010). This includes reimbursing
unit employees for any expenses resulting from Respondent's
unlawful changes to their contractual benefits (including changes
to health insurance benefits), as set forth in *Kraft Plumbing &
Heating*, 252 NLRB 891 fn. 2 (1980), affd. 661 F.2d 940 (9th
Cir. 1981), with interest as set forth in *New Horizons* and *Ken-
tucky River Medical Center*, supra. I further recommend that Re-
spondent be ordered to make all contributions to any fund estab-
lished by the expired collective-bargaining agreement, which
contributions the Respondent would have made but for the un-
lawful unilateral changes, in accordance with *Merryweather Op-
tical Co.*, 240 NLRB 1213, 1216 (1979).

Consistent with *Thryv, Inc.*, 372 NLRB No. 22, slip op. at 14
(2022), Respondent shall also compensate all bargaining unit
employees for any other direct or foreseeable pecuniary harms
incurred as a result of the unlawful unilateral changes. Compen-
sation for these harms shall be calculated separately from taxable
net backpay, with interest at the rate prescribed in *New Horizons*,
supra, compounded daily as prescribed in *Kentucky River Medi-
cal Center*, supra.

In accordance with *Don Chavas, LLC d/b/a Tortillas Don
Chavas*, 361 NLRB 101 (2014), Respondent shall compensate
all bargaining unit employees for the adverse tax consequences,
if any, of receiving a lump-sum backpay award. In addition, in
accordance with *AdvoServ of New Jersey, Inc.*, 363 NLRB 1324
(2016) and *Cascades Containerboard Packaging–Niagara*, 370
NLRB No. 76 (2021), as modified in 371 NLRB No. 25 (2021),
Respondent shall, within 21 days of the date the amount of back-
pay is fixed either by agreement or Board order, file with the
Regional Director for Region 6 a report allocating backpay to the
appropriate calendar year(s). Respondent shall also, within 21
days of the date the amount of backpay is fixed by agreement or
Board order or such additional time as the Regional Director may
allow for good cause shown, file a copy of each backpay recipi-
ent's W–2 form(s) reflecting the backpay award. The Regional
Director will then assume responsibility for transmitting the re-
port and W–2 form(s) to the Social Security Administration at
the appropriate time and in the appropriate manner.

### B. Special Remedies

#### 1. Bargaining order

The General Counsel requests an order requiring Respondent,
within 15 days of the Union's request, to meet with the Union at
reasonable times and bargain in good faith with the Union concerning
terms and conditions of employment and, if an understanding is
reached, embody the understanding in a signed agreement. The
General Counsel also requests that the order provide that upon
the Union's request, bargaining sessions should be held for a
minimum of 15 hours per week (or according to a different
schedule to which the Union agrees), and that Respondent sub-
mit a written bargaining progress report every 15 days to the
compliance officer for Region 6, with copies served on the Un-
ion.

The Board has a long-established practice of relying on bar-
gaining orders to remedy the vast majority of bad-faith

bargaining violations. See *Frontier Hotel & Casino*, 318 NLRB
857, 859 (1995), enfd. in relevant part sub nom. *Unbelievable,
Inc. v. NLRB*, 118 F.3d 795 (D.C. Cir. 1997); see also *Caterair
International*, 322 NLRB 64, 67 (1996) (explaining that an af-
firmative bargaining order serves the interests of an incumbent
union by restoring the bargaining opportunity that it should have
had in the absence of unlawful conduct). However, the U.S.
Court of Appeals for the District of Columbia Circuit has re-
quired the Board to justify, on the facts of each case, the imposi-
tion of an affirmative bargaining order. See, e.g., *Vincent Indus-
trial Plastics, Inc. v. NLRB*, 209 F.3d 727, 738–739 (D.C. Cir.
2000). In *Vincent*, supra at 738, the court stated that an affirma-
tive bargaining order must be justified by a reasoned analysis
that includes an explicit balancing of three considerations: (1)
the employees' Section 7 rights; (2) whether other purposes of
the Act override the rights of employees to choose their bargain-
ing representative; and (3) whether alternative remedies are ade-
quate to remedy the violations of the Act. Although the Board
has indicated that it disagrees with the requirements that the
court identified in *Vincent*, the Board has followed a practice of
examining whether an affirmative bargaining order is justified
according to the standard set forth in *Vincent*. See, e.g., *Wyman
Gordon Pennsylvania, LLC*, 368 NLRB No. 150, slip op. at 10–
11 (2019), enfd. 836 Fed.Appx. 1 (D.C. Cir. 2020).

Following the Board's approach, I have analyzed the facts of
this case under the three-factor balancing test outlined by the
U.S. Court of Appeals for the District of Columbia Circuit.

(1) An affirmative bargaining order in this case will vindicate
the Section 7 rights of the unit employees who were denied the
benefits of collective bargaining through their designated rep-
resentative by Respondent's failure and refusal to bargain in
good faith with the Union. While an affirmative bargaining or-
der comes with an attendant bar to raising a question concern-
ing the Union's majority status for a reasonable time, that bar
does not unduly prejudice the Section 7 rights of employees
who may oppose representation by the Union because the du-
ration of the order is no longer than is reasonably necessary to
remedy the ill effects of the violation. Since Respondent's un-
lawful bargaining practices prevented an agreement since
March 11, 2019 (a period of nearly 4 years), it is only by re-
storing the status quo ante and requiring Respondent to bargain
with the Union for a reasonable period of time that the employ-
ees will be able to fairly assess the Union's effectiveness as a
bargaining representative free of Respondent's unlawful con-
duct. The employees can then determine whether continued
representation by the Union is in their best interest.

(2) An affirmative bargaining order also serves the policies of
the Act by fostering meaningful collective bargaining and in-
dustrial peace. It removes Respondent's incentive to delay bar-
gaining in the hope of discouraging support for the Union and
ensures that the Union will not be pressured (e.g., by a decerti-
fication petition or withdrawal of recognition) to achieve im-
mediate results at the bargaining table following the Board's
resolution of its unfair labor practice charges and the issuance
of a cease-and-desist order.

(3) A cease-and-desist order alone would be inadequate to
remedy Respondent's failure and refusal to bargain with the
Union in good faith because it would permit a challenge to the
Union's majority status before the taint of Respondent's mis-
conduct has dissipated. Allowing a challenge to the Union's
majority status without a reasonable period for bargaining

would be unjust in circumstances such as those here, where given the passage of time the Union needs an opportunity to reestablish its role as the exclusive collective-bargaining representative of unit employees without, for example, the employee disaffection that may have resulted from unpopular terms and conditions of employment that Respondent unlawfully implemented in the absence of a good-faith impasse. Permitting a decertification petition to be filed immediately might very well allow Respondent to profit from its own unlawful conduct. I find that those concerns outweigh the temporary impact that the affirmative bargaining order will have on the rights of employees who oppose union representation.

For all of the foregoing reasons, I find that an affirmative bargaining order with its temporary decertification bar is necessary to fully remedy the violations in this case, and I shall include such an order as a remedy here. I shall also require Respondent to submit written bargaining progress reports every 30 days to the compliance officer for Region 6.[33]

2. Reimbursement of Union's negotiating costs and expenses

The Board has held that in the vast majority of cases involving bad-faith bargaining violations, a bargaining order accompanied by the usual cease-and-desist order and the posting of a notice will suffice to induce a respondent to fulfill its statutory obligations. However, "[i]n cases of unusually aggravated misconduct [] where it may fairly be said that a respondent's substantial unfair labor practices have infected the core of a bargaining process to such an extent that their 'effects cannot be eliminated by the application of traditional remedies,' an order requiring the respondent to reimburse the charging party for negotiation expenses is warranted both to make the charging party whole for the resources that were wasted because of the unlawful conduct, and to restore the economic strength that is necessary to ensure a return to the status quo ante at the bargaining table." *Frontier Hotel & Casino*, 318 NLRB at 859; see also *Nexstar Broadcasting, Inc. d/b/a KOIN-TV*, 371 NLRB No. 118, slip op. at 2 & fn. 5 (2022); *Regency Service Carts*, 345 NLRB 671, 676 (2005).[34]

I do not find that Respondent engaged in unusually aggravated misconduct in this case that would support ordering Respondent to reimburse the Union for negotiating costs and expenses. While Respondent did engage in bad-faith bargaining, the General Counsel has not maintained (or established) that Respondent has a history of violating the Act. The General Counsel also has not identified any other aggravated misconduct by Respondent that might justify the extraordinary remedy of requiring Respondent to reimburse the Union for negotiating costs and expenses. Given the lack of evidence on those points, I decline the General Counsel's request that I order Respondent to reimburse the Union for its negotiating costs and expenses.

3. Reimbursement of employee negotiators' lost earnings
and/or leave while attending bargaining sessions

The General Counsel also requests that I order Respondent to reimburse employee negotiators for any earnings and/or leave

lost while attending bargaining sessions during the time Respondent engaged in bad-faith bargaining (if the Union did not reimburse the employee negotiators for those expenses). In so arguing, the General Counsel relies on the Board's decision in *Nexstar Broadcasting*, in which the Board stated that "reimbursement of employee-negotiators lost wages serves the same purpose as the reimbursement of bargaining expenses – to make parties whole for any losses that occurred as a result of the [r]espondent's bad-faith bargaining." 371 NLRB No. 118, slip op. at 2–3 & fn. 6.

Since the Board has indicated that an award of employee negotiators' lost earnings and/or leave serves the same purpose as an award of bargaining expenses, I find that the same showing of unusually aggravated misconduct is required to justify the award. Indeed, that is consistent with the Board's analysis in *Frontier Hotel & Casino*, which did not include an award of employee negotiators' lost earnings and/or leave among the standard remedies that apply in cases of bad-faith bargaining violations. 318 NLRB at 859. As the General Counsel did not demonstrate that Respondent engaged in unusually aggravated misconduct in this case, I decline the General Counsel's request that I order Respondent to reimburse employee negotiators for any earnings and/or leave lost during the time period when Respondent engaged in bad-faith bargaining.

4. Notice reading

The General Counsel has requested that I require Respondent to have a representative read the notice aloud to employees on worktime in the presence of a Board agent at a meeting or meetings that are scheduled to ensure the widest possible attendance of employees. The General Counsel also requested that I require Respondent to distribute a copy of the notice to each employee who attends the notice reading. The Board has found a notice-reading remedy appropriate where the employer's violations are sufficiently numerous and serious that a reading of the notice is warranted to dissipate the chilling effect of the violations on employees' willingness to exercise their Section 7 rights. *Amerinox Processing, Inc.*, 371 NLRB No. 105, slip op. at 2 (2022); *Gavilon Grain, LLC*, 371 NLRB No. 79, slip op. at 1 (2022).

I do not find that a notice-reading (or accompanying notice distribution) remedy is warranted in this case. While Respondent committed serious unfair labor practices, I do not find that the violations were so widespread that a notice reading is necessary. The other remedies that I have ordered will reset the bargaining relationship between Respondent and the Union, and the standard notice posting remedy will accomplish the goal of ensuring employees that they may exercise their Section 7 rights free of coercion and that Respondent and its managers are bound by the requirements of the Act.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[35]

ORDER

Respondent, PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette, Pittsburgh, Pennsylvania, its officers, agents,

---

[33] I decline the General Counsel's request that I order bargaining sessions to be held, upon the Union's request, for a minimum of 15 hours per week. Respondent has generally made itself available for bargaining sessions upon request, and thus I leave it to the Union and Respondent to make arrangements for regular bargaining sessions.

[34] The General Counsel has asked the Board to clarify its precedent regarding when an award of bargaining expenses and costs is appropriate. (See GC Posttrial Br. at 55–56 (asserting that bargaining costs and

expenses should not be an extraordinary remedy).) I leave that question to the Board and rely here on the legal standard set forth in *Frontier Hotel & Casino*, 318 NLRB 857, 859, which the Board did not modify or overrule in *Nexstar Broadcasting*, 371 NLRB No. 118, slip op. at 2 & fn. 5.

[35] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

successors, and assigns, shall

1. Cease and desist from

(a) Failing and refusing to bargain with the Newspaper Guild of Pittsburgh/CWA Local 38061 (Union) in good faith as the exclusive collective-bargaining representative of the employees in the following appropriate bargaining unit:

All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

(b) Making unilateral changes to bargaining unit employees' terms and conditions of employment by implementing portions of its last, best, and final offer at a time when the parties had not reached a valid impasse in bargaining for a successor collective-bargaining agreement.

(c) Creating the impression among bargaining unit employees that their union activities are under surveillance.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Beginning within 15 days of the Union's request, meet with the Union at reasonable times and bargain in good faith with the Union as the exclusive representative of employees in the above-described bargaining unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement. Respondent shall submit written bargaining progress reports every 30 days to the compliance officer for Region 6, and shall serve copies of the reports on the Union.

(b) On request by the Union, rescind the changes to terms and conditions of employment for bargaining unit employees that Respondent unilaterally implemented on about July 27, 2020, and restore, honor, and continue the terms of the bargaining unit's collective-bargaining agreement that expired on March 31, 2017.

(c) Make bargaining unit employees whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the unlawful unilateral changes to terms and conditions of employment that Respondent made on about July 27, 2020, with interest, as provided for in the remedy section of this decision.

(d) Make all delinquent contributions to the applicable benefit funds on behalf of bargaining unit employees that have not been paid since July 27, 2020, including any additional amounts due to the funds, as provided for in the remedy section of this decision.

(e) Make bargaining unit employees whole for any expenses ensuing from the failure to make the required contributions to the applicable benefit funds, with interest, as provided for in the remedy section of this decision

(f) Compensate bargaining unit employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

(g) File with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each bargaining unit employee's W–2 form(s) reflecting the employee's backpay award.

(h) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(i) Within 14 days after service by the Region, post at its facility in Pittsburgh, Pennsylvania, a copy of the attached notice marked "Appendix A." Copies of the notice, on forms provided by the Regional Director for Region 6, after being signed by Respondent's authorized representative, shall be posted by Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, Respondent has gone out of business or closed the facility involved in these proceedings, Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by Respondent at the facility at any time since March 11, 2019.

(j) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C., January 26, 2023

APPENDIX A

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT fail and refuse to bargain with the Newspaper Guild of Pittsburgh/CWA Local 38061 (Union) in good faith as

the exclusive collective-bargaining representative of the employees in the following appropriate bargaining unit:

> All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

WE WILL NOT make unilateral changes to bargaining unit employees' terms and conditions of employment by implementing portions of our last, best, and final offer at a time when we and the Union have not reached a valid impasse in bargaining for a successor collective-bargaining agreement.

WE WILL NOT create the impression among bargaining unit employees that their union activities are under surveillance.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce employees in the exercise of the rights guaranteed them by Section 7 of the Act.

WE WILL, beginning within 15 days of the Union's request, meet with the Union at reasonable times and bargain in good faith with the Union as the exclusive representative of employees in the above-described bargaining unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement. WE WILL submit written bargaining progress reports every 30 days to the compliance officer for Region 6, and shall serve copies of the reports on the Union.

WE WILL, on request by the Union, rescind the changes to terms and conditions of employment for bargaining unit employees that we unilaterally implemented on about July 27, 2020, and restore, honor, and continue the terms of the bargaining unit's collective-bargaining agreement that expired on March 31, 2017.

WE WILL make bargaining unit employees whole for any loss of earnings and other benefits, and for any direct or foreseeable pecuniary harms suffered as a result of the unlawful unilateral changes to terms and conditions of employment that we made on about July 27, 2020, with interest.

WE WILL make all delinquent contributions to the applicable benefit funds on behalf of bargaining unit employees that have not been paid since July 27, 2020, including any additional amounts due to the funds.

WE WILL make bargaining unit employees whole for any expenses ensuing from the failure to make the required contributions to the applicable benefit funds, with interest.

WE WILL compensate bargaining unit employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file with the Regional Director for Region 6, within 21 days of the date that the amount of backpay is fixed, either by agreement or Board order, a report allocating each backpay WE WILL file with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each bargaining unit employee's W–2 form(s) reflecting the employee's backpay award.

PG PUBLISHING CO., INC. D/B/A PITTSBURGH POST-GAZETTE

The Administrative Law Judge's decision can be found at https://www.nlrb.gov/case/06-CA-248017 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



APPENDIX B

CORRECTIONS TO TRANSCRIPT
PG PUBLISHING CO., INC. D/B/A PITTSBURGH POST-GAZETTE,
6–CA–248017, ET AL.

P. 10, l. 20: "of" should be "off"
P. 12, l. 1: "John" should be "Jon"
P. 14, l. 2: "withdrawal" should be "withdraw"
P. 15, l. 1: "so we reflect" should be "so reflect"
P. 22, l. 8: "fertility" should be "futility"
P. 22, l. 13: "Analog" should be "NLRB"
P. 23, l. 11: "it's" should be "its"
P. 28, l. 13: "past" should be "passed"
P. 32, l. 15: "party's" should be "parties"
P. 55, l. 9: "Webber" should be "Weber"
P. 60, l. 10: "we're" should be "were"
P. 61, l. 19: "Blocks" should be "Block's"
P. 64, l. 16: "return" should be "returned"
P. 70, l. 9: "printout" should be "print out"
P. 70, l. 21: "first" should be "for us"
P. 117, l. 20: "this" should be "his" (2 instances)
P. 130, l. 20: "Teacher's" should be "Teamsters"
P. 131, l. 11: "at plus" should be "a plus"
P. 133, l. 10: "obtain" should be "maintain"
P. 133, l. 11: "eliminated" should be "eliminating"
P. 134, l. 6: "a numeration" should be "remuneration"
P. 136, ll. 8–9: "extensively" should be "essentially"
P. 140, l. 16: "Council" should be "Counsel"
P. 147, l. 14: "Blazine" should be "Blazina"
P. 156, l. 17: "Emitted" should be "admitted"
P. 175, l. 8: "failure" should be "familiar"
P. 184, l. 13: "inadequacy's" should be "inadequacies"
P. 185, l. 19: "John" should be "Jon"
P. 186, l. 7: "unit" should be "union"
P. 189, l. 21: "fires" should be "files"
P. 191, l. 9: "inadequacy's" should be "inadequacies"
P. 198, l. 15: "mating" should be "meeting"
P. 235, l. 7: "simple" should be "similar"
P. 263, l. 8: Mr. Pass was the speaker

P. 269, l. 17: "no –" should be "no claim?"

P. 273, l. 4: "DIRECT" should be "CROSS"

P. 289, l. 2: "trail" should be "trial"

P. 289, l. 3: "missioned" should be "admissions"

P. 296, l. 20: "goner" should be "gone over"

P. 289, l. 4: "property" should be "party"

P. 298, l. 6: "handed" should be "handled"

P. 299, l. 17: "John" should be "Jon"

P. 303, l. 9: "hold" should be "hole"

P. 303, l. 17: "write" should be "right"

P. 305, l. 2: "of" should be "from"

P. 307, l. 10: "about" should be "without"

P. 309, l. 6: "lick" should be "wink"

P. 309, l. 6: a quotation mark should appear after the period

P. 309, l. 18: "without" should be "with"

P. 313, l. 10: "John" should be "Jon"

P. 315, l. 25: a quotation mark should appear after the first comma

P. 318, l. 25: "doling" should be "doing"

P. 320, l. 1: a quotation mark should appear before the word "it"

P. 321, l. 13: "workplace ability" should be "work flexibility"

P. 323, l. 6: "permissible" should be "permissive"

P. 323, l. 6: "were not opposing" should be "were opposing"

P. 325, l. 23: "I didn't have" should be "I have"

P. 333, l. 2: "an aggressive" should be "a regressive"

P. 338, l. 14: "costs" should be "scales"

P. 341, l. 4: "o" should be "on"

P. 345, l. 24: "no more" should be "normal"

P. 346, l. 16: "techs" should be "days"

P. 347, l. 17: "gauge" should be "engage"

P. 349, l. 19: "waned" should be "wanted"

P. 349, l. 23: "our" should be "their"

P. 354, l. 22: "slipped" should be "split"

P. 355, ll. 21, 24: "Signing" should be "Assignment"

P. 356, l. 2: "Signing" should be "Assignment"

P. 362, l. 3: "you" should be "they"

P. 365, l. 19: "Yes, sir." should be "No, sir."

P. 374, l. 4: "gone" should be "going"

P. 374, l. 6: "John" should be "Jon"

P. 380, l. 21: a quotation mark should appear after the comma

P. 382, l. 12: a quotation mark should appear before the word "no"

P. 387, l. 6: "profit" should be "problem"

P. 407, l. 17: [Indiscernible] should be "and Washington"

P. 428, l. 1: "approve" should be "accrue"

P. 428, l. 18: "on vacation" should be "on termination"

P. 430, l. 6: "of" should be "from"

P. 434, l. 7: "two" should be "to"

P. 438, l. 17: no quotation mark should appear on this line

P. 439, l. 1: "maybe" should be "may be"

P. 439 l. 19: "off or" should be "off for"

P. 441, l. 5: a quotation mark should appear after the comma

P. 442, l. 1: "affects" should be "effects"

P. 480, l. 24: a quotation mark should appear before "whenever" and after "possible"

P. 483, l. 1: a quotation mark should appear before the word "the"

P. 483, l. 3: a quotation mark should appear after the comma

P. 483, l. 6: a quotation mark should appear before the word "Company"

P. 483, l. 7: a quotation mark should appear after the comma

P. 483, l. 22: a quotation mark should appear before the word "one"

P. 483, l. 23: a quotation mark should appear after the period

P. 495, l. 15: "guarantee" should be "guaranteed"

P. 501, l. 2: "at writing" should be "in writing"

P. 503, l. 12: "John" should be "Jon"

P. 507, l. 23: "I" should be "one"

P. 510, l. 13: "set to reject" should be "accept"

P. 511, l. 21: "well agreed" should be "we'll agree"

P. 512, l. 9: "vowed to be" should be "agreed to the"

P. 513, l. 8: "did" should be "did not"

P. 515, l. 21: "arbitrations" should be "arbitrators"

P. 516, l. 22: "percent" should be "present"

P. 517, l. 11: "eight" should be "weight"

P. 518, l. 13: "object of" should be "objective"

P. 523, l. 9: "consisted" should be "consistent"

P. 525, l. 1: "they" should be "the"

P. 529, l. 20: "bantering" should be "bannering"

P. 534, l. 4: a quotation mark should appear before the word "including" and after the word "to"

P. 539, l. 11: the words "requirements" and "needs" should each be in quotation marks

P. 542, l. 24: "they're" should be "their"

P. 547, l. 13: "aggressive" should be "regressive"

P. 548, l. 12: a quotation mark should appear before the word "no"

P. 548, l. 15: a quotation mark should appear after the period

P. 554, l. 7: "vain" should be "vein"

P. 561, l. 10: Ms. Stern was the speaker

P. 567, l. 1: "John" should be "Jon"

P. 571, l. 7: "screen" should be "scheme"

P. 571, l. 16: "working new" should be "breaking news"

P. 571, l. 25: "worst" should be "word"

P. 574, l. 9: "they're" should be "their"

P. 583, l. 10: "identification" should be "indemnification"

P. 590, l. 20: "bargain" should be "bargaining"

P. 610, l. 15: "John" should be "Jon"

P. 649, l. 4: "perceive" should be "proceed"

P. 652, l. 3: "Lewis" should be "Lowe"

P. 657, l. 9: "right" should be "write"

P. 668, l. 21: "CVA" should be "CBA"

P. 669, l. 24: "company" should be "copy"

P. 712, l. 4: Ms. Stern was the speaker

P. 722, l. 13: "EOC" should be "EEOC"

P. 755, l. 14: "Gest" should be "Guest"

P. 758, ll. 19–20: "predicably" should be "predictably"

P. 784, l. 8: "RESUMED DIRECT" should be "DIRECT"

P. 786, l. 19: Mr. Oesterle was the speaker

P. 786, l. 20: "motions dismissed" should be "motion to dismiss"

P. 786, l. 24: "divisional judges" should be "Division of Judges"

P. 787, l. 3: "motions" should be "motion"

P. 788, l. 3: Mr. Hunt was the speaker

P. 792, l. 17: "peaked" should be "piqued"

P. 800, l. 9: "11(vi)" should be "11(b)(i)"

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

P. 813, l. 21: "UCPR" should be "gallery"
P. 815, l. 10: "trail" should be "trial"

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

**PG PUBLISHING CO., INC. D/B/A**
**PITTSBURGH POST-GAZETTE,**

Petitioner,

v.

**NATIONAL LABOR RELATIONS**
**BOARD,**

Respondent.

Case No. _____

## PETITION FOR REVIEW

Petitioner PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette ("Post-Gazette" or the "Company") hereby petitions the United States Court of Appeals for the Third Circuit for review of an Order of the National Labor Relations Board ("NLRB") in the matter styled *PG Publishing Company d/b/a Pittsburgh Post-Gazette and Newspaper Guild of Pittsburgh/CWA Local 30861*, NLRB Cases 06-CA-248017, 06-CA-263791, and 06-CA-269346, reported in a Decision and Order at 373 NLRB No. 93, dated September 20, 2024.  [*See* Exhibit A attached hereto].

The Court has jurisdiction in this matter pursuant to Section 10(f) of the National Labor Relations Act ("Act") because the NLRB's Decision and Order is a final order.  *See* 29 U.S.C. § 160(f). The Post-Gazette is a party aggrieved by the Decision and Order.  The Post-Gazette transacts business within this judicial circuit,

JA0079

as defined in 28 U.S.C. § 41, by conducting operations in Pennsylvania.

The NLRB's Decision and Order against the Post-Gazette is not supported by substantial evidence and is contrary to law.  The Post-Gazette seeks review of the Decision and Order insofar as it finds the Company violated the Act, including but not limited to, violations of Section 8(a)(5) and (1) of the Act.

WHEREFORE, the Post-Gazette respectfully requests that this Court review and set aside the Decision and Order of the NLRB and receive any further relief to which it may be entitled.

Dated:        September 25, 2024

By:  */s/ Brian M. Hentosz*
     Brian M. Hentosz
     PA ID No. 317176

LITTLER MENDELSON, P.C.
625 Liberty Avenue
26th Floor
Pittsburgh, PA  15222
Telephone: 412.201.7600
Facsimile:  412.456.2377

Attorneys for Petitioner

2

JA0080

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing Petition for Review has

been filed via the Court's electronic filing system on September 25, 2024.

Additionally, it is hereby certified that the foregoing Petition for Review will

be served via certified mail on September 25, 2024 to the following individuals:

Jennifer Abruzzo, General Counsel
National Labor Relations Board
1099 14th Street, N.W.
Washington, D.C. 20570

Joseph J. Pass, Sr.
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Blvd.
Pittsburgh, Pa 15222-1576

*/s/ Brian M. Hentosz*
Brian M. Hentosz

4893-2682-4294.1 / 105601-1000

# EXHIBIT  A

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette** *and* **Newspaper Guild of Pittsburgh/CWA Local 38061.** Cases 06–CA–248017, 06–CA–263791, and 06–CA–269346

September 20, 2024

DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS PROUTY AND WILCOX

On January 26, 2023, Administrative Law Judge Geoffrey Carter issued the attached decision. The Respondent

---

[1] The Respondent has implicitly excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

We adopt the judge's findings, for the reasons he states, that the Respondent, by its overall conduct in negotiations for a successor collective-bargaining agreement, violated Sec. 8(a)(5) of the Act by failing and refusing to bargain in good faith with the Union.

In addition, we adopt the judge's finding that the Respondent violated Sec. 8(a)(5) when, on July 27, 2020, it unilaterally implemented changes to bargaining unit employees' terms and conditions of employment, including many terms from the Respondent's June 12, 2020 last, best, and final offer (LBFO) and some terms from that LBFO that the Respondent subsequently modified, without first bargaining to a good-faith impasse. In doing so, we note that there are no exceptions to the judge's finding that the Respondent implemented its LBFO, with some terms modified, on July 27, 2020. We also note that, in finding that the parties had not reached a valid impasse at the time it implemented these changes, the judge relied on the Respondent's failure and refusal to bargain in good faith during negotiations for the successor collective-bargaining agreement, as well as the fact that the Respondent understood that there was still room to bargain with the Union. For the reasons stated by the judge, we adopt his finding of this 8(a)(5) violation. We note, however, that, even absent the Respondent's failure and refusal to bargain in good faith with the Union during the negotiations for the successor collective-bargaining agreement, we would still find that the Respondent had not reached a valid impasse prior to implementing the changes to the employees' terms and conditions of employment on July 27, 2020. In this regard, as the judge explained: (1) the parties' written communications reflected substantive movement in the Union's September 6, 2019 and the Respondent's June 12, 2020 proposals that had not been discussed at the time of the Respondent's July 27 unilateral implementation; (2) the Union had attempted to schedule further bargaining; and (3) the Respondent implemented terms that differed from its final offer, thus demonstrating that it had additional room to move from what it had previously termed its "final" negotiating positions.

Having found, in agreement with the judge, that the Respondent violated Sec. 8(a)(5) on July 27, 2020, by unilaterally implementing changes to bargaining unit employees' terms and conditions of employment without first bargaining to a good-faith impasse, we find it unnecessary to reach the General Counsel's and the Charging Party's exceptions to the judge's dismissal of the General Counsel's alternative allegation that even if the parties had reached a valid impasse, the Respondent nevertheless violated Sec. 8(a)(5) by implementing proposals that differed from its LBFO.

We rely on *Audio Visual Services Group, Inc. d/b/a PSAV Presentation Services*, 367 NLRB No. 103, slip op. at 6–8 (2019), affd. sub nom.

---

filed exceptions and a supporting brief. The General Counsel and the Charging Party filed answering briefs, and the Respondent filed reply briefs. The General Counsel and the Charging Party each filed limited exceptions and supporting briefs, the Respondent filed answering briefs to both, and the General Counsel and Charging Party filed reply briefs.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[1] and conclusions, to amend the remedy, and to adopt the recommended Order as modified and set forth in full below.

---

*Theatrical Stage Employees, Local 15 v. NLRB*, 957 F.3d 1006 (9th Cir. 2020), instead of *District Hospital Partners, L.P. d/b/a The George Washington University Hospital*, 370 NLRB No. 118 (2021), vacated by 372 NLRB No. 109 (2023), which the judge relied on for the principle that a union should not assume that an employer's initial proposals are fixed positions and should test the employer's willingness to bargain. We deny, as moot, the General Counsel's request to overrule *District Hospital* (for reasons unrelated to the above principle) because the case has already been reconsidered and reported as *District Hospital Partners, L.P. d/b/a The George Washington University Hospital, a Limited Partnership & UHS of D.C. Inc., General Partner*, 373 NLRB No. 55 (2024).

We affirm the judge's dismissal of the allegation that the Respondent violated Sec. 8(a)(1) by surveilling employees and/or creating the impression of surveillance when its chief photo editor photographed employees publicly protesting its bargaining conduct outside its offices on September 25, 2020. Accordingly, we find it unnecessary to reach the Respondent's argument that it had a First Amendment right to do so.

We agree with the judge that during the Union's October 24 and 31, 2020 rallies, the Respondent violated Sec. 8(a)(1) by creating an impression of surveillance through two security guards hired from Kellington Protection, LLC. Stationed outside the house of the Respondent's publisher, John Block, the guards pointed their cell phones at rally participants, including employees, appearing to photograph them as they peacefully protested the Respondent's bargaining conduct on a public sidewalk on the opposite side of the street from Block's house. It is well settled that "absent proper justification, the photographing of employees engaged in protected concerted activities violates the Act because it has a tendency to intimidate." *F. W. Woolworth Co.*, 310 NLRB 1197, 1197 (1993). "[T]he Board requires an employer engaging in such photographing or videotaping to demonstrate that it had a reasonable basis to have anticipated misconduct by the employees." *National Steel & Shipbuilding Co.*, 324 NLRB 499, 499 (1997), enfd. 156 F.3d 1268 (D.C. Cir. 1998); see also *Waco, Inc.*, 273 NLRB 746, 747 (1984).

In finding the impression of surveillance violations related to the October 2020 rallies, we rely primarily on the Respondent's failure to justify photographing bargaining unit employees standing across the street and away from Block's property line by showing that it had reason to anticipate unlawful behavior. There was no evidence of unlawful behavior at the prior September 25 rally—nor did the Respondent show that any unlawful conduct actually occurred on October 24 and 31. Instead, the Respondent claims only that this was a time of "contentious protests throughout the United States that often turned violent," without showing that it had reason to believe that the particular protests involved in this proceeding would be of that nature. While the Respondent claims that employees trespassed and blocked access to the property, the record shows only an occasional protester positioned close to the property line, which would not justify photographing them when on the opposite side of the street. Indeed, even an "isolated" incident of "temporary blocking of entrances" does not justify photographic surveillance of protected concerted activity that "d[oes] not involve any arguable blocking." *Chester*

---

AMENDED REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, we shall order it to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act. We agree with the judge that the Respondent violated Section 8(a)(5) and (1) by failing and refusing to bargain in good faith with the exclusive collective-bargaining representative of its employees, and with the judge's recommended remedies of an affirmative bargaining order, the rescission of unilateral changes,[2] and the submission of bargaining progress reports every 30 days, but we disagree that these recommended remedies suffice to restore the Union and its negotiators to the position they would have been in had the Respondent bargained in good faith. Accordingly, we grant the Union's partial exception to the judge's recommended remedy, and amend it in the following respects.

In addition to the remedies ordered by the judge, we shall order the Respondent to compensate the Union for all bargaining expenses it incurred during the time the Respondent engaged in bad-faith bargaining through the parties' final bargaining session on September 8, 2020, including any lost wages the Union paid to bargaining committee members for bargaining conducted during working hours. See *Frontier Hotel & Casino*, 318 NLRB 857, 857–859 (1995), enfd. in relevant part sub nom. *Unbelievable, Inc. v. NLRB*, 118 F.3d 795 (D.C. Cir. 1997); see also *Troy Grove*, 372 NLRB No. 94, slip op. at 7 (2023); *Columbus Electric Cooperative*, 372 NLRB No. 89, slip op. at 2 (2023). We find this award necessary to make the Union whole and to ensure a return to the status quo ante at the bargaining table because the Union expended significant time and expense bargaining with a respondent that bargained in bad faith, insisted on provisions that left the Union with fewer rights and less protection than provided by law without a contract, *Public Service Co. of Oklahoma (PSO)*, 334 NLRB 487, 487–488, 489 (2001), enfd. 318 F.3d 1173 (10th Cir. 2003), and unilaterally implemented a modified version of certain of its final proposals without bargaining to a valid impasse.

We shall also order the Respondent to make whole any affected employee negotiators for any earnings and/or leave lost while attending bargaining sessions, plus interest, to the extent that these losses were not reimbursed by the Union. See *M.F.A. Milling Co.*, 170 NLRB 1079, 1080 (1968), enfd. sub nom. *Laborers Local 676 v. NLRB*, 463 F.2d 953 (D.C. Cir. 1972). In this regard, backpay shall be computed in the manner set forth in the remedy section of the judge's decision.[3]

We shall also modify the judge's recommended Order to provide for the posting of the notice in accordance with *Paragon Systems, Inc.*, 371 NLRB No. 104 (2022), and to conform to the Board's standard remedial language, and we shall substitute a new notice to conform to the Order as modified and set forth in full below.

ORDER

The National Labor Relations Board orders that the Respondent, PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette, Pittsburgh, Pennsylvania, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Failing and refusing to bargain with the Newspaper Guild of Pittsburgh/CWA Local 38061 (the Union) as the exclusive collective-bargaining representative of the employees in the bargaining unit.

(b) Unilaterally changing the terms and conditions of employment of its unit employees by implementing portions of its last, best, and final offer without first bargaining to a good-faith impasse.

(c) Creating the impression that it is engaged in surveillance of its employees' union or other protected concerted activities.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) On request, bargain with the Union as the exclusive collective-bargaining representative of the employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement:

---

*County Hospital,* 320 NLRB 604, 619–620 (1995), enfd. mem. 116 F.3d 469 (3d Cir. 1997). Nor does the fact that the Union sought publicity for these rallies mitigate the Respondent's unlawful behavior. See, e.g., *John Ascuaga's Nugget*, 298 NLRB 524, 524 fn. 3, 554 (1990), enfd. in rel. part sub nom. *Sparks Nugget v. NLRB*, 968 F.2d 991 (9th Cir. 1992) (finding it unlawful for an employer to photograph employees handbilling while attending union press conference in public park). Furthermore, we reject the Respondent's arguments that the guards may have been using their phones for purposes other than photographing, that it had no knowledge of Kellington's protocol of photographing events, and that it never saw any photographs, as these defenses are not relevant to the Board's objective test, which asks whether "employees would reasonably assume from the statement or actions that their union activities had been placed under surveillance, based on the perspective of a reasonable employee." *Acme Bus Corp.*, 357 NLRB 902, 923 (2011). We find that standard satisfied here.

[2] The judge recommended ordering the Respondent to rescind the unlawful unilateral changes implemented in the absence of a valid impasse. To the extent that the unlawful unilateral changes have improved the terms and conditions of unit employees, the Order set forth below shall not be construed as requiring or authorizing the Respondent to rescind such improvements unless requested to do so by the Union. See *Fresno Bee*, 339 NLRB 1214, 1216 fn. 6 (2003).

[3] We deny the General Counsel's and the Union's exceptions to the judge's failure to order notice reading and distribution. For the reasons stated in his concurrence in *CP Anchorage 2 d/b/a Hilton Anchorage*, 371 NLRB No. 151, slip op. at 9–15 (2022), enfd. 98 F.4th 314 (D.C. Cir. 2024), Member Prouty would make a reading of the notice to employees at a group meeting, accompanied by the distribution of the notice at the meeting, a part of the remedy in this case and a standard remedy for all unfair labor practices found by the Board.

All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

(b)  Submit written bargaining progress reports every 30 days to the compliance officer for Region 6 of the National Labor Relations Board, and serve copies of the reports on the Union.

(c)  On request by the Union, rescind the changes in the terms and conditions of employment for its unit employees that were unilaterally implemented on about July 27, 2020.

(d)  Before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of employees in the bargaining unit described above.

(e)  Compensate the Union for all bargaining expenses it incurred during the time it engaged in bad-faith bargaining through September 8, 2020, including any lost wages the Union paid to employee bargaining committee members for bargaining conducted during working hours. Upon receipt of a verified statement of costs and expenses from the Union, the Respondent promptly shall submit a reimbursement payment, in the amount of those costs and expenses, to the compliance officer for Region 6, who will document receipt and forward the payment to the Union.

(f)  Make whole any affected employee negotiators for any earnings lost while attending bargaining sessions during the time it engaged in bad-faith bargaining through September 8, 2020, with interest, in the manner set forth in the remedy section of the judge's decision, to the extent those earnings were not reimbursed by the Union.

(g)  Make bargaining unit employees whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the unlawful unilateral changes to terms and conditions of employment that the Respondent made on about July 27, 2020, with interest, as provided for in the remedy section of the judge's decision.

(h)  Make all delinquent contributions to the applicable benefit funds on behalf of bargaining unit employees that have not been paid since July 27, 2020, including any additional amounts due to the funds, as provided for in the remedy section of the judge's decision.

(i)  Make bargaining unit employees whole for any expenses ensuing from the failure to make the required contributions to the applicable benefit funds, with interest, as provided for in the remedy section of the judge's decision.

(j)  Compensate affected employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award(s) to the appropriate calendar year(s) for each employee.

(k)  File with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each backpay recipient's corresponding W–2 form(s) reflecting the backpay award.

(l)  Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(m)  Post at its Pittsburgh, Pennsylvania facility copies of the attached notice marked "Appendix."[4]  Copies of the notice, on forms provided by the Regional Director for Region 6, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted.  In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means.  The

---

[4] If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notice must be posted within 14 days after service by the Region. If the facility involved in these proceedings is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work. If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region. If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]." If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Respondent shall take reasonable steps to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since March 11, 2019.

(n) Within 21 days after service by the Region, file with the Regional Director for Region 6 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that the complaint is dismissed insofar as it alleges violations of the Act not specifically found.

Dated, Washington, D.C.  September 20, 2024

_____

Lauren McFerran,                     Chairman

_____

David M. Prouty,                     Member

_____

Gwynne A. Wilcox,                     Member

(SEAL)          NATIONAL LABOR RELATIONS BOARD

APPENDIX

NOTICE TO EMPLOYEES

POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT fail and refuse to bargain with the Newspaper Guild of Pittsburgh/CWA Local 38061 (the Union) as the exclusive collective-bargaining representative of our employees in the bargaining unit.

WE WILL NOT change your terms and conditions of employment by implementing portions of our last, best, and

final offer without first bargaining to a good-faith impasse.

WE WILL NOT create the impression that we are engaging in surveillance of your union or other protected concerted activity.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, on request, bargain with the Union as the exclusive collective-bargaining representative of our employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement.

All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

WE WILL submit written bargaining progress reports every 30 days to the compliance officer for Region 6 of the National Labor Relations Board, and serve copies of the reports on the Union.

WE WILL, on request by the Union, rescind the changes in the terms and conditions of employment for our unit employees that were unilaterally implemented on about July 27, 2020.

WE WILL, before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of our employees in the unit described above.

WE WILL compensate the Union for all bargaining expenses it incurred during the time we engaged in bad-faith bargaining through September 8, 2020, including any lost wages the Union paid to employee bargaining committee members for bargaining conducted during working hours.

WE WILL make whole any affected employee negotiators for any earnings lost while attending bargaining sessions during the time we engaged in bad-faith bargaining through September 8, 2020, with interest, to the extent those earnings were not reimbursed by the Union.

WE WILL make bargaining unit employees whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the unlawful unilateral changes to terms and conditions

of employment that we made on about July 27, 2020, with interest.

WE WILL make all delinquent contributions to the applicable benefit funds on behalf of bargaining unit employees that have not been paid since July 27, 2020, including any additional amounts due to the funds.

WE WILL make bargaining unit employees whole for any expenses ensuing from the failure to make the required contributions to the applicable benefit funds, with interest.

WE WILL compensate affected employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating each backpay award to the appropriate calendar year(s) for each employee.

WE WILL file with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each bargaining unit employee's W–2 form(s) reflecting the employee's backpay award.

PG PUBLISHING CO., INC. D/B/A PITTSBURGH POST-GAZETTE

The Board's decision can be found at www.nlrb.gov/case/06-CA-248017 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



*Julie Stern, Esq., for the General Counsel.*
*Mark Hunt, Michael Oesterle,* and *Jennifer Sherman, Esqs.,* for the Respondent.
*Joseph Pass, Esq.,* for the Charging Party.

DECISION

GEOFFREY CARTER, Administrative Law Judge. The General Counsel alleges that PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette (Respondent) violated the National Labor Relations Act (the Act) by: failing and refusing to bargain in good faith with the Newspaper Guild of Pittsburgh/CWA Local 38061 (Union or Charging Party) since about March 11, 2019; unilaterally implementing terms and conditions of employment on about July 27, 2020, when the parties had not yet reached an overall good-faith impasse in negotiations for a successor collective-bargaining agreement; and unlawfully surveilling employees in

September and October 2020, while they engaged in union activities, or creating the impression among employees that their union activities were under surveillance. As explained below, I have found that apart from a few limited exceptions, Respondent violated the Act as alleged.

STATEMENT OF THE CASE

This case was tried in Pittsburgh, Pennsylvania, on September 19–22 and October 12, 2022. The Union filed the unfair labor practice charges in this case on the following dates:

| Case | Filing Date | Amendment Date(s) |
|---|---|---|
| 06–CA–248017 | September 11, 2019 | April 7, 2021 |
| 06–CA–263791 | July 29, 2020 | March 9, 2021 |
| 06–CA–269346 | November 20 , 2020 | February 23, 2021, June 22, 2021, June 28, 2021, and October 20, 2021 |

On April 27, 2022, the General Counsel issued a consolidated complaint in which it alleged that Respondent violated Section 8(a)(5) and (1) of the Act by failing and refusing to bargain collectively and in good faith with the Union as the exclusive collective-bargaining representative of employees in the bargaining unit. Specifically, the General Counsel alleged Respondent:

(a) by its overall conduct since about March 11, 2019, failed and refused to bargain in good faith with the Union as the exclusive collective-bargaining representative of the bargaining unit;

(b) on about July 27, 2020, unilaterally implemented terms and conditions of employment for employees in the bargaining unit without first bargaining with the Union to an overall good-faith impasse for a successor collective-bargaining agreement, or alternatively (if it is determined that the parties bargained to an overall good-faith impasse) implementing terms and conditions of employment that were not reasonably comprehended by Respondent's pre-impasse proposals without affording the Union an opportunity to bargain; and

(c) on about July 27, 2020, implementing a discretionary proposal concerning the performance of bargaining unit work by non-Unit employees, and thereby retaining unilateral discretion over the performance of bargaining unit work by non-Unit employees and undermining the status of the Union as the employees' exclusive collective-bargaining representative.

The General Counsel also alleged that Respondent violated Section 8(a)(1) of the Act by interfering with, restraining, and coercing employees in the exercise of rights guaranteed in Section 7 of the Act. Specifically, the General Counsel alleged that Respondent engaged in surveillance of employees who were engaged in union activities and/or created an impression among its employees that their union activities were under surveillance by taking pictures and/or video recordings on September 25, October 24 and 31, 2020. Respondent filed a timely answer denying the alleged violations in the consolidated complaint.

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

On the entire record,[1] including my observation of the demeanor of the witnesses, and after considering the briefs filed by the General Counsel, Charging Party, and Respondent, I make the following

## FINDINGS OF FACT[2]

### I. JURISDICTION

At all material times Respondent, a Pennsylvania corporation with an office and place of business in Pittsburgh, Pennsylvania, has been engaged in the business of publishing the Pittsburgh Post-Gazette, a print and electronic newspaper. Respondent annually derived gross revenues in excess of $200,000 and: held membership in and subscribed to various interstate news services, including Associated Press; published various nationally syndicated features; and advertised various nationally sold products. During the same time period Respondent also purchased and received products, goods, and materials at its Pittsburgh, Pennsylvania facility that were valued in excess of $5,000 and came directly from points outside the Commonwealth of Pennsylvania. Respondent admits, and I find, that Respondent has at all material times been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act. Respondent also admits, and I find, that the Union at all material times has been a labor organization within the meaning of Section 2(5) of the Act.

### II. ALLEGED UNFAIR LABOR PRACTICES

#### A. Background

For several years, Respondent has recognized the Union as the exclusive collective-bargaining representative of employees in the following appropriate bargaining unit:

> All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

(Jt. Exh. 1.) Consistent with that recognition, Respondent and the Union have executed successive collective-bargaining agreements, the most recent of which was effective from October 15, 2014, through March 31, 2017. (GC Exh. 2; see also Tr. 75–77.)

In contract negotiations between about 1992 and 2014, Respondent bargained with representatives of several bargaining units[3] (collectively referred to as the "unity council") about

wages and healthcare. After those initial negotiations concluded, the Union and representatives of each of the other bargaining units negotiated separately with Respondent for their own contracts. The separate contracts incorporated the jointly negotiated wage and healthcare provisions. (Tr. 79–80.)

#### B. January 10, 2017: Respondent Requests Bargaining for a Successor Collective-Bargaining Agreement

On January 10, 2017, Respondent sent a letter to the Union to advise that it wished to open negotiations for a successor collective-bargaining agreement. Respondent also provided the Union with a copy of Respondent's initial contract proposal. Upon noticing that Respondent's initial contract proposal did not include any markings to show the changes that Respondent was proposing for terms and conditions of employment (in comparison to the expiring contract), the Union asked Respondent to provide a redlined version of the initial proposal. Respondent subsequently sent the Union a copy of the initial proposal that highlighted new language in yellow and struck through language that Respondent proposed to eliminate. (GC Exhs. 3–4; Tr. 82–86, 701–702.) On about February 8, 2017, the Union sent Respondent a copy of the Union's initial contract proposal. (Tr. 802–803; GC Exh. 5; R. Exh. 69.)

At some point on or before February 12, 2017, Respondent notified the Union that Respondent planned to negotiate individually with each bargaining unit and therefore would not be bargaining with the unity council about wages and healthcare. (Tr. 81, 195; R. Exh. 31; see also GC Exh. 10 (par. 1).) There is no evidence that the Union objected to bargaining separately as Respondent proposed.

#### C. March 10, 2017: First Bargaining Session

On March 10, 2017, Respondent and the Union met for their first bargaining session. Attorney Richard Lowe served as Respondent's chief negotiator and was joined on the bargaining team by senior human resources manager Linda Guest and newsroom manager Jerry Micco. Respondent hoped to negotiate concessions from the Union during bargaining because the newspaper was struggling financially due to competition from internet-based media and the resulting decline in print newspaper circulation and print advertising revenue. Among other concessions, Respondent indicated that the benefits under the current Teamsters Fund healthcare plan were "too rich" and that Respondent wanted more staffing flexibility (such as allowing Respondent to use more freelance reporters and permitting managers to perform bargaining unit work) to adjust to changes that might arise due to Respondent's expectation that it would be moving towards a digital media business model in the future. (Tr. 91, 94, 96–97, 296, 298–299, 301, 303, 682, 685, 697, 803; R. Exh. 196 (pp. 1–2); see also Tr. 722–723 (noting that Respondent was not

---

[1] The transcripts and exhibits in this case generally are accurate. During my review of the record, however, I identified transcript corrections that are warranted. In addition, both the General Counsel and Respondent proposed corrections to the transcripts. For the most part, the parties did not oppose each other's suggested corrections. For disputed proposed corrections and a handful of unopposed proposed corrections, I allowed the transcripts to stand unless I could confirm the correction through my memory of the testimony and/or other information in the evidentiary record. The transcript corrections that I have identified, along with proposed corrections that I have accepted, are set forth in Appendix

B to this decision. I have denied any requests for transcript corrections that do not appear in Appendix B.

[2] Although I have included several citations in this decision to highlight particular testimony or exhibits in the evidentiary record, I emphasize that my findings and conclusions are not based solely on those specific citations, but rather are based on my review and consideration of the entire record for this case.

[3] In addition to the bargaining unit represented by the Union, other bargaining units included: Advertising; Circulation and Distribution; Electricians; Finance; Machinists; Mailers (two units); Operating Engineers; and Pressmen. (Tr. 211–213, 296–297.)

claiming an inability to pay for increases in wages or benefits).)

Attorney Joseph Pass served as the Union's chief negotiator, and was joined on the bargaining team by Ed Blazina, Michael Fuoco, Jonathan Silver, Joe Smydo, and Melissa Tkach. The Union believed that it had made several concessions in previous years and was not inclined to make additional concessions in the new contract. In particular, the Union noted that bargaining unit employees had not received a wage increase over the previous 11 years. (Tr. 92, 179, 299, 302, 339–340, 688–689; R. Exhs. 189 (p. 1), 196 (p. 1); see also Tr. 802 (noting that with the exception of Pass, all members of the Union's bargaining team were working for Respondent as full-time journalists).)

Turning to specific aspects of its initial contract proposal, Respondent proposed that the bargaining unit switch from the Teamsters healthcare plan to the healthcare plan that Respondent provided for non-bargaining unit employees, with Respondent having the right to change or terminate the healthcare plan at its discretion. Regarding the bargaining unit's jurisdiction and staffing, Respondent sought (among other changes from the expiring contract) the right to: assign bargaining unit work to supervisors, non-bargaining unit employees, and "stringers" (journalists working as independent contractors); change the length of employee work hours and work days; and consider performance, attendance, and qualifications (in addition to seniority) when selecting employees for layoffs. Respondent also proposed: eliminating employees' ability to "bank" unused sick leave and instead covering employees under the company's short term disability policy (which Respondent reserved the right to modify in any way); and requiring grievances to be filed in writing within 10 days of the underlying event. Respondent did not propose any increases to wages. (Tr. 118–119, 128–129, 303, 338, 352–353, 366–367, 380–381, 697–698; GC Exh. 4.)

As for the Union's initial contract proposal, the Union sought wage increases of 7 percent each year, and also proposed eliminating all pension and wage "diversions" that existed in the expiring contract.[4] On bargaining unit jurisdiction and staffing, the Union proposed: eliminating the use of stringers; and limiting the total number of 2–year associates, paid interns, and employees averaging less than 35 hours per week to 15 percent of the bargaining unit membership. The Union also proposed (among other changes): increasing the amount of sick leave that employees accrued each year, as well as the amount of unused sick leave that employees could "bank"; and requiring Respondent to pay out unused sick leave when employees terminated their employment or retired. (GC Exh. 5.)

### D. Summary of Bargaining from April 6, 2017, through July 15, 2019

After their initial bargaining session, the parties met on 19 more occasions between April 6, 2017, and July 15, 2019, with each session lasting 4.5 to 6 hours.[5] (Tr. 93; R. Exhs. 188, 190,

192.) As bargaining progressed, certain issues continued to be points of contention. The most prominent issues, and the parties' bargaining about them in this timeframe, are discussed below.[6]

#### 1. Wages

The Union maintained that bargaining unit members needed a wage increase since wage rates had not changed for about 11 years. Respondent did not dispute that point, but took the position that the parties would need to "be creative" to come up with a workable wage increase due to the financial challenges that the newspaper was facing. (Tr. 339–340, 685.) With that backdrop, the parties made the following proposals about wages in this timeframe:

| Bargaining Session Date | Respondent Wage Proposal | Union Wage Proposal |
|---|---|---|
| March 10, 2017 | No increases to base wages<br><br>2% pension diversion<br><br>Wage diversion to be determined<br><br>(GC Exh. 4 (Art. III).) | 7 percent wage increase per year<br><br>Eliminate pension and wage diversions<br><br>(GC Exh. 5 (Art. III).) |
| June 12, 2017 | No increases to base wages<br><br>2% pension diversion<br><br>8% wage diversion<br><br>$4,000 annual cap on total diversion<br><br>(R. Exh. 73.) | |
| January 31, 2019 | Package proposal: Respondent will eliminate the 2% pension diversion _if_ the Union accepts Respondent's proposal to change bargaining unit members' healthcare plan from the Teamsters plan to Respondent's plan | |

---

[4] Under the expiring contract, employees did not receive their full base wages because of a 2–percent pension "diversion" and an additional 8–percent wage "diversion" (it is not clear how Respondent actually used the diverted payments). Thus, an employee earning $1000 per week would lose $20 as a pension diversion, and an additional $78.40 (8 percent of $980) as a wage diversion, leaving the employee with $901.60 for the week, before taxes and other deductions. The total diversion amount was capped each calendar year at $4,000. (GC Exh. 2, Art. III (describing the diversion percentages and caps that took effect on January 1, 2017); Tr. 137.)

[5] The bargaining sessions in this timeframe occurred on the following dates: April 6, 2017; May 3, 2017; June 12, 2017; September 1, 20, 2017; November 1, 28, 2017; January 4, 2018; February 9, 28, 2018; April 4, 11, 2018; May 3, 2018; September 18, 2018; November 14, 2018; December 13, 2018; January 31, 2019; May 20, 2019; and July 15, 2019. (See R. Exhs. 188, 190, 192.)

[6] In the discussion below I only identify bargaining dates on which one or both of the parties substantively changed its proposal. I also note that the discussion here is not meant to be exhaustive. The parties made several proposals that, in the interest of brevity, I do not summarize in this section.

| Bargaining Session Date | Respondent Wage Proposal | Union Wage Proposal |
|---|---|---|
| | (GC 21; Tr. 557.) | |

### 1. Health and welfare

In the expired contract, all bargaining unit employees who averaged more than 30 hours per week annually were covered under the Teamsters healthcare plan. Respondent paid all premiums for the plan,[7] including annal increases up to 5 percent. Bargaining unit employees paid for any premium increases that exceeded the 5–percent threshold. (GC Exh. 2 (Art. XX).)

In bargaining for a successor collective-bargaining agreement, Respondent proposed to cover bargaining unit employees under Respondent's healthcare plan, for which Respondent would pay 70 percent of the cost and employees would pay 30 percent. Respondent would also retain the right to change or terminate the healthcare plan in its sole discretion. The Union, by contrast, proposed that employees continue to be covered under the Teamsters plan. (Tr. 128–130, 172, 366–367, 369; R. Exh. 14 at 2; R. Exh. 142 (par. 2).) The specific proposals proceeded as follows:

| Bargaining Session Date | Respondent Health/Welfare Proposal | Union Health/Welfare Proposal |
|---|---|---|
| March 10, 2017 | Bargaining unit employees will be covered by Respondent's health, dental, vision and life insurance plans. The plans may be changed or terminated at Respondent's discretion.<br><br>(GC Exh. 4 (Art. XX).) | Bargaining unit employees will be covered by the Teamsters healthcare plan. Respondent shall pay for any annual increases in premiums up to 25 percent. Bargaining unit employees will pay for annual premium increases over the 25–percent threshold.<br><br>(GC Exh. 5 (Art. XX).) |
| February 9, 2018 | | Respondent shall pay the entire premium for the Teamsters healthcare plan for 2018. In subsequent years Respondent will pay for the annual insurance premium plus any increases up to 25 percent. For those years Respondent and bargaining unit |

| Bargaining Session Date | Respondent Health/Welfare Proposal | Union Health/Welfare Proposal |
|---|---|---|
| | | employees will equally split the amount of any premium increases over 25 percent.<br><br>(GC Exh. 13 (Art. XX).) |

The Union did, on January 31, 2019, verbally suggest exploring tiered rates available under the Teamsters healthcare plan (i.e., separate premiums for covering an individual, an individual plus one, or a family), but did not pursue that possibility after Respondent (through Lowe) indicated that it was not interested in continuing to offer the Teamsters plan.[8] (R. Exh. 142 (par. 7); Tr. 131, 172–173, 555–556, 805–806.)

### 2. Bargaining unit jurisdiction

Many of the disputed proposals related to the bargaining unit's jurisdiction, including when Respondent could subcontract bargaining unit work or have other individuals (such as managers or stringers) do bargaining unit work. The proposals related to bargaining unit jurisdiction proceeded as follows:

| Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals |
|---|---|---|
| March 10, 2017 | The work of bargaining unit employees will be work normally performed by bargaining unit employees and new or additional work that the company assigns. However, nothing in the Agreement shall be construed as giving the Union exclusive jurisdiction over or an exclusive right to perform any work.<br><br>Respondent shall have the exclusive right to assign bargaining unit work to non-bargaining unit employees, to individuals employed by any other company, or to contract out work | Exempt employees cannot do bargaining unit work as performed in the past nor do similar work that may result from the introduction of new print, electronic or other products.<br><br>Respondent will stop using stringers<br><br>The company may obtain content from commercial vendors for traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics. |

---

[7] The 8–percent wage diversion from bargaining unit employee paychecks may have been intended to offset the cost that Respondent paid for the healthcare plan, but the record is unclear on the point. (See Tr. 209–210, 687–688.)

[8] In a May 25, 2017 email, the Union asked the Teamsters healthcare plan administrator about tiered rates. (R. Exh. 15; Tr. 234.) The record does not establish what happened after that initial inquiry.

| Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals | Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals |
|---|---|---|---|---|---|
| | Supervisors/managers may do bargaining unit work without restriction.<br><br>No restrictions on Respondent's use of stringers<br><br>Delete language from expired contract that the number of managers may not exceed 30 percent of the number of full time employees represented by the Union[9]<br><br>(GC Exh. 4 at p. 1–2.) | The number of managers may not exceed 5 percent of the full-time employees represented by the Union<br><br>(GC Exh. 5 at pp. 1–3.) | | | classification in the work required is not available.<br><br>The Union recognizes that Respondent may use stringers.  Upon ratification, the maximum amount of money paid to stringers will be 7.5 percent of the annual bargaining unit payroll.  If Respondent exceeds the limit on annual stringer expenses then Respondent will match the excess with a payment that will be distributed equally to bargaining unit members.<br><br>Respondent may obtain content from commercial vendors for traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics only to the extent currently used and without displacing any bargaining unit employees.<br><br>The number of managers may not exceed 20 percent of the full-time employees represented by the Union<br><br>(GC Exh. 13 at pp. 1–3.) |
| June 12, 2017 | Respondent recognizes that the work normally performed by bargaining unit employees is the Union's jurisdiction, but subject to the following exceptions: (a) Supervisors/managers may do bargaining unit work; (b) Non-bargaining unit employees may do bargaining unit work on an occasional basis; (c) Respondent may subcontract work; (d) Respondent may use stringers up to 40 percent of annual bargaining unit payroll<br><br>(R. Exh. 71 at pp. 1–2.) | | | | |
| February 9, 2018 | | Exempt employees can do bargaining unit work in breaking news situations only if a [Union] member in the same | | | |

---

[9] Respondent viewed any proposed limit to the number of managers it could have as a permissive subject of bargaining that Respondent would not agree to.  On July 15, 2019, the Union stated that it would not go to impasse over the issue.  (See GC Exh. 23 (position statement at p. 1).)

| Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals |
|---|---|---|
| February 28, 2018 | Respondent recognizes that the work normally performed by bargaining unit employees is the Union's jurisdiction, but subject to the following exceptions: (a) Supervisors/managers may do bargaining unit work, but no bargaining unit employee will be laid off as a direct result of this practice; (b) Non-bargaining unit employees may do bargaining unit work on an occasional basis; (c) Respondent may subcontract work; (d) Respondent may use stringers up to 20 percent of annual bargaining unit payroll<br><br>No person under the Union's jurisdiction will be arbitrarily named as a manager and thereby excluded from the agreement<br><br>(R. Exh. 107 at pp. 1–2.) | |
| November 14, 2018 | | Exempt employees cannot do bargaining unit work as performed in the past nor do similar work that may result from the introduction of new print, electronic or other products.<br><br>Respondent cannot use stringers to perform bargaining unit work without first bargaining with the Union and |

| Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals |
|---|---|---|
| | | reaching a mutual agreement about whether and how stringers can be used.<br><br>Respondent may obtain content from commercial vendors for traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.<br><br>The number of managers may not exceed 10 percent of the full-time employees represented by the Union<br><br>(GC Exh. 19 at pp. 1–3.) |
| July 15, 2019 | | The Union recognizes that Respondent may use stringers. The maximum amount of money paid to stringers will be 15 percent of the annual bargaining unit payroll. If Respondent exceeds the limit on annual stringer expenses then Respondent will match the excess with a payment into the pension fund.<br><br>The number of managers may not exceed 20 percent of the full-time employees represented by the Union<br><br>(GC Exh. 22 at pp. 1–2.) |

4.  Bargaining progress on other topics

The parties made limited progress on other issues in this timeframe.  Generally speaking, the parties did not reach any

tentative agreements on any issues because they never established a ground rule on what would constitute a tentative agreement (e.g., agreement on an entire contract article vs. agreement on a specific paragraph within an article). (Tr. 324, 419, 510–511, 541, 801–802.) As for substantive topics where the parties disagreed, the parties were not able to find common ground in the following areas (among others):

(a) Sick leave and short term disability: Under the expired contract bargaining unit employees received 8 days of sick leave each year and also could bank unused sick leave up to a maximum of 90 days. Under an extended short term disability plan, employees could receive 26 weeks[10] of additional sick leave (at a reduced rate of pay) if they exhausted their sick leave and banked hours, plus additional sick leave up to a maximum based on years of service. (GC Exh. 2 (Art. VII).) Respondent proposed to eliminate the sick leave "bank" and awards of additional sick leave and instead simply cover employees under Respondent's short term disability policy, which Respondent retained the discretion to modify but would be the same policy provided to nonrepresented employees. The Union, by contrast, proposed: increasing the number of sick leave days that employees received annually; increasing employees' ability to bank unused sick leave and receive additional sick leave; and requiring Respondent to pay out banked sick leave (up to a maximum of 120 days) when employees retired or separated from the company. (GC Exhs. 4, 12 (Art. VII); GC Exh. 7 at p. 20.)

(b) Grievance filing deadlines: The expired contract did not specify a deadline by which an employee needed to file a grievance. (See GC Exh. 2 (Art. XVI, Sec. 1).) Respondent proposed that a grievance must be filed in writing within 10 or 15 days of the events giving rise to the grievance. The Union proposed various alternative deadlines that, in Respondent's view, fell short of setting a fixed time limit for filing a grievance. (GC Exhs. 4, 12 (Art. XVI, Sec. 1); Tr. 415, 501; see also, e.g., GC Exh. 13 (Art. XVI, Sec. 2) (Union proposal that it or the employee must file written grievance within 30 days of bringing the dispute to management's attention); GC Exh. 15 (Art. XVI, Sec. 2) (Union proposal that the Union must file written grievance within 30 days after the Union president or chairman becomes aware of a dispute).)

(c) Employee work schedule and work week: The expired contract did not address whether bargaining unit employees were guaranteed 40 hours of work each week, but the established practice was for full-time employees to work 40 hours weekly. (GC Exh. 2 (Art. IV); Tr. 120.) Respondent initially proposed contract language stating that the company did not guarantee any specified hours of work per day or week, and stating that Respondent reserved the right to enlarge or shorten the workday or workweek based on business need. The Union countered by proposing that Respondent guarantee a regular schedule of 5 consecutive days and 40 hours per week for full-time employees, and that the parties reach a mutual agreement in writing about any changes to the guaranteed work week. On February 28, 2018, Respondent modified its proposal to state that it does not guarantee any specified hours of work per day or week but would provide the Union with 10 days' notice if

Respondent sought to reduce an employee's workday or workweek due to a reduction in the company's print and/or digital publication schedule. Respondent reserved the right to implement the reduction in hours after the 10–day notice period. (GC Exhs. 4, 13 (Art. IV); R. Exh. 108; Tr. 495.)

(d) No-strike clause: The expired contract states that "[n]o strike, slowdown, work stoppage or any other interference with or interruption of work shall be permitted" during the term of the agreement. (GC Exh. 2 (Art. XIX, Sec. 7).) Respondent initially proposed to expand the no-strike clause to also prohibit sympathy strikes, bannering, boycotts against Respondent, boycotts of Respondent's advertisers that result from a dispute with Respondent, picketing, and any other acts that would interfere with Respondent's operations or the production or sale of its products. On November 14, 2018, however, Respondent revised its no-strike clause request by proposing a more limited expansion of the clause that would add sympathy strikes, picketing, boycotts, and bannering to the expired contract's list of conduct prohibited by the no-strike clause. The Union proposed maintaining the no-strike clause from the expired contract. (GC Exhs. 4, 18 (Art. XIX, Sec. 6); R. Exh. 101 (Art. XIX, Sec. 5); Tr. 363–365.)

(e) Layoffs and recalls: Under the expired contract, layoffs proceeded in inverse seniority order in the affected work group. Recalls, by contrast, proceeded by seniority in the affected work group. (GC Exh. 2 (Art. VIII, Sec. 4(C), 5).) The Union proposed to continue using seniority for layoffs and recalls. Respondent initially proposed that it would determine layoffs after considering seniority, performance, attendance, individual employee qualifications, special abilities or qualifications for the particular function, and the efficient operation of the company. Recalls, meanwhile, would proceed according to seniority, provided that efficiency, skill and ability to do the job are equal in Respondent's opinion. (GC Exh. 4 (Art. VIII, Sec. 3(B), 5); GC Exh. 5 (Art. VIII, Sec. 4(C), 5); see also Tr. 124–127.) On June 12, 2017, Respondent revised its proposals such that for layoffs, Respondent would consider seniority, qualifications, performance and skills when selecting employees for layoffs, and would follow seniority for recalls provided that skills and qualifications were equal in Respondent's opinion. (R. Exh. 78 (pars. 4(B)(2), 5).)

5. Other bargaining issues

The parties did not meet for bargaining on consecutive days in the April 6, 2017, to July 15, 2019 timeframe. Because of that practice, after each session the parties needed to arrange the next date(s) for bargaining. Respondent was generally able to offer proposed meeting dates fairly quickly. The Union, by contrast, generally took more time to identify workable meeting dates, citing the challenge of finding dates that worked for all five members of its negotiating team and the time that it took to compare Respondent's proposals to the expired contract and identify newly proposed contract language. On several occasions Respondent prompted the Union (usually via email) about scheduling the next bargaining session. For the most part, the Union responded in a timely manner to Respondent's inquiries but only offered limited available dates.[11] (Tr. 87–88, 94, 166–169, 171–

---

[10] Employees with less than 2 years of service were only eligible for an additional 13 weeks of sick leave. (GC Exh. 2 (Art. VII).)

[11] On April 8, 2019, the parties began working with a mediator from the Federal Mediation and Conciliation Service to assist with bargaining. Accordingly, from that date forward, the parties also needed to consider

172, 361–362, 587–588, 591–600, 802; R. Exhs. 61, 140–141, 143–152.) In July 2018 and July 2019, however, the Union did take the initiative to suggest that the parties bargain over contract terms after concluding effects bargaining sessions on other matters. Respondent declined that request in 2018 (citing its preference to reserve the entire day for effects bargaining), but agreed to the request in 2019. (GC Exhs 63–64; R. Exhs. 61, 153–154; Tr. 173, 348, 526–527, 599–600, 806–808; see also R. Exh. 61 (Respondent's request for bargaining dates in July 2018 that prompted the Union to suggest, in GC Exh. 63, that the parties bargain over the contract after effects bargaining on July 24, 2018).)

In mid-May 2017, Respondent scheduled a series of information presentations about its proposed healthcare plan. Although the presentations would be similar (if not identical), Respondent scheduled separate presentations for each union representing one of the bargaining units, with the presentation for the Union scheduled for May 17, 2017. On May 16, 2017, believing that they had received permission from Respondent, representatives of the Union (Fuoco and Silver) sought to attend the healthcare plan presentation for the Mailers bargaining unit. Respondent (Lowe and attorney Michael Oesterle) objected, and a heated discussion ensued about whether the Union's representatives should be allowed to stay for the presentation. The dispute was resolved when a representative of the Mailers bargaining unit stated that the Union's representatives could attend as temporary members of the Mailers' negotiating team (i.e., temporary members for the limited purpose of being authorized to attend the May 16 healthcare plan presentation). The presentation then proceeded without further incident, but the Union and Respondent did exchange letters to express their objections about the other side's conduct. (Tr. 192–199, 228–231, 254–255, 373–375; R. Exhs. 8, 10–14.)

On February 1, 2018, the Union sent a letter to Respondent to object to a "Negotiations Update" that the company posted in the newsroom. The Union also took issue with Lowe's conduct during negotiations and asserted that Respondent should jettison Lowe's law firm and find a different firm to handle negotiations. In an April 13, 2018 letter to the executive vice president of Block Communications Inc. (BCI, Respondent's parent company), the Union again objected to Lowe's approach to bargaining and asserted that BCI should replace Lowe as Respondent's lead negotiator. (R. Exhs. 23–24.)

*E. Bargaining Session: August 6, 2019*

At the August 6, 2019, bargaining session Respondent presented the Union with a "Position Statement" that summarized Respondent's view of where the parties stood with bargaining and provided/reiterated Respondent's rationale for its bargaining proposals. Among other points, Respondent emphasized that it needed flexibility with staffing decisions and employee work hours because Respondent was moving towards only publishing the newspaper on a digital platform. (GC Exh. 23 (Position Statement at 2, 6); R. Exh. 193 at p. 33; Tr. 566–567.)

Respondent also presented the Union with a "best offer" contract proposal. Respondent held to its prior offers on most issues, but for wages proposed to increase the minimum pay rate for employees with the highest level of experience[12] by: 3 percent on the effective date of the new contract; an additional 2 percent on the first contract anniversary date; and an additional 3 percent on the second contract anniversary date. The pay rates that Respondent used for its proposal included the pension and wage diversions from the old contract, and thus the wage increases essentially returned portions of the diversions to employees over the proposed 3–year contract period.[13] The wage increases also removed the annual $4,000 cap on wage and pension diversion payments. (GC Exh. 23 (p. 2 and Art. III) (noting that Respondent was not offering retroactive wage increases); R. Exh. 193 at p. 33; R. 196 at p. 20; Tr. 140–143, 340–341, 567–569, 685–686.) Respondent also added contract language stating that: employees would pay 30 percent of the premium costs for Respondent's health, dental, and vision insurance plans; and if Respondent changed the short-term disability policy it would do so on the same basis as for its nonrepresented employees. (GC Exh. 23 (Art. VII, XX); Tr. 369–371, 568.)

The Union stated that it would take a while to review Respondent's proposal and asked for a version of the proposal that included strikethrough language to show the language from the expired contract that was deleted, and bold language to indicate the parts of the proposal that were new additions. Respondent declined, stating that it did not have time to do that. Towards the end of the session, the Union also asked whether Respondent had accepted any of the Union's proposals. (Tr. 88–89; R. Exh. 192 at p. 15; R. Exh. 193 at p. 34; R. Exh. 196 at pp. 20–21 (noting that the parties continued to disagree about the healthcare plan).)

*F. Bargaining Session: September 6, 2019*

After exchanging a few emails about potential dates, the parties agreed to meet on September 6, 2019, for their next bargaining session. (R. Exhs. 155–159.) At that session, the Union presented a counterproposal that included the following changes:

> (a) Bargaining unit jurisdiction: Exempt employees can do bargaining unit work in breaking news situations only if a bargaining unit member in the same classification in the work required is not available. (GC Exh. 24 at p. 2; see also Tr. 319–320, 571 (noting that the Union made a similar proposal on February 9, 2018).) The Union also deleted its proposal to limit the number of Respondent's managers to a percentage of the full-time employees represented by the Union. (GC Exh. 24 at p. 1; compare GC Exhs. 2 and 22 at p. 1; see also R. Exh. 193 at p. 112; Tr. 335–336).)
>
> (b) Stringers: The Union recognized that Respondent may use stringers. Upon ratification, the maximum amount of money paid to stringers will be 15 percent of the annual bargaining unit payroll. If Respondent exceeds the limit on annual stringer expenses then Respondent will match the excess with a payment

---

the mediator's availability when scheduling bargaining sessions. (Tr. 300–301, 591–592; R. Exh. 144.)

[12] For each job classification, wages max out after a certain number of years of service (in most instances between 3 and 5 years). Respondent's wage proposal only increased wages for employees who had passed the years-of-service threshold for maxing out wages. (See, e.g., GC Exh. 23 (Art. III).)

[13] To illustrate, as previously noted, an employee with a wage rate of $1000/week would only receive $901.60 each week after the pension and wage diversions. (See Findings of Fact (FOF), Sec. II(C), supra.) For the wage increases in its August 6, 2019 proposal, Respondent used the post-diversion rates to calculate the proposed wage increases (i.e., for our example, Respondent used $901.60 instead of $1000 to calculate the wage increase).

that will be distributed equally to bargaining unit members.[14] (GC Exh. 24 at p. 2; Tr. 571.)

(c) Wages: starting with and retroactive to April 1, 2017, bargaining unit employees will receive annual wage increases of 7.5 percent, 6 percent, 5.5 percent, 6.5 percent, and 6 percent. All wage and pension diversions will be eliminated. (GC Exh. 24 (Art. III); Tr. 572.)

(d) Sick leave and short term disability: Any employee with at least one year of service shall have 20 days of disability coverage and can bank unused sick leave up to a maximum of 90 days. (GC Exh. 24 (Art. VII).)

In the discussion that followed, the parties disagreed on various issues, including whether/when managers should perform bargaining unit work and the extent that Respondent should be permitted to use stringers. Respondent also rejected the Union's proposal that Respondent pay a matching amount to the bargaining unit if Respondent exceeded the agreed limit for stringer expenses. Regarding wages, Respondent stated that the Union's proposal was an economic concession that Respondent was not willing to make. The Union responded that bargaining unit members had gone 13 years without a raise and had also been giving up wages due to the ongoing wage and pension diversions. The parties did not review the entire union proposal in the September 6, bargaining session. (R. Exh. 193 at pp. 112–116; Tr. 141–144.)

### G. Bargaining Session: February 24, 2020

#### 1. Delay between bargaining sessions

There is no evidence that the parties communicated between September 6, 2019, and mid–January 2020, about scheduling another bargaining session. On January 17, 2020, Respondent wrote a letter to the Union to assert that the Union had been deliberately avoiding negotiations and to request suggested dates for further bargaining. In a January 23, 2020 letter, the Union dismissed Respondent's assertions in the January 17 letter as self-serving. The Union did offer to bargain on February 24, 2020, which Respondent accepted.[15] (GC Exhs. 26–28; Tr. 154–155.)

#### 2. The February 24, 2020 bargaining session

On February 24, 2020, the parties resumed discussing aspects of Respondent's August 6, 2019 best offer and the Union's September 6, 2019 counterproposal. The parties agreed to three minor changes to Respondent's August 6, 2019 proposal, but disagreed on several other issues, including: whether employees should be guaranteed 40 hours of work per week; the amount of sick leave that employees should earn each year; and whether employees should be able to bank unused sick leave. (Tr. 142, 578–580; R. Exh. 138 (noting minor changes to Art. VII (sick leave) and Art. IX (expenses); R. 194 at pp. 1, 5; R. Exh. 195 at pp. 1–3.) There is no evidence that the parties bargained in any detail over disputed topics such as wages, healthcare, or bargaining unit jurisdiction. Further, both the Union and Respondent subsequently acknowledged that they had not yet finished discussing the Union's September 6, 2019 counterproposal. (See

FOF, Sec. II(I)(2), infra.)

### H. Communications Between March 6 and May 22, 2020

#### 1. Efforts to schedule the next bargaining session

On March 6, 2020, Respondent sent a letter to the Union to follow up on three proposed future bargaining dates that the mediator offered at the end of the February 24 bargaining session. The Union replied on March 10, confirming that it could meet for bargaining on March 25, 2020. Respondent subsequently reconfirmed that it was available on March 25. (GC Exhs. 29–31; R. Exh. 195 at p. 5; see also GC Exh. 31 (noting that Respondent was also available on March 23–24, 2020, the other two dates that the mediator offered).)

#### 2. March 22, 2020: Union cancels March 25 session due to Covid–19 pandemic

On March 22, 2020, Pass sent a letter to Respondent to cancel the March 25, 2020 bargaining session in light of the Covid–19 pandemic. Pass stated, in pertinent part, as follows in his letter:

> As I am sure you must be aware, the current Coronavirus pandemic is unlike anything we have ever experienced. The Federal Government, and more significantly the Governor of the State of Pennsylvania has ordered all non-essential services to be shuttered effective 8 a.m. March 23. The aim is to limit contact amongst individuals. Obviously the need for us to meet pales in comparison to the needs of the people. . . .

> When weighing the benefits of meeting and simply going through the worthless motions that for three plus years have proved the employer has no intention on reaching an amicable resolution to the various CBA's versus saving the lives of those of us involved in these fruitless meetings, makes our decision very easy.

> The [Union bargaining session] scheduled for the 25th will not be going forward, nor will there be any future meetings scheduled for any of the [unity council] bargaining units at the Post-Gazette until the Coronavirus pandemic is completely arrested.

> Finally, despite the obvious acrimony that has transpired over more than three years of wasted time and energy, I urge you and your family to keep safe.

(GC Exh. 32; see also R. Exh. 166 at 1–2 (indicating that Pass emailed the letter to Respondent and ten other individuals).)

On March 23, 2020, Pass emailed Lowe to confirm that Respondent received the letter canceling the March 25, 2020 bargaining session. Lowe replied on March 24, 2020, stating "Thanks for the heads up Joe. Stay safe and stay well." (GC Exhs. 33–34.)

#### 3. May 22, 2020: Respondent sends a written response to the Union's September 6, 2019 contract proposal

On May 22, 2020, Respondent sent the Union a letter urging the Union to accept Respondent's August 6, 2019 best offer (as subsequently modified). Respondent also attached a written response to the Union's September 6, 2019 contract proposal, in which Respondent summarized the parties' positions on various

---

[14] The Union also proposed that Respondent could use stringers to cover high school sports and "SEEN" events as long as at least one of those events per shift was covered by a bargaining unit member. (GC Exh. 24 at 2.)

[15] I give little weight to the emails that Respondent submitted that show members of the Union's bargaining team had scheduling conflicts

in January/February 2020. Fuoco took a leave of absence from working for Respondent from January 12 to February 17, 2020, to begin writing a book, but explicitly stated that he would continue to serve as union president and be available for meetings on union matters if the need arose. (See R. Exhs. 1–4; Tr. 179.) Silver, meanwhile, was only unavailable on February 3–7, 2020. (See R. Exh. 3.)

issues that remained unresolved in bargaining. There is no evidence that the Union replied to Respondent's May 22, 2020 letter and written response. (Tr. 110–111, 706; GC Exh. 35.)

*I. June 12, 2020: Respondent Sends its Last, Best, and Final Offer*

### 1. The last, best, and final offer

On June 12, 2020, Respondent sent a letter to the Union to convey Respondent's last, best, and final offer. Respondent stated as follows in the letter:

> Dear Joe,
>
> On August 6, 2019, the Union was presented with the Company's Best Offer. The Union responded with a counterproposal on September 6, 2019. The parties discussed the Union's counterproposal on September 6, 2019 and again on February 24, 2020. The Union cancelled the scheduled March 25, 2020 meeting date because of the pandemic. . . .
>
> On May 22, 2020, the Company provided the Union with a comprehensive, written response to the Union's September 6, 2019 counterproposal. The Company received no response from the Union.
>
> Attached hereto is the Company's Final Offer to the Union. We have included a "clean" version and a "red-lined" version to show the changes which have been made by the Company from its August 6, 2019 Best Offer. . . .
>
> The Company is proposing a three (3) year contract, effective on the signing date of the new Agreement. . . .
>
> We believe the Company's Final Offer is fair and in the best interest of both parties. We respectfully urge acceptance of this offer.

(GC Exh. 36 (pp. 1–2); Tr. 112–113, 581; see also Tr. 169–171 (noting that the redlined version of Respondent's last, best, and final offer did not show, via strikeouts or other means, what expired contract language Respondent deleted).)

Most of the proposals in Respondent's last, best, and final offer were largely the same as what Respondent offered on August 6, 2019. Respondent did, however, change its health and welfare proposal by adding language committing to provide a health, dental, vision and life insurance plan during the length of the contract (to address the Union's concern that Respondent might, if the new contract allowed it the discretion to do so, stop providing health and welfare benefits altogether). (GC Exh. 36 (Art. XX, Sec. 1); Tr. 128–129, 371–372; see also, e.g., GC Exh. 36 (Art. II - striking an indemnification clause related to claims about union dues and dues checkoff; Art. III, Sec. 1 – adding a clause stating that wage increases would not apply to employees on extended sick leave until those employees returned to work); compare GC Exh. 24 (Respondent's Aug. 6, 2019 proposal).)

### 2. Communications after Respondent's last, best, and final offer

After Respondent sent its last, best, and final offer, the parties exchanged a series of letters and emails about the status of bargaining. The Union began the exchange on June 22, 2020, by questioning why Respondent was sending a final offer when the parties had not finished going through the Union's September 6, 2019 proposal. The Union also stated that before it addressed the final offer, the Union needed to know if Respondent was taking the position that negotiations were terminated and that no

further bargaining sessions would occur. (GC Exh. 37.)

In a letter dated July 14, 2020, Respondent asserted that the Union failed to respond to the substance of Respondent's final offer, noting that the Union did not offer a counterproposal or offer to discuss the final offer. Respondent also stated its belief that negotiations were at impasse and invited the Union, if it believed the parties were not at impasse, to explain why it believed further bargaining would be fruitful. (GC Exh. 38.)

Later on July 14, 2020, the Union sent an email and letter to Respondent. The Union reiterated that it had not heard Respondent's position on two-thirds of the Union's September 6, 2019 proposal, and questioned how the parties could be at impasse under those circumstances. The Union also asserted (again) that before it replied to the final offer Respondent first needed to specify whether negotiations were terminated. (R. Exh. 170.)

On July 16, 2020, Respondent sent a letter to again state its belief that negotiations were at impasse. In support of that position, Respondent asserted that no agreement had been reached despite over 3 years of bargaining, and also asserted that the Union employed strategies of avoiding and delaying negotiations and making regressive proposals without justification. As for the Union's September 6, 2019 proposal, Respondent asserted that the parties discussed 75 percent of the proposal during bargaining on September 6, 2019, and February 24, 2020. Respondent then sent a written response to the Union's proposal in May 2020 after the March 25, 2020 bargaining session was canceled due to the Covid–19 pandemic. Finally, Respondent stated that its final offer did not terminate contract negotiations. In Respondent's view, the Union announced on March 22, 2020, that it would not meet with Respondent, and subsequently did not engage with Respondent about the terms of the final offer or explain why further bargaining would be fruitful. (GC Exh. 41.)

The Union replied in a July 20, 2020 letter. Regarding the bargaining history, the Union maintained that Respondent made regressive proposals and did not accept a single proposal that the Union offered. The Union also denied delaying or avoiding negotiations and emphasized that it canceled the March 25, 2022 bargaining session to ensure everyone's safety during the Covid–19 pandemic. As for why further bargaining would be fruitful, the Union indicated that bargaining was necessary for discussing, among other topics: whether the Union's September 19, 2019 proposal was acceptable (particularly as to two-thirds of the proposal that had not yet been addressed in a bargaining session); Respondent's rationale for seeking more money to hire stringers when Respondent was not using the amount permitted in the expired contract; and Respondent's healthcare plan and proposal language that would give Respondent the right to cancel the plan immediately after the parties signed a new agreement. The Union closed by stating that it was willing to meet to go through the Union's September 19, 2019 proposal and Respondent's final offer and suggest changes in an attempt to reach a mutual agreement, and asking Respondent for available dates to resume bargaining. (GC Exh. 42.)

*J. July 27, 2020: Respondent Declares Impasse and Implements Terms and Conditions of Employment*

### 1. Impasse letter

On July 27, 2020, Respondent declared impasse and implemented terms and conditions of employment. Respondent stated as follows in its letter:

> After over three years of negotiations, the Company believes the parties are at impasse. Therefore, negotiations are

terminated. The Company has implemented the following Articles and/or provisions of the Company's Final Offer:

> [Agreement Paragraph C and Paragraph D (Sec. 1–7);
> Art. III (excluding Sec. 4);
> Art. IV (excluding everything in Sec. 11 except for the first sentence);
> Art. V–VI;
> Art. VII (excluding the second sentence of Sec. 3);
> Art. VIII (excluding the phrase "in the Company's discretion" in Sec. 15);
> Arts. IX—XVIII;
> Art. XIX (Sec. 24 only); and
> Art. XX (as set forth in the addendum, excluding Secs. 2–3)]

The specific language of each Article and/or provision of the implemented terms and conditions referenced above is contained in the attached Addendum to this letter. The above implemented new terms and conditions supersedes and replaces the applicable Articles and/or provisions of the expired agreement.

Because of the impasse in these negotiations, the collective bargaining agreement is terminated. The evergreen provision in Article XXII provides that "[t]he terms and conditions of this Agreement shall remain in effect as long as negotiations continue." Negotiations are now terminated because of the impasse. The contractual terms and conditions of the collective bargaining agreement have expired, along with the evergreen provision. Article XXII is deleted and has no further force and effect.

The Company will continue to observe the established terms and conditions of the expired collective bargaining agreement as required by the National Labor Relations Act, except as otherwise modified by the implemented terms and conditions in this letter and except those terms and conditions recognized as strictly contractual. Additionally, the Company will no longer check off Union dues, including assessments. . . .

(GC Exh. 43 (pp. 1–3); see also Tr. 113, 690–691.)

### 2. Implemented terms

As indicated above, most of the terms and conditions that Respondent unilaterally implemented were the same as what Respondent set forth in its June 12, 2020 last, best, and final offer. The following implemented terms, however, included modifications that Respondent made after its last, best, and final offer:

Wages: deleted paragraph 4, which stated "Nothing in this agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established herein are minimums only. Individual merit shall be acknowledged by increases above the minimums." (Compare GC Exh. 36 (Art. III, Sec. 4) with GC Exh. 43 (Art. III).)[16]

Work hours: Respondent deleted the following language after a sentence stating that Respondent does not guarantee any specified hours of work per day or per week: "In the event the Company reduces its print and/or digital publication schedule

from its current schedule, the Company will give the Guild at least ten (10) days' notice prior to reducing an employee's workday or workweek. The parties shall meet during this ten (10) day notice period to discuss the effects of any planned reduction in hours. After the ten (10) day notice period has expired, the Company may implement the reduction in hours." (Compare GC Exh. 36 (Art. IV, Sec. 11) with GC Exh. 43 (Art. IV, Sec. 11).)

Short term disability: Respondent deleted the following language after a sentence stating that bargaining unit employees would be covered by Respondent's short term disability (STD) policy: "The Company reserves the right to modify or change the Company's STD policy on the same basis as nonrepresented employees of the Company." (Compare GC Exh. 36 (Art. VII, Sec. 3) with GC Exh. 43 (Art. VII, Sec. 3).)

Transfers due to workplace changes: Respondent deleted the phrase "in the Company's discretion" that followed a sentence stating that an employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes may be afforded the opportunity to transfer to other available positions. (Compare GC Exh. 36 (Art. VIII, Sec. 15) with GC Exh. 43 (Art. VIII, Sec. 15).)

Health and welfare: Respondent deleted the following language after a sentence stating that bargaining unit employees will be covered by the Company health, dental, vision, and life insurance plans: "Such plans may be amended, changed, replaced or terminated, in whole or in part . . . at the Company's sole discretion. . . . The Company agrees to provide a health, dental, vision and life insurance plan during the term of this Agreement." (Compare GC Exh. 36 (Art. XX, Sec. 1) with GC Exh. 43 (Art. XX, Sec. 1).)

(GC Exh. 43 (Addendum); see also Tr. 113, 144–145.)

### 3. Communications after Respondent implemented terms

On July 30–31, 2020, Respondent and the Union exchanged letters about the bargaining dispute. Respondent maintained that it lawfully implemented portions of its final offer after the parties bargained to a good-faith impasse, and took the position that it had no obligation to negotiate further until the impasse was broken. The Union, meanwhile, asserted that the parties were not at impasse and asked Respondent to provide dates to resume bargaining.[17] (GC Exhs. 45–47.)

### K. September/October 2020: Union Rallies

#### 1. September 25, 2020: rally in front of Respondent's facility

On September 25, 2020, the Union held a rally in front of the North Shore Drive building where Respondent's offices are located. The Union organized the rally to, among other things, protest Respondent's decision to declare impasse and unilaterally implement terms and conditions of employment. Many rally attendees chanted and held signs with phrases such as "[Respondent] Declares Unlawful Impasse!" and "[Respondent] Bargains in Bad Faith!" In addition, an airplane flying overhead displayed a banner stating "Fair Contract Now. #NoPGWithoutMe." Various individuals spoke with a microphone at the

---

[16] The paragraph that Respondent deleted was in the expired contract. (GC Exh. 2 (Art. III, Sec. 6).)

[17] The parties met for a bargaining session on September 8, 2020 (see GC Exhs. 48–49), but I do not find that session to be relevant to whether the parties were at a good-faith impasse when Respondent unilaterally

implemented terms and conditions of employment on July 27, 2020. See *Mike-Sell's Potato Chip Co.*, 360 NLRB 131, 131 fn. 1 (2014) (declining to consider the union's offers of bargaining concessions that occurred after the employer declared impasse and unilaterally implemented its final contract offers), enfd. 807 F.3d 318 (D.C. Cir. 2015).

rally, including (now former) Pennsylvania Lieutenant Governor John Fetterman, and some individuals at the rally were taking photographs. (Tr. 50–52, 248–249, 275, 278–279, 740–742; GC Exhs. 52, 54; R. Exhs. 26–27, 33–36, 39–40; see also Tr. 51–52 (estimating that around 125 people attended the rally).)

Chief photo editor Arturo Fernandez was working inside Respondent's facility when he heard the rally occurring outside. Thinking that the rally could be a "spot news" event (i.e., a news event occurring spontaneously), Fernandez used his cell phone and his professional camera to take photographs of the rally while standing at different windows on the third floor. Rally participants, including bargaining unit members, could see Fernandez as he took photographs. Fernandez saved the photographs on his computer and then notified the night editor that the photographs were not publishable because the photographs included disparaging signs and posters. (Tr. 53–58, 771, 788–796, 798; GC Exhs. 52–54; see also GC Exh. 59 (p. 2).) Respondent's director of operations, Rob Weber, who is in charge of facilities and security (among other responsibilities) also observed the rally from inside the building.[18] (Tr. 55, 725–726, 740–741; see also GC Exh. 59 (p. 2); GC Exh. 60 (pp. 1–3).)

2. October 24 and 31, 2020: rallies in front of John Block's home

On October 24, 2020, the Union held a rally and informational picket, this time in front of Respondent's publisher, John Block's home. Seeking to call attention to the labor dispute and pressure Respondent to return to the bargaining table, some rally participants held signs with phrases such as "[Respondent] Declares Unlawful Impasse!" and "[Respondent] Illegally Imposes Horrible Working Conditions." Other participants used a bullhorn to give speeches, and a few participants had cameras with them and were taking photos. For the most part, rally participants stood on the sidewalk in front of the home, on or across the street, on the driveway entrance (between the street and sidewalk), or on a strip of grass between the street and the sidewalk. (Tr. 39–42, 46–49, 59–61, 725–726; GC Exh. 51, 55; see also Tr. 59 (estimating that around 50 people, a majority of whom were bargaining unit members, attended the rally).)

The Union held another rally and informational picket in front of John Block's home on October 31, 2020, this time with a Halloween funeral theme. Rally participants placed a mock coffin on the sidewalk along with cardboard tombstones with phrases such as "Here Lies Local News" and "RIP Staff Morale." Other participants used a bullhorn to give speeches. Rally participants for the most part stood on the sidewalk in front of the home, on the street, or on the driveway entrance (between the street and sidewalk). Occasionally, however, a rally participant stood a few feet closer to the home on the walkway leading to the front door or the portion of the driveway leading from the sidewalk to the home. (Tr. 64–65, 67–68, 281–286; GC Exh. 57; R. Exhs. 41–46; see also Tr. 65 (estimating that around 60 people, a majority of whom were bargaining unit members, attended the rally) .)

In an effort to ensure that the October 24 and 31 rallies did not get out of control, Respondent asked Kellington Protection, LLC to provide security guards to be present during both of the rallies

in front of John Block's home. Two security guards (Steve Cain and Charles Sansky) attended each rally and took photographs of rally participants, including bargaining unit members when they were located across the street from John Block's home. Respondent did not ask the security guards to photograph the rallies, but also did not provide any instructions that prohibited the security guards from taking photographs. (Tr. 40–41, 43, 60–63, 65–68, 726–727, 729–730, 736, 739, 771–773; GC Exhs. 50, 58 (Oct. 24 rally); GC Exh. 56 (Oct. 31 rally); R. Exh. 197 (indicating that Respondent signed a contract with Kellington Protection in December 2018); see also Tr. 61–62 (explaining that the security guard shown aiming his phone in GC Exh. 58 was aiming at October 24 rally participants who were located across the street from John Block's home), 66–67 (explaining that the security guard shown aiming his phone in GC Exh. 56 was aiming at October 31 rally participants who were located across the street from John Block's home); GC Exh. 59 (p. 3); GC Exh. 60 (pp. 3–5).)

### DISCUSSION AND ANALYSIS

#### A. Credibility Findings

A credibility determination may rely on a variety of factors, including the context of the witness' testimony, the witness' demeanor, the weight of the respective evidence, established or admitted facts, inherent probabilities and reasonable inferences that may be drawn from the record as a whole. Credibility findings need not be all-or-nothing propositions — indeed, nothing is more common in all kinds of judicial decisions than to believe some, but not all, of a witness' testimony. *Farm Fresh Co., Target One, LLC*, 361 NLRB 848, 860 (2014) (noting that an administrative law judge may draw an adverse inference from a party's failure to call a witness who may reasonably be assumed to be favorably disposed to a party, and who could reasonably be expected to corroborate its version of events, particularly when the witness is the party's agent). To the extent that credibility issues arose in this case, I have stated my credibility findings in the Findings of Fact above.

#### B. Did Respondent Violate the Act by Failing and Refusing to Bargain in Good Faith with the Union?

##### 1. Complaint allegations

The General Counsel alleges that Respondent violated Section 8(a)(5) and (1) of the Act by, through its overall conduct since about March 11, 2019, failing and refusing to bargain in good faith with the Union as the exclusive collective-bargaining representative of the bargaining unit. In particular, the General Counsel alleges that Respondent bargained with no intention of reaching an agreement by: (a) insisting on proposals that are predictably unacceptable to the Union, including unilateral control over wage rates, hours and numbers of hours worked, subcontracting bargaining unit work, provisions of health insurance, layoffs, and a broadly worded no-strike clause; (b) failing to provide explanations to the Union regarding Respondent's proposals; and (c) prematurely declaring impasse.

##### 1. Applicable legal standard

The Supreme Court has held that the statutory duty to "meet .

was not corroborated by any other evidence (e.g., testimony by another witness, photographs), is too thin for me to conclude that Weber was or gave the appearance that he was photographing employees as they engaged in union activities. I also note that Weber credibly denied that he took photos of the rally. (See Tr. 742.)

. . and confer in good faith" is not fulfilled by "purely formal meetings between management and labor, while each maintains an attitude of 'take it or leave it.'"  Instead, "[c]ollective bargaining. . . presupposes a desire to reach an ultimate agreement, to enter into a collective-bargaining contract."  *NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 485 (1960); see also National Labor Relations Act, Sec. 8(d).

The touchstone of bad-faith bargaining is a purpose to frustrate the very possibility of reaching an agreement.  *Phillips 66*, 369 NLRB No. 13, slip op. at 6 (2020).  In assessing whether a party has failed or refused to bargain in good faith, the Board considers the totality of the circumstances, including conduct both at and away from the bargaining table.  From the context of an employer's total conduct, it must be decided whether the employer is engaging in hard but lawful bargaining to achieve a contract that it considers desirable or is unlawfully endeavoring to frustrate the possibility of arriving at any agreement.  Although the Board does not evaluate whether particular proposals are acceptable or unacceptable, it will examine proposals when appropriate and consider whether, on the basis of objective factors, bargaining demands constitute evidence of bad-faith bargaining.  *Altura Communication Solutions, LLC*, 369 NLRB No. 85, slip op. at 3 (2020), enfd. 848 Fed.Appx. 344 (9th Cir. 2021); *Audio Visual Services Group, Inc. d/b/a PSAV Presentation Services*, 367 NLRB No. 103, slip op. at 5 (2019), affd. 957 F.3d 1006 (9th Cir. 2020).

### 3.  Analysis

The General Counsel contends that Respondent engaged in overall bad-faith bargaining by presenting contract proposals that, when considered as a whole, evidence an intent not to reach agreement; failing to explain its proposals to the Union; and prematurely declaring impasse.  I do not find merit to the argument that Respondent failed to explain its proposals to the Union.  The General Counsel presented limited evidence on this point, as due to the number of bargaining sessions witnesses generally offered testimony in broad strokes and did not go into detail about what each party said during their 22 bargaining sessions before Respondent declared impasse.  Further, during the August 6, 2019 bargaining session, Respondent provided a position statement to the Union that described Respondent's positions on each of the areas where the parties disagreed about contract terms.  (See FOF, Sec. II(E).)

With that stated, I do find merit to the arguments that Respondent prematurely declared impasse (see Discussion and Analysis, Sec. C(3), infra) and presented proposals that, viewed as a whole, evidence an intent not to reach an agreement.[19]  I discuss Respondent's proposals below.

The last, best and final offer that Respondent communicated to the Union on June 12, 2020, included the following proposals,[20]

Bargaining unit jurisdiction: The Union's jurisdiction includes work normally performed by bargaining unit employees but is subject to the following exceptions: (a) Supervisors and managerial employees may perform bargaining unit work.  No bargaining unit employee will be laid off as a direct result of that practice; (b) Non-bargaining unit employees may perform bargaining unit work on an occasional basis; (c) Respondent may subcontract work; and (d) Respondent may use stringers but the maximum amount paid to stringers will not exceed 20 percent of the annual bargaining unit payroll.  (GC Exh. 36 at pp. 2–3; FOF, Sec. II(D)(3).)

Wages:  Increase the minimum pay rate for employees with the highest level of experience by: 3 percent on the effective date of the new contract; an additional 2 percent on the first contract anniversary date; and an additional 3 percent on the second contract anniversary date.  The baseline pay rates for the wage proposal incorporate the pension and wage diversions from the old contract (i.e., if an employee's wage rate was $1000 under the old contract and $901.60 after subtracting diversions, Respondent used the $901.60 amount as the baseline wage for its proposal).  (GC Exh. 36 (Art. III); FOF, Sec. II(E).)

Work hours: Respondent "does not guarantee any specified hours of work per day or per week" but will provide the Union with 10 days' notice if Respondent seeks to reduce an employee's workday or workweek due to a reduction in the company's print and/or digital publication schedule.  Respondent reserves the right to implement the reduction in hours after the 10–day notice period.  (GC Exh. 36 (Art. IV, Sec. 11); FOF, Sec. II(D)(4)(c).)[21]

Sick leave:  Bargaining unit employees will be covered by Respondent's short term disability policy (STD).  Respondent reserves the right to modify or change the Company's STD policy on the same basis as Respondent's nonrepresented employees.  Sick leave payments shall terminate upon termination of employment or death of the employee.  (GC Exh. 36 (Art. VII, Sec. 3, 6); FOF, Sec. II(E).)

Layoffs/recalls:  To select employees for layoffs, Respondent will give consideration to seniority, qualifications, performance, and skills in the affected work group.  Recalls shall be in order of seniority if skill and qualifications are equal in Respondent's opinion.  (GC Exh. 36 (Art. VII, Sec. 4(B), 5); FOF, Sec. II(D)(4)(e).)

No-strike clause: No strike, sympathy strike, slowdown, work stoppage, picketing, boycotts, bannering, or any other

---

[19] The General Counsel has asserted that Respondent's proposals were "predictably unacceptable to the Union."  While the Board has used that phrasing in a few decisions I do not do so here because I do not find it to be helpful in analyzing the facts of this particular case.

On a related point, I note that I stand by my rulings during trial to exclude several exhibits (mostly proposals and contracts involving other bargaining units) that Respondent offered to rebut the argument that its proposals here were predictably unacceptable to the Union. (See, e.g., Tr. 646, 651, 770 (rejecting R. Exhs. 178–187, 198–204); see also Tr. 748 (explaining that my ruling did not preclude Respondent from presenting testimony about its state of mind in making contract proposals to the Union).)  Specifically, Respondent maintained that if a different union accepted a contract proposal, the General Counsel could not claim that a similar proposal to the Union was "predictably unacceptable."

[20] This list is not intended to be exhaustive.  I have only highlighted a selection of the proposals from Respondent's last, best, and final offer.

[21] Although there was an established past practice of bargaining unit employees working 40 hours per week, Respondent's last, best, and final offer included a proposal that the new contract would supersede all past practices.  (See FOF, Sec. II(D)(4)(c); GC Exh. 36 (Art. XIX, Sec. 23) (proposing that the collective-bargaining agreement supersedes all prior agreements between Respondent and the Union, including any letters of interpretation, verbal understandings and/or past practices).)

(See Tr. 625.)  It suffices to say that I found Respondent's proffered evidence to be too remote from the issues at hand in this case.  Every bargaining unit has its own priorities, goals, and interests, and I do not have a basis to conclude that a bargaining proposal or concession accepted by one unit would (or should) be palatable for an entirely different unit.

interference with or interruption of work shall be permitted during the term of the contract. (GC Exh. 36 (Art. XIX, Sec. 6); FOF, Sec. II(D)(4)(d).)

Health and welfare: Bargaining unit employees will be covered by Respondent's health, dental, vision, and life insurance plans. Respondent may amend, change, replace or terminate those plans in its sole discretion. Respondent agrees to provide a health, dental, vision and life insurance plan during the term of the contract. Bargaining unit employees shall pay 30 percent of the premium costs for Respondent's health, vision, and dental insurance programs. (GC Exh. 36 (Art. XX, Sec. 1); FOF, Sec. II(E), (I)(1).)

It bears repeating that these proposals were part of Respondent's best offer. Respondent's proposals in these areas in earlier bargaining sessions were identical or less favorable to the Union.

The Board has explained that "proposals that would authorize an employer to make unilateral changes to a broad range of significant terms and conditions of employment, or that would amount to a 'perpetual reopener clause' as to those terms during the life of the contract, are [] 'at odds with the basic concept of a collective-bargaining agreement.'" *Altura Communication Solutions, LLC*, 369 NLRB No. 85, slip op. at 4 (quoting *Radisson Plaza Minneapolis*, 307 NLRB 94, 95 (1992), enfd. 987 F.2d 1376 (8th Cir. 1993)). The proposals in Respondent's last, best, and final offer fit that description.

First, Respondent's proposals would have enabled it to unilaterally encroach upon the Union's jurisdiction by subcontracting work and by assigning bargaining unit work to employees outside of the bargaining unit. The Union would have no recourse if Respondent took action under the proposal that infringed on the Union's jurisdiction and/or reduced the size of the bargaining unit.

Second, Respondent's proposals would have granted it discretion over hours of work. As the Board has explained, a contractual provision that affords an employer complete discretion over work hours also affords the employer unilateral control over employees' pay. See *Altura Communication Solutions, LLC*, 369 NLRB No. 85, slip op. at 5 (discussing an employer's proposal that nothing in the agreement should be construed as a guarantee of hours of work per shift, per day or per week); compare GC Exh. 36, Sec. 11 ("The Company does not guarantee any specified hours or work per day or per week.").

Third, Respondent proposed having the ability to unilaterally alter or scale back its bargaining unit employees' healthcare, dental, vision, and life insurance plans. Respondent also sought unilateral control over bargaining unit employees' short term disability plan, up to and including the right to eliminate the plan (though any changes to the short-term disability plan would also have to apply to non-unit employees). Bargaining unit employees therefore could not count on any of these benefits under Respondent's proposals, as Respondent would have the right to

change the benefits at any time. Such proposals are at odds with the basic concept of a collective-bargaining agreement. *Altura Communication Solutions, LLC*, 369 NLRB No. 85, slip op. at 5.

Fourth, Respondent proposed to have discretion to select employees for layoffs and recalls, with seniority being only one of several factors regarding layoffs, and merely a tiebreaking factor regarding recalls. Through the proposal, the Union would lose any meaningful way to monitor or enforce the layoff/recall provisions in the contract, as Respondent would be able to justify its layoff and recall decisions as discretionary decisions about employee skills and qualifications.[22]

Considering the proposals in Respondent's last, best, and final offer in combination, I find that Respondent failed to bargain in good faith. An inference of bad faith is appropriate when the employer's proposals, taken a whole, would leave the union and the employees it represents with substantially fewer rights than provided by law without a contract. That is what we have here, as Respondent's proposals effectively sought the discretion to limit the Union's jurisdiction (via subcontracting and assigning bargaining unit work to nonunit employees) and remove the Union from representing bargaining unit members interests concerning: work hours; health, dental, vision, and life insurance plans; the short-term disability plan; and layoffs/recalls. *Kitsap Tenant Support Services, Inc.*, 366 NLRB No. 98, slip op. at 8–9 (2018) (finding bad faith bargaining where the employer's proposals sought to deny the union any role in determining wages and benefits during the contract term, and also sought to afford the employer unfettered discretion regarding discipline and discharge), enfd. 2019 U.S.App. LEXIS 13055 (D.C. Cir. 2019); *Public Service Co. of Oklahoma (PSO)*, 334 NLRB 487, 487–489 (2001) (noting that without a contract, the union would have the statutory right to prior notice and bargaining over changes or modifications in terms and conditions of employment and would retain the right to strike in protest of such actions), enfd. 318 F.3d 1173 (10th Cir. 2003).

I am not persuaded by the defenses that Respondent offered in response to the bad-faith bargaining allegation in the complaint. Respondent maintains that the complaint allegation that it (Respondent) insisted upon proposals that were "predictably unacceptable" to the Union should be dismissed under Section 10(b) of the Act because the Union should have filed unfair labor practice charges regarding any such proposals within 6 months of the date that Respondent made the proposal (generally in 2017). (See R. Posttrial Br. at 25–27; see also GC Exh. 1(a) (unfair labor practice charge alleging that Respondent bargained in bad faith, filed on September 11, 2019). The Board has indicated that a union should not assume that an employer's initial proposals are fixed positions and should test the employer's willingness to bargain before filing a bad-faith bargaining charge. See *District Hospital Partners, L.P. d/b/a The George Washington*

---

[22] I would be remiss if I did not also point out that there is no evidence that Respondent offered any meaningful economic concessions or benefits to the bargaining unit in exchange for the broad discretion that it proposed in the areas discussed above. See *Sweeney & Co.*, 176 NLRB 208, 211–212 (1969) (finding that the employer's rigid refusal to make any meaningful concessions on critical economic issues supported a finding that the employer bargained in bad faith), enfd. in pertinent part, 437 F.2d 1127 (5th Cir. 1971). The wage increases that Respondent offered are offset by several factors, including but not limited to: the new obligation for bargaining unit employees to pay 30 percent of the premium costs for

Respondent's health, vision, and dental insurance programs; the removal of the annual $4,000 cap on pension and wage diversions which were incorporated into wage rates before any wage increases; and the loss of all sick leave that bargaining unit employees banked under the sick leave provisions in the expired contract. There is no evidence that Respondent offered any other increased financial compensation or benefits to the bargaining unit during negotiations. (See FOF, Sec. II(D)(4)(a), (E); Tr. 688–690 (Lowe, Respondent's chief negotiator, could not identify any financial benefit that Respondent offered to the bargaining unit besides wage increases).)

*University Hospital*, 370 NLRB No. 118, slip op. at 6 (2021).[23] Based on that authority, I find that the Union filed its bad-faith bargaining charge at an appropriate time (i.e. after it tested Respondent's willingness to bargain), and I also find that Section 10(b) of the Act does not bar the General Counsel's allegation that Respondent engaged in bad-faith bargaining by (among other conduct) insisting on predictably unacceptable proposals since March 11, 2019.[24]

Respondent also contends that the General Counsel did not present evidence of bad-faith bargaining in the form of delaying tactics, unilateral changes in mandatory subjects of bargaining, efforts to bypass the Union, failure to designate an agent with sufficient bargaining authority, withdrawal of already agreed-upon provisions, or arbitrary scheduling of meetings. (R. Posttrial Br. at 27–28.) That argument misses the mark because the General Counsel presented other evidence of bad-faith bargaining, including evidence that Respondent prematurely declared impasse and made a combination of contract proposals in its final offer that demonstrate an intent to frustrate arriving at an agreement. See *Altura Communications Solutions, LLC*, 369 NLRB No. 85, slip op. at 6 (finding bad-faith bargaining based in part on the employer's contract proposals); *South Carolina Baptist Ministries*, 310 NLRB 156, 157 (1993) (finding bad-faith bargaining based on, among other misconduct, the employer's premature declaration of impasse and employer's insistence on proposals that would have left the union with fewer rights than imposed by law without a contract).

In sum, I find that since about March 11, 2019, Respondent, by its overall conduct in negotiations for a successor collective-bargaining agreement (including prematurely declaring impasse and insisting on proposals that, viewed as a whole, would leave the union and bargaining unit employees with substantially fewer rights and less protection than provided by law without a contract), failed and refused to bargain in good faith with the Union as the exclusive collective-bargaining representative of the bargaining unit and thereby violated Section 8(a)(5) and (1) of the Act.

*C. Did Respondent Violate the Act when it Unilaterally Implemented Terms and Conditions of Employment on July 27, 2020?*

1. Complaint allegations

The General Counsel alleges that Respondent violated Section 8(a)(5) and (1) of the Act by, on or about July 27, 2020, implementing changes to bargaining unit employees' terms and conditions of employment without first bargaining with the Union to an overall good-faith impasse for a successor collective-bargaining agreement.

2. Applicable legal standard

Under the unilateral change doctrine, an employer's duty to bargain under the Act includes the obligation to refrain from changing its employees' terms and conditions of employment without first bargaining to impasse with the employees' collective-bargaining representative concerning the contemplated changes.[25] The Act prohibits employers from taking unilateral action regarding mandatory subjects of bargaining such as rates of pay, wages, hours of employment and other conditions of employment. An employer's regular and longstanding practices that are neither random nor intermittent become terms and conditions of employment even if those practices are not required by a collective-bargaining agreement. The party asserting the existence of a past practice bears the burden of proof on the issue and must show that the practice occurred with such regularity and frequency that employees could reasonably expect the practice to continue or reoccur on a regular and consistent basis. *Raytheon Network Centric Systems*, 365 NLRB 1722, 1726, 1729, 1737, 1741 (2017); *Howard Industries, Inc.*, 365 NLRB 28, 30–31 (2016).

On the issue of whether the parties bargained to an impasse, the Board defines a bargaining impasse as the point in time of negotiations when the parties are warranted in assuming that further bargaining would be futile because both parties believe they are at the end of their rope. The question of whether an impasse exists is a matter of judgment based on several factors, including: the bargaining history; the good faith of the parties in negotiations; the length of the negotiations; the importance of the issue or issues as to which there is disagreement; and the contemporaneous understanding of the parties as to the state of negotiations. The party asserting impasse bears the burden of proof on the issue. *Phillips 66*, 369 NLRB No. 13, slip op. at 7 (2020); *Taft Broadcasting Co.*, 163 NLRB 475, 478 (1967), review denied sub nom. *American Federation of Television & Radio Artists v. NLRB*, 395 F.2d 622 (D.C. Cir. 1968).

If an employer makes a unilateral change to a term and condition of employment, it may still assert certain defenses. For example, the employer may assert that the change: did not alter the status quo (e.g., because the change in question was part of a regular and consistent past pattern); did not involve a mandatory subject of bargaining; was not material, substantial and significant; or did not vary in kind or degree from what has been customary in the past. *MV Transportation, Inc.*, 368 NLRB No. 66, slip op. at 11 (2019); *Raytheon Network Centric Systems*, 365 NLRB 1722, 1726, 1729, 1737, 1741. In addition, the employer may assert that the contractual language privileged it to make the disputed change without further bargaining (the "contract coverage" defense). Under the contract coverage defense, the Board will determine whether the parties' collective-bargaining agreement covers the disputed unilateral change. In making that determination, the Board will give effect to the plain meaning of the relevant contractual language, applying ordinary principles of contract interpretation, and the Board will find that the agreement covers the challenged unilateral act if the act falls within the compass or scope of contract language that grants the employer the right to act unilaterally. Since a collective-bargaining agreement establishes principles that govern a myriad of fact patterns, the Board will not require (as a prerequisite to the defense) that the agreement specifically mention, refer to or address the employer decision at issue. If the contract coverage defense is not met, then the Board will determine whether the union waived

---

[23] The General Counsel maintains that the Board should overrule its decision in *District Hospital Partners, L.P. d/b/a The George Washington University Hospital*, 370 NLRB No. 118 (2021), albeit for reasons that do not relate to my citation here. (See GC Posttrial Br. at 50–51.) I leave that request for the Board to consider.

[24] As an aside, I note that bargaining conduct before March 11, 2019, remains relevant as it sheds light on bargaining conduct within the 10(b)

period. See *Regency Service Carts*, 345 NLRB 671, 672 fn. 3 (2005); *Rescar, Inc.*, 274 NLRB 1, 2 (1985).

[25] Separate and apart from the unilateral change doctrine, an employer also has a "duty to engage in bargaining regarding any and all mandatory bargaining subjects *upon the union's request* to bargain," unless an exception to that duty applies. *Raytheon Network Centric Systems*, 365 NLRB 1722, 1732–1733, 1737–1738, 1741 (emphasis in original).

its right to bargain about a challenged unilateral change. *MV Transportation, Inc.*, 368 NLRB No. 66, slip op. at 11–12.

### 3. Analysis

There is no dispute that on July 27, 2020, Respondent declared that the parties were at impasse and unilaterally implemented terms and conditions of employment for the bargaining unit. Many of the terms that Respondent implemented were the same as what Respondent set forth in its June 12, 2020 last, best, and final offer. Some of the terms that Respondent implemented, however, differed from the last, best, and final offer, including: wages, work hours, short term disability, transfers due to work-place changes, and health and welfare. (FOF, Sec. II(J)(1)–(2).)

Respondent contends that it was permitted to implement terms and conditions of employment because the parties reached an impasse in their negotiations for a successor collective-bargaining agreement. Respondent's argument fails on this point. First, the Board has long held that a finding of impasse is precluded if that outcome is reached in the context of serious unremedied unfair labor practices that affect the negotiations. *Royal Motor Sales*, 329 NLRB 760, 762, 764 (1999), enfd. 2 Fed.Appx. 1 (D.C. Cir. 2001). That is the situation here, as I have found that Respondent engaged in overall bad-faith bargaining since about March 11, 2019, in part because Respondent's contract proposals demonstrate Respondent's intent to frustrate arriving at an agreement. (See Discussion and Analysis, Sec. B(3), supra.)

Second, Respondent declared impasse at a time in negotiations when neither party would have been warranted in assuming that further bargaining would be futile and when neither party could have reasonably believed that they were at the end of their rope. When the parties concluded their February 24, 2020 bargaining session, they had not yet finished discussing the Union's contract proposal from September 2019. Presumably the parties would have continued that discussion at the next bargaining session, but the Covid–19 pandemic began and the Union canceled the March 25, 2020 session. Respondent did not object to the cancellation when it occurred. When bargaining continued to be on hold and Respondent's May 22, 2020 written response to the Union's September 2019 proposal did not prompt a reply, Respondent sent the Union a last, best, and final offer on June 12, 2020. The last, best, and final offer included a handful of updated proposals, including a health and welfare proposal in which Respondent committed to providing health, dental, vision,

and life insurance plans to the bargaining unit for the length of the contract. The parties did not have a bargaining session to discuss Respondent's last, best, and final offer, nor did they have a bargaining session to discuss the additional updated proposals that Respondent used when it declared impasse and unilaterally implemented terms and conditions of employment on July 27, 2020.[26] In short, Respondent declared impasse when the parties still needed to bargain about the Union's September 2019 proposal, Respondent's June 12, 2020 last, best, and final offer, and the terms that Respondent implemented on July 27, 2020. Those checkpoints included movement on key issues such as wages, health and welfare, work hours, and short term disability coverage. (See FOF, Sec. II(G)(2), H(2)–(3), (I)(1)–(2); see also FOF, Sec. II(I)(2) (noting that on July 20, 2020, the Union explicitly offered to meet and bargain over its September 2019 proposal and Respondent's last, best, and final offer).)

Third, I am not persuaded by Respondent's argument that the Union engaged in bad-faith bargaining that supported Respondent's declaration of impasse.[27] Specifically, Respondent contends that the Union improperly: avoided or delayed in meeting to negotiate; engaged in regressive bargaining; insisted on permissive subjects of bargaining; attempted to interfere with Respondent's choice of its bargaining representatives; and refused to reach tentative agreements on proposals unless the tentative agreement covered an entire contract article. (See R. Posttrial Br. at 34–36.) While I would not say that the Union's conduct during bargaining was beyond reproach, I do not find that any of the conduct that Respondent identified demonstrates that additional bargaining would have been futile. For example, while it is true that Respondent was more proactive and flexible than the Union with scheduling bargaining dates, the fact remains that the parties agreed to multiple bargaining dates throughout negotiations.[28] (See FOF, Sec. II(D)(5).) As for Respondent's assertion that the Union made regressive (or permissive) proposals concerning when Respondent could use stringers, when managers could perform bargaining unit work, and the number of managers that Respondent could have in relation to the size of the bargaining unit, I note that the Union corrected or withdrew the majority of those proposals during bargaining. Perhaps more important, none of the Union's proposals that Respondent flagged as regressive or permissive was so problematic that Respondent could reasonably conclude that further bargaining would be fruitless. (See FOF, Sec. II(D)(3), (F).)[29]

---

[26] Respondent's actions on July 27, 2020, were inherently contradictory. Specifically, Respondent declared that the parties were at impasse, but simultaneously announced that it was implementing terms and conditions of employment that differed from what Respondent set forth in its last, best, and final offer. By implementing new terms, Respondent demonstrated that it had room to move from what it characterized as its last, best and final offer on June 12, 2020, and thus demonstrated that the parties were not at impasse.

[27] I do not find that the Board has recognized a defense that would permit an employer to implement its final offer based on a union's alleged bad-faith bargaining tactics (but in the absence of an impasse). To the contrary, when one party asserts that it may act unilaterally because another party has acted in bad-faith during bargaining, that issue is addressed in the context of evaluating whether the parties have reached a good-faith impasse and whether it would be futile to engage in additional bargaining. I have followed that approach here. See, e.g., *Jefferson Smurfit Corp.*, 311 NLRB 41, 60 (1993) (finding that an employer reasonably concluded that further bargaining would not be fruitful, in part because the union was engaging in conduct that was preventing the parties from reaching an agreement or a genuine impasse); *M & M*

*Contractors*, 262 NLRB 1472, 1472 (1982) (same, where the union "over a period of 7 months had clearly manifested its aversion to bargaining" with the employer), petition for review denied, 707 F.2d 516 (9th Cir. 1983); see also *Wilkes-Barre Behavioral Hospital Co., LLC d/b/a First Hospital Wyoming Valley*, 370 NLRB No. 17, slip op. at 17–18 (2020) (rejecting a "union acted in bad faith" defense to an allegation that the employer unlawfully implemented its final offer in the absence of a good-faith impasse).)

[28] To the extent that Respondent takes issue with the fact that no bargaining sessions were scheduled between September 2019 and February 2020 (see R. Posttrial Br. at 37–38), I note that neither party reached out in Fall 2019 to schedule the next bargaining session. When Respondent did reach out in mid–January 2020, the Union proposed February 24, 2020, as the next date for bargaining and Respondent accepted. The parties planned to meet again on March 25, 2020, but the Union canceled that session (without objection from Respondent) due to the onset of the Covid–19 pandemic. (FOF, Sec. II(G)(1), (H)(1)–(2).)

[29] I do not discuss each of Respondent's assertions of Union misconduct here because many of the assertions lack merit insofar as the alleged misconduct had little to no effect on negotiations. For example, the

Viewing the dispute as a whole, I find that the parties had not bargained to a good-faith impasse when Respondent unilaterally implemented terms and conditions of employment on July 27, 2020. As noted above, Respondent violated the Act by failing and refusing to bargain in good faith during negotiations, and that unfair labor practice had not been remedied when Respondent declared impasse. In addition, Respondent was aware that there was still room to bargain, as the parties had not yet finished discussing the Union's September 2019 proposal, the Union stated that it was willing to continue bargaining, and Respondent demonstrated its potential flexibility by modifying its proposals shortly before (and on the same day) it declared impasse. Those factors outweigh the fact that negotiations were lengthy and the fact that the parties' disagreement centered around critical issues such as wages, health and welfare benefits, and the Union's jurisdiction.[30] Since the parties were not at an overall good-faith impasse in their negotiations for a successor collective-bargaining agreement and no other defenses apply, I find that Respondent violated Section 8(a)(5) and (1) of the Act when it, on July 27, 2020, unilaterally implemented changes to bargaining unit employees' terms and conditions of employment.

*D. If the Parties Were at a Valid Impasse, Did Respondent Nonetheless Violate the Act by Unilaterally Implementing Improper Terms and Conditions of Employment on July 27, 2020?*

### 1. Complaint allegations

The General Counsel alleges, as an alternative theory if it is determined that the parties bargained to an overall good-faith impasse before July 27, 2020, that Respondent violated Section 8(a)(5) and (1) of the Act by unilaterally implementing various terms and conditions of employment on or about July 27, 2020, that were not reasonably comprehended by its pre-impasse proposals.

The General Counsel also alleges that Respondent violated Section 8(a)(5) and (1) of the Act by, on or about July 27, 2020, unilaterally implementing a discretionary proposal concerning the performance of bargaining unit work by non-unit employees, and thereby undermining the status of the Union as the employees' exclusive collective-bargaining representative.

### 2. Applicable legal standard

It is well established that an employer may not, unilaterally and without first notifying the union and affording an opportunity to bargain, implement more generous terms and conditions of employment than what the employer offered during negotiations. *NLRB v. Crompton-Highland Mills, Inc.*, 337 U.S. 217, 225 (1949). That principle applies not only while the parties are actively bargaining, but also when the parties reach a valid impasse. See *Cleveland Cinemas Management Co.*, 346 NLRB 785, 785 & fn. 3, 788–789 (2006).

The Board has recognized a narrow exception to an employer's right to unilaterally implement contract proposals after bargaining to a good-faith impasse. Specifically, in *McClatchy Newspapers*, the Board held that the employer violated the Act when, after reaching impasse, the employer unilaterally implemented a merit wage increase proposal that gave the employer carte blanche authority over wage increases without limitation by time, standards, criteria, or the need to secure the union's agreement. The implemented wage proposal was unlawful because it excluded the union from any meaningful bargaining about merit wage increases and thereby demonstrated the union's incapacity to act as the employees' representative and was inherently destructive of the fundamental principles of collective bargaining. 321 NLRB 1386, 1389–1391 (1996), enfd. 131 F.3d 1026 (D.C. Cir. 1997); see also *KSM Industries*, 336 NLRB 133, 134–135 (2001) (applying *McClatchy Newspapers* to a health benefits proposal).

### 3. Analysis

The evidentiary record shows that the terms and conditions of employment that Respondent unilaterally implemented on July 27, 2020, were different from (and arguably more favorable than) what Respondent offered at the bargaining table or in its June 12, 2020 last, best, and final offer. (FOF, Sec. II(J)(2) (describing modifications that Respondent made to its position on work hours, short term disability benefits, and health and welfare benefits, among other areas).) The General Counsel maintains that these unilateral changes violate the Act even if the parties reached a good-faith impasse. (GC Posttrial Br. at 48–50.)

The record also establishes that when Respondent unilaterally implemented terms and conditions of employment on July 27, 2020, those terms stated exceptions to the Union's jurisdiction that permitted Respondent to subcontract work, have supervisors and managerial employees perform bargaining unit work (as long as no bargaining unit employee was laid off as a direct result), and have non-bargaining unit employees perform bargaining unit work on an occasional basis. (See FOF, Sec. II(D)(3), (E), (I)(1), (J)(2).) The General Counsel maintains that these implemented terms violate the Act as explained in *McClatchy Newspapers*. (GC Posttrial Br. at 47–48.)

I recommend that each of these complaint allegations be dismissed as moot since I have found that the parties were not at a good-faith impasse on July 27, 2020, and thus found that it was unlawful for Respondent to unilaterally implement terms and conditions of employment (including the terms described above). Given those findings, there is no need to address legal theories that would only apply here if the parties reached a good-faith impasse.

*E. Did Respondent Violate the Act by Surveilling Employees' Union Activities and/or Creating the Impression of Surveillance?*

### 1. Complaint allegations

The General Counsel alleges that Respondent violated Section 8(a)(1) of the Act by, on or about September 25, October 24 and 31, 2020, taking pictures and/or video recordings and thereby engaging in surveillance of employees who were engaged in union activities or creating an impression among employees that their union activities were under surveillance.[31]

---

Union's statements that Respondent should change its bargaining representative arose briefly in early 2018 and did not arise again afterwards. (FOF, Sec. II(D)(5).) Similarly, regarding whether the parties should have reached tentative agreements on subsections of Articles, there is no evidence that the parties agreed on any ground rules for locking in areas of agreement (see FOF, Sec. II(D)(4)), nor is there evidence that the

Union's practices on tentative agreements became a material point of contention during negotiations.

[30] I find that the bargaining history factor is neutral as to whether the parties reached a good faith impasse.

[31] The General Counsel withdrew its complaint allegation that Respondent also unlawfully engaged in surveillance or created the impression of surveillance on October 3, 2020. (Tr. 14–15.)

### 2. Applicable legal standard

An employer's routine observation of employees engaged in open Section 7 activity on or near the employer's property does not constitute unlawful surveillance. However, an employer violates Section 8(a)(1) when it surveils employees engaged in Section 7 activity by observing them in a way that is out of the ordinary and thereby coercive. Indicia of coerciveness include the duration of the observation, the employer's distance from its employees while observing them, and whether the employer engaged in other coercive behavior during its observation. *NCRNC, LLC d/b/a Northeast Center for Rehabilitation*, 372 NLRB No. 35, slip op. at 3–4, 6–7 (2022); *Aladdin Gaming, LLC*, 345 NLRB 585, 585–586 (2005), petition for review denied 515 F.3d 942 (9th Cir. 2008).

The Board's test for determining whether an employer has unlawfully created an impression of surveillance is whether, under all the relevant circumstances, reasonable employees would assume from the statement or conduct in question that their union or other protected activities have been placed under surveillance. The standard is an objective one, based on the rationale that employees should be free to participate in union activities without the fear that members of management are peering over their shoulders, taking note of who is involved in union activities, and in what particular ways. *Metro One Loss Prevention Services*, 356 NLRB 89, 102 (2010).

### 3. Analysis

The evidentiary record shows that on September 25, 2020, the Union held a public rally on the street in front of Respondent's facility. Hearing the noise from the rally, Respondent's chief photo editor, Arturo Fernandez, took photographs from the third floor (near where his desk was located) because he believed the rally could be a "spot news" event that the newspaper should cover.[32] (FOF, Sec. II(K)(1).)

The General Counsel maintains that Respondent, through Fernandez' actions, unlawfully engaged in surveillance or created the impression of surveillance. I disagree. Regarding alleged surveillance, I find that due to the public nature of the rally and Fernandez' role as a journalist, it was not out of the ordinary for Fernandez to take photographs of the rally in case the event proved to be newsworthy. Moreover, there is no evidence that Fernandez engaged in any other behavior while taking photographs that could be deemed coercive. As for allegedly creating the impression of surveillance, I do not find that a reasonable employee, knowing Fernandez' role as chief photo editor and understanding that the rally was a public event, would assume from Fernandez' conduct that Respondent had placed employees' union activities under surveillance.

I take a different view of Respondent's actions at the October 24 and 31, 2020 rallies outside of publisher John Block's home. At each of those rallies, Respondent had security guards present to ensure that the rallies did not get out of control. The security guards took photographs at each rally, and in particular appeared to take photographs of rally participants (including employees) when the participants were across the street from Block's home. Because the security guards gave the impression that they were photographing employees when they were not near the property line for Block's home, I do not find that the security guards were

simply documenting intrusions onto the Blocks' private property. There is also no evidence that the security guards were attempting to document unlawful conduct that rally participants engaged in while they were located across the street from the Blocks' home. Under those circumstances, a reasonable employee would conclude that Respondent, through security guards serving as its agents, had placed employees' union activities under surveillance.

In sum, I find that Respondent violated Section 8(a)(1) of the Act by, on October 24 and 31, 2020, appearing to take photographs of employees across the street from John Block's home and thereby creating an impression among its employees that their union activities were under surveillance. I recommend that the complaint allegations regarding alleged surveillance and creating the impression of surveillance on September 25, 2020, be dismissed.

### CONCLUSIONS OF LAW

1. Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. The Union is a labor organization within the meaning of Section 2(5) of the Act.

3. By its overall conduct in negotiations for a successor collective-bargaining agreement since about March 11, 2019, including prematurely declaring impasse and insisting on proposals that, viewed as a whole, would leave the Union and bargaining unit employees with substantially fewer rights and less protection than provided by law without a contract, Respondent failed and refused to bargain in good faith with the Union as the exclusive collective-bargaining representative of the bargaining unit and thereby violated Section 8(a)(5) and (1) of the Act.

4. By, on July 27, 2020, unilaterally implementing changes to bargaining unit employees' terms and conditions of employment without first bargaining with the Union to an overall good-faith impasse for a successor collective-bargaining agreement, Respondent violated Section 8(a)(5) and (1) of the Act.

5. By, on October 24 and 31, 2020, appearing to take photographs of bargaining unit employees while they engaged in union activities across the street from publisher John Block's residence and thereby creating the impression among its employees that their union activities were under surveillance, Respondent violated Section 8(a)(1) of the Act.

6. The unfair labor practices stated in Conclusions of Law 3–5, above, affect commerce within the meaning of Section 2(6) and (7) of the Act.

### REMEDY

#### A. Standard Remedies

Having found that Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act.

Upon request of the Union, Respondent shall rescind the unlawful unilateral changes and put into effect the corresponding terms and conditions of employment set forth in the collective-bargaining agreement that expired on March 31, 2017, and shall maintain those terms in effect until the parties have bargained to agreement or a valid impasse, or the Union has agreed to

---

[32] Robert Weber also observed the rally but the General Counsel did not prove that Weber took or appeared to take photographs or video recordings. (FOF, Sec. II(K)(1).)

changes. In addition, Respondent must make its employees whole for any loss of earnings and other benefits that resulted from its unlawful unilateral changes. Backpay for these violations shall be computed in accordance with *Ogle Protection Service*, 183 NLRB 682 (1970), enfd. 444 F.2d 502 (6th Cir. 1971), with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010). This includes reimbursing unit employees for any expenses resulting from Respondent's unlawful changes to their contractual benefits (including changes to health insurance benefits), as set forth in *Kraft Plumbing & Heating*, 252 NLRB 891 fn. 2 (1980), affd. 661 F.2d 940 (9th Cir. 1981), with interest as set forth in *New Horizons* and *Kentucky River Medical Center*, supra. I further recommend that Respondent be ordered to make all contributions to any fund established by the expired collective-bargaining agreement, which contributions the Respondent would have made but for the unlawful unilateral changes, in accordance with *Merryweather Optical Co.*, 240 NLRB 1213, 1216 (1979).

Consistent with *Thryv, Inc.*, 372 NLRB No. 22, slip op. at 14 (2022), Respondent shall also compensate all bargaining unit employees for any other direct or foreseeable pecuniary harms incurred as a result of the unlawful unilateral changes. Compensation for these harms shall be calculated separately from taxable net backpay, with interest at the rate prescribed in *New Horizons*, supra, compounded daily as prescribed in *Kentucky River Medical Center*, supra.

In accordance with *Don Chavas, LLC d/b/a Tortillas Don Chavas,* 361 NLRB 101 (2014), Respondent shall compensate all bargaining unit employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award. In addition, in accordance with *AdvoServ of New Jersey, Inc.*, 363 NLRB 1324 (2016) and *Cascades Containerboard Packaging–Niagara*, 370 NLRB No. 76 (2021), as modified in 371 NLRB No. 25 (2021), Respondent shall, within 21 days of the date the amount of backpay is fixed either by agreement or Board order, file with the Regional Director for Region 6 a report allocating backpay to the appropriate calendar year(s). Respondent shall also, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, file a copy of each backpay recipient's W–2 form(s) reflecting the backpay award. The Regional Director will then assume responsibility for transmitting the report and W–2 form(s) to the Social Security Administration at the appropriate time and in the appropriate manner.

### B. Special Remedies

#### 1. Bargaining order

The General Counsel requests an order requiring Respondent, within 15 days of the Union's request, to meet with the Union at reasonable times and bargain in good faith with the Union concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement. The General Counsel also requests that the order provide that upon the Union's request, bargaining sessions should be held for a minimum of 15 hours per week (or according to a different schedule to which the Union agrees), and that Respondent submit a written bargaining progress report every 15 days to the compliance officer for Region 6, with copies served on the Union.

The Board has a long-established practice of relying on bargaining orders to remedy the vast majority of bad-faith bargaining violations. See *Frontier Hotel & Casino*, 318 NLRB 857, 859 (1995), enfd. in relevant part sub nom. *Unbelievable, Inc. v. NLRB*, 118 F.3d 795 (D.C. Cir. 1997); see also *Caterair International*, 322 NLRB 64, 67 (1996) (explaining that an affirmative bargaining order serves the interests of an incumbent union by restoring the bargaining opportunity that it should have had in the absence of unlawful conduct). However, the U.S. Court of Appeals for the District of Columbia Circuit has required the Board to justify, on the facts of each case, the imposition of an affirmative bargaining order. See, e.g., *Vincent Industrial Plastics, Inc. v. NLRB*, 209 F.3d 727, 738–739 (D.C. Cir. 2000). In *Vincent*, supra at 738, the court stated that an affirmative bargaining order must be justified by a reasoned analysis that includes an explicit balancing of three considerations: (1) the employees' Section 7 rights; (2) whether other purposes of the Act override the rights of employees to choose their bargaining representative; and (3) whether alternative remedies are adequate to remedy the violations of the Act. Although the Board has indicated that it disagrees with the requirements that the court identified in *Vincent*, the Board has followed a practice of examining whether an affirmative bargaining order is justified according to the standard set forth in *Vincent*. See, e.g., *Wyman Gordon Pennsylvania, LLC*, 368 NLRB No. 150, slip op. at 10–11 (2019), enfd. 836 Fed.Appx. 1 (D.C. Cir. 2020).

Following the Board's approach, I have analyzed the facts of this case under the three-factor balancing test outlined by the U.S. Court of Appeals for the District of Columbia Circuit.

(1) An affirmative bargaining order in this case will vindicate the Section 7 rights of the unit employees who were denied the benefits of collective bargaining through their designated representative by Respondent's failure and refusal to bargain in good faith with the Union. While an affirmative bargaining order comes with an attendant bar to raising a question concerning the Union's majority status for a reasonable time, that bar does not unduly prejudice the Section 7 rights of employees who may oppose representation by the Union because the duration of the order is no longer than is reasonably necessary to remedy the ill effects of the violation. Since Respondent's unlawful bargaining practices prevented an agreement since March 11, 2019 (a period of nearly 4 years), it is only by restoring the status quo ante and requiring Respondent to bargain with the Union for a reasonable period of time that the employees will be able to fairly assess the Union's effectiveness as a bargaining representative free of Respondent's unlawful conduct. The employees can then determine whether continued representation by the Union is in their best interest.

(2) An affirmative bargaining order also serves the policies of the Act by fostering meaningful collective bargaining and industrial peace. It removes Respondent's incentive to delay bargaining in the hope of discouraging support for the Union and ensures that the Union will not be pressured (e.g., by a decertification petition or withdrawal of recognition) to achieve immediate results at the bargaining table following the Board's resolution of its unfair labor practice charges and the issuance of a cease-and-desist order.

(3) A cease-and-desist order alone would be inadequate to remedy Respondent's failure and refusal to bargain with the Union in good faith because it would permit a challenge to the Union's majority status before the taint of Respondent's misconduct has dissipated. Allowing a challenge to the Union's majority status without a reasonable period for bargaining

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

would be unjust in circumstances such as those here, where given the passage of time the Union needs an opportunity to reestablish its role as the exclusive collective-bargaining representative of unit employees without, for example, the employee disaffection that may have resulted from unpopular terms and conditions of employment that Respondent unlawfully implemented in the absence of a good-faith impasse. Permitting a decertification petition to be filed immediately might very well allow Respondent to profit from its own unlawful conduct. I find that those concerns outweigh the temporary impact that the affirmative bargaining order will have on the rights of employees who oppose union representation.

For all of the foregoing reasons, I find that an affirmative bargaining order with its temporary decertification bar is necessary to fully remedy the violations in this case, and I shall include such an order as a remedy here. I shall also require Respondent to submit written bargaining progress reports every 30 days to the compliance officer for Region 6.[33]

   2. Reimbursement of Union's negotiating costs and expenses

The Board has held that in the vast majority of cases involving bad-faith bargaining violations, a bargaining order accompanied by the usual cease-and-desist order and the posting of a notice will suffice to induce a respondent to fulfill its statutory obligations. However, "[i]n cases of unusually aggravated misconduct [] where it may fairly be said that a respondent's substantial unfair labor practices have infected the core of a bargaining process to such an extent that their 'effects cannot be eliminated by the application of traditional remedies,' an order requiring the respondent to reimburse the charging party for negotiation expenses is warranted both to make the charging party whole for the resources that were wasted because of the unlawful conduct, and to restore the economic strength that is necessary to ensure a return to the status quo ante at the bargaining table." *Frontier Hotel & Casino*, 318 NLRB at 859; see also *Nexstar Broadcasting, Inc. d/b/a KOIN-TV*, 371 NLRB No. 118, slip op. at 2 & fn. 5 (2022); *Regency Service Carts*, 345 NLRB 671, 676 (2005).[34]

I do not find that Respondent engaged in unusually aggravated misconduct in this case that would support ordering Respondent to reimburse the Union for negotiating costs and expenses. While Respondent did engage in bad-faith bargaining, the General Counsel has not maintained (or established) that Respondent has a history of violating the Act. The General Counsel also has not identified any other aggravated misconduct by Respondent that might justify the extraordinary remedy of requiring Respondent to reimburse the Union for negotiating costs and expenses. Given the lack of evidence on those points, I decline the General Counsel's request that I order Respondent to reimburse the Union for its negotiating costs and expenses.

   3. Reimbursement of employee negotiators' lost earnings and/or leave while attending bargaining sessions

The General Counsel also requests that I order Respondent to reimburse employee negotiators for any earnings and/or leave

lost while attending bargaining sessions during the time Respondent engaged in bad-faith bargaining (if the Union did not reimburse the employee negotiators for those expenses). In so arguing, the General Counsel relies on the Board's decision in *Nexstar Broadcasting*, in which the Board stated that "reimbursement of employee-negotiators lost wages serves the same purpose as the reimbursement of bargaining expenses – to make parties whole for any losses that occurred as a result of the [r]espondent's bad-faith bargaining." 371 NLRB No. 118, slip op. at 2–3 & fn. 6.

Since the Board has indicated that an award of employee negotiators' lost earnings and/or leave serves the same purpose as an award of bargaining expenses, I find that the same showing of unusually aggravated misconduct is required to justify the award. Indeed, that is consistent with the Board's analysis in *Frontier Hotel & Casino*, which did not include an award of employee negotiators' lost earnings and/or leave among the standard remedies that apply in cases involving bad-faith bargaining violations. 318 NLRB at 859. As the General Counsel did not demonstrate that Respondent engaged in unusually aggravated misconduct in this case, I decline the General Counsel's request that I order Respondent to reimburse employee negotiators for any earnings and/or leave lost during the time period when Respondent engaged in bad-faith bargaining.

   4. Notice reading

The General Counsel has requested that I require Respondent to have a representative read the notice aloud to employees on worktime in the presence of a Board agent at a meeting or meetings that are scheduled to ensure the widest possible attendance of employees. The General Counsel also requested that I require Respondent to distribute a copy of the notice to each employee who attends the notice reading. The Board has found a notice-reading remedy appropriate where the employer's violations are sufficiently numerous and serious that a reading of the notice is warranted to dissipate the chilling effect of the violations on employees' willingness to exercise their Section 7 rights. *Amerinox Processing, Inc.*, 371 NLRB No. 105, slip op. at 2 (2022); *Gavilon Grain, LLC*, 371 NLRB No. 79, slip op. at 1 (2022).

I do not find that a notice-reading (or accompanying notice distribution) remedy is warranted in this case. While Respondent committed serious unfair labor practices, I do not find that the violations were so widespread that a notice reading is necessary. The other remedies that I have ordered will reset the bargaining relationship between Respondent and the Union, and the standard notice posting remedy will accomplish the goal of ensuring employees that they may exercise their Section 7 rights free of coercion and that Respondent and its managers are bound by the requirements of the Act.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[35]

          ORDER

Respondent, PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette, Pittsburgh, Pennsylvania, its officers, agents,

---

[33] I decline the General Counsel's request that I order bargaining sessions to be held, upon the Union's request, for a minimum of 15 hours per week. Respondent has generally made itself available for bargaining sessions upon request, and thus I leave it to the Union and Respondent to make arrangements for regular bargaining sessions.

[34] The General Counsel has asked the Board to clarify its precedent regarding when an award of bargaining expenses and costs is appropriate. (See GC Posttrial Br. at 55–56 (asserting that bargaining costs and

expenses should not be an extraordinary remedy).) I leave that question to the Board and rely here on the legal standard set forth in *Frontier Hotel & Casino*, 318 NLRB 857, 859, which the Board did not modify or overrule in *Nexstar Broadcasting*, 371 NLRB No. 118, slip op. at 2 & fn. 5.

[35] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

successors, and assigns, shall

1. Cease and desist from

(a) Failing and refusing to bargain with the Newspaper Guild of Pittsburgh/CWA Local 38061 (Union) in good faith as the exclusive collective-bargaining representative of the employees in the following appropriate bargaining unit:

All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

(b) Making unilateral changes to bargaining unit employees' terms and conditions of employment by implementing portions of its last, best, and final offer at a time when the parties had not reached a valid impasse in bargaining for a successor collective-bargaining agreement.

(c) Creating the impression among bargaining unit employees that their union activities are under surveillance.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Beginning within 15 days of the Union's request, meet with the Union at reasonable times and bargain in good faith with the Union as the exclusive representative of employees in the above-described bargaining unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement. Respondent shall submit written bargaining progress reports every 30 days to the compliance officer for Region 6, and shall serve copies of the reports on the Union.

(b) On request by the Union, rescind the changes to terms and conditions of employment for bargaining unit employees that Respondent unilaterally implemented on about July 27, 2020, and restore, honor, and continue the terms of the bargaining unit's collective-bargaining agreement that expired on March 31, 2017.

(c) Make bargaining unit employees whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the unlawful unilateral changes to terms and conditions of employment that Respondent made on about July 27, 2020, with interest, as provided for in the remedy section of this decision.

(d) Make all delinquent contributions to the applicable benefit funds on behalf of bargaining unit employees that have not been paid since July 27, 2020, including any additional amounts due to the funds, as provided for in the remedy section of this decision.

(e) Make bargaining unit employees whole for any expenses ensuing from the failure to make the required contributions to the applicable benefit funds, with interest, as provided for in the remedy section of this decision

(f) Compensate bargaining unit employees for the adverse tax

consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

(g) File with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each bargaining unit employee's W–2 form(s) reflecting the employee's backpay award.

(h) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(i) Within 14 days after service by the Region, post at its facility in Pittsburgh, Pennsylvania, a copy of the attached notice marked "Appendix A." Copies of the notice, on forms provided by the Regional Director for Region 6, after being signed by Respondent's authorized representative, shall be posted by Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, Respondent has gone out of business or closed the facility involved in these proceedings, Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by Respondent at the facility at any time since March 11, 2019.

(j) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C., January 26, 2023

APPENDIX A

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT fail and refuse to bargain with the Newspaper Guild of Pittsburgh/CWA Local 38061 (Union) in good faith as

the exclusive collective-bargaining representative of the employees in the following appropriate bargaining unit:

> All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

WE WILL NOT make unilateral changes to bargaining unit employees' terms and conditions of employment by implementing portions of our last, best, and final offer at a time when we and the Union have not reached a valid impasse in bargaining for a successor collective-bargaining agreement.

WE WILL NOT create the impression among bargaining unit employees that their union activities are under surveillance.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce employees in the exercise of the rights guaranteed them by Section 7 of the Act.

WE WILL, beginning within 15 days of the Union's request, meet with the Union at reasonable times and bargain in good faith with the Union as the exclusive representative of employees in the above-described bargaining unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement. WE WILL submit written bargaining progress reports every 30 days to the compliance officer for Region 6, and shall serve copies of the reports on the Union.

WE WILL, on request by the Union, rescind the changes to terms and conditions of employment for bargaining unit employees that we unilaterally implemented on about July 27, 2020, and restore, honor, and continue the terms of the bargaining unit's collective-bargaining agreement that expired on March 31, 2017.

WE WILL make bargaining unit employees whole for any loss of earnings and other benefits, and for any direct or foreseeable pecuniary harms suffered as a result of the unlawful unilateral changes to terms and conditions of employment that we made on about July 27, 2020, with interest.

WE WILL make all delinquent contributions to the applicable benefit funds on behalf of bargaining unit employees that have not been paid since July 27, 2020, including any additional amounts due to the funds.

WE WILL make bargaining unit employees whole for any expenses ensuing from the failure to make the required contributions to the applicable benefit funds, with interest.

WE WILL compensate bargaining unit employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file with the Regional Director for Region 6, within 21 days of the date that the amount of backpay is fixed, either by agreement or Board order, a report allocating each backpay WE WILL file with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each bargaining unit employee's W–2 form(s) reflecting the employee's backpay award.

PG PUBLISHING CO., INC. D/B/A PITTSBURGH POST-GAZETTE

The Administrative Law Judge's decision can be found at https://www.nlrb.gov/case/06-CA-248017 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



APPENDIX B

CORRECTIONS TO TRANSCRIPT
PG PUBLISHING CO., INC. D/B/A PITTSBURGH POST-GAZETTE, 6–CA–248017, ET AL.

P. 10, l. 20: "of" should be "off"
P. 12, l. 1: "John" should be "Jon"
P. 14, l. 2: "withdrawal" should be "withdraw"
P. 15, l. 1: "so we reflect" should be "so reflect"
P. 22, l. 8: "fertility" should be "futility"
P. 22, l. 13: "Analog" should be "NLRB"
P. 23, l. 11: "it's" should be "its"
P. 28, l. 13: "past" should be "passed"
P. 32, l. 15: "party's" should be "parties"
P. 55, l. 9: "Webber" should be "Weber"
P. 60, l. 10: "we're" should be "were"
P. 61, l. 19: "Blocks" should be "Block's"
P. 64, l. 16: "return" should be "returned"
P. 70, l. 9: "printout" should be "print out"
P. 70, l. 21: "first" should be "for us"
P. 117, l. 20: "this" should be "his" (2 instances)
P. 130, l. 20: "Teacher's" should be "Teamsters"
P. 131, l. 11: "at plus" should be "a plus"
P. 133, l. 10: "obtain" should be "maintain"
P. 133, l. 11: "eliminated" should be "eliminating"
P. 134, l. 6: "a numeration" should be "remuneration"
P. 136, ll. 8–9: "extensively" should be "essentially"
P. 140, l. 16: "Council" should be "Counsel"
P. 147, l. 14: "Blazine" should be "Blazina"
P. 156, l. 17: "Emitted" should be "admitted"
P. 175, l. 8: "failure" should be "familiar"
P. 184, l. 13: "inadequacy's" should be "inadequacies"
P. 185, l. 19: "John" should be "Jon"
P. 186, l. 7: "unit" should be "union"
P. 189, l. 21: "fires" should be "files"
P. 191, l. 9: "inadequacy's" should be "inadequacies"
P. 198, l. 15: "mating" should be "meeting"
P. 235, l. 7: "simple" should be "similar"
P. 263, l. 8: Mr. Pass was the speaker

P. 269, l. 17: "no –" should be "no claim?"

P. 273, l. 4: "DIRECT" should be "CROSS"

P. 289, l. 2: "trail" should be "trial"

P. 289, l. 3: "missioned" should be "admissions"

P. 296, l. 20: "goner" should be "gone over"

P. 289, l. 4: "property" should be "party"

P. 298, l. 6: "handed" should be "handled"

P. 299, l. 17: "John" should be "Jon"

P. 303, l. 9: "hold" should be "hole"

P. 303, l. 17: "write" should be "right"

P. 305, l. 2: "of" should be "from"

P. 307, l. 10: "about" should be "without"

P. 309, l. 6: "lick" should be "wink"

P. 309, l. 6: a quotation mark should appear after the period

P. 309, l. 18: "without" should be "with"

P. 313, l. 10: "John" should be "Jon"

P. 315, l. 25: a quotation mark should appear after the first comma

P. 318, l. 25: "doling" should be "doing"

P. 320, l. 1: a quotation mark should appear before the word "it"

P. 321, l. 13: "workplace ability" should be "work flexibility"

P. 323, l. 6: "permissible" should be "permissive"

P. 323, l. 6: "were not opposing" should be "were opposing"

P. 325, l. 23: "I didn't have" should be "I have"

P. 333, l. 2: "an aggressive" should be "a regressive"

P. 338, l. 14: "costs" should be "scales"

P. 341, l. 4: "o" should be "on"

P. 345, l. 24: "no more" should be "normal"

P. 346, l. 16: "techs" should be "days"

P. 347, l. 17: "gauge" should be "engage"

P. 349, l. 19: "waned" should be "wanted"

P. 349, l. 23: "our" should be "their"

P. 354, l. 22: "slipped" should be "split"

P. 355, ll. 21, 24: "Signing" should be "Assignment"

P. 356, l. 2: "Signing" should be "Assignment"

P. 362, l. 3: "you" should be "they"

P. 365, l. 19: "Yes, sir." should be "No, sir."

P. 374, l. 4: "gone" should be "going"

P. 374, l. 6: "John" should be "Jon"

P. 380, l. 21: a quotation mark should appear after the comma

P. 382, l. 12: a quotation mark should appear before the word "no"

P. 387, l. 6: "profit" should be "problem"

P. 407, l. 17: [Indiscernible] should be "and Washington"

P. 428, l. 1: "approve" should be "accrue"

P. 428, l. 18: "on vacation" should be "on termination"

P. 430, l. 6: "of" should be "from"

P. 434, l. 7: "two" should be "to"

P. 438, l. 17: no quotation mark should appear on this line

P. 439, l. 1: "maybe" should be "may be"

P. 439 l. 19: "off or" should be "off for"

P. 441, l. 5: a quotation mark should appear after the comma

P. 442, l. 1: "affects" should be "effects"

P. 480, l. 24: a quotation mark should appear before "whenever" and after "possible"

P. 483, l. 1: a quotation mark should appear before the word "the"

P. 483, l. 3: a quotation mark should appear after the comma

P. 483, l. 6: a quotation mark should appear before the word "Company"

P. 483, l. 7: a quotation mark should appear after the comma

P. 483, l. 22: a quotation mark should appear before the word "one"

P. 483, l. 23: a quotation mark should appear after the period

P. 495, l. 15: "guarantee" should be "guaranteed"

P. 501, l. 2: "at writing" should be "in writing"

P. 503, l. 12: "John" should be "Jon"

P. 507, l. 23: "I" should be "one"

P. 510, l. 13: "set to reject" should be "accept"

P. 511, l. 21: "well agreed" should be "we'll agree"

P. 512, l. 9: "vowed to be" should be "agreed to the"

P. 513, l. 8: "did" should be "did not"

P. 515, l. 21: "arbitrations" should be "arbitrators"

P. 516, l. 22: "percent" should be "present"

P. 517, l. 11: "eight" should be "weight"

P. 518, l. 13: "object of" should be "objective"

P. 523, l. 9: "consisted" should be "consistent"

P. 525, l. 1: "they" should be "the"

P. 529, l. 20: "bantering" should be "bannering"

P. 534, l. 4: a quotation mark should appear before the word "including" and after the word "to"

P. 539, l. 11: the words "requirements" and "needs" should each be in quotation marks

P. 542, l. 24: "they're" should be "their"

P. 547, l. 13: "aggressive" should be "regressive"

P. 548, l. 12: a quotation mark should appear before the word "no"

P. 548, l. 15: a quotation mark should appear after the period

P. 554, l. 7: "vain" should be "vein"

P. 561, l. 10: Ms. Stern was the speaker

P. 567, l. 1: "John" should be "Jon"

P. 571, l. 7: "screen" should be "scheme"

P. 571, l. 16: "working new" should be "breaking news"

P. 571, l. 25: "worst" should be "word"

P. 574, l. 9: "they're" should be "their"

P. 583, l. 10: "identification" should be "indemnification"

P. 590, l. 20: "bargain" should be "bargaining"

P. 610, l. 15: "John" should be "Jon"

P. 649, l. 4: "perceive" should be "proceed"

P. 652, l. 3: "Lewis" should be "Lowe"

P. 657, l. 9: "right" should be "write"

P. 668, l. 21: "CVA" should be "CBA"

P. 669, l. 24: "company" should be "copy"

P. 712, l. 4: Ms. Stern was the speaker

P. 722, l. 13: "EOC" should be "EEOC"

P. 755, l. 14: "Gest" should be "Guest"

P. 758, ll. 19–20: "predicably" should be "predictably"

P. 784, l. 8: "RESUMED DIRECT" should be "DIRECT"

P. 786, l. 19: Mr. Oesterle was the speaker

P. 786, l. 20: "motions dismissed" should be "motion to dismiss"

P. 786, l. 24: "divisional judges" should be "Division of Judges"

P. 787, l. 3: "motions" should be "motion"

P. 788, l. 3: Mr. Hunt was the speaker

P. 792, l. 17: "peaked" should be "piqued"

P. 800, l. 9: "11(vi)" should be "11(b)(i)"

P. 813, l. 21: "UCPR" should be "gallery"
P. 815, l. 10: "trail" should be "trial"



United States Government

## NATIONAL LABOR RELATIONS BOARD

## OFFICE OF THE GENERAL COUNSEL

Washington, D.C.  20570

October 31, 2024

Patricia S. Dodszuweit
Clerk, United States Court of Appeals
 for the Third Circuit
James A. Byrne United States Courthouse
601 Market Street
Philadelphia, PA 19106-1790

   Re: *PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette v. NLRB*
     3rd Cir. No. 24-2788
     Board Case Nos. 06–CA–248017, 06–CA–263791
     and 06–CA–269346

Dear Ms. Dodszuweit:

  I am enclosing the National Labor Relations Board's cross-application for enforcement of its Order against the Petitioner, PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette, in the above-captioned case.

  Please serve a copy of the cross-application on the Petitioner, PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette, whose address appears on the service list.  I have served a copy of the cross-application on each party admitted to participate in the Board proceedings, and their names and addresses also appear on the service list.

  I am counsel of record for the Board, and all correspondence should be addressed to me.  The Board attorneys directly responsible for this case are Milakshmi V. Rajapakse, (202) 273-4231, and David A. Seid, (202) 273-2941.

Very truly yours,

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street SE
Washington, DC 20570
(202) 273-2960

Encls.

2

## SERVICE LIST

*PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette v. NLRB,* 24-2788
Board Case Nos. 06–CA–248017, 06–CA–263791 and 06–CA–269346

Brian M. Hentosz, Esq.                           Petitioner's Counsel
Littler Mendelson, P.C.
625 Liberty Avenue, 26th Floor
Pittsburgh, PA 15222
Phone: 412-201-7676
Fax: 412-456-1241
Email: bhentosz@littler.com

Morgan S. Dull, Esq.                             Petitioner's Counsel
Littler Mendelson, P.C.
One PPG Place, Suite 2400
Pittsburgh, PA 15222
Phone: 412-201-7622
Fax: 412-774-2068
Email: mdull@littler.com

Linda Guest                                      Petitioner
Senior HR Manager
PG Publishing Co., Inc. d/b/a
   Pittsburgh Post-Gazette
2301 Sweeney Drive
Clinton, PA 15026
Phone: (412) 263-1329
Email: lguest@post-gazette.com

Joseph J. Pass Esq.                              Charging Party's Counsel
Jubelirer, Pass & Intrieri, P.C.
219 Fort Pitt Boulevard
Pittsburgh, PA 15222
Phone: (412) 281-3850
Fax: (412) 281-1985
Email: jjp@jpilaw.com

JA0113

SERVICE LIST (cont'd)

*PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette v. NLRB,* 24-2788
Board Case Nos. 06–CA–248017, 06–CA–263791 and 06–CA–269346

Lacretia Wimbley                                    Charging Party
President, Newspaper Guild of
 Pittsburgh/CWA Local 38061
322 North Shore Drive, Suite 250
Pittsburgh, PA 15212
Phone: (412) 880-4001
Email: cretia483@gmail.com

2

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| PG PUBLISHING CO., INC. d/b/a PITTSBURGH POST-GAZETTE | ) | No. 24-2788 |
| | ) | |
| Petitioner | ) | |
| | ) | Board Case Nos. |
| v. | ) | 06–CA–248017 |
| | ) | 06–CA–263791 |
| NATIONAL LABOR RELATIONS BOARD | ) | 06–CA–269346 |
| | ) | |
| Respondent | ) | |

## CROSS-APPLICATION FOR ENFORCEMENT
## OF AN ORDER OF THE
## NATIONAL LABOR RELATIONS BOARD

The National Labor Relations Board hereby cross-applies to the Court for enforcement of its Order issued against PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette on September 20, 2024, in Board Case Nos. 06–CA–248017, 06–CA–263791 and 06–CA–269346, reported at 373 NLRB No. 93. On September 25, 2024, the Petitioner, PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette, filed a petition with this Court to review the same Board Order. The Board seeks enforcement of its Order in full.

The Court has jurisdiction over this cross-application pursuant to Section 10(e) and (f) of the National Labor Relations Act, as amended (29 U.S.C. § 160(e) and (f)), because the Petitioner is aggrieved by the Board's Order. Venue is proper in this Circuit under Section 10(e) and (f) of the Act.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 31st day of October 2024

JA0115

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

| | | |
|---|---|---|
| PG PUBLISHING CO., INC. d/b/a PITTSBURGH POST-GAZETTE | ) | No. 24-2788 |
| | ) | |
| Petitioner | ) | |
| | ) | Board Case Nos. |
| v. | ) | 06–CA–248017 |
| | ) | 06–CA–263791 |
| NATIONAL LABOR RELATIONS BOARD | ) | 06–CA–269346 |
| | ) | |
| Respondent | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system.  I further certify that the foregoing document was served on all parties or their counsel of record through the appellate CM/ECF system.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 31st day of October 2024

JA0116

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette *and* Newspaper Guild of Pittsburgh/CWA Local 38061.** Cases 06–CA–248017, 06–CA–263791, and 06–CA–269346

September 20, 2024

DECISION AND ORDER

BY CHAIRMAN MCFERRAN AND MEMBERS PROUTY AND WILCOX

On January 26, 2023, Administrative Law Judge Geoffrey Carter issued the attached decision. The Respondent

[1] The Respondent has implicitly excepted to some of the judge's credibility findings. The Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us that they are incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), enfd. 188 F.2d 362 (3d Cir. 1951). We have carefully examined the record and find no basis for reversing the findings.

We adopt the judge's findings, for the reasons he states, that the Respondent, by its overall conduct in negotiations for a successor collective-bargaining agreement, violated Sec. 8(a)(5) of the Act by failing and refusing to bargain in good faith with the Union.

In addition, we adopt the judge's finding that the Respondent violated Sec. 8(a)(5) when, on July 27, 2020, it unilaterally implemented changes to bargaining unit employees' terms and conditions of employment, including many terms from the Respondent's June 12, 2020 last, best, and final offer (LBFO) and some terms from that LBFO that the Respondent subsequently modified, without first bargaining to a good-faith impasse. In doing so, we note that there are no exceptions to the judge's finding that the Respondent implemented its LBFO, with some terms modified, on July 27, 2020. We also note that, in finding that the parties had not reached a valid impasse at the time it implemented these changes, the judge relied on the Respondent's failure and refusal to bargain in good faith during negotiations for the successor collective-bargaining agreement, as well as the fact that the Respondent understood that there was still room to bargain with the Union. For the reasons stated by the judge, we adopt his finding of this 8(a)(5) violation. We note, however, that, even absent the Respondent's failure and refusal to bargain in good faith with the Union during the negotiations for the successor collective-bargaining agreement, we would still find that the Respondent had not reached a valid impasse prior to implementing the changes to the employees' terms and conditions of employment on July 27, 2020. In this regard, as the judge explained: (1) the parties' written communications reflected substantive movement in the Union's September 6, 2019 and the Respondent's June 12, 2020 proposals that had not been discussed at the time of the Respondent's July 27 unilateral implementation; (2) the Union had attempted to schedule further bargaining; and (3) the Respondent implemented terms that differed from its final offer, thus demonstrating that it had additional room to move from what it had previously termed its "final" negotiating positions.

Having found, in agreement with the judge, that the Respondent violated Sec. 8(a)(5) on July 27, 2020, by unilaterally implementing changes to bargaining unit employees' terms and conditions of employment without first bargaining to a good-faith impasse, we find it unnecessary to reach the General Counsel and the Charging Party's exceptions to the judge's dismissal of the General Counsel's alternative allegation that even if the parties had reached a valid impasse, the Respondent nevertheless violated Sec. 8(a)(5) by implementing proposals that differed from its LBFO.

We rely on *Audio Visual Services Group, Inc. d/b/a PSAV Presentation Services*, 367 NLRB No. 103, slip op. at 6–8 (2019), affd. sub nom.

filed exceptions and a supporting brief. The General Counsel and the Charging Party filed answering briefs, and the Respondent filed reply briefs. The General Counsel and the Charging Party each filed limited exceptions and supporting briefs, the Respondent filed answering briefs to both, and the General Counsel and Charging Party filed reply briefs.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings,[1] and conclusions, to amend the remedy, and to adopt the recommended Order as modified and set forth in full below.

*Theatrical Stage Employees, Local 15 v. NLRB*, 957 F.3d 1006 (9th Cir. 2020), instead of *District Hospital Partners, L.P. d/b/a The George Washington University Hospital*, 370 NLRB No. 118 (2021), vacated by 372 NLRB No. 109 (2023), which the judge relied on for the principle that a union should not assume that an employer's initial proposals are fixed positions and should test the employer's willingness to bargain. We deny, as moot, the General Counsel's request to overrule *District Hospital* (for reasons unrelated to the above principle) because the case has already been reconsidered and reported as *District Hospital Partners, L.P. d/b/a The George Washington University Hospital, a Limited Partnership & UHS of D.C. Inc., General Partner*, 373 NLRB No. 55 (2024).

We affirm the judge's dismissal of the allegation that the Respondent violated Sec. 8(a)(1) by surveilling employees and/or creating the impression of surveillance when its chief photo editor photographed employees publicly protesting its bargaining conduct outside its offices on September 25, 2020. Accordingly, we find it unnecessary to reach the Respondent's argument that it had a First Amendment right to do so.

We agree with the judge that during the Union's October 24 and 31, 2020 rallies, the Respondent violated Sec. 8(a)(1) by creating an impression of surveillance through two security guards hired from Kellington Protection, LLC. Stationed outside the house of the Respondent's publisher, John Block, the guards pointed their cell phones at rally participants, including employees, appearing to photograph them as they peacefully protested the Respondent's bargaining conduct on a public sidewalk on the opposite side of the street from Block's house. It is well settled that "absent proper justification, the photographing of employees engaged in protected concerted activities violates the Act because it has a tendency to intimidate." *F. W. Woolworth Co.*, 310 NLRB 1197, 1197 (1993). "[T]he Board requires an employer engaging in such photographing or videotaping to demonstrate that it had a reasonable basis to have anticipated misconduct by the employees." *National Steel & Shipbuilding Co.*, 324 NLRB 499, 499 (1997), enfd. 156 F.3d 1268 (D.C. Cir. 1998); see also *Waco, Inc.*, 273 NLRB 746, 747 (1984).

In finding the impression of surveillance violations related to the October 2020 rallies, we rely primarily on the Respondent's failure to justify photographing bargaining unit employees standing across the street and away from Block's property line by showing that it had reason to anticipate unlawful behavior. There was no evidence of unlawful behavior at the prior September 25 rally—nor did the Respondent show that any unlawful conduct actually occurred on October 24 and 31. Instead, the Respondent claims only that this was a time of "contentious protests throughout the United States that often turned violent," without showing that it had reason to believe that the particular protests involved in this proceeding would be of that nature. While the Respondent claims that employees trespassed and blocked access to the property, the record shows only an occasional protester positioned close to the property line, which would not justify photographing them when on the opposite side of the street. Indeed, even an "isolated" incident of "temporary blocking of entrances" does not justify photographic surveillance of protected concerted activity that "d[oes] not involve any arguable blocking." *Chester*

2            DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

AMENDED REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, we shall order it to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act. We agree with the judge that the Respondent violated Section 8(a)(5) and (1) by failing and refusing to bargain in good faith with the exclusive collective-bargaining representative of its employees, and with the judge's recommended remedies of an affirmative bargaining order, the rescission of unilateral changes,[2] and the submission of bargaining progress reports every 30 days, but we disagree that these recommended remedies suffice to restore the Union and its negotiators to the position they would have been in had the Respondent bargained in good faith. Accordingly, we grant the Union's partial exception to the judge's recommended remedy, and amend it in the following respects.

In addition to the remedies ordered by the judge, we shall order the Respondent to compensate the Union for all bargaining expenses it incurred during the time the Respondent engaged in bad-faith bargaining through the parties' final bargaining session on September 8, 2020, including any lost wages the Union paid to bargaining committee members for bargaining conducted during working hours. See *Frontier Hotel & Casino*, 318 NLRB 857, 857–859 (1995), enfd. in relevant part sub nom. *Unbelievable, Inc. v. NLRB*, 118 F.3d 795 (D.C. Cir. 1997); see also *Troy Grove*, 372 NLRB No. 94, slip op. at 7 (2023); *Columbus Electric Cooperative*, 372 NLRB No. 89, slip op. at 2 (2023). We find this award necessary to make the Union whole and to ensure a return to the status quo ante at the bargaining table because the Union expended significant time and expense bargaining with a respondent that bargained in bad faith, insisted on provisions that left the Union with fewer rights and less protection than provided by law without a contract, *Public Service Co. of Oklahoma (PSO)*, 334 NLRB 487, 487–488, 489 (2001), enfd. 318 F.3d 1173 (10th Cir. 2003), and unilaterally implemented a modified version of certain of its final proposals without bargaining to a valid impasse.

We shall also order the Respondent to make whole any affected employee negotiators for any earnings and/or leave lost while attending bargaining sessions, plus interest, to the extent that these losses were not reimbursed by the Union. See *M.F.A. Milling Co.*, 170 NLRB 1079, 1080 (1968), enfd. sub nom. *Laborers Local 676 v. NLRB*, 463 F.2d 953 (D.C. Cir. 1972). In this regard, backpay shall be computed in the manner set forth in the remedy section of the judge's decision.[3]

We shall also modify the judge's recommended Order to provide for the posting of the notice in accordance with *Paragon Systems, Inc.*, 371 NLRB No. 104 (2022), and to conform to the Board's standard remedial language, and we shall substitute a new notice to conform to the Order as modified and set forth in full below.

ORDER

The National Labor Relations Board orders that the Respondent, PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette, Pittsburgh, Pennsylvania, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Failing and refusing to bargain with the Newspaper Guild of Pittsburgh/CWA Local 38061 (the Union) as the exclusive collective-bargaining representative of the employees in the bargaining unit.

(b) Unilaterally changing the terms and conditions of employment of its unit employees by implementing portions of its last, best, and final offer without first bargaining to a good-faith impasse.

(c) Creating the impression that it is engaged in surveillance of its employees' union or other protected concerted activities.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) On request, bargain with the Union as the exclusive collective-bargaining representative of the employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement:

---

*County Hospital,* 320 NLRB 604, 619–620 (1995), enfd. mem. 116 F.3d 469 (3d Cir. 1997). Nor does the fact that the Union sought publicity for these rallies mitigate the Respondent's unlawful behavior. See, e.g., *John Ascuaga's Nugget*, 298 NLRB 524, 524 fn. 3, 554 (1990), enfd. in rel. part sub nom. *Sparks Nugget v. NLRB*, 968 F.2d 991 (9th Cir. 1992) (finding it unlawful for an employer to photograph employees handbilling while attending union press conference in public park). Furthermore, we reject the Respondent's arguments that the guards may have been using their phones for purposes other than photographing, that it had no knowledge of Kellington's protocol of photographing events, and that it never saw any photographs, as these defenses are not relevant to the Board's objective test, which asks whether "employees would reasonably assume from the statement or actions that their union activities had been placed under surveillance, based on the perspective of a reasonable employee." *Acme Bus Corp*., 357 NLRB 902, 923 (2011). We find that standard satisfied here.

[2] The judge recommended ordering the Respondent to rescind the unlawful unilateral changes implemented in the absence of a valid impasse. To the extent that the unlawful unilateral changes have improved the terms and conditions of unit employees, the Order set forth below shall not be construed as requiring or authorizing the Respondent to rescind such improvements unless requested to do so by the Union. See *Fresno Bee*, 339 NLRB 1214, 1216 fn. 6 (2003).

[3] We deny the General Counsel's and the Union's exceptions to the judge's failure to order notice reading and distribution. For the reasons stated in his concurrence in *CP Anchorage 2 d/b/a Hilton Anchorage*, 371 NLRB No. 151, slip op. at 9–15 (2022), enfd. 98 F.4th 314 (D.C. Cir. 2024), Member Prouty would make a reading of the notice to employees at a group meeting, accompanied by the distribution of the notice at the meeting, a part of the remedy in this case and a standard remedy for all unfair labor practices found by the Board.

All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

(b)  Submit written bargaining progress reports every 30 days to the compliance officer for Region 6 of the National Labor Relations Board, and serve copies of the reports on the Union.

(c)  On request by the Union, rescind the changes in the terms and conditions of employment for its unit employees that were unilaterally implemented on about July 27, 2020.

(d)  Before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of employees in the bargaining unit described above.

(e)  Compensate the Union for all bargaining expenses it incurred during the time it engaged in bad-faith bargaining through September 8, 2020, including any lost wages the Union paid to employee bargaining committee members for bargaining conducted during working hours. Upon receipt of a verified statement of costs and expenses from the Union, the Respondent promptly shall submit a reimbursement payment, in the amount of those costs and expenses, to the compliance officer for Region 6, who will document receipt and forward the payment to the Union.

(f)  Make whole any affected employee negotiators for any earnings lost while attending bargaining sessions during the time it engaged in bad-faith bargaining through September 8, 2020, with interest, in the manner set forth in the remedy section of the judge's decision, to the extent those earnings were not reimbursed by the Union.

(g)  Make bargaining unit employees whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the unlawful unilateral changes to terms and conditions of employment that the Respondent made on about July 27, 2020, with interest, as provided for in the remedy section of the judge's decision.

(h)  Make all delinquent contributions to the applicable benefit funds on behalf of bargaining unit employees that have not been paid since July 27, 2020, including any additional amounts due to the funds, as provided for in the remedy section of the judge's decision.

(i)  Make bargaining unit employees whole for any expenses ensuing from the failure to make the required contributions to the applicable benefit funds, with interest, as provided for in the remedy section of the judge's decision.

(j)  Compensate affected employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award(s) to the appropriate calendar year(s) for each employee.

(k)  File with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each backpay recipient's corresponding W–2 form(s) reflecting the backpay award.

(l)  Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(m)  Post at its Pittsburgh, Pennsylvania facility copies of the attached notice marked "Appendix."[4]  Copies of the notice, on forms provided by the Regional Director for Region 6, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. The

---

[4]  If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notice must be posted within 14 days after service by the Region. If the facility involved in these proceedings is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID-19) pandemic, the notice must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work. If, while closed or not staffed by a substantial complement of employees due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region. If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]." If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

4                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Respondent shall take reasonable steps to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since March 11, 2019.

(n) Within 21 days after service by the Region, file with the Regional Director for Region 6 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that the complaint is dismissed insofar as it alleges violations of the Act not specifically found.

Dated, Washington, D.C.  September 20, 2024

_____
Lauren McFerran,                    Chairman

_____
David M. Prouty,                    Member

_____
Gwynne A. Wilcox,                    Member

(SEAL)          NATIONAL LABOR RELATIONS BOARD
APPENDIX
NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT fail and refuse to bargain with the Newspaper Guild of Pittsburgh/CWA Local 38061 (the Union) as the exclusive collective-bargaining representative of our employees in the bargaining unit.

WE WILL NOT change your terms and conditions of employment by implementing portions of our last, best, and final offer without first bargaining to a good-faith impasse.

WE WILL NOT create the impression that we are engaging in surveillance of your union or other protected concerted activity.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL, on request, bargain with the Union as the exclusive collective-bargaining representative of our employees in the following appropriate unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement.

All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

WE WILL submit written bargaining progress reports every 30 days to the compliance officer for Region 6 of the National Labor Relations Board, and serve copies of the reports on the Union.

WE WILL, on request by the Union, rescind the changes in the terms and conditions of employment for our unit employees that were unilaterally implemented on about July 27, 2020.

WE WILL, before implementing any changes in wages, hours, or other terms and conditions of employment of unit employees, notify and, on request, bargain with the Union as the exclusive collective-bargaining representative of our employees in the unit described above.

WE WILL compensate the Union for all bargaining expenses it incurred during the time we engaged in bad-faith bargaining through September 8, 2020, including any lost wages the Union paid to employee bargaining committee members for bargaining conducted during working hours.

WE WILL make whole any affected employee negotiators for any earnings lost while attending bargaining sessions during the time we engaged in bad-faith bargaining through September 8, 2020, with interest, to the extent those earnings were not reimbursed by the Union.

WE WILL make bargaining unit employees whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the unlawful unilateral changes to terms and conditions

of employment that we made on about July 27, 2020, with interest.

WE WILL make all delinquent contributions to the applicable benefit funds on behalf of bargaining unit employees that have not been paid since July 27, 2020, including any additional amounts due to the funds.

WE WILL make bargaining unit employees whole for any expenses ensuing from the failure to make the required contributions to the applicable benefit funds, with interest.

WE WILL compensate affected employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating each backpay award to the appropriate calendar year(s) for each employee.

WE WILL file with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each bargaining unit employee's W–2 form(s) reflecting the employee's backpay award.

PG PUBLISHING CO., INC. D/B/A PITTSBURGH POST-GAZETTE

The Board's decision can be found at www.nlrb.gov/case/06-CA-248017 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



*Julie Stern, Esq.,* for the General Counsel.
*Mark Hunt, Michael Oesterle,* and *Jennifer Sherman, Esqs.,* for the Respondent.
*Joseph Pass, Esq.,* for the Charging Party.

## DECISION

GEOFFREY CARTER, Administrative Law Judge. The General Counsel alleges that PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette (Respondent) violated the National Labor Relations Act (the Act) by: failing and refusing to bargain in good faith with the Newspaper Guild of Pittsburgh/CWA Local 38061 (Union or Charging Party) since about March 11, 2019; unilaterally implementing terms and conditions of employment on about July 27, 2020, when the parties had not yet reached an overall good-faith impasse in negotiations for a successor collective-bargaining agreement; and unlawfully surveilling employees in

September and October 2020, while they engaged in union activities, or creating the impression among employees that their union activities were under surveillance. As explained below, I have found that apart from a few limited exceptions, Respondent violated the Act as alleged.

STATEMENT OF THE CASE

This case was tried in Pittsburgh, Pennsylvania, on September 19–22 and October 12, 2022. The Union filed the unfair labor practice charges in this case on the following dates:

| Case | Filing Date | Amendment Date(s) |
|---|---|---|
| 06–CA–248017 | September 11, 2019 | April 7, 2021 |
| 06–CA–263791 | July 29, 2020 | March 9, 2021 |
| 06–CA–269346 | November 20, 2020 | February 23, 2021, June 22, 2021, June 28, 2021, and October 20, 2021 |

On April 27, 2022, the General Counsel issued a consolidated complaint in which it alleged that Respondent violated Section 8(a)(5) and (1) of the Act by failing and refusing to bargain collectively and in good faith with the Union as the exclusive collective-bargaining representative of employees in the bargaining unit. Specifically, the General Counsel alleged Respondent:

(a) by its overall conduct since about March 11, 2019, failed and refused to bargain in good faith with the Union as the exclusive collective-bargaining representative of the bargaining unit;

(b) on about July 27, 2020, unilaterally implemented terms and conditions of employment for employees in the bargaining unit without first bargaining with the Union to an overall good-faith impasse for a successor collective-bargaining agreement, or alternatively (if it is determined that the parties bargained to an overall good-faith impasse) implementing terms and conditions of employment that were not reasonably comprehended by Respondent's pre-impasse proposals without affording the Union an opportunity to bargain; and

(c) on about July 27, 2020, implementing a discretionary proposal concerning the performance of bargaining unit work by non-Unit employees, and thereby retaining unilateral discretion over the performance of bargaining unit work by non-Unit employees and undermining the status of the Union as the employees' exclusive collective-bargaining representative.

The General Counsel also alleged that Respondent violated Section 8(a)(1) of the Act by interfering with, restraining, and coercing employees in the exercise of rights guaranteed in Section 7 of the Act. Specifically, the General Counsel alleged that Respondent engaged in surveillance of employees who were engaged in union activities and/or created an impression among its employees that their union activities were under surveillance by taking pictures and/or video recordings on September 25, October 24 and 31, 2020. Respondent filed a timely answer denying the alleged violations in the consolidated complaint.

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

On the entire record,[1] including my observation of the demeanor of the witnesses, and after considering the briefs filed by the General Counsel, Charging Party, and Respondent, I make the following

FINDINGS OF FACT[2]

### I. JURISDICTION

At all material times Respondent, a Pennsylvania corporation with an office and place of business in Pittsburgh, Pennsylvania, has been engaged in the business of publishing the Pittsburgh Post-Gazette, a print and electronic newspaper. Respondent annually derived gross revenues in excess of $200,000 and: held membership in and subscribed to various interstate news services, including Associated Press; published various nationally syndicated features; and advertised various nationally sold products. During the same time period Respondent also purchased and received products, goods, and materials at its Pittsburgh, Pennsylvania facility that were valued in excess of $5,000 and came directly from points outside the Commonwealth of Pennsylvania. Respondent admits, and I find, that Respondent has at all material times been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act. Respondent also admits, and I find, that the Union at all material times has been a labor organization within the meaning of Section 2(5) of the Act.

### II. ALLEGED UNFAIR LABOR PRACTICES

*A. Background*

For several years, Respondent has recognized the Union as the exclusive collective-bargaining representative of employees in the following appropriate bargaining unit:

> All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

(Jt. Exh. 1.) Consistent with that recognition, Respondent and the Union have executed successive collective-bargaining agreements, the most recent of which was effective from October 15, 2014, through March 31, 2017. (GC Exh. 2; see also Tr. 75–77.)

In contract negotiations between about 1992 and 2014, Respondent bargained with representatives of several bargaining units[3] (collectively referred to as the "unity council") about

wages and healthcare. After those initial negotiations concluded, the Union and representatives of each of the other bargaining units negotiated separately with Respondent for their own contracts. The separate contracts incorporated the jointly negotiated wage and healthcare provisions. (Tr. 79–80.)

*B. January 10, 2017: Respondent Requests Bargaining for a Successor*

Collective-Bargaining Agreement

On January 10, 2017, Respondent sent a letter to the Union to advise that it wished to open negotiations for a successor collective-bargaining agreement. Respondent also provided the Union with a copy of Respondent's initial contract proposal. Upon noticing that Respondent's initial contract proposal did not include any markings to show the changes that Respondent was proposing for terms and conditions of employment (in comparison to the expiring contract), the Union asked Respondent to provide a redlined version of the initial proposal. Respondent subsequently sent the Union a copy of the initial proposal that highlighted new language in yellow and struck through language that Respondent proposed to eliminate. (GC Exhs. 3–4; Tr. 82–86, 701–702.) On about February 8, 2017, the Union sent Respondent a copy of the Union's initial contract proposal. (Tr. 802–803; GC Exh. 5; R. Exh. 69.)

At some point on or before February 12, 2017, Respondent notified the Union that Respondent planned to negotiate individually with each bargaining unit and therefore would not be bargaining with the unity council about wages and healthcare. (Tr. 81, 195; R. Exh. 31; see also GC Exh. 10 (par. 1).) There is no evidence that the Union objected to bargaining separately as Respondent proposed.

*C. March 10, 2017: First Bargaining Session*

On March 10, 2017, Respondent and the Union met for their first bargaining session. Attorney Richard Lowe served as Respondent's chief negotiator and was joined on the bargaining team by senior human resources manager Linda Guest and newsroom manager Jerry Micco. Respondent hoped to negotiate concessions from the Union during bargaining because the newspaper was struggling financially due to competition from internet-based media and the resulting decline in print newspaper circulation and print advertising revenue. Among other concessions, Respondent indicated that the benefits under the current Teamsters Fund healthcare plan were "too rich" and that Respondent wanted more staffing flexibility (such as allowing Respondent to use more freelance reporters and permitting managers to perform bargaining unit work) to adjust to changes that might arise due to Respondent's expectation that it would be moving towards a digital media business model in the future. (Tr. 91, 94, 96–97, 296, 298–299, 301, 303, 682, 685, 697, 803; R. Exh. 196 (pp. 1–2); see also Tr. 722–723 (noting that Respondent was not

---

[1] The transcripts and exhibits in this case generally are accurate. During my review of the record, however, I identified transcript corrections that are warranted. In addition, both the General Counsel and Respondent proposed corrections to the transcripts. For the most part, the parties did not oppose each other's suggested corrections. For disputed proposed corrections and a handful of unopposed proposed corrections, I allowed the transcripts to stand unless I could confirm the correction through my memory of the testimony and/or other information in the evidentiary record. The transcript corrections that I have identified, along with proposed corrections that I have accepted, are set forth in Appendix

B to this decision. I have denied any requests for transcript corrections that do not appear in Appendix B.

[2] Although I have included several citations in this decision to highlight particular testimony or exhibits in the evidentiary record, I emphasize that my findings and conclusions are not based solely on those specific citations, but rather are based on my review and consideration of the entire record for this case.

[3] In addition to the bargaining unit represented by the Union, other bargaining units included: Advertising; Circulation and Distribution; Electricians; Finance; Machinists; Mailers (two units); Operating Engineers; and Pressmen. (Tr. 211–213, 296–297.)

claiming an inability to pay for increases in wages or benefits).)

Attorney Joseph Pass served as the Union's chief negotiator, and was joined on the bargaining team by Ed Blazina, Michael Fuoco, Jonathan Silver, Joe Smydo, and Melissa Tkach. The Union believed that it had made several concessions in previous years and was not inclined to make additional concessions in the new contract. In particular, the Union noted that bargaining unit employees had not received a wage increase over the previous 11 years. (Tr. 92, 179, 299, 302, 339–340, 688–689; R. Exhs. 189 (p. 1), 196 (p. 1); see also Tr. 802 (noting that with the exception of Pass, all members of the Union's bargaining team were working for Respondent as full-time journalists).)

Turning to specific aspects of its initial contract proposal, Respondent proposed that the bargaining unit switch from the Teamsters healthcare plan to the healthcare plan that Respondent provided for non-bargaining unit employees, with Respondent having the right to change or terminate the healthcare plan at its discretion. Regarding the bargaining unit's jurisdiction and staffing, Respondent sought (among other changes from the expiring contract) the right to: assign bargaining unit work to supervisors, non-bargaining unit employees, and "stringers" (journalists working as independent contractors); change the length of employee work hours and work days; and consider performance, attendance, and qualifications (in addition to seniority) when selecting employees for layoffs. Respondent also proposed: eliminating employees' ability to "bank" unused sick leave and instead covering employees under the company's short term disability policy (which Respondent reserved the right to modify in any way); and requiring grievances to be filed in writing within 10 days of the underlying event. Respondent did not propose any increases to wages. (Tr. 118–119, 128–129, 303, 338, 352–353, 366–367, 380–381, 697–698; GC Exh. 4.)

As for the Union's initial contract proposal, the Union sought wage increases of 7 percent each year, and also proposed eliminating all pension and wage "diversions" that existed in the expiring contract.[4] On bargaining unit jurisdiction and staffing, the Union proposed: eliminating the use of stringers; and limiting the total number of 2–year associates, paid interns, and employees averaging less than 35 hours per week to 15 percent of the bargaining unit membership. The Union also proposed (among other changes): increasing the amount of sick leave that employees accrued each year, as well as the amount of unused sick leave that employees could "bank"; and requiring Respondent to pay out unused sick leave when employees terminated their employment or retired. (GC Exh. 5.)

### D. Summary of Bargaining from April 6, 2017, through July 15, 2019

After their initial bargaining session, the parties met on 19 more occasions between April 6, 2017, and July 15, 2019, with each session lasting 4.5 to 6 hours.[5] (Tr. 93; R. Exhs. 188, 190,

192.) As bargaining progressed, certain issues continued to be points of contention. The most prominent issues, and the parties' bargaining about them in this timeframe, are discussed below.[6]

#### 1. Wages

The Union maintained that bargaining unit members needed a wage increase since wage rates had not changed for about 11 years. Respondent did not dispute that point, but took the position that the parties would need to "be creative" to come up with a workable wage increase due to the financial challenges that the newspaper was facing. (Tr. 339–340, 685.) With that backdrop, the parties made the following proposals about wages in this timeframe:

| Bargaining Session Date | Respondent Wage Proposal | Union Wage Proposal |
|---|---|---|
| March 10, 2017 | No increases to base wages<br><br>2% pension diversion<br><br>Wage diversion to be determined<br><br>(GC Exh. 4 (Art. III).) | 7 percent wage increase per year<br><br>Eliminate pension and wage diversions<br><br>(GC Exh. 5 (Art. III).) |
| June 12, 2017 | No increases to base wages<br><br>2% pension diversion<br><br>8% wage diversion<br><br>$4,000 annual cap on total diversion<br><br>(R. Exh. 73.) | |
| January 31, 2019 | Package proposal: Respondent will eliminate the 2% pension diversion <u>if</u> the Union accepts Respondent's proposal to change bargaining unit members' healthcare plan from the Teamsters plan to Respondent's plan | |

---

[4] Under the expiring contract, employees did not receive their full base wages because of a 2–percent pension "diversion" and an additional 8–percent wage "diversion" (it is not clear how Respondent actually used the diverted payments). Thus, an employee earning $1000 per week would lose $20 as a pension diversion, and an additional $78.40 (8 percent of $980) as a wage diversion, leaving the employee with $901.60 for the week, before taxes and other deductions. The total diversion amount was capped each calendar year at $4,000. (GC Exh. 2, Art. III (describing the diversion percentages and caps that took effect on January 1, 2017); Tr. 137.)

[5] The bargaining sessions in this timeframe occurred on the following dates: April 6, 2017; May 3, 2017; June 12, 2017; September 1, 20, 2017; November 1, 28, 2017; January 4, 2018; February 9, 28, 2018; April 4, 11, 2018; May 3, 2018; September 18, 2018; November 14, 2018; December 13, 2018; January 31, 2019; May 20, 2019; and July 15, 2019. (See R. Exhs. 188, 190, 192.)

[6] In the discussion below I only identify bargaining dates on which one or both of the parties substantively changed its proposal. I also note that the discussion here is not meant to be exhaustive. The parties made several proposals that, in the interest of brevity, I do not summarize in this section.

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

| Bargaining Session Date | Respondent Wage Proposal | Union Wage Proposal |
|---|---|---|
| | (GC 21; Tr. 557.) | |

### 1. Health and welfare

In the expired contract, all bargaining unit employees who averaged more than 30 hours per week annually were covered under the Teamsters healthcare plan. Respondent paid all premiums for the plan,[7] including annal increases up to 5 percent. Bargaining unit employees paid for any premium increases that exceeded the 5–percent threshold. (GC Exh. 2 (Art. XX).)

In bargaining for a successor collective-bargaining agreement, Respondent proposed to cover bargaining unit employees under Respondent's healthcare plan, for which Respondent would pay 70 percent of the cost and employees would pay 30 percent. Respondent would also retain the right to change or terminate the healthcare plan in its sole discretion. The Union, by contrast, proposed that employees continue to be covered under the Teamsters plan. (Tr. 128–130, 172, 366–367, 369; R. Exh. 14 at 2; R. Exh. 142 (par. 2).) The specific proposals proceeded as follows:

| Bargaining Session Date | Respondent Health/Welfare Proposal | Union Health/Welfare Proposal |
|---|---|---|
| March 10, 2017 | Bargaining unit employees will be covered by Respondent's health, dental, vision and life insurance plans. The plans may be changed or terminated at Respondent's discretion.<br><br>(GC Exh. 4 (Art. XX).) | Bargaining unit employees will be covered by the Teamsters healthcare plan. Respondent shall pay for any annual increases in premiums up to 25 percent. Bargaining unit employees will pay for annual premium increases over the 25–percent threshold.<br><br>(GC Exh. 5 (Art. XX).) |
| February 9, 2018 | | Respondent shall pay the entire premium for the Teamsters healthcare plan for 2018. In subsequent years Respondent will pay for the annual insurance premium plus any increases up to 25 percent. For those years Respondent and bargaining unit |

| Bargaining Session Date | Respondent Health/Welfare Proposal | Union Health/Welfare Proposal |
|---|---|---|
| | | employees will equally split the amount of any premium increases over 25 percent.<br><br>(GC Exh. 13 (Art. XX).) |

The Union did, on January 31, 2019, verbally suggest exploring tiered rates available under the Teamsters healthcare plan (i.e., separate premiums for covering an individual, an individual plus one, or a family), but did not pursue that possibility after Respondent (through Lowe) indicated that it was not interested in continuing to offer the Teamsters plan.[8] (R. Exh. 142 (par. 7); Tr. 131, 172–173, 555–556, 805–806.)

### 2. Bargaining unit jurisdiction

Many of the disputed proposals related to the bargaining unit's jurisdiction, including when Respondent could subcontract bargaining unit work or have other individuals (such as managers or stringers) do bargaining unit work. The proposals related to bargaining unit jurisdiction proceeded as follows:

| Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals |
|---|---|---|
| March 10, 2017 | The work of bargaining unit employees will be work normally performed by bargaining unit employees and new or additional work that the company assigns. However, nothing in the Agreement shall be construed as giving the Union exclusive jurisdiction over or an exclusive right to perform any work.<br><br>Respondent shall have the exclusive right to assign bargaining unit work to non-bargaining unit employees, to individuals employed by any other company, or to contract out work | Exempt employees cannot do bargaining unit work as performed in the past nor do similar work that may result from the introduction of new print, electronic or other products.<br><br>Respondent will stop using stringers<br><br>The company may obtain content from commercial vendors for traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics. |

---

[7] The 8–percent wage diversion from bargaining unit employee paychecks may have been intended to offset the cost that Respondent paid for the healthcare plan, but the record is unclear on the point. (See Tr. 209–210, 687–688.)

[8] In a May 25, 2017 email, the Union asked the Teamsters healthcare plan administrator about tiered rates. (R. Exh. 15; Tr. 234.) The record does not establish what happened after that initial inquiry.

| Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals | Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals |
|---|---|---|---|---|---|
| | Supervisors/managers may do bargaining unit work without restriction.

No restrictions on Respondent's use of stringers

Delete language from expired contract that the number of managers may not exceed 30 percent of the number of full time employees represented by the Union[9]

(GC Exh. 4 at p. 1–2.) | The number of managers may not exceed 5 percent of the full-time employees represented by the Union

(GC Exh. 5 at pp. 1–3.) | | | classification in the work required is not available.

The Union recognizes that Respondent may use stringers. Upon ratification, the maximum amount of money paid to stringers will be 7.5 percent of the annual bargaining unit payroll. If Respondent exceeds the limit on annual stringer expenses then Respondent will match the excess with a payment that will be distributed equally to bargaining unit members.

Respondent may obtain content from commercial vendors for traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics only to the extent currently used and without displacing any bargaining unit employees.

The number of managers may not exceed 20 percent of the full-time employees represented by the Union

(GC Exh. 13 at pp. 1–3.) |
| June 12, 2017 | Respondent recognizes that the work normally performed by bargaining unit employees is the Union's jurisdiction, but subject to the following exceptions: (a) Supervisors/managers may do bargaining unit work; (b) Non-bargaining unit employees may do bargaining unit work on an occasional basis; (c) Respondent may subcontract work; (d) Respondent may use stringers up to 40 percent of annual bargaining unit payroll

(R. Exh. 71 at pp. 1–2.) | | | | |
| February 9, 2018 | | Exempt employees can do bargaining unit work in breaking news situations only if a [Union] member in the same | | | |

[9] Respondent viewed any proposed limit to the number of managers it could have as a permissive subject of bargaining that Respondent would not agree to. On July 15, 2019, the Union stated that it would not go to impasse over the issue. (See GC Exh. 23 (position statement at p. 1).)

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

| Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals |
|---|---|---|
| February 28, 2018 | Respondent recognizes that the work normally performed by bargaining unit employees is the Union's jurisdiction, but subject to the following exceptions: (a) Supervisors/managers may do bargaining unit work, but no bargaining unit employee will be laid off as a direct result of this practice; (b) Non-bargaining unit employees may do bargaining unit work on an occasional basis; (c) Respondent may subcontract work; (d) Respondent may use stringers up to 20 percent of annual bargaining unit payroll

No person under the Union's jurisdiction will be arbitrarily named as a manager and thereby excluded from the agreement

(R. Exh. 107 at pp. 1–2.) | |
| November 14, 2018 | | Exempt employees cannot do bargaining unit work as performed in the past nor do similar work that may result from the introduction of new print, electronic or other products.

Respondent cannot use stringers to perform bargaining unit work without first bargaining with the Union and |

| Bargaining Session Date | Respondent Bargaining Unit Jurisdiction Proposals | Union Bargaining Unit Jurisdiction Proposals |
|---|---|---|
| | | reaching a mutual agreement about whether and how stringers can be used.

Respondent may obtain content from commercial vendors for traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

The number of managers may not exceed 10 percent of the full-time employees represented by the Union

(GC Exh. 19 at pp. 1–3.) |
| July 15, 2019 | | The Union recognizes that Respondent may use stringers. The maximum amount of money paid to stringers will be 15 percent of the annual bargaining unit payroll. If Respondent exceeds the limit on annual stringer expenses then Respondent will match the excess with a payment into the pension fund.

The number of managers may not exceed 20 percent of the full-time employees represented by the Union

(GC Exh. 22 at pp. 1–2.) |

4. Bargaining progress on other topics

The parties made limited progress on other issues in this timeframe. Generally speaking, the parties did not reach any

tentative agreements on any issues because they never established a ground rule on what would constitute a tentative agreement (e.g., agreement on an entire contract article vs. agreement on a specific paragraph within an article). (Tr. 324, 419, 510–511, 541, 801–802.) As for substantive topics where the parties disagreed, the parties were not able to find common ground in the following areas (among others):

(a) Sick leave and short term disability: Under the expired contract bargaining unit employees received 8 days of sick leave each year and also could bank unused sick leave up to a maximum of 90 days. Under an extended short term disability plan, employees could receive 26 weeks[10] of additional sick leave (at a reduced rate of pay) if they exhausted their sick leave and banked hours, plus additional sick leave up to a maximum based on years of service. (GC Exh. 2 (Art. VII).) Respondent proposed to eliminate the sick leave "bank" and awards of additional sick leave and instead simply cover employees under Respondent's short term disability policy, which Respondent retained the discretion to modify but would be the same policy provided to nonrepresented employees. The Union, by contrast, proposed: increasing the number of sick leave days that employees received annually; increasing employees' ability to bank unused sick leave and receive additional sick leave; and requiring Respondent to pay out banked sick leave (up to a maximum of 120 days) when employees retired or separated from the company. (GC Exhs. 4, 12 (Art. VII); GC Exh. 7 at p. 20.)

(b) Grievance filing deadlines: The expired contract did not specify a deadline by which an employee needed to file a grievance. (See GC Exh. 2 (Art. XVI, Sec. 1).) Respondent proposed that a grievance must be filed in writing within 10 or 15 days of the events giving rise to the grievance. The Union proposed various alternative deadlines that, in Respondent's view, fell short of setting a fixed time limit for filing a grievance. (GC Exhs. 4, 12 (Art. XVI, Sec. 1); Tr. 415, 501; see also, e.g., GC Exh. 13 (Art. XVI, Sec. 2) (Union proposal that it or the employee must file written grievance within 30 days of bringing the dispute to management's attention); GC Exh. 15 (Art. XVI, Sec. 2) (Union proposal that the Union must file written grievance within 30 days after the Union president or chairman becomes aware of a dispute).)

(c) Employee work schedule and work week: The expired contract did not address whether bargaining unit employees were guaranteed 40 hours of work each week, but the established practice was for full-time employees to work 40 hours weekly. (GC Exh. 2 (Art. IV); Tr. 120.) Respondent initially proposed contract language stating that the company did not guarantee any specified hours of work per day or week, and stating that Respondent reserved the right to enlarge or shorten the workday or workweek based on business need. The Union countered by proposing that Respondent guarantee a regular schedule of 5 consecutive days and 40 hours per week for full-time employees, and that the parties reach a mutual agreement in writing about any changes to the guaranteed work week. On February 28, 2018, Respondent modified its proposal to state that it does not guarantee any specified hours of work per day or week but would provide the Union with 10 days' notice if

---

[10] Employees with less than 2 years of service were only eligible for an additional 13 weeks of sick leave. (GC Exh. 2 (Art. VII).)

Respondent sought to reduce an employee's workday or workweek due to a reduction in the company's print and/or digital publication schedule. Respondent reserved the right to implement the reduction in hours after the 10-day notice period. (GC Exhs. 4, 13 (Art. IV); R. Exh. 108; Tr. 495.)

(d) No-strike clause: The expired contract states that "[n]o strike, slowdown, work stoppage or any other interference with or interruption of work shall be permitted" during the term of the agreement. (GC Exh. 2 (Art. XIX, Sec. 7).) Respondent initially proposed to expand the no-strike clause to also prohibit sympathy strikes, bannering, boycotts against Respondent, boycotts of Respondent's advertisers that result from a dispute with Respondent, picketing, and any other acts that would interfere with Respondent's operations or the production or sale of its products. On November 14, 2018, however, Respondent revised its no-strike clause proposal by proposing a more limited expansion of the clause that would add sympathy strikes, picketing, boycotts, and bannering to the expired contract's list of conduct prohibited by the no-strike clause. The Union proposed maintaining the no-strike clause from the expired contract. (GC Exhs. 4, 18 (Art. XIX, Sec. 6); R. Exh. 101 (Art. XIX, Sec. 5); Tr. 363–365.)

(e) Layoffs and recalls: Under the expired contract, layoffs proceeded in inverse seniority order in the affected work group. Recalls, by contrast, proceeded by seniority in the affected work group. (GC Exh. 2 (Art. VIII, Sec. 4(C), 5).) The Union proposed to continue using seniority for layoffs and recalls. Respondent initially proposed that it would determine layoffs after considering seniority, performance, attendance, individual employee qualifications, special abilities or qualifications for the particular function, and the efficient operation of the company. Recalls, meanwhile, would proceed according to seniority, provided that efficiency, skill and ability to do the job are equal in Respondent's opinion. (GC Exh. 4 (Art. VIII, Sec. 3(B), 5); GC Exh. 5 (Art. VIII, Sec. 4(C), 5); see also Tr. 124–127.) On June 12, 2017, Respondent revised its proposals such that for layoffs, Respondent would consider seniority, qualifications, performance and skills when selecting employees for layoffs, and would follow seniority for recalls provided that skills and qualifications were equal in Respondent's opinion. (R. Exh. 78 (pars. 4(B)(2), 5).)

### 5. Other bargaining issues

The parties did not meet for bargaining on consecutive days in the April 6, 2017, to July 15, 2019 timeframe. Because of that practice, after each session the parties needed to arrange the next date(s) for bargaining. Respondent was generally able to offer proposed meeting dates fairly quickly. The Union, by contrast, generally took more time to identify workable meeting dates, citing the challenge of finding dates that worked for all five members of its negotiating team and the time that it took to compare Respondent's proposals to the expired contract and identify newly proposed contract language. On several occasions Respondent prompted the Union (usually via email) about scheduling the next bargaining session. For the most part, the Union responded in a timely manner to Respondent's inquiries but only offered limited available dates.[11] (Tr. 87–88, 94, 166–169, 171–

---

[11] On April 8, 2019, the parties began working with a mediator from the Federal Mediation and Conciliation Service to assist with bargaining. Accordingly, from that date forward, the parties also needed to consider

172, 361–362, 587–588, 591–600, 802; R. Exhs. 61, 140–141, 143–152.) In July 2018 and July 2019, however, the Union did take the initiative to suggest that the parties bargain over contract terms after concluding effects bargaining sessions on other matters. Respondent declined that request in 2018 (citing its preference to reserve the entire day for effects bargaining), but agreed to the request in 2019. (GC Exhs 63–64; R. Exhs. 61, 153–154; Tr. 173, 348, 526–527, 599–600, 806–808; see also R. Exh. 61 (Respondent's request for bargaining dates in July 2018 that prompted the Union to suggest, in GC Exh. 63, that the parties bargain over the contract after effects bargaining on July 24, 2018).)

In mid-May 2017, Respondent scheduled a series of information presentations about its proposed healthcare plan. Although the presentations would be similar (if not identical), Respondent scheduled separate presentations for each union representing one of the bargaining units, with the presentation for the Union scheduled for May 17, 2017. On May 16, 2017, believing that they had received permission from Respondent, representatives of the Union (Fuoco and Silver) sought to attend the healthcare plan presentation for the Mailers bargaining unit. Respondent (Lowe and attorney Michael Oesterle) objected, and a heated discussion ensued about whether the Union's representatives should be allowed to stay for the presentation. The dispute was resolved when a representative of the Mailers bargaining unit stated that the Union's representatives could attend as temporary members of the Mailers' negotiating team (i.e., temporary members for the limited purpose of being authorized to attend the May 16 healthcare plan presentation). The presentation then proceeded without further incident, but the Union and Respondent did exchange letters to express their objections about the other side's conduct. (Tr. 192–199, 228–231, 254–255, 373–375; R. Exhs. 8, 10–14.)

On February 1, 2018, the Union sent a letter to Respondent to object to a "Negotiations Update" that the company posted in the newsroom. The Union also took issue with Lowe's conduct during negotiations and asserted that Respondent should jettison Lowe's law firm and find a different firm to handle negotiations. In an April 13, 2018 letter to the executive vice president of Block Communications Inc. (BCI, Respondent's parent company), the Union again objected to Lowe's approach to bargaining and asserted that BCI should replace Lowe as Respondent's lead negotiator. (R. Exhs. 23–24.)

### E. Bargaining Session: August 6, 2019

At the August 6, 2019, bargaining session Respondent presented the Union with a "Position Statement" that summarized Respondent's view of where the parties stood with bargaining and provided/reiterated Respondent's rationale for its bargaining proposals. Among other points, Respondent emphasized that it needed flexibility with staffing decisions and employee work hours because Respondent was moving towards only publishing the newspaper on a digital platform. (GC Exh. 23 (Position Statement at 2, 6); R. 193 at p. 33; Tr. 566–567.)

Respondent also presented the Union with a "best offer" contract proposal. Respondent held to its prior offers on most issues, but for wages proposed to increase the minimum pay rate for employees with the highest level of experience[12] by: 3 percent on the effective date of the new contract; an additional 2 percent on the first contract anniversary date; and an additional 3 percent on the second contract anniversary date. The pay rates that Respondent used for its proposal included the pension and wage diversions from the old contract, and thus the wage increases essentially returned portions of the diversions to employees over the proposed 3–year contract period.[13] The wage increases also removed the annual $4,000 cap on wage and pension diversion payments. (GC Exh. 23 (p. 2 and Art. III) (noting that Respondent was not offering retroactive wage increases); R. Exh. 193 at p. 33; R. 196 at p. 20; Tr. 140–143, 340–341, 567–569, 685–686.) Respondent also added contract language stating that: employees would pay 30 percent of the premium costs for Respondent's health, dental, and vision insurance plans; and if Respondent changed the short-term disability policy it would do so on the same basis as for its nonrepresented employees. (GC Exh. 23 (Art. VII, XX); Tr. 369–371, 568.)

The Union stated that it would take a while to review Respondent's proposal and asked for a version of the proposal that included strikethrough language to show the language from the expired contract that was deleted, and bold language to indicate the parts of the proposal that were new additions. Respondent declined, stating that it did not have time to do that. Towards the end of the session, the Union also asked whether Respondent had accepted any of the Union's proposals. (Tr. 88–89; R. Exh. 192 at p. 15; R. Exh. 193 at p. 34; R. Exh. 196 at pp. 20–21 (noting that the parties continued to disagree about the healthcare plan).)

### F. Bargaining Session: September 6, 2019

After exchanging a few emails about potential dates, the parties agreed to meet on September 6, 2019, for their next bargaining session. (R. Exhs. 155–159.) At that session, the Union presented a counterproposal that included the following changes:

(a) Bargaining unit jurisdiction: Exempt employees can do bargaining unit work in breaking news situations only if a bargaining unit member in the same classification in the work required is not available. (GC Exh. 24 at p. 2; see also Tr. 319–320, 571 (noting that the Union made a similar proposal on February 9, 2018).) The Union also deleted its proposal to limit the number of Respondent's managers to a percentage of the full-time employees represented by the Union. (GC Exh. 24 at p. 1; compare GC Exhs. 2 and 22 at p. 1; see also R. Exh. 193 at p. 112; Tr. 335–336).)

(b) Stringers: The Union recognized that Respondent may use stringers. Upon ratification, the maximum amount of money paid to stringers will be 15 percent of the annual bargaining unit payroll. If Respondent exceeds the limit on annual stringer expenses then Respondent will match the excess with a payment

---

[12] For each job classification, wages max out after a certain number of years of service (in most instances between 3 and 5 years). Respondent's wage proposal only increased wages for employees who had passed the years-of-service threshold for maxing out wages. (See, e.g., GC Exh. 23 (Art. III).)

the mediator's availability when scheduling bargaining sessions. (Tr. 300–301, 591–592; R. Exh. 144.)

[13] To illustrate, as previously noted, an employee with a wage rate of $1000/week would only receive $901.60 each week after the pension and wage diversions. (See Findings of Fact (FOF), Sec. II(C), supra.) For the wage increases in its August 6, 2019 proposal, Respondent used the post-diversion rates to calculate the proposed wage increases (i.e., for our example, Respondent used $901.60 instead of $1000 to calculate the wage increase).

that will be distributed equally to bargaining unit members.[14] (GC Exh. 24 at p. 2; Tr. 571.)

(c) Wages: starting with and retroactive to April 1, 2017, bargaining unit employees will receive annual wage increases of 7.5 percent, 6 percent, 5.5 percent, 6.5 percent, and 6 percent. All wage and pension diversions will be eliminated. (GC Exh. 24 (Art. III); Tr. 572.)

(d) Sick leave and short term disability: Any employee with at least one year of service shall have 20 days of disability coverage and can bank unused sick leave up to a maximum of 90 days. (GC Exh. 24 (Art. VII).)

In the discussion that followed, the parties disagreed on various issues, including whether/when managers should perform bargaining unit work and the extent that Respondent should be permitted to use stringers. Respondent also rejected the Union's proposal that Respondent pay a matching amount to the bargaining unit if Respondent exceeded the agreed limit for stringer expenses. Regarding wages, Respondent stated that the Union's proposal was an economic concession that Respondent was not willing to make. The Union responded that bargaining unit members had gone 13 years without a raise and had also been giving up wages due to the ongoing wage and pension diversions. The parties did not review the entire union proposal in the September 6, bargaining session. (R. Exh. 193 at pp. 112–116; Tr. 141–144.)

### G.  Bargaining Session: February 24, 2020

#### 1.  Delay between bargaining sessions

There is no evidence that the parties communicated between September 6, 2019, and mid–January 2020, about scheduling another bargaining session. On January 17, 2020, Respondent wrote a letter to the Union to assert that the Union had been deliberately avoiding negotiations and to request suggested dates for further bargaining. In a January 23, 2020 letter, the Union dismissed Respondent's assertions in the January 17 letter as self-serving. The Union did offer to bargain on February 24, 2020, which Respondent accepted.[15] (GC Exhs. 26–28; Tr. 154–155.)

#### 2.  The February 24, 2020 bargaining session

On February 24, 2020, the parties resumed discussing aspects of Respondent's August 6, 2019 best offer and the Union's September 6, 2019 counterproposal. The parties agreed to three minor changes to Respondent's August 6, 2019 proposal, but disagreed on several other points, including: whether employees should be guaranteed 40 hours of work per week; the amount of sick leave that employees should earn each year; and whether employees should be able to bank unused sick leave. (Tr. 142, 578–580; R. Exh. 138 (noting minor changes to Art. VII (sick leave) and Art. IX (expenses); R. 194 at pp. 1, 5; R. Exh. 195 at pp. 1–3.) There is no evidence that the parties bargained in any detail over disputed topics such as wages, healthcare, or bargaining unit jurisdiction. Further, both the Union and Respondent subsequently acknowledged that they had not yet finished discussing the Union's September 6, 2019 counterproposal. (See

FOF, Sec. II(I)(2), infra.)

### H.  Communications Between March 6 and May 22, 2020

#### 1.  Efforts to schedule the next bargaining session

On March 6, 2020, Respondent sent a letter to the Union to follow up on three proposed future bargaining dates that the mediator offered at the end of the February 24 bargaining session. The Union replied on March 10, confirming that it could meet for bargaining on March 25, 2020. Respondent subsequently reconfirmed that it was available on March 25. (GC Exhs. 29–31; R. Exh. 195 at p. 5; see also GC Exh. 31 (noting that Respondent was also available on March 23–24, 2020, the other two dates that the mediator offered).)

#### 2.  March 22, 2020: Union cancels March 25 session due to Covid–19 pandemic

On March 22, 2020, Pass sent a letter to Respondent to cancel the March 25, 2020 bargaining session in light of the Covid–19 pandemic. Pass stated, in pertinent part, as follows in his letter:

> As I am sure you must be aware, the current Coronavirus pandemic is unlike anything we have ever experienced. The Federal Government, and more significantly the Governor of the State of Pennsylvania has ordered all non-essential services to be shuttered effective 8 a.m. March 23. The aim is to limit contact amongst individuals. Obviously the need for us to meet pales in comparison to the needs of the people. . . .

> When weighing the benefits of meeting and simply going through the worthless motions that for three plus years have proved the employer has no intention on reaching an amicable resolution to the various CBA's versus saving the lives of those of us involved in these fruitless meetings, makes our decision very easy.

> The [Union bargaining session] scheduled for the 25th will not be going forward, nor will there be any future meetings scheduled for any of the [unity council] bargaining units at the Post-Gazette until the Coronavirus pandemic is completely arrested.

> Finally, despite the obvious acrimony that has transpired over more than three years of wasted time and energy, I urge you and your family to keep safe.

(GC Exh. 32; see also R. Exh. 166 at 1–2 (indicating that Pass emailed the letter to Respondent and ten other individuals).)

On March 23, 2020, Pass emailed Lowe to confirm that Respondent received the letter canceling the March 25, 2020 bargaining session. Lowe replied on March 24, 2020, stating "Thanks for the heads up Joe. Stay safe and stay well." (GC Exhs. 33–34.)

#### 3.  May 22, 2020: Respondent sends a written response to the Union's September 6, 2019 contract proposal

On May 22, 2020, Respondent sent the Union a letter urging the Union to accept Respondent's August 6, 2019 best offer (as subsequently modified). Respondent also attached a written response to the Union's September 6, 2019 contract proposal, in which Respondent summarized the parties' positions on various

---

[14] The Union also proposed that Respondent could use stringers to cover high school sports and "SEEN" events as long as at least one of those events per shift was covered by a bargaining unit member. (GC Exh. 24 at 2.)

[15] I give little weight to the emails that Respondent submitted that show members of the Union's bargaining team had scheduling conflicts

in January/February 2020. Fuoco took a leave of absence from working for Respondent from January 12 to February 17, 2020, to begin writing a book, but explicitly stated that he would continue to serve as union president and be available for meetings on union matters if the need arose. (See R. Exhs. 1–4; Tr. 179.) Silver, meanwhile, was only unavailable on February 3–7, 2020. (See R. Exh. 3.)

issues that remained unresolved in bargaining. There is no evidence that the Union replied to Respondent's May 22, 2020 letter and written response. (Tr. 110–111, 706; GC Exh. 35.)

*I. June 12, 2020: Respondent Sends its Last, Best, and Final Offer*

1. The last, best, and final offer

On June 12, 2020, Respondent sent a letter to the Union to convey Respondent's last, best, and final offer. Respondent stated as follows in the letter:

> Dear Joe,
>
> On August 6, 2019, the Union was presented with the Company's Best Offer. The Union responded with a counterproposal on September 6, 2019. The parties discussed the Union's counterproposal on September 6, 2019 and again on February 24, 2020. The Union cancelled the scheduled March 25, 2020 meeting date because of the pandemic. . . .
>
> On May 22, 2020, the Company provided the Union with a comprehensive, written response to the Union's September 6, 2019 counterproposal. The Company received no response from the Union.
>
> Attached hereto is the Company's Final Offer to the Union. We have included a "clean" version and a "red-lined" version to show the changes which have been made by the Company from its August 6, 2019 Best Offer. . . .
>
> The Company is proposing a three (3) year contract, effective on the signing date of the new Agreement. . . .
>
> We believe the Company's Final Offer is fair and in the best interest of both parties. We respectfully urge acceptance of this offer.

(GC Exh. 36 (pp. 1–2); Tr. 112–113, 581; see also Tr. 169–171 (noting that the redlined version of Respondent's last, best, and final offer did not show, via strikeouts or other means, what expired contract language Respondent deleted).)

Most of the proposals in Respondent's last, best, and final offer were largely the same as what Respondent offered on August 6, 2019. Respondent did, however, change its health and welfare proposal by adding language committing to provide a health, dental, vision and life insurance plan during the length of the contract (to address the Union's concern that Respondent might, if the new contract allowed it the discretion to do so, stop providing health and welfare benefits altogether). (GC Exh. 36 (Art. XX, Sec. 1); Tr. 128–129, 371–372; see also, e.g., GC Exh. 36 (Art. II - striking an indemnification clause related to claims about union dues and dues checkoff; Art. III, Sec. 1 – adding a clause stating that wage increases would not apply to employees on extended sick leave until those employees returned to work); compare GC Exh. 24 (Respondent's Aug. 6, 2019 proposal).)

2. Communications after Respondent's last, best, and final offer

After Respondent sent its last, best, and final offer, the parties exchanged a series of letters and emails about the status of bargaining. The Union began the exchange on June 22, 2020, by questioning why Respondent was sending a final offer when the parties had not finished going through the Union's September 6, 2019 proposal. The Union also stated that before it addressed the final offer, the Union needed to know if Respondent was taking the position that negotiations were terminated and that no

further bargaining sessions would occur. (GC Exh. 37.)

In a letter dated July 14, 2020, Respondent asserted that the Union failed to respond to the substance of Respondent's final offer, noting that the Union did not offer a counterproposal or offer to discuss the final offer. Respondent also stated its belief that negotiations were at impasse and invited the Union, if it believed the parties were not at impasse, to explain why it believed further bargaining would be fruitful. (GC Exh. 38.)

Later on July 14, 2020, the Union sent an email and letter to Respondent. The Union reiterated that it had not heard Respondent's position on two-thirds of the Union's September 6, 2019 proposal, and questioned how the parties could be at impasse under those circumstances. The Union also asserted (again) that before it replied to the final offer Respondent first needed to specify whether negotiations were terminated. (R. Exh. 170.)

On July 16, 2020, Respondent sent a letter to again state its belief that negotiations were at impasse. In support of that position, Respondent asserted that no agreement had been reached despite over 3 years of bargaining, and also asserted that the Union employed strategies of avoiding and delaying negotiations and making regressive proposals without justification. As for the Union's September 6, 2019 proposal, Respondent asserted that the parties discussed 75 percent of the proposal during bargaining on September 6, 2019, and February 24, 2020. Respondent then sent a written response to the Union's proposal in May 2020 after the March 25, 2020 bargaining session was canceled due to the Covid–19 pandemic. Finally, Respondent stated that its final offer did not terminate contract negotiations. In Respondent's view, the Union announced on March 22, 2020, that it would not meet with Respondent, and subsequently did not engage with Respondent about the terms of the final offer or explain why further bargaining would be fruitful. (GC Exh. 41.)

The Union replied in a July 20, 2020 letter. Regarding the bargaining history, the Union maintained that Respondent made regressive proposals and did not accept a single proposal that the Union offered. The Union also denied delaying or avoiding negotiations and emphasized that it canceled the March 25, 2022 bargaining session to ensure everyone's safety during the Covid–19 pandemic. As for why further bargaining would be fruitful, the Union indicated that bargaining was necessary for discussing, among other topics: whether the Union's September 19, 2019 proposal was acceptable (particularly as to two-thirds of the proposal that had not yet been addressed in a bargaining session); Respondent's rationale for seeking more money to hire stringers when Respondent was not using the amount permitted in the expired contract; and Respondent's healthcare plan and proposal language that would give Respondent the right to cancel the plan immediately after the parties signed a new agreement. The Union closed by stating that it was willing to meet to go through the Union's September 19, 2019 proposal and Respondent's final offer and suggest changes in an attempt to reach a mutual agreement, and asking Respondent for available dates to resume bargaining. (GC Exh. 42.)

*J. July 27, 2020: Respondent Declares Impasse and Implements Terms and Conditions of Employment*

1. Impasse letter

On July 27, 2020, Respondent declared impasse and implemented terms and conditions of employment. Respondent stated as follows in its letter:

> After over three years of negotiations, the Company believes the parties are at impasse. Therefore, negotiations are

terminated. The Company has implemented the following Articles and/or provisions of the Company's Final Offer:

> [Agreement Paragraph C and Paragraph D (Sec. 1–7);
> Art. III (excluding Sec. 4);
> Art. IV (excluding everything in Sec. 11 except for the first sentence);
> Art. V–VI;
> Art. VII (excluding the second sentence of Sec. 3);
> Art. VIII (excluding the phrase "in the Company's discretion" in Sec. 15);
> Arts. IX—XVIII;
> Art. XIX (Sec. 24 only); and
> Art. XX (as set forth in the addendum, excluding Secs. 2–3)]

The specific language of each Article and/or provision of the implemented terms and conditions referenced above is contained in the attached Addendum to this letter. The above implemented new terms and conditions supersedes and replaces the applicable Articles and/or provisions of the expired agreement.

Because of the impasse in these negotiations, the collective bargaining agreement is terminated. The evergreen provision in Article XXII provides that "[t]he terms and conditions of this Agreement shall remain in effect as long as negotiations continue." Negotiations are now terminated because of the impasse. The contractual terms and conditions of the collective bargaining agreement have expired, along with the evergreen provision. Article XXII is deleted and has no further force and effect.

The Company will continue to observe the established terms and conditions of the expired collective bargaining agreement as required by the National Labor Relations Act, except as otherwise modified by the implemented terms and conditions in this letter and except those terms and conditions recognized as strictly contractual. Additionally, the Company will no longer check off Union dues, including assessments. . . .

(GC Exh. 43 (pp. 1–3); see also Tr. 113, 690–691.)

### 2. Implemented terms

As indicated above, most of the terms and conditions that Respondent unilaterally implemented were the same as what Respondent set forth in its June 12, 2020 last, best, and final offer. The following implemented terms, however, included modifications that Respondent made after its last, best, and final offer:

Wages: deleted paragraph 4, which stated "Nothing in this agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established herein are minimums only. Individual merit shall be acknowledged by increases above the minimums." (Compare GC Exh. 36 (Art. III, Sec. 4) with GC Exh. 43 (Art. III).)[16]

Work hours: Respondent deleted the following language after a sentence stating that Respondent does not guarantee any specified hours of work per day or per week: "In the event the Company reduces its print and/or digital publication schedule

from its current schedule, the Company will give the Guild at least ten (10) days' notice prior to reducing an employee's workday or workweek. The parties shall meet during this ten (10) day notice period to discuss the effects of any planned reduction in hours. After the ten (10) day notice period has expired, the Company may implement the reduction in hours." (Compare GC Exh. 36 (Art. IV, Sec. 11) with GC Exh. 43 (Art. IV, Sec. 11)

Short term disability: Respondent deleted the following language after a sentence stating that bargaining unit employees would be covered by Respondent's short term disability (STD) policy: "The Company reserves the right to modify or change the Company's STD policy on the same basis as nonrepresented employees of the Company." (Compare GC Exh. 36 (Art. VII, Sec. 3) with GC Exh. 43 (Art. VII, Sec. 3).)

Transfers due to workplace changes: Respondent deleted the phrase "in the Company's discretion" that followed a sentence stating that an employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes may be afforded the opportunity to transfer to other available positions. (Compare GC Exh. 36 (Art. VIII, Sec. 15) with GC Exh. 43 (Art. VIII, Sec. 15).)

Health and welfare: Respondent deleted the following language after a sentence stating that bargaining unit employees will be covered by the Company health, dental, vision, and life insurance plans: "Such plans may be amended, changed, replaced or terminated, in whole or in part . . . at the Company's sole discretion. . . . The Company agrees to provide a health, dental, vision and life insurance plan during the term of this Agreement." (Compare GC Exh. 36 (Art. XX, Sec. 1) with GC Exh. 43 (Art. XX, Sec. 1).)

(GC Exh. 43 (Addendum); see also Tr. 113, 144–145.)

### 3. Communications after Respondent implemented terms

On July 30–31, 2020, Respondent and the Union exchanged letters about the bargaining dispute. Respondent maintained that it lawfully implemented portions of its final offer after the parties bargained to a good-faith impasse, and took the position that it had no obligation to negotiate further until the impasse was broken. The Union, meanwhile, asserted that the parties were not at impasse and asked Respondent to provide dates to resume bargaining.[17]  (GC Exhs. 45–47.)

### K. September/October 2020: Union Rallies

#### 1. September 25, 2020: rally in front of Respondent's facility

On September 25, 2020, the Union held a rally in front of the North Shore Drive building where Respondent's offices are located. The Union organized the rally to, among other things, protest Respondent's decision to declare impasse and unilaterally implement terms and conditions of employment. Many rally attendees chanted and held signs with phrases such as "[Respondent] Declares Unlawful Impasse!" and "[Respondent] Bargains in Bad Faith!" In addition, an airplane flying overhead displayed a banner stating "Fair Contract Now. #NoPGWithoutMe." Various individuals spoke with a microphone at the

---

[16] The paragraph that Respondent deleted was in the expired contract. (GC Exh. 2 (Art. III, Sec. 6).)

[17] The parties met for a bargaining session on September 8, 2020 (see GC Exhs. 48–49), but I do not find that session to be relevant to whether the parties were at a good-faith impasse when Respondent unilaterally

implemented terms and conditions of employment on July 27, 2020. See *Mike-Sell's Potato Chip Co.*, 360 NLRB 131, 131 fn. 1 (2014) (declining to consider the union's offers of bargaining concessions that occurred after the employer declared impasse and unilaterally implemented its final contract offers), enfd. 807 F.3d 318 (D.C. Cir. 2015).

rally, including (now former) Pennsylvania Lieutenant Governor John Fetterman, and some individuals at the rally were taking photographs. (Tr. 50–52, 248–249, 275, 278–279, 740–742; GC Exhs. 52, 54; R. Exhs. 26–27, 33–36, 39–40; see also Tr. 51–52 (estimating that around 125 people attended the rally).)

Chief photo editor Arturo Fernandez was working inside Respondent's facility when he heard the rally occurring outside. Thinking that the rally could be a "spot news" event (i.e., a news event occurring spontaneously), Fernandez used his cell phone and his professional camera to take photographs of the rally while standing at different windows on the third floor. Rally participants, including bargaining unit members, could see Fernandez as he took photographs. Fernandez saved the photographs on his computer and then notified the night editor that the photographs were not publishable because the photographs included disparaging signs and posters. (Tr. 53–58, 771, 788–796, 798; GC Exhs. 52–54; see also GC Exh. 59 (p. 2).) Respondent's director of operations, Rob Weber, who is in charge of facilities and security (among other responsibilities) also observed the rally from inside the building.[18] (Tr. 55, 725–726, 740–741; see also GC Exh. 59 (p. 2); GC Exh. 60 (pp. 1–3).)

2. October 24 and 31, 2020: rallies in front of John Block's home

On October 24, 2020, the Union held a rally and informational picket, this time in front of Respondent's publisher, John Block's home. Seeking to call attention to the labor dispute and pressure Respondent to return to the bargaining table, some rally participants held signs with phrases such as "[Respondent] Declares Unlawful Impasse!" and "[Respondent] Illegally Imposes Horrible Working Conditions." Other participants used a bullhorn to give speeches, and a few participants had cameras with them and were taking photos. For the most part, rally participants stood on the sidewalk in front of the home, on or across the street, on the driveway entrance (between the street and sidewalk), or on a strip of grass between the street and the sidewalk. (Tr. 39–42, 46–49, 59–61, 725–726; GC Exh. 51, 55; see also Tr. 59 (estimating that around 50 people, a majority of whom were bargaining unit members, attended the rally).)

The Union held another rally and informational picket in front of John Block's home on October 31, 2020, this time with a Halloween funeral theme. Rally participants placed a mock coffin on the sidewalk along with cardboard tombstones with phrases such as "Here Lies Local News" and "RIP Staff Morale." Other participants used a bullhorn to give speeches. Rally participants for the most part stood on the sidewalk in front of the home, on the street, or on the driveway entrance (between the street and sidewalk). Occasionally, however, a rally participant stood a few feet closer to the home on the walkway leading to the front door or the portion of the driveway leading from the sidewalk to the home. (Tr. 64–65, 67–68, 281–286; GC Exh. 57; R. Exhs. 41–46; see also Tr. 65 (estimating that around 60 people, a majority of whom were bargaining unit members, attended the rally) .)

In an effort to ensure that the October 24 and 31 rallies did not get out of control, Respondent asked Kellington Protection, LLC to provide security guards to be present during both of the rallies

in front of John Block's home. Two security guards (Steve Cain and Charles Sansky) attended each rally and took photographs of rally participants, including bargaining unit members when they were located across the street from John Block's home. Respondent did not ask the security guards to photograph the rallies, but also did not provide any instructions that prohibited the security guards from taking photographs. (Tr. 40–41, 43, 60–63, 65–68, 726–727, 729–730, 736, 739, 771–773; GC Exhs. 50, 58 (Oct. 24 rally); GC Exh. 56 (Oct. 31 rally); R. Exh. 197 (indicating that Respondent signed a contract with Kellington Protection in December 2018); see also Tr. 61–62 (explaining that the security guard shown aiming his phone in GC Exh. 58 was aiming at October 24 rally participants who were located across the street from John Block's home), 66–67 (explaining that the security guard shown aiming his phone in GC Exh. 56 was aiming at October 31 rally participants who were located across the street from John Block's home); GC Exh. 59 (p. 3); GC Exh. 60 (pp. 3–5).)

## DISCUSSION AND ANALYSIS

### A. Credibility Findings

A credibility determination may rely on a variety of factors, including the context of the witness' testimony, the witness' demeanor, the weight of the respective evidence, established or admitted facts, inherent probabilities and reasonable inferences that may be drawn from the record as a whole. Credibility findings need not be all-or-nothing propositions — indeed, nothing is more common in all kinds of judicial decisions than to believe some, but not all, of a witness's testimony. *Farm Fresh Co., Target One, LLC*, 361 NLRB 848, 860 (2014) (noting that an administrative law judge may draw an adverse inference from a party's failure to call a witness who may reasonably be assumed to be favorably disposed to a party, and who could reasonably be expected to corroborate its version of events, particularly when the witness is the party's agent). To the extent that credibility issues arose in this case, I have stated my credibility findings in the Findings of Fact above.

### B. Did Respondent Violate the Act by Failing and Refusing to Bargain in Good Faith with the Union?

#### 1. Complaint allegations

The General Counsel alleges that Respondent violated Section 8(a)(5) and (1) of the Act by, through its overall conduct since about March 11, 2019, failing and refusing to bargain in good faith with the Union as the exclusive collective-bargaining representative of the bargaining unit. In particular, the General Counsel alleges that Respondent bargained with no intention of reaching an agreement by: (a) insisting on proposals that are predictably unacceptable to the Union, including unilateral control over wage rates, hours and numbers of hours worked, subcontracting bargaining unit work, provisions of health insurance, layoffs, and a broadly worded no-strike clause; (b) failing to provide explanations to the Union regarding Respondent's proposals; and (c) prematurely declaring impasse.

#### 1. Applicable legal standard

The Supreme Court has held that the statutory duty to "meet .

---

[18] I do not find that Weber took (or gave the appearance of taking) photos of the September 25 rally. The General Counsel presented limited evidence on this point, as only one witness at a distance (from the street while Weber was at a third-floor window) stated that he saw Weber point his cell phone at rally participants. (See Tr. 53.) That testimony, which

was not corroborated by any other evidence (e.g., testimony by another witness, photographs), is too thin for me to conclude that Weber was or gave the appearance that he was photographing employees as they engaged in union activities. I also note that Weber credibly denied that he took photos of the rally. (See Tr. 742.)

. . and confer in good faith" is not fulfilled by "purely formal meetings between management and labor, while each maintains an attitude of 'take it or leave it.'" Instead, "[c]ollective bargaining. . . presupposes a desire to reach an ultimate agreement, to enter into a collective-bargaining contract." *NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 485 (1960); see also National Labor Relations Act, Sec. 8(d).

The touchstone of bad-faith bargaining is a purpose to frustrate the very possibility of reaching an agreement. *Phillips 66*, 369 NLRB No. 13, slip op. at 6 (2020). In assessing whether a party has failed or refused to bargain in good faith, the Board considers the totality of the circumstances, including conduct both at and away from the bargaining table. From the context of an employer's total conduct, it must be decided whether the employer is engaging in hard but lawful bargaining to achieve a contract that it considers desirable or is unlawfully endeavoring to frustrate the possibility of arriving at any agreement. Although the Board does not evaluate whether particular proposals are acceptable or unacceptable, it will examine proposals when appropriate and consider whether, on the basis of objective factors, bargaining demands constitute evidence of bad-faith bargaining. *Altura Communication Solutions, LLC*, 369 NLRB No. 85, slip op. at 3 (2020), enfd. 848 Fed.Appx. 344 (9th Cir. 2021); *Audio Visual Services Group, Inc. d/b/a PSAV Presentation Services*, 367 NLRB No. 103, slip op. at 5 (2019), affd. 957 F.3d 1006 (9th Cir. 2020).

### 3. Analysis

The General Counsel contends that Respondent engaged in overall bad-faith bargaining by presenting contract proposals that, when considered as a whole, evidence an intent not to reach agreement; failing to explain its proposals to the Union; and prematurely declaring impasse. I do not find merit to the argument that Respondent failed to explain its proposals to the Union. The General Counsel presented limited evidence on this point, as due to the number of bargaining sessions witnesses generally offered testimony in broad strokes and did not go into detail about what each party said during their 22 bargaining sessions before Respondent declared impasse. Further, during the August 6, 2019 bargaining session, Respondent provided a position statement to the Union that described Respondent's positions on each of the areas where the parties disagreed about contract terms. (See FOF, Sec. II(E).)

With that stated, I do find merit to the arguments that Respondent prematurely declared impasse (see Discussion and Analysis, Sec. C(3), infra) and presented proposals that, viewed as a whole, evidence an intent not to reach an agreement.[19] I discuss Respondent's proposals below.

The last, best and final offer that Respondent communicated

to the Union on June 12, 2020, included the following proposals,[20]

Bargaining unit jurisdiction: The Union's jurisdiction includes work normally performed by bargaining unit employees but is subject to the following exceptions: (a) Supervisors and managerial employees may perform bargaining unit work. No bargaining unit employee will be laid off as a direct result of that practice; (b) Non-bargaining unit employees may perform bargaining unit work on an occasional basis; (c) Respondent may subcontract work; and (d) Respondent may use stringers but the maximum amount paid to stringers will be no more than 20 percent of the annual bargaining unit payroll. (GC Exh. 36 at pp. 2–3; FOF, Sec. II(D)(3).)

Wages: Increase the minimum pay rate for employees with the highest level of experience by: 3 percent on the effective date of the new contract; an additional 2 percent on the first contract anniversary date; and an additional 3 percent on the second contract anniversary date. The baseline pay rates for the wage proposal incorporate the pension and wage diversions from the old contract (i.e., if an employee's wage rate was $1000 under the old contract and $901.60 after subtracting diversions, Respondent used the $901.60 amount as the baseline wage for its proposal). (GC Exh. 36 (Art. III); FOF, Sec. II(E).)

Work hours: Respondent "does not guarantee any specified hours of work per day or per week" but will provide the Union with 10 days' notice if Respondent seeks to reduce an employee's workday or workweek due to a reduction in the company's print and/or digital publication schedule. Respondent reserves the right to implement the reduction in hours after the 10–day notice period. (GC Exh. 36 (Art. IV, Sec. 11); FOF, Sec. II(D)(4)(c).)[21]

Sick leave: Bargaining unit employees will be covered by Respondent's short term disability policy (STD). Respondent reserves the right to modify or change the Company's STD policy on the same basis as Respondent's nonrepresented employees. Sick leave payments shall terminate upon termination of employment or death of the employee. (GC Exh. 36 (Art. VII, Sec. 3, 6); FOF, Sec. II(E).)

Layoffs/recalls: To select employees for layoffs, Respondent will give consideration to seniority, qualifications, performance, and skills in the affected work group. Recalls shall be in order of seniority if skill and qualifications are equal in Respondent's opinion. (GC Exh. 36 (Art. VII, Sec. 4(B), 5); FOF, Sec. II(D)(4)(e).)

No-strike clause: No strike, sympathy strike, slowdown, work stoppage, picketing, boycotts, bannering, or any other

---

[19] The General Counsel has asserted that Respondent's proposals were "predictably unacceptable to the Union." While the Board has used that phrasing in a few decisions I do not do so here because I do not find it to be helpful in analyzing the facts of this particular case.

On a related point, I note that I stand by my rulings during trial to exclude several exhibits (mostly proposals and contracts involving other bargaining units) that Respondent offered to rebut the argument that its proposals here were predictably unacceptable to the Union. (See, e.g., Tr. 646, 651, 770 (rejecting R. Exhs. 178–187, 198–204); see also Tr. 748 (explaining that my ruling did not preclude Respondent from presenting testimony about its state of mind in making contract proposals to the Union).) Specifically, Respondent maintained that if a different union accepted a contract proposal, the General Counsel could not claim that a similar proposal to the Union was "predictably unacceptable."

[20] This list is not intended to be exhaustive. I have only highlighted a selection of the proposals from Respondent's last, best, and final offer.

[21] Although there was an established past practice of bargaining unit employees working 40 hours per week, Respondent's last, best, and final offer included a proposal that the new contract would supersede all past practices. (See FOF, Sec. II(D)(4)(c); GC Exh. 36 (Art. XIX, Sec. 23) (proposing that the collective-bargaining agreement supersedes all prior agreements between Respondent and the Union, including any letters of interpretation, verbal understandings and/or past practices)).

(See Tr. 625.) It suffices to say that I found Respondent's proffered evidence to be too remote from the issues at hand in this case. Every bargaining unit has its own priorities, goals, and interests, and I do not have a basis to conclude that a bargaining proposal or concession accepted by one unit would (or should) be palatable for an entirely different unit.

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

interference with or interruption of work shall be permitted during the term of the contract. (GC Exh. 36 (Art. XIX, Sec. 6); FOF, Sec. II(D)(4)(d).)

Health and welfare: Bargaining unit employees will be covered by Respondent's health, dental, vision, and life insurance plans. Respondent may amend, change, replace or terminate those plans in its sole discretion. Respondent agrees to provide a health, dental, vision and life insurance plan during the term of the contract. Bargaining unit employees shall pay 30 percent of the premium costs for Respondent's health, vision, and dental insurance programs. (GC Exh. 36 (Art. XX, Sec. 1); FOF, Sec. II(E), (I)(1).)

It bears repeating that these proposals were part of Respondent's best offer. Respondent's proposals in these areas in earlier bargaining sessions were identical or less favorable to the Union.

The Board has explained that "proposals that would authorize an employer to make unilateral changes to a broad range of significant terms and conditions of employment, or that would amount to a 'perpetual reopener clause' as to those terms during the life of the contract, are [] 'at odds with the basic concept of a collective-bargaining agreement.'" *Altura Communication Solutions, LLC*, 369 NLRB No. 85, slip op. at 4 (quoting *Radisson Plaza Minneapolis*, 307 NLRB 94, 95 (1992), enfd. 987 F.2d 1376 (8th Cir. 1993)). The proposals in Respondent's last, best, and final offer fit that description.

First, Respondent's proposals would have enabled it to unilaterally encroach upon the Union's jurisdiction by subcontracting work and by assigning bargaining unit work to employees outside of the bargaining unit. The Union would have no recourse if Respondent took action under the proposal that infringed on the Union's jurisdiction and/or reduced the size of the bargaining unit.

Second, Respondent's proposals would have granted it discretion over hours of work. As the Board has explained, a contractual provision that affords an employer complete discretion over work hours also affords the employer unilateral control over employees' pay. See *Altura Communication Solutions, LLC*, 369 NLRB No. 85, slip op. at 5 (discussing an employer's proposal that nothing in the agreement should be construed as a guarantee of hours of work per shift, per day or per week); compare GC Exh. 36, Sec. 11 ("The Company does not guarantee any specified hours or work per day or per week.").

Third, Respondent proposed having the ability to unilaterally alter or scale back its bargaining unit employees' healthcare, dental, vision, and life insurance plans. Respondent also sought unilateral control over bargaining unit employees' short term disability plan, up to and including the right to eliminate the plan (though any changes to the short-term disability plan would also have to apply to non-unit employees). Bargaining unit employees therefore could not count on any of these benefits under Respondent's proposals, as Respondent would have the right to change the benefits at any time. Such proposals are at odds with the basic concept of a collective-bargaining agreement. *Altura Communication Solutions, LLC*, 369 NLRB No. 85, slip op. at 5.

Fourth, Respondent proposed to have discretion to select employees for layoffs and recalls, with seniority being only one of several factors regarding layoffs, and merely a tiebreaking factor regarding recalls. Through the proposal, the Union would lose any meaningful way to monitor or enforce the layoff/recall provisions in the contract, as Respondent would be able to justify its layoff and recall decisions as discretionary decisions about employee skills and qualifications.[22]

Considering the proposals in Respondent's last, best, and final offer in combination, I find that Respondent failed to bargain in good faith. An inference of bad faith is appropriate when the employer's proposals, taken a whole, would leave the union and the employees it represents with substantially fewer rights than provided by law without a contract. That is what we have here, as Respondent's proposals effectively sought the discretion to limit the Union's jurisdiction (via subcontracting and assigning bargaining unit work to nonunit employees) and remove the Union from representing bargaining unit members interests concerning: work hours; health, dental, vision, and life insurance plans; the short-term disability plan; and layoffs/recalls. *Kitsap Tenant Support Services, Inc.*, 366 NLRB No. 98, slip op. at 8–9 (2018) (finding bad faith bargaining where the employer's proposals sought to deny the union any role in determining wages and benefits during the contract term, and also sought to afford the employer unfettered discretion regarding discipline and discharge), enfd. 2019 U.S.App. LEXIS 13055 (D.C. Cir. 2019); *Public Service Co. of Oklahoma (PSO)*, 334 NLRB 487, 487–489 (2001) (noting that without a contract, the union would have the statutory right to prior notice and bargaining over changes or modifications in terms and conditions of employment and would retain the right to strike in protest of such actions), enfd. 318 F.3d 1173 (10th Cir. 2003).

I am not persuaded by the defenses that Respondent offered in response to the bad-faith bargaining allegation in the complaint. Respondent maintains that the complaint allegation that it (Respondent) insisted upon proposals that were "predictably unacceptable" to the Union should be dismissed under Section 10(b) of the Act because the Union should have filed unfair labor practice charges regarding any such proposals within 6 months of the date that Respondent made the proposal (generally in 2017). (See R. Posttrial Br. at 25–27; see also GC Exh. 1(a) (unfair labor practice charge alleging that Respondent bargained in bad faith, filed on September 11, 2019). The Board has indicated that a union should not assume that an employer's initial proposals are fixed positions and should test the employer's willingness to bargain before filing a bad-faith bargaining charge. See *District Hospital Partners, L.P. d/b/a The George Washington*

---

[22] I would be remiss if I did not also point out that there is no evidence that Respondent offered any meaningful economic concessions or benefits to the bargaining unit in exchange for the broad discretion that it proposed in the areas discussed above. See *Sweeney & Co.*, 176 NLRB 208, 211–212 (1969) (finding that the employer's rigid refusal to make any meaningful concessions on critical economic issues supported a finding that the employer bargained in bad faith), enfd. in pertinent part, 437 F.2d 1127 (5th Cir. 1971). The wage increases that Respondent offered are offset by several factors, including but not limited to: the new obligation for bargaining unit employees to pay 30 percent of the premium costs for Respondent's health, vision, and dental insurance programs; the removal of the annual $4,000 cap on pension and wage diversions which were incorporated into wage rates before any wage increases; and the loss of all sick leave that bargaining unit employees banked under the sick leave provisions in the expired contract. There is no evidence that Respondent offered any other increased financial compensation or benefits to the bargaining unit during negotiations. (See FOF, Sec. II(D)(4)(a), (E); Tr. 688–690 (Lowe, Respondent's chief negotiator, could not identify any financial benefit that Respondent offered to the bargaining unit besides wage increases).)

PG PUBLISHING CO. D/B/A PITTSBURGH POST-GAZETTE          19

*University Hospital*, 370 NLRB No. 118, slip op. at 6 (2021).[23] Based on that authority, I find that the Union filed its bad-faith bargaining charge at an appropriate time (i.e. after it tested Respondent's willingness to bargain), and I also find that Section 10(b) of the Act does not bar the General Counsel's allegation that Respondent engaged in bad-faith bargaining by (among other conduct) insisting on predictably unacceptable proposals since March 11, 2019.[24]

Respondent also contends that the General Counsel did not present evidence of bad-faith bargaining in the form of delaying tactics, unilateral changes in mandatory subjects of bargaining, efforts to bypass the Union, failure to designate an agent with sufficient bargaining authority, withdrawal of already agreed-upon provisions, or arbitrary scheduling of meetings. (R. Posttrial Br. at 27–28.) That argument misses the mark because the General Counsel presented other evidence of bad-faith bargaining, including evidence that Respondent prematurely declared impasse and made a combination of contract proposals in its final offer that demonstrate an intent to frustrate arriving at an agreement. See *Altura Communications Solutions, LLC*, 369 NLRB No. 85, slip op. at 6 (finding bad-faith bargaining based in part on the employer's contract proposals); *South Carolina Baptist Ministries*, 310 NLRB 156, 157 (1993) (finding bad-faith bargaining based on, among other misconduct, the employer's premature declaration of impasse and employer's insistence on proposals that would have left the union with fewer rights than imposed by law without a contract).

In sum, I find that since about March 11, 2019, Respondent, by its overall conduct in negotiations for a successor collective-bargaining agreement (including prematurely declaring impasse and insisting on proposals that, viewed as a whole, would leave the union and bargaining unit employees with substantially fewer rights and less protection than provided by law without a contract), failed and refused to bargain in good faith with the Union as the exclusive collective-bargaining representative of the bargaining unit and thereby violated Section 8(a)(5) and (1) of the Act.

### C. Did Respondent Violate the Act when it Unilaterally Implemented Terms and Conditions of Employment on July 27, 2020?

#### 1. Complaint allegations

The General Counsel alleges that Respondent violated Section 8(a)(5) and (1) of the Act by, on or about July 27, 2020, implementing changes to bargaining unit employees' terms and conditions of employment without first bargaining with the Union to an overall good-faith impasse for a successor collective-bargaining agreement.

#### 2. Applicable legal standard

Under the unilateral change doctrine, an employer's duty to bargain under the Act includes the obligation to refrain from changing its employees' terms and conditions of employment without first bargaining to impasse with the employees' collective-bargaining representative concerning the contemplated changes.[25] The Act prohibits employers from taking unilateral action regarding mandatory subjects of bargaining such as rates of pay, wages, hours of employment and other conditions of employment. An employer's regular and longstanding practices that are neither random nor intermittent become terms and conditions of employment even if those practices are not required by a collective-bargaining agreement. The party asserting the existence of a past practice bears the burden of proof on the issue and must show that the practice occurred with such regularity and frequency that employees could reasonably expect the practice to continue or reoccur on a regular and consistent basis. *Raytheon Network Centric Systems*, 365 NLRB 1722, 1726, 1729, 1737, 1741 (2017); *Howard Industries, Inc.*, 365 NLRB 28, 30–31 (2016).

On the issue of whether the parties bargained to an impasse, the Board defines a bargaining impasse as the point in time of negotiations when the parties are warranted in assuming that further bargaining would be futile because both parties believe they are at the end of their rope. The question of whether an impasse exists is a matter of judgment based on several factors, including: the bargaining history; the good faith of the parties in negotiations; the length of the negotiations; the importance of the issue or issues as to which there is disagreement; and the contemporaneous understanding of the parties as to the state of negotiations. The party asserting impasse bears the burden of proof on the issue. *Phillips 66*, 369 NLRB No. 13, slip op. at 7 (2020); *Taft Broadcasting Co.*, 163 NLRB 475, 478 (1967), review denied sub nom. *American Federation of Television & Radio Artists v. NLRB*, 395 F.2d 622 (D.C. Cir. 1968).

If an employer makes a unilateral change to a term and condition of employment, it may still assert certain defenses. For example, the employer may assert that the change: did not alter the status quo (e.g., because the change in question was part of a regular and consistent past pattern); did not involve a mandatory subject of bargaining; was not material, substantial and significant; or did not vary in kind or degree from what has been customary in the past. *MV Transportation, Inc.*, 368 NLRB No. 66, slip op. at 11 (2019); *Raytheon Network Centric Systems*, 365 NLRB 1722, 1726, 1729, 1737, 1741. In addition, the employer may assert that the contractual language privileged it to make the disputed change without further bargaining (the "contract coverage" defense). Under the contract coverage defense, the Board will determine whether the parties' collective-bargaining agreement covers the disputed unilateral change. In making that determination, the Board will give effect to the plain meaning of the relevant contractual language, applying ordinary principles of contract interpretation, and the Board will find that the agreement covers the challenged unilateral act if the act falls within the compass or scope of contract language that grants the employer the right to act unilaterally. Since a collective-bargaining agreement establishes principles that govern a myriad of fact patterns, the Board will not require (as a prerequisite to the defense) that the agreement specifically mention, refer to or address the employer decision at issue. If the contract coverage defense is not met, then the Board will determine whether the union waived

---

[23] The General Counsel maintains that the Board should overrule its decision in *District Hospital Partners, L.P. d/b/a The George Washington University Hospital*, 370 NLRB No. 118 (2021), albeit for reasons that do not relate to my citation here. (See GC Posttrial Br. at 50–51.) I leave that request for the Board to consider.

[24] As an aside, I note that bargaining conduct before March 11, 2019, remains relevant as it sheds light on bargaining conduct within the 10(b) period. See *Regency Service Carts*, 345 NLRB 671, 672 fn. 3 (2005); *Rescar, Inc.*, 274 NLRB 1, 2 (1985).

[25] Separate and apart from the unilateral change doctrine, an employer also has a "duty to engage in bargaining regarding any and all mandatory bargaining subjects *upon the union's request* to bargain," unless an exception to that duty applies. *Raytheon Network Centric Systems*, 365 NLRB 1722, 1732–1733, 1737–1738, 1741 (emphasis in original).

its right to bargain about a challenged unilateral change. *MV Transportation, Inc.*, 368 NLRB No. 66, slip op. at 11–12.

### 3. Analysis

There is no dispute that on July 27, 2020, Respondent declared that the parties were at impasse and unilaterally implemented terms and conditions of employment for the bargaining unit. Many of the terms that Respondent implemented were the same as what Respondent set forth in its June 12, 2020 last, best, and final offer. Some of the terms that Respondent implemented, however, differed from the last, best, and final offer, including: wages, work hours, short term disability, transfers due to workplace changes, and health and welfare. (FOF, Sec. II(J)(1)–(2).)

Respondent contends that it was permitted to implement terms and conditions of employment because the parties reached an impasse in their negotiations for a successor collective-bargaining agreement. Respondent's argument fails on this point. First, the Board has long held that a finding of impasse is precluded if that outcome is reached in the context of serious unremedied unfair labor practices that affect the negotiations. *Royal Motor Sales*, 329 NLRB 760, 762, 764 (1999), enfd. 2 Fed.Appx. 1 (D.C. Cir. 2001). That is the situation here, as I have found that Respondent engaged in overall bad-faith bargaining since about March 11, 2019, in part because Respondent's contract proposals demonstrate Respondent's intent to frustrate arriving at an agreement. (See Discussion and Analysis, Sec. B(3), supra.)

Second, Respondent declared impasse at a time in negotiations when neither party would have been warranted in assuming that further bargaining would be futile and when neither party could have reasonably believed that they were at the end of their rope. When the parties concluded their February 24, 2020 bargaining session, they had not yet finished discussing the Union's contract proposal from September 2019. Presumably the parties would have continued that discussion at the next bargaining session, but the Covid–19 pandemic began and the Union canceled the March 25, 2020 session. Respondent did not object to the cancellation when it occurred. When bargaining continued to be on hold and Respondent's May 22, 2020 written response to the Union's September 2019 proposal did not prompt a reply, Respondent sent the Union a last, best, and final offer on June 12, 2020. The last, best, and final offer included a handful of updated proposals, including a health and welfare proposal in which Respondent committed to providing health, dental, vision,

and life insurance plans to the bargaining unit for the length of the contract. The parties did not have a bargaining session to discuss Respondent's last, best, and final offer, nor did they have a bargaining session to discuss the additional updated proposals that Respondent used when it declared impasse and unilaterally implemented terms and conditions of employment on July 27, 2020.[26] In short, Respondent declared impasse when the parties still needed to bargain about the Union's September 2019 proposal, Respondent's June 12, 2020 last, best, and final offer, and the terms that Respondent implemented on July 27, 2020. Those checkpoints included movement on key issues such as wages, health and welfare, work hours, and short term disability coverage. (See FOF, Sec. II(G)(2), H(2)–(3), (I)(1)–(2); see also FOF, Sec. II(I)(2) (noting that on July 20, 2020, the Union explicitly offered to meet and bargain over its September 2019 proposal and Respondent's last, best, and final offer).)

Third, I am not persuaded by Respondent's argument that the Union engaged in bad-faith bargaining that supported Respondent's declaration of impasse.[27] Specifically, Respondent contends that the Union improperly: avoided or delayed in meeting to negotiate; engaged in regressive bargaining; insisted on permissive subjects of bargaining; attempted to interfere with Respondent's choice of its bargaining representatives; and refused to reach tentative agreements on proposals unless the tentative agreement covered an entire contract article. (See. R. Posttrial Br. at 34–36.) While I would not say that the Union's conduct during bargaining was beyond reproach, I do not find that any of the conduct that Respondent identified demonstrates that additional bargaining would have been futile. For example, while it is true that Respondent was more proactive and flexible than the Union with scheduling bargaining dates, the fact remains that the parties agreed to multiple bargaining dates throughout negotiations.[28] (See FOF, Sec. II(D)(5).) As for Respondent's assertion that the Union made regressive (or permissive) proposals concerning when Respondent could use stringers, when managers could perform bargaining unit work, and the number of managers that Respondent could have in relation to the size of the bargaining unit, I note that the Union corrected or withdrew the majority of those proposals during bargaining. Perhaps more important, none of the Union's proposals that Respondent flagged as regressive or permissive was so problematic that Respondent could reasonably conclude that further bargaining would be fruitless. (See FOF, Sec. II(D)(3), (F).)[29]

---

[26] Respondent's actions on July 27, 2020, were inherently contradictory. Specifically, Respondent declared that the parties were at impasse, but simultaneously announced that it was implementing terms and conditions of employment that differed from what Respondent set forth in its last, best, and final offer. By implementing new terms, Respondent demonstrated that it had room to move from what it characterized as its last, best and final offer on June 12, 2020, and thus demonstrated that the parties were not at impasse.

[27] I do not find that the Board has recognized a defense that would permit an employer to implement its final offer based on a union's alleged bad-faith bargaining tactics (but in the absence of an impasse). To the contrary, when one party asserts that it may act unilaterally because another party has acted in bad-faith during bargaining, that issue is addressed in the context of evaluating whether the parties have reached a good-faith impasse and whether it would be futile to engage in additional bargaining. I have followed that approach here. See, e.g., *Jefferson Smurfit Corp.*, 311 NLRB 41, 60 (1993) (finding that an employer reasonably concluded that further bargaining would not be fruitful, in part because the union was engaging in conduct that was preventing the parties from reaching an agreement or a genuine impasse); *M & M*

*Contractors*, 262 NLRB 1472, 1472 (1982) (same, where the union "over a period of 7 months had clearly manifested its aversion to bargaining" with the employer), petition for review denied, 707 F.2d 516 (9th Cir. 1983); see also *Wilkes-Barre Behavioral Hospital Co., LLC d/b/a First Hospital Wyoming Valley*, 370 NLRB No. 17, slip op. at 17–18 (2020) (rejecting a "union acted in bad faith" defense to an allegation that the employer unlawfully implemented its final offer in the absence of a good-faith impasse).)

[28] To the extent that Respondent takes issue with the fact that no bargaining sessions were scheduled between September 2019 and February 2020 (see R. Posttrial Br. at 37–38), I note that neither party reached out in Fall 2019 to schedule the next bargaining session. When Respondent did reach out in mid–January 2020, the Union proposed February 24, 2020, as the next date for bargaining and Respondent accepted. The parties planned to meet again on March 25, 2020, but the Union canceled that session (without objection from Respondent) due to the onset of the Covid–19 pandemic. (FOF, Sec. II(G)(1), (H)(1)–(2).)

[29] I do not discuss each of Respondent's assertions of Union misconduct here because many of the assertions lack merit insofar as the alleged misconduct had little to no effect on negotiations. For example, the

Viewing the dispute as a whole, I find that the parties had not bargained to a good-faith impasse when Respondent unilaterally implemented terms and conditions of employment on July 27, 2020. As noted above, Respondent violated the Act by failing and refusing to bargain in good faith during negotiations, and that unfair labor practice had not been remedied when Respondent declared impasse. In addition, Respondent was aware that there was still room to bargain, as the parties had not yet finished discussing the Union's September 2019 proposal, the Union stated that it was willing to continue bargaining, and Respondent demonstrated its potential flexibility by modifying its proposals shortly before (and on the same day) it declared impasse. Those factors outweigh the fact that negotiations were lengthy and the fact that the parties' disagreement centered around critical issues such as wages, health and welfare benefits, and the Union's jurisdiction.[30] Since the parties were not at an overall good-faith impasse in their negotiations for a successor collective-bargaining agreement and no other defenses apply, I find that Respondent violated Section 8(a)(5) and (1) of the Act when it, on July 27, 2020, unilaterally implemented changes to bargaining unit employees' terms and conditions of employment.

*D. If the Parties Were at a Valid Impasse, Did Respondent Nonetheless Violate the Act by Unilaterally Implementing Improper Terms and Conditions of Employment on July 27, 2020?*

### 1. Complaint allegations

The General Counsel alleges, as an alternative theory if it is determined that the parties bargained to an overall good-faith impasse before July 27, 2020, that Respondent violated Section 8(a)(5) and (1) of the Act by unilaterally implementing various terms and conditions of employment on or about July 27, 2020, that were not reasonably comprehended by its pre-impasse proposals.

The General Counsel also alleges that Respondent violated Section 8(a)(5) and (1) of the Act by, on or about July 27, 2020, unilaterally implementing a discretionary proposal concerning the performance of bargaining unit work by non-unit employees, and thereby undermining the status of the Union as the employees' exclusive collective-bargaining representative.

### 2. Applicable legal standard

It is well established that an employer may not, unilaterally and without first notifying the union and affording an opportunity to bargain, implement more generous terms and conditions of employment than what the employer offered during negotiations. *NLRB v. Crompton-Highland Mills, Inc.*, 337 U.S. 217, 225 (1949). That principle applies not only while the parties are actively bargaining, but also when the parties reach a valid impasse. See *Cleveland Cinemas Management Co.*, 346 NLRB 785, 785 & fn. 3, 788–789 (2006).

The Board has recognized a narrow exception to an employer's right to unilaterally implement contract proposals after bargaining to a good-faith impasse. Specifically, in *McClatchy Newspapers*, the Board held that the employer violated the Act when, after reaching impasse, the employer unilaterally implemented a merit wage increase proposal that gave the employer carte blanche authority over wage increases without limitation by time, standards, criteria, or the need to secure the union's agreement. The implemented wage proposal was unlawful because it excluded the union from any meaningful bargaining about merit wage increases and thereby demonstrated the union's incapacity to act as the employees' representative and was inherently destructive of the fundamental principles of collective bargaining. 321 NLRB 1386, 1389–1391 (1996), enfd. 131 F.3d 1026 (D.C. Cir. 1997); see also *KSM Industries*, 336 NLRB 133, 134–135 (2001) (applying *McClatchy Newspapers* to a health benefits proposal).

### 3. Analysis

The evidentiary record shows that the terms and conditions of employment that Respondent unilaterally implemented on July 27, 2020, were different from (and arguably more favorable than) what Respondent offered at the bargaining table or in its June 12, 2020 last, best, and final offer. (FOF, Sec. II(J)(2) (describing modifications that Respondent made to its position on work hours, short term disability benefits, and health and welfare benefits, among other areas).) The General Counsel maintains that these unilateral changes violate the Act even if the parties reached a good-faith impasse. (GC Posttrial Br. at 48–50.)

The record also establishes that when Respondent unilaterally implemented terms and conditions of employment on July 27, 2020, those terms stated exceptions to the Union's jurisdiction that permitted Respondent to subcontract work, have supervisors and managerial employees perform bargaining unit work (as long as no bargaining unit employee was laid off as a direct result), and have non-bargaining unit employees perform bargaining unit work on an occasional basis. (See FOF, Sec. II(D)(3), (E), (I)(1), (J)(2).) The General Counsel maintains that these implemented terms violate the Act as explained in *McClatchy Newspapers*. (GC Posttrial Br. at 47–48.)

I recommend that each of these complaint allegations be dismissed as moot since I have found that the parties were not at a good-faith impasse on July 27, 2020, and thus found that it was unlawful for Respondent to unilaterally implement terms and conditions of employment (including the terms described above). Given those findings there is no need to address legal theories that would only apply here if the parties reached a good-faith impasse.

*E. Did Respondent Violate the Act by Surveilling Employees' Union Activities and/or Creating the Impression of Surveillance?*

### 1. Complaint allegations

The General Counsel alleges that Respondent violated Section 8(a)(1) of the Act by, on or about September 25, October 24 and 31, 2020, taking pictures and/or video recordings and thereby engaging in surveillance of employees who were engaged in union activities or creating an impression among employees that their union activities were under surveillance.[31]

---

Union's statements that Respondent should change its bargaining representative arose briefly in early 2018 and did not arise again afterwards. (FOF, Sec. II(D)(5).) Similarly, regarding whether the parties should have reached tentative agreements on subsections of Articles, there is no evidence that the parties agreed on any ground rules for locking in areas of agreement (see FOF, Sec. II(D)(4)), nor is there evidence that the

Union's practices on tentative agreements became a material point of contention during negotiations.

[30] I find that the bargaining history factor is neutral as to whether the parties reached a good faith impasse.

[31] The General Counsel withdrew its complaint allegation that Respondent also unlawfully engaged in surveillance or created the impression of surveillance on October 3, 2020. (Tr. 14–15.)

22                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

### 2. Applicable legal standard

An employer's routine observation of employees engaged in open Section 7 activity on or near the employer's property does not constitute unlawful surveillance. However, an employer violates Section 8(a)(1) when it surveils employees engaged in Section 7 activity by observing them in a way that is out of the ordinary and thereby coercive. Indicia of coerciveness include the duration of the observation, the employer's distance from its employees while observing them, and whether the employer engaged in other coercive behavior during its observation. *NCRNC, LLC d/b/a Northeast Center for Rehabilitation*, 372 NLRB No. 35, slip op. at 3–4, 6–7 (2022); *Aladdin Gaming, LLC*, 345 NLRB 585, 585–586 (2005), petition for review denied 515 F.3d 942 (9th Cir. 2008).

The Board's test for determining whether an employer has unlawfully created an impression of surveillance is whether, under all the relevant circumstances, reasonable employees would assume from the statement or conduct in question that their union or other protected activities have been placed under surveillance. The standard is an objective one, based on the rationale that employees should be free to participate in union activities without the fear that members of management are peering over their shoulders, taking note of who is involved in union activities, and in what particular ways. *Metro One Loss Prevention Services*, 356 NLRB 89, 102 (2010).

### 3. Analysis

The evidentiary record shows that on September 25, 2020, the Union held a public rally on the street in front of Respondent's facility. Hearing the noise from the rally, Respondent's chief photo editor, Arturo Fernandez, took photographs from the third floor (near where his desk was located) because he believed the rally could be a "spot news" event that the newspaper should cover.[32] (FOF, Sec. II(K)(1).)

The General Counsel maintains that Respondent, through Fernandez' actions, unlawfully engaged in surveillance or created the impression of surveillance. I disagree. Regarding alleged surveillance, I find that due to the public nature of the rally and Fernandez' role as a journalist, it was not out of the ordinary for Fernandez to take photographs of the rally in case the event proved to be newsworthy. Moreover, there is no evidence that Fernandez engaged in any other behavior while taking photographs that could be deemed coercive. As for allegedly creating the impression of surveillance, I do not find that a reasonable employee, knowing Fernandez' role as chief photo editor and understanding that the rally was a public event, would assume from Fernandez' conduct that Respondent had placed employees' union activities under surveillance.

I take a different view of Respondent's actions at the October 24 and 31, 2020 rallies outside of publisher John Block's home. At each of those rallies, Respondent had security guards present to ensure that the rallies did not get out of control. The security guards took photographs at each rally, and in particular appeared to take photographs of rally participants (including employees) when the participants were across the street from Block's home. Because the security guards gave the impression that they were photographing employees when they were not near the property line for Block's home, I do not find that the security guards were

simply documenting intrusions onto the Blocks' private property. There is also no evidence that the security guards were attempting to document unlawful conduct that rally participants engaged in while they were located across the street from the Blocks' home. Under those circumstances, a reasonable employee would conclude that Respondent, through security guards serving as its agents, had placed employees' union activities under surveillance.

In sum, I find that Respondent violated Section 8(a)(1) of the Act by, on October 24 and 31, 2020, appearing to take photographs of employees across the street from John Block's home and thereby creating an impression among its employees that their union activities were under surveillance. I recommend that the complaint allegations regarding alleged surveillance and creating the impression of surveillance on September 25, 2020, be dismissed.

### CONCLUSIONS OF LAW

1. Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2. The Union is a labor organization within the meaning of Section 2(5) of the Act.

3. By its overall conduct in negotiations for a successor collective-bargaining agreement since about March 11, 2019, including prematurely declaring impasse and insisting on proposals that, viewed as a whole, would leave the Union and bargaining unit employees with substantially fewer rights and less protection than provided by law without a contract, Respondent failed and refused to bargain in good faith with the Union as the exclusive collective-bargaining representative of the bargaining unit and thereby violated Section 8(a)(5) and (1) of the Act.

4. By, on July 27, 2020, unilaterally implementing changes to bargaining unit employees' terms and conditions of employment without first bargaining with the Union to an overall good-faith impasse for a successor collective-bargaining agreement, Respondent violated Section 8(a)(5) and (1) of the Act.

5. By, on October 24 and 31, 2020, appearing to take photographs of bargaining unit employees while they engaged in union activities across the street from publisher John Block's residence and thereby creating the impression among its employees that their union activities were under surveillance, Respondent violated Section 8(a)(1) of the Act.

6. The unfair labor practices stated in Conclusions of Law 3–5, above, affect commerce within the meaning of Section 2(6) and (7) of the Act.

### REMEDY

#### A. Standard Remedies

Having found that Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act.

Upon request of the Union, Respondent shall rescind the unlawful unilateral changes and put into effect the corresponding terms and conditions of employment set forth in the collective-bargaining agreement that expired on March 31, 2017, and shall maintain those terms in effect until the parties have bargained to agreement or a valid impasse, or the Union has agreed to

---

[32] Robert Weber also observed the rally but the General Counsel did not prove that Weber took or appeared to take photographs or video recordings. (FOF, Sec. II(K)(1).)

changes. In addition, Respondent must make its employees whole for any loss of earnings and other benefits that resulted from its unlawful unilateral changes. Backpay for these violations shall be computed in accordance with *Ogle Protection Service*, 183 NLRB 682 (1970), enfd. 444 F.2d 502 (6th Cir. 1971), with interest at the rate prescribed in *New Horizons*, 283 NLRB 1173 (1987), compounded daily as prescribed in *Kentucky River Medical Center*, 356 NLRB 6 (2010). This includes reimbursing unit employees for any expenses resulting from Respondent's unlawful changes to their contractual benefits (including changes to health insurance benefits), as set forth in *Kraft Plumbing & Heating*, 252 NLRB 891 fn. 2 (1980), affd. 661 F.2d 940 (9th Cir. 1981), with interest as set forth in *New Horizons* and *Kentucky River Medical Center*, supra. I further recommend that Respondent be ordered to make all contributions to any fund established by the expired collective-bargaining agreement, which contributions the Respondent would have made but for the unlawful unilateral changes, in accordance with *Merryweather Optical Co.*, 240 NLRB 1213, 1216 (1979).

Consistent with *Thryv, Inc.*, 372 NLRB No. 22, slip op. at 14 (2022), Respondent shall also compensate all bargaining unit employees for any other direct or foreseeable pecuniary harms incurred as a result of the unlawful unilateral changes. Compensation for these harms shall be calculated separately from taxable net backpay, with interest at the rate prescribed in *New Horizons*, supra, compounded daily as prescribed in *Kentucky River Medical Center*, supra.

In accordance with *Don Chavas, LLC d/b/a Tortillas Don Chavas*, 361 NLRB 101 (2014), Respondent shall compensate all bargaining unit employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award. In addition, in accordance with *AdvoServ of New Jersey, Inc.*, 363 NLRB 1324 (2016) and *Cascades Containerboard Packaging–Niagara*, 370 NLRB No. 76 (2021), as modified in 371 NLRB No. 25 (2021), Respondent shall, within 21 days of the date the amount of backpay is fixed either by agreement or Board order, file with the Regional Director for Region 6 a report allocating backpay to the appropriate calendar year(s). Respondent shall also, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, file a copy of each backpay recipient's W–2 form(s) reflecting the backpay award. The Regional Director will then assume responsibility for transmitting the report and W–2 form(s) to the Social Security Administration at the appropriate time and in the appropriate manner.

### B. Special Remedies

#### 1. Bargaining order

The General Counsel requests an order requiring Respondent, within 15 days of the Union's request, to meet with the Union at reasonable times and bargain in good faith with the Union concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement. The General Counsel also requests that the order provide that upon the Union's request, bargaining sessions should be held for a minimum of 15 hours per week (or according to a different schedule to which the Union agrees), and that Respondent submit a written bargaining progress report every 15 days to the compliance officer for Region 6, with copies served on the Union.

The Board has a long-established practice of relying on bargaining orders to remedy the vast majority of bad-faith bargaining violations. See *Frontier Hotel & Casino*, 318 NLRB 857, 859 (1995), enfd. in relevant part sub nom. *Unbelievable, Inc. v. NLRB*, 118 F.3d 795 (D.C. Cir. 1997); see also *Caterair International*, 322 NLRB 64, 67 (1996) (explaining that an affirmative bargaining order serves the interests of an incumbent union by restoring the bargaining opportunity that it should have had in the absence of unlawful conduct). However, the U.S. Court of Appeals for the District of Columbia Circuit has required the Board to justify, on the facts of each case, the imposition of an affirmative bargaining order. See, e.g., *Vincent Industrial Plastics, Inc. v. NLRB*, 209 F.3d 727, 738–739 (D.C. Cir. 2000). In *Vincent*, supra at 738, the court stated that an affirmative bargaining order must be justified by a reasoned analysis that includes an explicit balancing of three considerations: (1) the employees' Section 7 rights; (2) whether other purposes of the Act override the rights of employees to choose their bargaining representative; and (3) whether alternative remedies are adequate to remedy the violations of the Act. Although the Board has indicated that it disagrees with the requirements that the court identified in *Vincent*, the Board has followed a practice of examining whether an affirmative bargaining order is justified according to the standard set forth in *Vincent*. See, e.g., *Wyman Gordon Pennsylvania, LLC*, 368 NLRB No. 150, slip op. at 10–11 (2019), enfd. 836 Fed.Appx. 1 (D.C. Cir. 2020).

Following the Board's approach, I have analyzed the facts of this case under the three-factor balancing test outlined by the U.S. Court of Appeals for the District of Columbia Circuit.

(1) An affirmative bargaining order in this case will vindicate the Section 7 rights of the unit employees who were denied the benefits of collective bargaining through their designated representative by Respondent's failure and refusal to bargain in good faith with the Union. While an affirmative bargaining order comes with an attendant bar to raising a question concerning the Union's majority status for a reasonable time, that bar does not unduly prejudice the Section 7 rights of employees who may oppose representation by the Union because the duration of the order is no longer than is reasonably necessary to remedy the ill effects of the violation. Since Respondent's unlawful bargaining practices prevented an agreement since March 11, 2019 (a period of nearly 4 years), it is only by restoring the status quo ante and requiring Respondent to bargain with the Union for a reasonable period of time that the employees will be able to fairly assess the Union's effectiveness as a bargaining representative free of Respondent's unlawful conduct. The employees can then determine whether continued representation by the Union is in their best interest.

(2) An affirmative bargaining order also serves the policies of the Act by fostering meaningful collective bargaining and industrial peace. It removes Respondent's incentive to delay bargaining in the hope of discouraging support for the Union and ensures that the Union will not be pressured (e.g., by a decertification petition or withdrawal of recognition) to achieve immediate results at the bargaining table following the Board's resolution of its unfair labor practice charges and the issuance of a cease-and-desist order.

(3) A cease-and-desist order alone would be inadequate to remedy Respondent's failure and refusal to bargain with the Union in good faith because it would permit a challenge to the Union's majority status before the taint of Respondent's misconduct has dissipated. Allowing a challenge to the Union's majority status without a reasonable period for bargaining

would be unjust in circumstances such as those here, where given the passage of time the Union needs an opportunity to reestablish its role as the exclusive collective-bargaining representative of unit employees without, for example, the employee disaffection that may have resulted from unpopular terms and conditions of employment that Respondent unlawfully implemented in the absence of a good-faith impasse. Permitting a decertification petition to be filed immediately might very well allow Respondent to profit from its own unlawful conduct. I find that those concerns outweigh the temporary impact that the affirmative bargaining order will have on the rights of employees who oppose union representation.

For all of the foregoing reasons, I find that an affirmative bargaining order with its temporary decertification bar is necessary to fully remedy the violations in this case, and I shall include such an order as a remedy here. I shall also require Respondent to submit written bargaining progress reports every 30 days to the compliance officer for Region 6.[33]

2. Reimbursement of Union's negotiating costs and expenses

The Board has held that in the vast majority of cases involving bad-faith bargaining violations, a bargaining order accompanied by the usual cease-and-desist order and the posting of a notice will suffice to induce a respondent to fulfill its statutory obligations. However, "[i]n cases of unusually aggravated misconduct [] where it may fairly be said that a respondent's substantial unfair labor practices have infected the core of a bargaining process to such an extent that their 'effects cannot be eliminated by the application of traditional remedies,' an order requiring the respondent to reimburse the charging party for negotiation expenses is warranted both to make the charging party whole for the resources that were wasted because of the unlawful conduct, and to restore the economic strength that is necessary to ensure a return to the status quo ante at the bargaining table." *Frontier Hotel & Casino*, 318 NLRB at 859; see also *Nexstar Broadcasting, Inc. d/b/a KOIN-TV*, 371 NLRB No. 118, slip op. at 2 & fn. 5 (2022); *Regency Service Carts*, 345 NLRB 671, 676 (2005).[34]

I do not find that Respondent engaged in unusually aggravated misconduct in this case that would support ordering Respondent to reimburse the Union for negotiating costs and expenses. While Respondent did engage in bad-faith bargaining, the General Counsel has not maintained (or established) that Respondent has a history of violating the Act. The General Counsel also has not identified any other aggravated misconduct by Respondent that might justify the extraordinary remedy of requiring Respondent to reimburse the Union for negotiating costs and expenses. Given the lack of evidence on those points, I decline the General Counsel's request that I order Respondent to reimburse the Union for its negotiating costs and expenses.

3. Reimbursement of employee negotiators' lost earnings
and/or leave while attending bargaining sessions

The General Counsel also requests that I order Respondent to reimburse employee negotiators for any earnings and/or leave lost while attending bargaining sessions during the time Respondent engaged in bad-faith bargaining (if the Union did not reimburse the employee negotiators for those expenses). In so arguing, the General Counsel relies on the Board's decision in *Nexstar Broadcasting*, in which the Board stated that "reimbursement of employee-negotiators lost wages serves the same purpose as the reimbursement of bargaining expenses – to make parties whole for any losses that occurred as a result of the [r]espondent's bad-faith bargaining." 371 NLRB No. 118, slip op. at 2–3 & fn. 6.

Since the Board has indicated that an award of employee negotiators' lost earnings and/or leave serves the same purpose as an award of bargaining expenses, I find that the same showing of unusually aggravated misconduct is required to justify the award. Indeed, that is consistent with the Board's analysis in *Frontier Hotel & Casino*, which did not include an award of employee negotiators' lost earnings and/or leave among the standard remedies that apply in cases involving bad-faith bargaining violations. 318 NLRB at 859. As the General Counsel did not demonstrate that Respondent engaged in unusually aggravated misconduct in this case, I decline the General Counsel's request that I order Respondent to reimburse employee negotiators for any earnings and/or leave lost during the time period when Respondent engaged in bad-faith bargaining.

4. Notice reading

The General Counsel has requested that I require Respondent to have a representative read the notice aloud to employees on worktime in the presence of a Board agent at a meeting or meetings that are scheduled to ensure the widest possible attendance of employees. The General Counsel also requested that I require Respondent to distribute a copy of the notice to each employee who attends the notice reading. The Board has found a notice-reading remedy appropriate where the employer's violations are sufficiently numerous and serious that a reading of the notice is warranted to dissipate the chilling effect of the violations on employees' willingness to exercise their Section 7 rights. *Amerinox Processing, Inc.*, 371 NLRB No. 105, slip op. at 2 (2022); *Gavilon Grain, LLC*, 371 NLRB No. 79, slip op. at 1 (2022).

I do not find that a notice-reading (or accompanying notice distribution) remedy is warranted in this case. While Respondent committed serious unfair labor practices, I do not find that the violations were so widespread that a notice reading is necessary. The other remedies that I have ordered will reset the bargaining relationship between Respondent and the Union, and the standard notice posting remedy will accomplish the goal of ensuring employees that they may exercise their Section 7 rights free of coercion and that Respondent and its managers are bound by the requirements of the Act.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[35]

ORDER

Respondent, PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette, Pittsburgh, Pennsylvania, its officers, agents,

---

[33] I decline the General Counsel's request that I order bargaining sessions to be held, upon the Union's request, for a minimum of 15 hours per week. Respondent has generally made itself available for bargaining sessions upon request, and thus I leave it to the Union and Respondent to make arrangements for regular bargaining sessions.

[34] The General Counsel has asked the Board to clarify its precedent regarding when an award of bargaining expenses and costs is appropriate. (See GC Posttrial Br. at 55–56 (asserting that bargaining costs and

expenses should not be an extraordinary remedy).) I leave that question to the Board and rely here on the legal standard set forth in *Frontier Hotel & Casino*, 318 NLRB 857, 859, which the Board did not modify or overrule in *Nexstar Broadcasting*, 371 NLRB No. 118, slip op. at 2 & fn. 5.

[35] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

successors, and assigns, shall

1. Cease and desist from

(a) Failing and refusing to bargain with the Newspaper Guild of Pittsburgh/CWA Local 38061 (Union) in good faith as the exclusive collective-bargaining representative of the employees in the following appropriate bargaining unit:

> All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

(b) Making unilateral changes to bargaining unit employees' terms and conditions of employment by implementing portions of its last, best, and final offer at a time when the parties had not reached a valid impasse in bargaining for a successor collective-bargaining agreement.

(c) Creating the impression among bargaining unit employees that their union activities are under surveillance.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Beginning within 15 days of the Union's request, meet with the Union at reasonable times and bargain in good faith with the Union as the exclusive representative of employees in the above-described bargaining unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement. Respondent shall submit written bargaining progress reports every 30 days to the compliance officer for Region 6, and shall serve copies of the reports on the Union.

(b) On request by the Union, rescind the changes to terms and conditions of employment for bargaining unit employees that Respondent unilaterally implemented on about July 27, 2020, and restore, honor, and continue the terms of the bargaining unit's collective-bargaining agreement that expired on March 31, 2017.

(c) Make bargaining unit employees whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the unlawful unilateral changes to terms and conditions of employment that Respondent made on about July 27, 2020, with interest, as provided for in the remedy section of this decision.

(d) Make all delinquent contributions to the applicable benefit funds on behalf of bargaining unit employees that have not been paid since July 27, 2020, including any additional amounts due to the funds, as provided for in the remedy section of this decision.

(e) Make bargaining unit employees whole for any expenses ensuing from the failure to make the required contributions to the applicable benefit funds, with interest, as provided for in the remedy section of this decision

(f) Compensate bargaining unit employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and file with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed, either by agreement or Board order, a report allocating the backpay award to the appropriate calendar year(s).

(g) File with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each bargaining unit employee's W–2 form(s) reflecting the employee's backpay award.

(h) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of backpay due under the terms of this Order.

(i) Within 14 days after service by the Region, post at its facility in Pittsburgh, Pennsylvania, a copy of the attached notice marked "Appendix A." Copies of the notice, on forms provided by the Regional Director for Region 6, after being signed by Respondent's authorized representative, shall be posted by Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, Respondent has gone out of business or closed the facility involved in these proceedings, Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by Respondent at the facility at any time since March 11, 2019.

(j) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C., January 26, 2023

### APPENDIX A

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

### FEDERAL LAW GIVES YOU THE RIGHT TO

> Form, join, or assist a union
> Choose representatives to bargain with us on your behalf
> Act together with other employees for your benefit and protection
> Choose not to engage in any of these protected activities.

WE WILL NOT fail and refuse to bargain with the Newspaper Guild of Pittsburgh/CWA Local 38061 (Union) in good faith as

the exclusive collective-bargaining representative of the employees in the following appropriate bargaining unit:

> All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

WE WILL NOT make unilateral changes to bargaining unit employees' terms and conditions of employment by implementing portions of our last, best, and final offer at a time when we and the Union have not reached a valid impasse in bargaining for a successor collective-bargaining agreement.

WE WILL NOT create the impression among bargaining unit employees that their union activities are under surveillance.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce employees in the exercise of the rights guaranteed them by Section 7 of the Act.

WE WILL, beginning within 15 days of the Union's request, meet with the Union at reasonable times and bargain in good faith with the Union as the exclusive representative of employees in the above-described bargaining unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in a signed agreement. WE WILL submit written bargaining progress reports every 30 days to the compliance officer for Region 6, and shall serve copies of the reports on the Union.

WE WILL, on request by the Union, rescind the changes to terms and conditions of employment for bargaining unit employees that we unilaterally implemented on about July 27, 2020, and restore, honor, and continue the terms of the bargaining unit's collective-bargaining agreement that expired on March 31, 2017.

WE WILL make bargaining unit employees whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the unlawful unilateral changes to terms and conditions of employment that we made on about July 27, 2020, with interest.

WE WILL make all delinquent contributions to the applicable benefit funds on behalf of bargaining unit employees that have not been paid since July 27, 2020, including any additional amounts due to the funds.

WE WILL make bargaining unit employees whole for any expenses ensuing from the failure to make the required contributions to the applicable benefit funds, with interest.

WE WILL compensate bargaining unit employees for the adverse tax consequences, if any, of receiving a lump-sum backpay award, and WE WILL file with the Regional Director for Region 6, within 21 days of the date that the amount of backpay is fixed, either by agreement or Board order, a report allocating each backpay WE WILL file with the Regional Director for Region 6, within 21 days of the date the amount of backpay is fixed by agreement or Board order or such additional time as the Regional Director may allow for good cause shown, a copy of each bargaining unit employee's W–2 form(s) reflecting the employee's backpay award.

PG PUBLISHING CO., INC. D/B/A PITTSBURGH POST-GAZETTE

The Administrative Law Judge's decision can be found at https://www.nlrb.gov/case/06-CA-248017 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



APPENDIX B

CORRECTIONS TO TRANSCRIPT
PG PUBLISHING CO., INC. D/B/A PITTSBURGH POST-GAZETTE,
6–CA–248017, ET AL.

P. 10, l. 20: "of" should be "off"
P. 12, l. 1: "John" should be "Jon"
P. 14, l. 2: "withdrawal" should be "withdraw"
P. 15, l. 1: "so we reflect" should be "so reflect"
P. 22, l. 8: "fertility" should be "futility"
P. 22, l. 13: "Analog" should be "NLRB"
P. 23, l. 11: "it's" should be "its"
P. 28, l. 13: "past" should be "passed"
P. 32, l. 15: "party's" should be "parties"
P. 55, l. 9: "Webber" should be "Weber"
P. 60, l. 10: "we're" should be "were"
P. 61, l. 19: "Blocks" should be "Block's"
P. 64, l. 16: "return" should be "returned"
P. 70, l. 9: "printout" should be "print out"
P. 70, l. 21: "first" should be "for us"
P. 117, l. 20: "this" should be "his" (2 instances)
P. 130, l. 20: "Teacher's" should be "Teamsters"
P. 131, l. 11: "at plus" should be "a plus"
P. 133, l. 10: "obtain" should be "maintain"
P. 133, l. 11: "eliminated" should be "eliminating"
P. 134, l. 6: "a numeration" should be "remuneration"
P. 136, ll. 8–9: "extensively" should be "essentially"
P. 140, l. 16: "Council" should be "Counsel"
P. 147, l. 14: "Blazine" should be "Blazina"
P. 156, l. 17: "Emitted" should be "admitted"
P. 175, l. 8: "failure" should be "familiar"
P. 184, l. 13: "inadequacy's" should be "inadequacies"
P. 185, l. 19: "John" should be "Jon"
P. 186, l. 7: "unit" should be "union"
P. 189, l. 21: "fires" should be "files"
P. 191, l. 9: "inadequacy's" should be "inadequacies"
P. 198, l. 15: "mating" should be "meeting"
P. 235, l. 7: "simple" should be "similar"
P. 263, l. 8: Mr. Pass was the speaker

P. 269, l. 17: "no –" should be "no claim?"
P. 273, l. 4: "DIRECT" should be "CROSS"
P. 289, l. 2: "trail" should be "trial"
P. 289, l. 3: "missioned" should be "admissions"
P. 296, l. 20: "goner" should be "gone over"
P. 289, l. 4: "property" should be "party"
P. 298, l. 6: "handed" should be "handled"
P. 299, l. 17: "John" should be "Jon"
P. 303, l. 9: "hold" should be "hole"
P. 303, l. 17: "write" should be "right"
P. 305, l. 2: "of" should be "from"
P. 307, l. 10: "about" should be "without"
P. 309, l. 6: "lick" should be "wink"
P. 309, l. 6: a quotation mark should appear after the period
P. 309, l. 18: "without" should be "with"
P. 313, l. 10: "John" should be "Jon"
P. 315, l. 25: a quotation mark should appear after the first comma
P. 318, l. 25: "doling" should be "doing"
P. 320, l. 1: a quotation mark should appear before the word "it"
P. 321, l. 13: "workplace ability" should be "work flexibility"
P. 323, l. 6: "permissible" should be "permissive"
P. 323, l. 6: "were not opposing" should be "were opposing"
P. 325, l. 23: "I didn't have" should be "I have"
P. 333, l. 2: "an aggressive" should be "a regressive"
P. 338, l. 14: "costs" should be "scales"
P. 341, l. 4: "o" should be "on"
P. 345, l. 24: "no more" should be "normal"
P. 346, l. 16: "techs" should be "days"
P. 347, l. 17: "gauge" should be "engage"
P. 349, l. 19: "waned" should be "wanted"
P. 349, l. 23: "our" should be "their"
P. 354, l. 22: "slipped" should be "split"
P. 355, ll. 21, 24: "Signing" should be "Assignment"
P. 356, l. 2: "Signing" should be "Assignment"
P. 362, l. 3: "you" should be "they"
P. 365, l. 19: "Yes, sir." should be "No, sir."
P. 374, l. 4: "gone" should be "going"
P. 374, l. 6: "John" should be "Jon"
P. 380, l. 21: a quotation mark should appear after the comma
P. 382, l. 12: a quotation mark should appear before the word "no"
P. 387, l. 6: "profit" should be "problem"
P. 407, l. 17: [Indiscernible] should be "and Washington"
P. 428, l. 1: "approve" should be "accrue"
P. 428, l. 18: "on vacation" should be "on termination"
P. 430, l. 6: "of" should be "from"
P. 434, l. 7: "two" should be "to"
P. 438, l. 17: no quotation mark should appear on this line
P. 439, l. 1: "maybe" should be "may be"
P. 439 l. 19: "off or" should be "off for"
P. 441, l. 5: a quotation mark should appear after the comma
P. 442, l. 1: "affects" should be "effects"
P. 480, l. 24: a quotation mark should appear before "whenever" and after "possible"

P. 483, l. 1: a quotation mark should appear before the word "the"
P. 483, l. 3: a quotation mark should appear after the comma
P. 483, l. 6: a quotation mark should appear before the word "Company"
P. 483, l. 7: a quotation mark should appear after the comma
P. 483, l. 22: a quotation mark should appear before the word "one"
P. 483, l. 23: a quotation mark should appear after the period
P. 495, l. 15: "guarantee" should be "guaranteed"
P. 501, l. 2: "at writing" should be "in writing"
P. 503, l. 12: "John" should be "Jon"
P. 507, l. 23: "I" should be "one"
P. 510, l. 13: "set to reject" should be "accept"
P. 511, l. 21: "well agreed" should be "we'll agree"
P. 512, l. 9: "vowed to be" should be "agreed to the"
P. 513, l. 8: "did" should be "did not"
P. 515, l. 21: "arbitrations" should be "arbitrators"
P. 516, l. 22: "percent" should be "present"
P. 517, l. 11: "eight" should be "weight"
P. 518, l. 13: "object of" should be "objective"
P. 523, l. 9: "consisted" should be "consistent"
P. 525, l. 1: "they" should be "the"
P. 529, l. 20: "bantering" should be "bannering"
P. 534, l. 4: a quotation mark should appear before the word "including" and after the word "to"
P. 539, l. 11: the words "requirements" and "needs" should each be in quotation marks
P. 542, l. 24: "they're" should be "their"
P. 547, l. 13: "aggressive" should be "regressive"
P. 548, l. 12: a quotation mark should appear before the word "no"
P. 548, l. 15: a quotation mark should appear after the period
P. 554, l. 7: "vain" should be "vein"
P. 561, l. 10: Ms. Stern was the speaker
P. 567, l. 1: "John" should be "Jon"
P. 571, l. 7: "screen" should be "scheme"
P. 571, l. 16: "working new" should be "breaking news"
P. 571, l. 25: "worst" should be "word"
P. 574, l. 9: "they're" should be "their"
P. 583, l. 10: "identification" should be "indemnification"
P. 590, l. 20: "bargain" should be "bargaining"
P. 610, l. 15: "John" should be "Jon"
P. 649, l. 4: "perceive" should be "proceed"
P. 652, l. 3: "Lewis" should be "Lowe"
P. 657, l. 9: "right" should be "write"
P. 668, l. 21: "CVA" should be "CBA"
P. 669, l. 24: "company" should be "copy"
P. 712, l. 4: Ms. Stern was the speaker
P. 722, l. 13: "EOC" should be "EEOC"
P. 755, l. 14: "Gest" should be "Guest"
P. 758, ll. 19–20: "predicably" should be "predictably"
P. 784, l. 8: "RESUMED DIRECT" should be "DIRECT"
P. 786, l. 19: Mr. Oesterle was the speaker
P. 786, l. 20: "motions dismissed" should be "motion to dismiss"
P. 786, l. 24: "divisional judges" should be "Division of Judges"
P. 787, l. 3: "motions" should be "motion"
P. 788, l. 3: Mr. Hunt was the speaker
P. 792, l. 17: "peaked" should be "piqued"
P. 800, l. 9: "11(vi)" should be "11(b)(i)"

P. 813, l. 21: "UCPR" should be "gallery"
P. 815, l. 10: "trail" should be "trial"

## <u>CERTIFICATE OF SERVICE</u>

I, Brian M. Hentosz, counsel for Petitioner Pittsburgh Post-Gazette, certify

that on January 14, 2025, I filed the foregoing Joint Appendix Volume I via the

Court's CM/ECF system, causing a Notice of Docket Activity to be served upon the

following counsel of record who are registered CM/ECF Filing Users, along with a

paper copy via Federal Express:

| | |
|---|---|
| Joseph J. Pass | Ruth E. Burdick |
| Jacqueline Skye McCollum | David Seid |
| 219 Fort Pitt Boulevard | Milakshmi V. Rajapakse |
| Pittsburgh, PA 15222 | National Labor Relations Board |
| jjp@jpilaw.com | 1015 Half Street, SE |
| jsm@jpilaw.com | Washington, DC 20570 |
| | ruth.burdick@nlrb.gov |
| | david.seid@nlrb.gov |
| | milakshmi.rajapakse@nlrb.gov |

Pursuant to Local Appellate Rule 31.1(a), four (4) identical copies of this Joint

Appendix Volume II were sent to the Clerk of the Court via Federal Express:

Patricia S. Dodszuweit, Clerk
Office of the Clerk
United States Court of Appeals for the Third Circuit
21400 United States Courthouse
601 Market Street
Philadelphia, PA 19106-1790

Dated: January 14, 2025

*/s/ Brian M. Hentosz*
Brian M. Hentosz
Morgan S. Dull

*Attorneys for Petitioner*
*PG Publishing, Inc. d/b/a Pittsburgh*
*Post-Gazette*